# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

|  |  |  |
|---|---|---|
| BLUE WATER AUTONOMY, INC., | ) | **REDACTED VERSION** |
|  | ) |  |
| Plaintiff, | ) | Case No. _____ |
|  | ) |  |
| v. | ) | Judge:_____ |
|  | ) |  |
| THE UNITED STATES, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Blue Water Autonomy, Inc. ("Blue Water" or "BWA") files this Complaint to protest the determination by the U.S. Department of the Navy, Portfolio Acquisition Executive ("PAE"), Robotic and Autonomous Systems ("PAE RAS") (collectively the "Navy" or the "Government") excluding Blue Water from the next phase of consideration for award under Medium Unmanned Surface Vessels ("MUSV") Request for Prototype Proposals No. N00024-26-R-6326, as amended (the "RPP" or "Solicitation"). The RPP seeks to award one or more prototype other transaction agreements ("OTA") under the authority of 10 U.S.C. § 4022 to perform an MUSV autonomy and on-water vessel performance test no later than September 30, 2026 in anticipation of a follow-on procurement involving successful participants in the prototype phase. Because the Navy's determination to exclude Blue Water from consideration was arbitrary, capricious, and not in accordance with statute or regulation, the Court should sustain this protest and enjoin the Navy from concluding testing and from obligating all program funding for follow-on production contracts until it remedies its prejudicial errors and Blue Water is afforded an opportunity to complete testing and demonstrate its eligibility for a follow-on production contract.

████████████████████████████████████████████████

**INTRODUCTION**

1.      The MUSV program is part of a generational investment in enhancing the Navy's Unmanned Surface Vessel ("USV") capabilities and broader efforts to expedite the production and procurement of unmanned vessels.

2.      The MUSV OTA seeks prototypes of autonomous MUSVs that can carry containerized payloads and can be tested by the end of Fiscal Year ("FY") 2026.  The RPP establishes certain threshold performance requirements for a vessel's range, payload capacity, speed, autonomous capabilities, and manufacturing and production capability, and provides that offers meeting those threshold requirements would be selected to test their designs on the water and negotiate a prototype agreement.  Following testing, the Navy contemplates moving directly to award follow-on production contracts or transactions to successful prototype project participants so that vessels can be operational and fielded in FY 2027.

3.      A few months before it issued the RPP for MUSV, the Navy selected Blue Water's Liberty vessel for its predecessor prototype program, Modular Attack Surface Craft ("MASC"), which similarly sought medium USV prototypes.  The Navy evaluated Blue Water's vessel solution through a multi-stage process and selected Blue Water's solution before the Navy abruptly canceled the MASC program and replaced it with the MUSV program.

4.      In response to the MUSV RPP, Blue Water proposed ████████████████ Liberty vessel solution████████████████████████████████████████████ ████████████████████that the Navy had selected just a few months prior under MASC as a viable model with a fulsome explanation of its design and production timeline.  The Liberty vessel ████████████████████████████████████████████ ████████████████████████████ and it meets or exceeds all of the Navy's listed

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

requirements for MUSV.  Production of the Liberty vessel was already underway as of the Navy's deadline for proposal submissions in the MUSV prototype OT competition.

5.      In furtherance of the Navy's stated goal of leveraging know-how and experience in the private sector regarding autonomy and maritime vessels, Blue Water's solution is ████████

████████████████████████████████████████████████████

████████████████████████████████████████.  Relying on the Navy's stated goal of using commercial innovations to procure the next generation of autonomous vessels to support Navy operations, Blue Water and its partners, including top-tier venture capital investors such as Google Ventures, made significant financial investments in Blue Water's solution.

6.      The RPP provided that selected offerors would undergo an on-water MUSV "Test Event" using a "test asset" that is "representative" of its proposed vessel.  Awardees whose tests were successful would then be able to engage in negotiations with the Navy over the terms of a prototype agreement.  But rather than allow Blue Water to test its surrogate vessel and demonstrate that its vessel met the Navy's requirements, the Navy arbitrarily and prematurely excluded Blue Water from further consideration in the competition.  The Navy arbitrarily deemed Blue Water ████████████████████████████ for a potential OT prototype award based on unstated and overly restrictive evaluation criteria, a misreading of Blue Water's proposal, and irrational conclusions that are inconsistent with the RPP and statutory requirements.  As a result, the Navy failed to utilize competitive procedures, violated statutory requirements, and otherwise conducted an evaluation that is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

7.      The Navy's determination that Blue Water was ████████████ was flawed in two fundamental ways.

████████████████████████████████████████████████████████
████████████████████████████████████████████

8.      First, the Navy baselessly asserts that ████████████████████████████

████████████████████████████████████████████████████████

████████. In support of this conclusion, the Navy found that ████████████████

████████ proposed by Blue Water, that ████████████████████████████████████████,

and that ██████████████████████████████. These findings are flatly refuted by the

RPP, which expressly contemplates solutions using ████████████████████████,

without any threshold requirements or evaluation criteria for ████████████████████

████████. The Navy's rationale is also inconsistent with the fact that Modular Attack Surface

Craft Block 0 vessels including MUSVs are required by statute to be "purpose-built" and therefore

necessarily require ██████████████████████████████.    FY 2026 National Defense

Authorization Act ("NDAA"), P.L. No. 119-16, 139 Stat. 757–58, § 130.

9.      The Navy's findings are also refuted by Blue Water's proposal, which explains that

its vessel is **_already under construction_** ██████████████████████████ consistent

with the Navy's required timeline.  Moreover, the Navy's suggestion that the Liberty ████

█████████████████████████████████████████████████ is irrational given the Navy's

selection of the Liberty vessel under the predecessor MASC program, whereby ████████

██████████████████████████████. Ex. 11 at ¶ 7.

10.     The Navy's evaluation is thus a departure from the plain terms of the RPP, arbitrary

and capricious, and contrary to the law.

11.     Second, and equally problematic, is the Navy's erroneous determination that ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

███████████████████████████████████████████████████████████
███████████████████████████████████████

Here too, the Navy departed from the RPP, applying a ████████████ standard that no vessel could meet. The Navy's determination is contrary to the RPP's testing criteria against which offerors were to be evaluated, which does not include any assessment or evaluation of ████████ ████████████. Rather, the RPP's testing is narrowly directed at validation of autonomy and perception behaviors set forth in the RPP's test plan. In response to questions during Q&As, the Navy confirmed that the test would be conducted based upon specific criteria in Attachment J-5, which focuses on a vessel's autonomy and its interface with machinery control. Ex. 3. One offeror asked which subsystems must match the production vessel and which may differ without affecting evaluation, and the Government simply pointed the offeror to Attachment J-5, which does not call for testing of a vessel's ████████████████. *Id.* The Navy's evaluation of Blue Water under Criteria 4 is thus arbitrary and capricious, and amounts to an improper use of unstated evaluation criteria to unfairly hold Blue Water to an unfair and restrictive standard.

12. These errors in the evaluation were highly prejudicial to Blue Water because they led directly to ████████████████████████ of Blue Water's proposal, the Navy's unjustified exclusion of Blue Water from the competition, and the Navy's subsequent decision to award OTAs to seven of Blue Water's competitors while denying Blue Water the opportunity to compete. Had the Navy properly evaluated Blue Water under Criteria 2 and Criteria 4, it would have concluded that Blue Water is ██████████████—but that it far exceeds the Navy's requirements.

13. For these reasons and as discussed in detail below, Blue Water respectfully requests that this Court: (1) declare the Navy's evaluation and related exclusion decisions to be arbitrary, capricious, unreasonable, and contrary to law; and (2) issue preliminary and permanent injunctive relief prohibiting the Navy from concluding testing and from obligating all program funding for follow-on production contracts until the Navy reevaluates Blue Water's proposal reasonably and

██████████████████████████████████████████████████

in accordance with the RPP and existing law and Blue Water completes testing in sufficient time to allow it to be eligible for a follow-on production contract.

## JURISDICTION AND STANDING

14.     The Court has jurisdiction over this bid protest under 28 U.S.C. § 1491(b)(1) of the Tucker Act.

15.     Section 1491(b)(1) states that the Court has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

16.     The United States Court of Appeals for the Federal Circuit has not considered the Tucker Act's application to OTAs, and this Court has issued opinions on the subject with differences that vary to certain degrees and note the lack of controlling case law.  It is clear, however, that OTs are not categorically precluded from judicial review, even though OT prototype agreements are not themselves procurement contracts, *see Hydraulics Int'l Inc. v. United States*, 161 Fed. Cl. 167, 176 (2022), and the Federal Circuit has held that the Tucker Act "does not require an actual procurement" in order for the Court to have jurisdiction under section 1491(b)(1) because the statute "explicitly contemplates the ability to protest . . . pre-procurement decisions." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008).

17.     Also, the Federal Circuit has explained that "the operative phrase 'in connection with' is very sweeping in scope," and "'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Id.* at 1345; *see also Sys. Application &*

6

*Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (affirming that "section 1491(b)(1) provides a broad grant of jurisdiction").

18.     This Court held in *Hydraulics* that it had jurisdiction over a protest challenging a prototype OT because it was "part of the Army's 'process for determining a need for acquisition" and thus was "in connection with a proposed procurement[.]" 161 Fed. Cl. at 176 (quoting *AugustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 (Fed. Cir. 2018)).   In *Independent Rough Terrain Center v. United States*, the Court explained that to determine whether the Court has jurisdiction over an OT protest, the "relevant inquiry requires the [c]ourt to look at what the [g]overnment is seeking" to obtain, *i.e.*, a product or service.   172 Fed. Cl. 250, 258 (2024); *cf. Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 727–731 (2025) (applying a "principal purpose" test to determine whether jurisdiction over an OT exists and adopting a narrower formulation than in *Hydraulics*); *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 284-294 (2025) (stating that jurisdiction to hear an OT protest "requires an evaluation of the federal agency's immediate endgame" and declaring the Court the "de facto forum" for OT protests).[1]

19.     The RPP states: "In accordance with 10 U.S.C. 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the successful prototype project participants." Ex. 1 at 7 (§ 3.1.4(6)).   It also specifically requires offerors to explain in their proposals their "manufacturing readiness to support future production of MUSV (Criteria 3)[.]" Ex. 1 at 7 (§ 3.2); *see id.* at 11–12 (§ 3.2.3 outlining elements of showing "manufacturing readiness" for production).

---

[1] To the extent that jurisdiction is challenged, Blue Water reserves the right to address this issue further at the appropriate time in light of the Court's recent case law.

20.     The Navy has stated, directly to Blue Water and publicly, that successful prototype testing will lead promptly to follow-on production.  The program's action officer advised Blue Water in writing that, under the prototype OT, the Navy expects to award follow-on production agreements within one to two months of a successful test. Ex. 7 at 1 ("though under the prototype OT, we expect to . . . award follow-on production OTs ASAP (hopefully within 1-2 months of success)").  The Navy's senior acquisition official likewise stated publicly that the Navy has $2.1 billion for the MUSV family of vessels, of which $1.9 billion is obligated for procurement of MUSV, and the Navy intends to move directly to procurement and obligate production funds this year.  *See* Ex. 8 at 5; Ex. 10 at 12–13 ("we just closed the [MUSV] solicitation Friday, and we are going through the proposals now . . . and are aiming for approximately 30 [MUSVs] in the first buy, and we will open the marketplace again for additional requirements as we receive them"); Ex. 9 at 5 ("over the next five years we plan to procure 122 manned and *63 medium unmanned vessels* reaching 450 total naval vessels in 2031." (emphasis added)).  The Navy's PAE stated publicly that the Navy intends to go "straight to procurement" and obligate production funds "this year," describing the effort as "a direct path to production."  Ex. 8 at 4.

21.     Consequently, the Navy's issuance of the MUSV RPP initiated the process of "determining a need for property or services" that will result in multiple production contracts, thus satisfying the jurisdictional requirement for this Court that the disputed award be in connection with a procurement or a proposed procurement.  *See Distributed Sols.,* 539 F.3d at 1345.  This Court thus has jurisdiction to review each of Blue Water's counts set forth in this complaint.

22.     Blue Water has standing to bring this bid protest because it was an actual offeror under the RPP, and it timely submitted a compliant proposal that, but for the Navy's arbitrary and capricious evaluation and violation of relevant law, would have had a substantial chance of being

selected for an OTA award.  Blue Water's direct economic interest was adversely affected by the Navy's arbitrary and capricious evaluation and its failure to award an OTA to Blue Water.  *See Amer. Fed. Of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (holding that standing under section 1491(b)(1) "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

## PARTIES

23.     Plaintiff Blue Water Autonomy, Inc. is a Non-traditional Defense Contractor ("NDC"), with its principal place of business located at 18 Hartwell Ave, Lexington, MA 02421. Blue Water was established in 2024 as a robotics-first maritime autonomy company focused on developing autonomous ships for open-ocean use by the Navy.  Blue Water combines experience in robotics commercialization, autonomy engineering, and Navy operations to solve the practical reliability problem for autonomous ships at sea.  As a leading USV innovator, Blue Water was selected for the final stage of the Navy's MASC OTA based on the strength of its proposed Liberty vessel, before the MASC program was cancelled and replaced with the MUSV program.  Blue Water has invested significant private capital to develop solutions under both the MASC and MUSV programs and to build a lasting partnership with the Navy to support its missions.

24.     Defendant is the United States of America, acting by and through the Department of the Navy, PAE RAS, located at 1333 Isaac Hull Ave., SE, Washington, DC 20376.

███████████████████████████████████████

**STATEMENT OF FACTS**

A.    **The Navy's OTA Authority**

25.    The Navy has authority under 10 U.S.C. § 4022 to enter into OTAs for prototype projects for the purpose of improving platforms, systems, components, or materials used or developed by the Department of Defense or armed forces.

26.    10 U.S.C. § 4022(b)(2) mandates that "[t]o the maximum extent practicable, competitive procedures shall be used when entering into [OTAs] to carry out the prototype projects."

27.    A prerequisite to any OTA entered into under 10 U.S.C. § 4022 is that at least one of the following conditions must be met: at least one non-traditional defense contractor or non-profit research institution participates to a "significant extent"; all significant participants are small businesses or nontraditional defense contractors; at least one third of the cost of the project is paid by sources other than the federal government; or the senior procurement official makes a written determination that exceptional circumstances justify use of OTA authority. 10 U.S.C. § 4022(d).

28.    The Navy also has authority under § 4022(f) to enter into follow-on production contracts or transactions with those that participate in prototype transactions.  If a prototype OTA is awarded using competitive procedures, a "follow-on production contract or transaction" may be awarded "without the use of competitive procedures" if "the participants in the transaction successfully completed the prototype project provided for in the transaction."  10 U.S.C. § 4022(f)(2).

B.    **MASC Program**

29.    On July 31, 2025, the Navy released a solicitation for the MASC OTA program to develop low-cost, rapidly deployable uncrewed vessels capable of carrying large, modular

██████████████████████████████████████████████████████████████

containerized payloads.[2]  The MASC program arose out of the Navy's determination to shift away from the Large USV program to focus on medium-sized USVs.

30.    The Navy evaluated Blue Water's Liberty vessel solution through a multi-stage process — an in-person pitch, a question-and-answer session, and a facilities site visit, followed by direct negotiations.

31.    On November 14, 2025, as part of the MASC OT program, the Navy notified Blue Water that Blue Water's ██████████████████ solution consisting of a Liberty vessel ██████ ████████████████████████████████████████████, was one of the handful of solutions selected for OTA negotiations. Ex. 11 at ¶¶ 7–8.  Thereafter, Blue Water submitted its pricing proposal and proceeded to discuss its solution with the Navy.

32.    The MASC program then stalled from late December 2025 through March 2026 before the Navy announced that the MASC program was being cancelled and replaced with the MUSV program.

## C.    The RPP

33.    On March 26, 2026, the Navy's PAE RAS issued the RPP to award prototype OTAs for MUSVs that satisfy the Navy's vessel and autonomy requirements.  Ex. 1.  The Navy's announcement stated that it was issuing the RPP in order to award OTAs in accordance with 10 U.S.C. § 4022.  The Navy encouraged offerors to partner or team with one another to provide a "complete system that is production-ready, inexpensive, and operationally effective."  *Id.* at 4.

---

[2] Solicitation No. N00024-25-R-6314, Modular Attack Surface Craft (MASC) Solicitation, available at https://sam.gov/workspace/contract/opp/8b9b32c898a64ddc9d7dcd3d208cfb0e/view (last visited June 28, 2026).

███████████████████████████████████████████████████████████

34.     The Solicitation explains that "MUSVs must provide autonomous carrying capacity of containerized payloads while possessing the attributes defined herein." Ex. 1 at 1 (§ 1.1). It expressly states that "MUSVs may be new construction and/or converted vessels." *Id.*

35.     The Solicitation establishes "competitive procedures" consisting of two phases: Phase 1 – proposals would be evaluated against the criteria specified in Section 4; and Phase 2 – companies would be selected for potential award of a prototype OT and invited to negotiate the terms of a prototype OT agreement. *Id.* (§ 1.2). The Government will not pay companies for costs associated with Phase 1 and 2. *Id.* (§1.2).

36.     In contrast to the MASC competition, the Navy evaluates offerors' core solutions on written proposals alone, with no interactive exchange, clarification, or site visit. *See generally*, *id.*

37.     The RPP mandates that proposals address four criteria: (1) Proposed Business Model; (2) Vessel Solution Design; (3) Manufacturing Readiness to Support Future Production of MUSV; and (4) A Plan for Test Execution to Complete an On-Water MUSV Test Event. *Id.* at 7 (§ 3.2).

### i.     Criteria 1

38.     As outlined in Section 3.2.1 (Proposed Business Model), Criteria 1 called for offerors to provide pricing for the delivery of MUSVs under two alternative business models. *Id.* at 7 (§ 3.2.1). Model 1 is a Contractor owned and Contractor operated model with an option for the Government to purchase the vessel at the expiration of the term. *Id.* at 7–8. This model required annual rates and pricing for production, operation, and maintenance of five vessels and ten vessels. *Id.* at 7. Model 2 is a Government owned and Government operated model and

requested, among other things, pricing and delivery timelines for block buys of 5 and 10 vessels. *Id.* at 8.

### ii. Criteria 2

39. Criteria 2, Vessel Solution Design, requires a "summary of the MUSV production design and the test vessel." *Id.* at 8 (§ 3.2.2). It directs offerors to "propose an MUSV design that is a vessel with the ability to operate autonomously and carry containerized payloads." *Id.*

40. Criteria 2 lists "MUSV Threshold Requirements," along with "MUSV Desired Attributes." *Id.* at 8–9. Each offeror "shall meet or exceed the threshold requirements and may meet or exceed the desired attributes[.]" *Id.* at 7.

41. The MUSV Threshold Requirements are:

i. Vessel Range: 2500 nm [nautical miles] at 25 knots while carrying a 25 MT [metric ton] load on the payload deck.

ii. Payload Capacity: Two (2) Forty-foot Equivalent Units (FEU).

iii. Autonomous Performance: capable of fully autonomous operations both day and night in varying weather conditions.

iv. Emissions control: Capable of restricting all Radio Frequency (RF) emissions when commanded while continuing to autonomously operate, perception system for autonomy with a passive mode.

v. Refueling: receive 2,000 gallons per minute of fuel through deck connections.

vi. Interior Reservation: space, weight, power, and cooling.

vii. Vessels meet the appropriate American Bureau of Shipping (ABS) standard and provide initial class for the vessel.

viii. Seakeeping: open ocean operation with a wide range of speeds and headings, and while maintaining watertight integrity.

ix. Field operational vessel in FY27.

*Id.* at 8–9.

███████████████████████████████████████████████

42.    The RPP includes nine "Desired Attributes," including the contractor's "ability to field five (5) and ten (10) operational MUSVs in FY27." *Id.* at 9.  The RPP further directs offerors to provide an overview of the autonomous capabilities and vessel characteristics, including a demonstration of the maturity of the design that enables fielding of operational vessels in FY 2027. *Id.* at 9–10.

43.    For offerors that "elect[] to convert existing vessels in lieu of new construction to provide MUSV capability," the RPP directs that certain conversion information be provided.  *See id.* at 10–11.

### iii.    Criteria 3

44.    For Criteria 3, Manufacturing readiness to support the future production of MUSV, the Solicitation directs each offeror to "demonstrate it is ready to produce MUSV vessels to accomplish the offerors proposed business models in section 3.2.1., i.e., Model 1 and Model 2." *Id.* at 11 (§ 3.2.3).  The Solicitation further instructs offerors to detail its manufacturing and production capabilities, including Workload, Workforce, Facilities, Production, Quality Control, and Supply Chain and Supplier Management Plan.  *Id.* at 11–12.  Each of these topic areas also includes a number of sub-topics that offerors must address. *See id.*  For example, under Workload, offerors must address the "[m]aximum production capacity of proposed design per year for five (5) years."  *Id.* at 11.

### iv.    Criteria 4

45.    With respect to Criteria 4, the Solicitation directs each offeror to "detail its planned execution of the scope in Attachment J-1 MUSV Statement of Work" by providing, among other things, a description of the vessel in placemat format, the earliest date for testing, a description of how the test asset is "representative of the MUSVs used in the offeror's proposed business models

███████████████████████████████████████████

in section 3.2.1," and how the small and medium test contacts will provide [International Maritime Organization numbers], sustained speed, and required refueling. *Id.* at 12 (§ 3.2.4).

### v.    Evaluation Approach

46.    Section 4 of the RPP describes the Government's evaluation approach. It provides that a finding of "Unacceptable" under any of the four criteria will result in the proposal being deemed unacceptable. *Id.* (§ 4.1).

47.    For Criteria 2, for the Navy evaluators were required to provide a rating of "Acceptable" or "Unacceptable" based on whether the offeror "demonstrates the proposed MUSV Design meets or exceeds the threshold requirements." *Id.* at 12–13.

48.    For Criteria 3, the evaluation calls for a rating of "Acceptable" or "Unacceptable" based on whether or not the offeror "fully demonstrates feasibility and manufacturing readiness (workload, workforce, facilities, production, quality control, and supply chain and supplier management plan specified in Section 3.2.3) in executing the offeror's proposed business model(s) i.e., Model 1 and Model 2." *Id.* at 13.

49.    For Criteria 4, the evaluation approach similarly provides for either a rating of "Acceptable" or "Unacceptable" based on whether the offeror "demonstrates the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrates a test asset that is representative of the MUSVs used in the offerors proposed business models in 3.2.1." *Id.*

50.    The RPP explains that the Government will assess proposals and notify offerors of selection to proceed or otherwise that its proposal was not selected to move forward. *Id.* at 13 (§ 4.1.1).

████████████████████████████████████
████████████████████████████████████

### vi.    SOW and Test Plan

51.     Attachment J-1 contains the Statement of Work ("SOW").  Ex. 2.  The SOW provides for a Post Award Conference during which the contractor will "cover the test plan detail, schedule, and information on the production vessel solution."  *Id.* at 4.

52.     Attachment J-1, Section 7 requires that the contractor "successfully complete the MUSV Test Event and meet or exceed all test criteria in Attachment J-5 (test criteria to be provided at prototype OT award)" and "perform the MUSV Test Event in accordance with [Attachment] J-5 MUSV test plan."  *Id.* at 6.  It further requires that the MUSV Test Event be completed, and a test submitted, by September 30, 2026.  *Id.*; Ex. 1 at 1 (§ 1.2).

53.     Attachment J-5 imposes important constraints on the testing process.  Ex. 3.  It contains the MUSV Test Plan and "establishes the objectives and measures of success for the Test and Evaluation (T&E) of the surrogate MUSV System for the MUSV 10 U.S.C. 4022 prototyping."  *Id.* at 2.  The purpose of the Test Plan is to provide "a framework for verifying system performance against attributes, evaluating operational effectiveness, and assessing overall system maturity."  *Id.*

54.     The Test Plan explains that the MUSV prototype testing consists of: (i) Perception and Situation Awareness ("PSA"); (ii) COLREGS[3] compliance & Vessel Safety; and (iii) Long-duration mission capabilities.  *Id.*

55.     Attachment J-5 states: "This Test Plan addresses ***all test criteria***, ***methodologies, scenarios, and data collection requirements*** for MUSV prototype testing."  *Id.* (emphasis added).  By its plain terms, Attachment J-5 is comprehensive as to the criteria to be used during testing.

---

[3] COLREGS or the "Convention on the International Regulations for Preventing Collisions at Sea" dictates how vessels navigate at sea and prevent accidents and collisions.

16

████████████████                                                    ████████████

56.     Section 2 of the Test Plan, System and Test Asset Description and Limitations, addresses USV Autonomy Systems, USV Test Vessel (Surrogate or Representative Prototype), Contact Vessels, and Go/No Go Criteria. *Id.* at 3.

57.     For USV Autonomy System testing, offerors must provide a "brief overview of the autonomy system architecture, including key software and hardware components (e.g., Autonomy Control System, Perception Suite, Machinery Control System)." *Id.*  The Test Plan further identifies the following "Key Capabilities": "Autonomous navigation, contact tracking, obstacle avoidance, COLREGS reasoning, mission planning, and remote monitoring." *Id.*

58.     For USV Test Vessel (Surrogate or Representative Prototype), the Test Plan directs the offeror to provide information on the vessel name/class, length overall, max speed/propulsion, sensor suite, and placemat. *Id.*

59.     The testing is organized into three phases: PSA Testing, COLREGS & Safety Scenarios, and Long Duration Mission. *Id.* at 4.

60.     Throughout testing, the vessel must operate in a safe manner.  The test will be considered unsuccessful if the USV has contact with a charted object, contact with a not charted static object, or has a collision or allision with another vessel. *Id.*  The test will also be unsuccessful if the vessel sustains a "[f]ailure of [Machinery Control System ("MCS")] to appropriately control machinery resulting in an unsafe condition of an [Hull, Mechanical, & Electrical ("HM&E")] component." *Id.*

61.     The PSA test scenario assesses whether the vessel's perception systems are capable of identifying small and medium vessels to quantify the performance of the radar and sensors for detection, tracking, and classification. *Id.* at 6–18.  The COLREGS test evaluates the autonomy system's ability to correctly execute maneuvers and navigate safely when traveling at sea, through

17

███████████████████████████████████████████████████████

simulated traffic and obstacle courses with different water depths. *Id.* at 18–36. Finally, the Long Duration Mission test assesses whether the vessel can navigate through 25 distinct legs while navigating different obstacles. *Id.* at 36–40.

### vii.    The Navy Responds to Questions

62.    On April 9, 2026, the Navy released responses to questions submitted by industry regarding the RPP. *See* Ex. 4. Simultaneously, the Navy issued an amended version of the RPP, Statement of Work ("SOW"), Attachment J-5 MUSV Test Plan, and cost template.

63.    The Navy received multiple questions seeking clarification of what the Navy meant for a vessel to be "representative" for purposes of the Test Plan. *See* Ex. 4 (Qs 4, 13, 16, 49). For example, asked "how does the Government define 'representative' with respect to the test asset" as it relates to the MUSV Test Event and, "[i]n particular, which subsystems or performance characteristics must match the proposed production MUSV, and which may differ without impacting evaluation[,]" the Navy simply responded: "Test vessel must be able to perform the test plan defined in the J-5 Attachment. Section 7 of the J-1 Attachment discusses the approval process for test USVs." *Id.* at 3 (Q49). Thus, asked to identify which subsystems must match the production vessel and which may differ without impacting evaluation, the Government simply directed offerors only to perform the J-5 test plan and to the Section 7 approval process.

64.    In another question, an offeror similarly asked:

> What characteristics or performance criteria are important to making the MUSV Test Event surrogate vessel "representative"?

> There are tradeoffs when solving for "representativeness" in the surrogate vessel's characteristics. For example, a vessel with a representative sensor architecture would have a MUSV-sized mast with large, heavy sensors (and perform well on the PSA test), but such a vessel may sacrifice on maneuver agility (and be non-representative for COLREGs tests). Optimizing for sensors, onboard control systems, speed, range and other vessel dynamics all at the same time - this can only result by using the production vessel itself.

███████████████████████████████████████████████████
█████████████████████████████████

> Absent government guidance on these tradeoffs, we aim to conduct the test event on a vessel that represents accurately our autonomy and C2 systems, rather than maneuver characteristics, since the former are key technology, while the latter are functions of hull form and architecture.

*Id.* at 1 (Q4); *see also id.* at 2 (Q36).

65.    In response to this question, the Navy again directed offerors to Attachments J-1 and J-5 of the RPP as governing what would be considered "representative," stating that the "Test vessel shall be able to perform the test plan *as written in the J-5 Attachment*" and "Section 7 of the J-1 Attachment discusses the approval process for test USVs." *Id.* (emphasis added).

66.    Proposals were required to be submitted to the Navy by April 17, 2026, at 12:00 pm ET.  Ex. 1 at 6 (§ 3.1.4).

**D.    Blue Water Timely Submits Its Proposal**

67.    Blue Water timely submitted a proposal to deliver its Liberty vessel—the same ████████████████ that was selected under the Navy's predecessor MASC program just months earlier, ███████████████████████████████████████████████████ ████████████.

68.    Blue Water's proposal explains that ██████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ Ex. 5 at 1.

69.    Also, Blue Water's ██████████████████████████████ ███████████████████████████████████████████████████ ████████ *Id.* at 5.

70.    ███████████████████████████████████████████████ ███████████████████████████████████████████████████

*Id.* at 8.  Specifically, ███████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████ *Id.* at 15.  Because Blue Water ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ *Id.* at 15.

71.    Blue Water's proposal also describes ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ *Id.*; *see also id.* at 1 (████████████████████████

████████████████████████████████████████

████████████████████████████████████████).

72.    For the requirement to █████████████████████ Blue Water explains: "The first Liberty vessel is currently under construction ████████████████████

█████████████████████████████████████" *Id.* at 9.  It further highlights that ████████████████████████████████████████

███████████████████████████████████ *Id.*; *see also id.* at 17 ("The first Liberty is currently under construction at ████████████████████

███████████████████████████████). In Section 3 of its proposal, Blue Water ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ *Id.* at 17.

█████████████████████████████████████████████

73.   Blue Water proposed ████████████████████████████

███████████████████████████████████████████████

██████████ *Id.* at 27.  As Blue Water explained, ████████████████

███████████████████████████████████████████████

*Id.*   Indeed, ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████  *Id.*  The proposal explains ██

███████████████████████████████████████████████

████████████████████████████  *Id.*

**E.     The Navy's Announcement of Awards to Seven Offerors**

74.   On June 1, 2026, the Navy announced that it had selected seven offerors to participate in at-sea testing: (1) Sea Machines; (2) Leidos; (3) Saronic Technologies; (4) Galliano Marine Services; (5) PacMar Technologies; (6) Birdon; and (7) Huntington Ingalls Industries.

75.   The Navy also informed Blue Water that it had not been selected, but did not provide any debriefing until June 12, 2026, when it issued Blue Water an undated three-page document consisting of Blue Water's written debriefing.  *See* Ex. 6.

76.   The Navy's debriefing states that Blue Water was found ██████████ under Criteria 2 and Criteria 4.  Ex. 6 at 1.  The debriefing does not say anything about Criteria 3, ████████████████████████████████████████.  *See id.*

77.   In support of its ██████████ finding under Criteria 2, the Navy found that ██

███████████████████████████████████████████████

*Id.* at 1.  According to the Navy, ████████████████████████████

21

███████████████████████████████████████████████████████
███████████████████████████

██████ as Blue Water proposed. *Id.* The Navy notes that ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

*Id.*

78.    Second, the Navy acknowledges that Blue Water proposes ████████████ but

claims Blue Water proposed ███████████████████████████████

███████████████████████████████████████████ *Id.* at 1–2.

79.    Third, the Navy faults Blue Water on grounds that ██████████████████

████████████████████ *Id.* at 2.

80.    Based on these evaluation findings, the Navy concluded that █████████

█████████████████████████████████████ *Id.*

81.    Under Criteria 4, the Navy found ████████████████████████

████████████████████████████  ████████████████████████

███████████████████████████████████████████████████████

██████████████████████. *Id.* at 2–3. Specifically, the Navy found that ██████████

███████████████████████████████████████████████████████

███████████████████████████████████ *Id.* at 2. The

Navy contended that the test vessel's use of ████████████████████████████

███████████████████████████████████. *Id.* at 3.

82.    On these bases, the Navy concluded that Blue Water's proposal was ██████████

under Criteria 4 and thus excluded Blue Water from the competition. *Id.*

███████████    ███████████████████████████████

## COUNT I

**THE NAVY CONDUCTED AN IRRATIONAL, ARBITRARY, AND CAPRICIOUS EVALUATION OF BLUE WATER UNDER CRITERIA 2 CONTRARY TO THE SOLICITATION'S TERMS[4]**

83.    Blue Water incorporates by reference and re-alleges the allegations in all preceding paragraphs of this Complaint, as though fully set forth in this count.

84.    The Navy's evaluation and the assignment of an ██████████ rating to Blue Water under Criteria 2, Vessel Solution Design, were flawed and irrational, and improperly relied on unstated evaluation criteria and misinterpretations of Blue Water's proposal.  *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) (agency improperly used unstated evaluation criterion).

85.    As a result, the Navy's evaluation under Criteria 2 was arbitrary, capricious, an abuse of discretion, and inconsistent with the Solicitation.

86.    The Navy improperly found Blue Water's vessel design ███████████████ ████████████████████████████ based on three erroneous conclusions:  ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████  Ex. 6 at 1–2.

87.    Each of these putative reasons for disqualifying Blue Water is unfounded and inconsistent with the RPP.

---

[4] To the extent that the record establishes that the Navy applied its evaluation criteria unequally or otherwise engaged in disparate treatment, Blue Water reserves the right to assert additional protest grounds at the appropriate time.

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

88.    *First*, the Navy's findings about ██████████ are contrary to the terms of the RPP and effectively hold Blue Water's proposal to an unstated, arbitrary evaluation criterion.

89.    The Navy's reasoning that, because the Liberty ████████████████████████ ████████████████████████████████████████ it necessarily must ████████ ████████████████████████████████████, Ex. 6 at 2, is antithetical to the terms of the Solicitation, which expressly provides that "MUSVs *may be new construction* and/or converted vessels." Ex. 1 at 1 (emphasis added). Indeed, the RPP required offerors to demonstrate their manufacturing readiness to support the "future production" of MUSVs without any requirement that vessels must be already built. *Id.* at 11-12 (Solicitation § 3.2.3). Rather, offerors had to provide a "[p]roduction strategy plan" that included a "build strategy plan, shipyard facility scheduling, module laydown plan, and scheduling." *Id.* at 11–12. To declare Blue Water's vessel ██████████ on the ground that ████████████████████████ is a blatant a violation of the RPP, the purpose of which was to field a new class of autonomous vessels for the Navy, not only pre-fabricated existing vessels.

90.    Contrary to the Navy's arbitrary conception of ████████ in the debriefing, the RPP's definition of "prototype project" includes a "proof of concept or model[,]" a "pilot or novel application of commercial technologies for defense purposes," "agile development activity," and the "creation, design, development, or demonstration of technical or operational utility, or combinations of the foregoing." Ex. 1 at 3 (§ 2); *see* 10 U.S.C. § 4022(e)(5) (defining "prototype project" for OTs). Also, a "prototype may be physical, virtual, or conceptual in nature." Ex. 1 at 3 (§ 2).

91.    Nowhere within the RPP did the Navy inform offerors that it required a vessel that ████████████████████ *See generally*, Ex. 1. If ████████████████████████ were a threshold

24

██████████████████████████████████████████
████████████████████████████████████████

requirement to being acceptable, no MUSV selectee should have been found "acceptable" to the extent that they contemplated future production. The Navy's evaluation of Blue Water is thus irrational and an abuse of discretion. *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 449–50 (2022) (finding that "it was arbitrary and capricious for the agency not to disclose [an] evaluation criterion to offerors in the Solicitation prior to accepting bids").

92.     Indeed, the entire purpose of the prototype phase of the OT is to identify viable vessels for further production—not to buy an already built vessel. *See* Ex. 1 at 3 ("A prototype may be physical, virtual, or conceptual in nature"). The RPP expressly allows test vessels that are "representative of the MUSVs" proposed by the offeror. *See id.* at 1, 9, 10–11, 12; Ex. 3 at 1, 3 (specifically calling out "Surrogate or Representative Prototype"). There would be no need to convert existing vessels or provide a "representative" vessel if the RPP required only vessels that have already "been constructed."

93.     *Second*, the Navy's reliance on ███████████████████████████ ████████████████ as reasons to rate Blue Water ████████████ constitute the application of unstated evaluation criteria. *See* Ex. 6 at 1; Ex. 1 at 12–13.

94.     The evaluation for Criteria 2 provides for either an "Acceptable" or "Unacceptable" rating based on whether the offeror "demonstrates the proposed MUSV Design meets or exceeds the threshold requirements." *Id.* at 12–13. An offeror "shall meet or exceed" the threshold requirements, in contrast with "desired attributes" that it "may meet or exceed." *Id.* at 7.

95.     The RPP sets forth nine threshold MUSV requirements: (i) vessel range; (ii) payload capacity; (iii) autonomous performance; (iv) emissions control; (v) refueling; (vi) interior reservation; (vii) meeting ABS standards; (viii) seakeeping; and (ix) "Field operational vessel in FY27." Ex. 1 at 8–9.



96.     Further, the RPP's evaluation criteria do not provide for an assessment of ███ ██████████████████████████████████████████████; it calls for a pass/fail ███████ ███████████ determination.  The Navy's purported assessment of the ████████████ ███████████████████████████████████ is a different, arbitrarily restrictive test than the one announced in the RPP for Criteria 3 governing Vessel Solution Design.

97.     Indeed, although the RPP required offerors to demonstrate that █████████ ███████████████████████████████████ in their proposals, *id.* at 10, the RPP does *not identify* █████████ as a threshold requirement, and critically, as noted above, an offeror's ability to demonstrate that it "meets or exceeds the threshold requirements" is the *sole basis* for the Navy's rating of a proposal ████████████████████████████ under Section 4.1 of the evaluation criteria.  *Id.* at 8–9, 13.  The Navy's evaluation is thus plainly in violation of the RPP.

98.     To the extent that aspects of a vessel's design besides its ability to meet or exceed the threshold requirements are relevant to the Navy's evaluation, under Section 4.1.1 of the RPP, they would only be evaluated by the Navy at a later stage—after the offeror has successfully been found Acceptable under Criteria 2, 3 and 4, at which point the Navy "will assess proposals and provide notification of selection to proceed to prototype agreement negotiations or notification that a proposal was not selected to move forward."  *Id.* at 13.  There is thus no basis for the Navy's rating of Blue Water as ███████████ under Criteria 2 based on an unsupported finding that has nothing to do with the specific ██████████████████████ rating criteria in the RPP.

99.     *Third*, in addition to being blatantly inconsistent with the RPP, the Navy's assertion that ████████████████████████████████████ ignores or misinterprets information in Blue Water's proposal that is not open to interpretation.  *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 397 (2025) (sustaining protest challenging agency's evaluation errors where the

███████████████████████████████████████████████

Government "conceded" that "the Agency was obligated to consider" statements in the protester's proposal but "also conceded that there is no evidence that the Agency did so"); *see also Air Borealis Ltd. P'ship v. United States*, 167 Fed. Cl. 370, 385 (2023) ("When the government misinterprets a proposal, its decision may be arbitrary or capricious. . . . That is especially true when the misinterpretation has the effect of adding a criterion that does not appear in the solicitation or results in disparate treatment") (citation omitted); *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247 (2011) (stating that an award may be arbitrary and capricious "if the agency were to misunderstand factual information in a proposal that is not open to interpretation, or make findings that are internally inconsistent").

100. Notwithstanding the Navy's findings, Blue Water's proposal explains in Section 2.2.4 that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ex. 5 at 15. It further explains: ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *Id.* at 15 (emphasis added). Blue Water's ████████████████████

████████████████████████████████████ is far more than any untested, paper design.

101. The Navy's purported criticisms that ████████████████████████████ also disregard Blue Water's explanation in its proposal that the "first Liberty is *under construction* ████████████████████████████ and ████████████ ████████████████ ████████████████████████████████ *Id.* at 1 (emphasis added); *see also id.* at 9 ("The first Liberty vessel is currently under construction ████████████████

27

██████████████████████████████████████████████████
████████████████████████████████

██████████████████████████████████████████). Blue Water's proposal

also explains: ████████████████████████████████████████████

██████████████████████████████████████ *Id.* at 9. The Navy

evidently failed to consider, much less rebut, any of these statements establishing that Blue Water's

vessel is already under construction and on track to be fielded and operational in FY 2027.

102.    The Navy's rating of Blue Water as ████████ under Criteria 2 is also

irreconcilable with the Navy's apparent finding that Blue Water's proposal was "Acceptable"

under Criteria 3, Manufacturing Readiness.  Under Criteria 3, the Navy evaluated whether offerors

demonstrate the "feasibility and manufacturing readiness" to support the production of up to 10

MUSVs, including the "[m]aximum production capacity of the proposed design per year."  *See*

Ex. 1 at 7–8, 11–13.  Blue Water's debriefing makes no mention of Criteria 3, logically supporting

the inference that the Navy found Blue Water's "feasibility and manufacturing readiness" to be

Acceptable based on its proposal that ████████████████████████████

████  *See* Ex. 5 at 17; Ex. 6.  ██████████████████████████████

██████████████████████████  The Navy cannot have it both ways, and its

████████ rating under Criteria 2 cannot stand.  *See Tech Sys., Inc. v. United States*, 98 Fed.

Cl. 228, 247 (2011) (stating that an award may be arbitrary and capricious "if the agency were to

. . .  make findings that are internally inconsistent"); *see also E.W., Inc. v. United States*, No. 11–

455C, 2012 WL 4465228, at *1 (Fed. Cl. Sept. 26, 2012) (finding agency's evaluation irrational

where it was "the product of inconsistent subjective judgments"); *Cosette Pharms., Inc. v. United

States*, 179 Fed. Cl. 740, 759 (2025) (finding competitive range determination arbitrary where the

agency's reasoning was internally inconsistent).

████████████████████████████████████████████████████████████
██████████████████████████████████████████████

103.    *Fourth*, the Navy's putative concern that ██████████████████████████████ ████████████████ is not a rational basis for evaluating Blue Water as ██████████ under Criteria 2.[5]  There is no threshold requirement that ████████████████████████████ ███████████████████████████████████████████  *See* Ex. 1 at 8–9.  The evaluation criteria called for a pass/fail determination based solely on meeting the stated threshold requirements.   By  treating  ████████████████████████████████████████ ███████████ ██████████████, the Navy departed from the stated evaluation criteria.  The Navy's elimination of Blue Water is thus inconsistent with the terms of the RPP.

104.    *Fifth*, the Navy's complaint that Blue Water's ███████████████████████ ███████████████████████████████████████████████████████████████████ ██████████ is contrary to the FY 2026 NDAA's statutory requirement that USVs be "purpose-built."  Ex. 6 at 2; P.L. 119-60, 139 Stat. 757–58, § 130.

105.    Blue Water's proposal states in Section 2.2.4 that ████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████  Ex. 5 at 15.

106.    The ████████████████████████ cited by the Navy achieve the "purpose-built" and fully unmanned statutory requirement in the FY 2026 NDAA, which mandates that MUSVs be "purpose-built  unmanned  vessels  engineered  to  operate  without  human  support  systems  or operational requirements intended for crewed vessels."  P.L. 119-60, 139 Stat. 757–58.

---

[5] Indeed, in December 2023, the Navy ran a test on large USVs using a single diesel engine for vessels that would ultimately use multiple engines.  *See* Ex. 12.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████

107.    The only way to comply with the "purpose-built" and fully unmanned requirements would be to either: (a) modify a vessel built for another purpose; or (b) use the exact design of a vessel built for the MUSV's purposes.  Thus, any "purpose-built" vessel will necessarily require ██████████████████████████████████ to meet the Navy's specific requirements.

108.    Furthermore, ██████████ are also required to offer necessary machinery spaces and fuel capacity to achieve the speed and range requirements set forth in the Solicitation, as well as the deck area to carry the payloads.  If ██████████ were unnecessary, the Navy could simply purchase an existing vessel rather than use the prototype OTA process.  But the Solicitation is premised on the understanding that an existing vessel that meets the Navy's requirements cannot simply be purchased—hence the need for a prototype process.

109.    The Navy's asserted concern over ██████████ to Blue Water's vessel is also inconsistent with the terms of the Solicitation, which explicitly allows offerors to "convert existing vessels in lieu of new construction to provide MUSV capability."  Ex. 1 at 10; *see also id.* at 1 ("MUSVs may be new construction and/or converted vessels"), 9 (providing that "[f]or conversions of existing vessels, all converted vessels [must] have the same or similar architecture").

110.    In accordance with the express terms of the RPP, Blue Water ████████████



████████████████████ ; instead, it ███████████████████████████████████

██████████████████████████████████████████████████ . *See* Ex. 5 at 9

(███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ ).  The Navy failed to credit Blue Water's focus ██████████████

███████████████████████████████████████████ . Ex. 6 at 1–2.

30

███████████████████████████████████████████████████████████

111.    The Navy cannot rationally allow offerors to propose the conversion of existing vessels—which necessarily entails ██████████████████████—while also finding Blue Water ███████████████████████████████████ as permitted under the terms of the RPP.  *See Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247 (2011) (stating that an award may be arbitrary and capricious "if the agency . . . make[s] findings that are internally inconsistent").

112.    It is also irrational for the Navy to claim Blue Water's █████████████████ when the Navy accepted Blue Water's MASC proposal for a Liberty vessel design, ████████████ ████████████████████████ just six months prior.  Ex. 11 at ¶ 8.  ██████████████████

████████████████████████████████████████████████████████████

████████████████████    *Id.* at ¶ 9.  The Navy's decision to credit the Liberty vessel in MASC only to now assert (without giving Blue Water an opportunity to test its vessel solution) that Blue Water's ███████████████ is arbitrary and unreasonable.

113.    Under the predecessor MASC competition, the Navy evaluated Blue Water's vessel solution through a multi-stage process—an in-person pitch, a question-and-answer session, and a facilities site visit, followed by direct negotiations.   Ex. 11 at ¶ 6; Ex. 12.  For MUSV, the Navy evaluated the same offeror's core solution on the written proposal alone, with no interactive exchange, clarification, or site visit, before finding it ███████████ on grounds such an exchange would have addressed.  Where the Government had readily practicable competitive procedures available, and used them months earlier for the same offeror's vessel, declining all of them is inconsistent with the direction to use competitive procedures to the maximum extent practicable. Indeed, the Navy unreasonably failed to engage in clarifications under these circumstances.

114.    The Navy's evaluation of Blue Water thus cannot stand.

31

███████████████████████████████████████████
███████████████████████████

*Prejudice*

115.    Blue Water was prejudiced by the Navy's improper and irrational evaluation under Criteria 2.  In the absence of the Navy's evaluation errors, Blue Water would have received an ████████ rating under Criteria 2 because its proposal was consistent with the terms of the RPP.

116.    As a result, had the Navy conducted a reasonable evaluation under Criteria 2 (as well as the other evaluation factors discussed below), Blue Water would not have been excluded from the Navy's competition and would have had a substantial chance of receiving an OTA award.

117.    Accordingly, the Navy's evaluation of Blue Water should be set aside, and the Navy should be enjoined and directed to proceed as set forth in the request for relief below.

## COUNT II

### THE NAVY VIOLATED 10 U.S.C. § 4022 BY FAILING TO SATISFY THE COMPETITIVE PROCEDURES REQUIREMENT AND DISREGARDING THE DEFINITION OF A "PROTOTYPE" WHEN EVALUATING CRITERIA 2

118.    Blue Water incorporates by reference and re-alleges the allegations in all preceding paragraphs of this Complaint, as though fully set forth in this count.

119.    The Navy's anticompetitive evaluation under Criteria 2 was also not in accordance with law; namely, the requirement of 10 U.S.C. § 4022(b)(2) for the Navy to use "competitive procedures" to the maximum extent practicable.  *See Telesto*, 176 Fed. Cl. at 735  (concluding protesters may maintain challenges to an agency's compliance with the terms of a prototype OT solicitation and other program-related documents because such documents "are integral to the statutory and regulatory integrity of the OT"); *see also SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547, 1553–54 (Fed. Cir. 1988) (interpreting "shall . . . to the maximum extent practicable" to mean the contracting officer was required to conduct a reprocurement "in the most competitive manner feasible"); *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 269 (2016) ("The word 'maximum' in the phrase 'to the maximum extent practicable,' therefore, should not

████████████████████████████████████████████████

be ignored and read out of the statute.  Given the congressional choice of the word 'maximum,' even when coupled with words like 'practicable' and 'appropriate,' agencies cannot ignore or superficially comply with the requirement….”), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).

120.    The Navy issued the MUSV RPP pursuant to 10 U.S.C. § 4022.  Section 4022(b)(2) states: “To the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects under subsection (a).”

121.    The Navy seeks to enter into OT agreements to carry out prototype projects authorized by 10 U.S.C. § 4022(a) based on its evaluation decision.  The Navy is therefore required by statute to use “competitive procedures” to the “maximum extent practicable” in conducting its evaluation.  10 U.S.C. § 4022(b)(2).

122.    The Navy failed to use competitive procedures in its evaluation under Criteria 2 and in selecting offerors for award of the MUSV OTAs for all the reasons set forth in the preceding paragraphs of this Complaint.  In particular, the Navy departing from and contradicting the terms of the solicitation, applying unstated evaluation criteria, and ignoring information in Blue Water's proposal constitute a failure to use competitive procedures.

123.    Further, the Navy departed from the broad definition of a “prototype project” in 10 U.S.C. § 4022(e)(5) by arbitrarily finding that Blue Water's proposed vessel ██████████ Such a finding was contrary to the statute as well as the RPP's substantially similar definition of “prototype project” to include a “proof of concept or model[,]” a “pilot or novel application of commercial technologies for defense purposes,” “agile development activity,” and the “creation, design, development, or demonstration of operational utility, or combinations of the foregoing.” Ex. 1 at 3 (§ 2); *see* 10 U.S.C. § 4022(e)(5) (defining “prototype project” for OTs).

*Prejudice*

33

██████████████████████████████████████████████

124.    Blue Water was prejudiced by the Navy's improper and irrational evaluation under Criteria 2. In the absence of the Navy's evaluation errors, Blue Water would have ████████ ████████ rating under Criteria 2 because its proposal was consistent with the terms of the RPP.

125.    As a result, had the Navy conducted a reasonable evaluation under Criteria 2 (as well as the other evaluation factors discussed below), Blue Water would not have been excluded from the Navy's competition and would have had a substantial chance of receiving an OTA award.

126.    Accordingly, the Navy's evaluation of Blue Water should be set aside, and the Navy should be enjoined and directed to proceed as set forth in the request for relief below.

## COUNT III

**THE NAVY ARBITRARILY AND IRRATIONALLY EVALUATED BLUE WATER UNDER CRITERION 4 USING UNSTATED EVALUATION CRITERIA, DEPARTING FROM THE SOLICITATION'S TERMS**

127.    Blue Water incorporates by reference and re-alleges the allegations in all preceding paragraphs of this Complaint, as though fully set forth in this count.

128.    The Navy's evaluation and the assigned ████████ rating to Blue Water under Criteria 4 (A Plan for Test Execution to Complete An On-Water MUSV Test Event), was flawed and inconsistent with the RPP. The Navy applied unstated evaluation criteria, misread Blue Water's proposal, and otherwise arrived at arbitrary and unsupported evaluation conclusions.

129.    Because of these errors, the Navy's evaluation under Criteria 4 was arbitrary, capricious, and an abuse of discretion. The Navy's anticompetitive evaluation was also not in accordance with law—namely, the requirement of 10 U.S.C. § 4022(b)(2) for the Navy to use "competitive procedures" to the maximum extent practicable. *See Telesto*, 176 Fed. Cl. at 735; *see also SMS Data*, 853 F.2d at 1553–54; *Palantir*, 129 Fed. Cl. at 269.

██████████████████████████████████████████████████

██████████████████████████████████

130.    In assigning an ███████████ rating to Blue Water under Criteria 4, the Navy relied on the faulty and unsupported assertion that ██████████████████████████████████ to wrongly conclude that the test vessel is not ████████████ of the proposed solution.

131.    But the RPP does not require that ███████████████████████████ be █████████████ of the final production material.

132.    The RPP evaluation criteria for Criteria 4 provides that a rating of "Acceptable" will be assigned where "the Offeror demonstrates the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrates a test asset that is representative of the MUSVs used in the offerors proposed business models in 3.2.1." Ex. 1 at 13.

133.    The RPP does not identify what constitutes a "representative" test asset. But it expressly allows test vessels, thereby necessarily permitting vessels that may differ from the proposed production vessels to some unspecified degree. *See* Ex. 3 at 2–3 (specifically calling out "Surrogate or Representative Prototype").

134.    The Navy made clear during the Q&A phase that "representative" vessels would be tested based on specific testing criteria in the RPP. During the Q&A, multiple questions were submitted seeking clarification of the term "representative." *See* Ex. 4 (Qs 4, 13, 16, 49). In response to these questions, the Agency pointed offerors to Attachments J-1 and J-5 of the RPP, stating that the "Test vessel shall be able to perform the test plan as written in the J-5 Attachment" and "Section 7 of the J-1 Attachment discusses the approval process for test USVs." *Id.* at 1, 3.

135.    Attachment J-5 states that testing consists of: (i) Perception and Situation Awareness; (ii) COLREGS compliance and Vessel Safety; and (iii) Long-duration mission capabilities. Ex. 3 at 2. The scope section is explicit that the "Test Plan *addresses all test criteria*,

███████████████████████████████████████████████████

███████████████████████████████████

*methodologies, scenarios, and data collection requirements* for MUSV prototype testing." *Id.* (emphasis added). Thus, the Test Plan contains "all test criteria" and is comprehensive.

136. But critically, none of the "test criteria, methodologies, scenarios, and data collection requirements" for MUSV testing in the Test Plan calls for testing of ████████ ██████████████████. *Id.*

137. The System and Test Asset Description and Limitations section identifies the USV Autonomy System, USV Test Vessel (Surrogate or Representative), contact vessels, and Go/No Go Criteria. *Id.* at 3. The USV Autonomy System requires a brief description of the autonomy system architecture and components, including the Autonomy Control System, Perception Suite, and Machinery Control System, and identifies the following key capabilities for evaluation: autonomous navigation, contact tracking, obstacle avoidance, collision avoidance, mission planning, and remote monitoring. *Id.*

138. The USV Test Vessel (Surrogate or Representative Prototype) section lists the following testing assets to be evaluated: test vessel length, max speed/propulsion, sensor suite, and placemat. *Id.* Notably, ████████████████ are not listed as assets that are evaluated in the testing. *See id.*

139. The tests themselves only assess the vessel's perception capabilities to detect and track objects at sea, capability to operate autonomously, and capability to navigate safely with other vessels and around obstacles. *Id.* at 6–40.

140. Blue Water's proposal explains that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 5 at 27 (§ 4.3). These are the characteristics being tested according to the test plan, thus making Blue Water's test vessel a

36

████████████████████████████████████████████████████████████████

representative prototype, in accordance with the requirements of the RPP. *See* Ex. 3 at 1–4; *see also* Ex. 4 at 1 ("Test vessel shall be able to perform the test plan as written in the J-5 Attachment").

141.    The ████████████████ appears in Attachment J-5 only ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████    Neither is a requirement that the test vessel's

████████████ be representative of the production vessel's ████████████.

142.    Notably, Attachment J-5 exclusively refers to the USV Test Vessel and "Surrogate or Representative Prototype," meaning the RPP does not contemplate that the exact production vessel will be used as the Test Vessel. Ex. 3 at 3. Indeed, unless a test vessel matched the production vessel's size, weight, power, and sustained speed at range, no offeror's ████████ ██████ would be "representative" ████████████. A representativeness standard that no surrogate in the competition could meet cannot possibly be the standard. Its application to Blue Water is thus irrational and contrary to a competitive process.

143.    The Navy's assessment of Blue Water as ████████ under Criteria 4 is thus a flagrant departure from the terms of the RPP using impermissible, unstated evaluation criteria to prematurely disqualify an offeror. *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 449–50 (2022) (finding that "it was arbitrary and capricious for the agency not to disclose [an] evaluation criterion to offerors in the Solicitation prior to accepting bids"); *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) (sustaining protest where agency improperly used an unstated evaluation criterion to downgrade protester's proposal for lacking a capability that it was not required to have until after award at first article inspection).

144.    The Navy's reliance on ████████████████████ as a basis for finding Blue Water ████████ is dependent on unstated evaluation criteria and thus arbitrary and capricious.

37

██████████████████████████████████████████████████████
████████████████████████████████████████████

*Prejudice*

145.    Blue Water was prejudiced by the Navy's improper and irrational evaluation under Criteria 4.  In the absence of the Navy's evaluation errors, Blue Water would have ████████ ██████ rating under Criteria 4.

146.    As a result, had the Navy conducted a reasonable evaluation under Criteria 4 (as well as the other evaluation factors discussed above), Blue Water would not have been excluded from the Navy's competition and would have had a substantial chance of award of the OTA.

147.    Accordingly, the Navy's evaluation of Blue Water should be set aside, and the Navy should be enjoined and directed to proceed as set forth in the request for relief below.

## COUNT IV

### THE NAVY VIOLATED 10 U.S.C. § 4022 BY FAILING TO SATISFY THE COMPETITIVE PROCEDURES REQUIREMENT IN EVALUATING CRITERIA 4

148.    Blue Water incorporates by reference and re-alleges the allegations in all preceding paragraphs of this Complaint, as though fully set forth in this count.

149.    The Navy's anticompetitive evaluation under Criteria 4 was also not in accordance with law; namely, the requirement of 10 U.S.C. § 4022(b)(2) for the Navy to use "competitive procedures" to the maximum extent practicable.  *See Telesto*, 176 Fed. Cl. at 735; *see also SMS Data Prods.*, 853 F.2d at 1553-54; *Palantir*, 129 Fed. Cl. at 269.

150.    The Navy issued the MUSV RPP pursuant to 10 U.S.C. § 4022.  Section 4022(b)(2) states: "To the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects under subsection (a)."

151.    The Navy seeks to enter into OT agreements to carry out prototype projects authorized by 10 U.S.C. § 4022(a) based on its evaluation decision.  The Navy is therefore required

38

████████████████████          ████████████████████████████████

by statute to use "competitive procedures" to the "maximum extent practicable" in conducting its evaluation.  10 U.S.C. § 4022(b)(2).

152.    The Navy failed to use competitive procedures in its evaluation under Criteria 4  for all the reasons set forth in the preceding paragraphs of this Complaint.  In particular, the Navy departing from and contradicting the terms of the solicitation, applying unstated evaluation criteria, and ignoring information in Blue Water's proposal constitute a failure to use competitive procedures.

*Prejudice*

153.    Blue Water was prejudiced by the Navy's improper and irrational evaluation under Criteria 4.  In the absence of the Navy's evaluation errors, Blue Water would have ████████ ████████ rating under Criteria 4.

154.    As a result, had the Navy conducted a reasonable evaluation under Criteria 4 (as well as the other evaluation factors discussed above), Blue Water would not have been excluded from the Navy's competition and would have had a substantial chance at award of the OTA.

155.    Accordingly, the Navy's evaluation of Blue Water should be set aside, and the Navy should be enjoined and directed to proceed as set forth in the request for relief below.

## COUNT V

### BLUE WATER IS ENTITLED TO INJUNCTIVE RELIEF

156.    Blue Water incorporates by reference and re-alleges the allegations in all preceding paragraphs of this Complaint, as though fully set forth in this count.

157.    28 U.S.C. 1491(b)(2) grants this Court the authority to impose injunctive relief where a protester objects to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

████████████████████████████████████████████████

158.    The Court must consider four factors when assessing whether a plaintiff is entitled to permanent injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds relief; (3) whether the balance of hardships to the respective parties favors granting injunctive relief; and (4) whether the public interest is served in granting injunctive relief. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 990-91 (Fed. Cir. 2018).

159.    Blue Water has established that it will succeed on the merits of its protest because, as described above, the Navy acted irrationally, arbitrarily, capriciously, and in violation of the law in its evaluation of Blue Water, departing from the terms of the solicitation, applying unstated evaluation criteria, disregarding information in Blue Water's proposal, and contravening the OT statute and FY 2026 NDAA Section 130, thereby unjustifiably excluding Blue Water from the next phase of competition for the MUSV OTA award.

160.    Blue Water will be irreparably harmed if the Navy is permitted to move forward with the next phase of the MUSV OTA competition after improperly excluding Blue Water from further consideration.  If not reversed, the Navy's improper decision will cause Blue Water to lose out on a significant business opportunity, which will reduce its resources and harm its ability to compete for OTA awards and other contracting awards in the future.  Indeed, the decisions of this Court have consistently held that "a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 323 (2022) (quoting *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016)).

161.    The Navy has announced that it will not wait for all testing to be completed before starting to award production contracts.  Ex. 8 at 7.  Consequently, Blue Water seeks injunctive

40

relief to ensure it is still able to meaningfully compete. In particular, it requests that the Court enjoin the Navy from completing the testing phase until its evaluation errors are corrected, Blue Water is able to conduct its test, and, subject to a successful test, is able to compete for and obtain a follow-on MUSV production contract with appropriate funding. But for such injunctive relief, Blue Water will lose the opportunity to meaningfully obtain the production contract it seeks. Ex. 11.

162.    Moreover, absent a permanent injunction, Blue Water will be competitively disadvantaged. Due to the early-stage nature of USV technology, Blue Water will face a materially higher barrier when competing for production contracts or other USV efforts unless Blue Water is allowed to complete testing on an expedited basis similar to other awardees and, provided that its test is successful, negotiate a follow-on MUSV contract. Such injunctive relief and an expedited briefing schedule in this protest thus will be necessary to minimize the prejudice to Blue Water as the Navy proceeds to conduct tests of the awardees' vessels. Ex. 11.

163.    Under the RPP, testing was to be completed by September 30, 2026. The technology underlying the competition is proprietary autonomy software that improves with data. *Id.* During the on-water Test Event, operational autonomy and perception data is generated in a real-life setting involving real contacts and encounters over multi-day missions that will allow offerors to receive valuable data and feedback from the Navy on each company's autonomy and design. *Id.* More data yields better autonomy and helps the Navy and the offerors develop a better understanding of the Navy's requirements and improves customer confidence. *Id.*

164.    Blue Water seeks to ensure that, in the event that it prevails in this protest, it does not lose out on such opportunities to not only test its vessel but to receive such feedback and data

41

███████████████

generated during the Test Event—during substantially the same timeframe as other companies selected for award to the fullest extent possible. *Id.*

165.    Thus, absent the injunctive relief noted above and expedited consideration of this protest, the Navy's already selected offerors may gain an unfair competitive advantage as they proceed to testing and potentially negotiate follow-on contracts, and Blue Water will be unfairly deprived of the data, feedback, experience, and knowledge it should have received. The impact on Blue Water's brand and market recognition would be consequential.

166.    In considering the balance of hardships, the decisions of this Court weigh the irreparable harm the plaintiff will suffer absent an injunction against the harm such an injunction may inflict on the defendant. *See WHR Grp., Inc. v. United States*, 115 Fed Cl. 386, 404 (2014). Here, the balance of hardship is clearly in favor of Blue Water, which will suffer demonstrable irreparable harm if it loses out on this significant business opportunity due to an unfair and irrational evaluation. The Government will suffer limited hardship in being required to follow the law and reasonably evaluate Blue Water's proposal.

167.    The public interest is best served through the grant of the injunction, as it will ensure that the Navy will not be permitted to irrationally and unreasonably deviate from its own competitive terms in evaluating an offeror, and instead must award the OT award through a fair competition and in accordance with the RPP and applicable law. The decisions of this Court have "long held" that where a "contract award violated procurement regulations and involved arbitrary and capricious behavior," then "[t]he public interest in preserving the integrity of the procurement system ... weighs in favor of granting injunctive relief." *IAP Worldwide Servs.*, 159 Fed. Cl. at 323 (quoting *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 117 (2013)).

███████████████████████████████████████████
███████████████████████████

**PRAYER FOR RELIEF**

Blue Water respectfully requests that the Court:

1)      Declare the Navy's evaluation and award decision arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

2)      Permanently enjoin the Navy from concluding testing and from expending all available funds for follow-on production contracts until the Navy reevaluates Blue Water's proposal reasonably and in accordance with the RPP and Blue Water has completed testing with sufficient time and sufficient funding (at a minimum $500 million) available for Blue Water to be selected for and to obtain a follow-on production contract;

3)      Award Blue Water its bid protest costs, its proposal preparation costs, and such other costs or damages that the Court deems appropriate; and

4)      Grant such other and further relief as the Court deems just and appropriate.


Dated: June 29, 2026

                                                        Respectfully submitted,

                                                        *s/ Alexander O. Canizares*
*Of Counsel:*                                           Alexander O. Canizares
Christopher M. O'Brien                                  VINSON & ELKINS LLP
VINSON & ELKINS LLP                                     2200 Pennsylvania Avenue, N.W.
2200 Pennsylvania Avenue, N.W.                          Suite 500 West
Suite 500 West                                          Washington, D.C. 20037
Washington, D.C. 20037                                  Telephone: (202) 639-6581
Telephone: (202) 639-6565                               Facsimile: (202) 639-6604
Facsimile: (202) 639-6604                               Email: acanizares@velaw.com
Email: cobrien@velaw.com

                                                        *Lead Attorney for Plaintiff*
                                                        *Blue Water Autonomy, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, I electronically filed the foregoing Complaint, accompanying Exhibits, Civil Cover Sheet, and Rule 7.1 Disclosure under seal with the Clerk of the Court using the CM/ECF system, which will send notification of such to counsel of record. Pursuant to the Court's Amended General Order No. 2026-01, I hereby certify that a true and correct copy was also emailed to the following parties this 29th day of June, 2026:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530
E-mail: nationalcourts.bidprotest@usdoj.gov

Respectfully submitted,

*s/ Alexander O. Canizares*
Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com

*Lead Attorney for Plaintiff*
*Blue Water Autonomy, Inc.*