██████ Redacted Version

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| SAILDRONE, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | Case No. 1:26 - _____<br><br><br>**FILED UNDER SEAL** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Saildrone, Inc. ("Saildrone"), by and through the undersigned counsel, files this action pursuant to 28 U.S.C. § 1491(b) challenging the United States Navy's ("Navy" or "Agency") failure to ██████████████████████████ to qualify for the on-water test event in connection with Solicitation No. N00024-26-R-6326 ("Solicitation") for Medium Unmanned Surface Vessels ("MUSVs").

## NATURE OF THE ACTION

1. Saildrone—a global leader in operational autonomous uncrewed surface vessels ("USVs")—brings this bid protest to set aside the arbitrary and capricious evaluation of Saildrone's proposal by Navy Portfolio Acquisition Executive for Robotic and Autonomous Systems ("PAE RAS" or "RAS"). As a result of that flawed evaluation, RAS excluded Saildrone from further consideration for a prototype Other Transaction ("OT") agreement.

2. RAS issued the Solicitation to "accelerate the design, development, and demonstration" of MUSVs by identifying "technically mature solutions that satisfy the vessel and autonomy performance requirements" and "for those solutions to complete an MUSV autonomy

and vessel performance test by the end of fiscal year 2026."  Ex. 1 (Solicitation) §§ 1.1, 1.2; *see also* Exs. 2-7 (Solicitation Attachments).

3.      The Solicitation has two phases: In "Phase 1," RAS evaluated proposals against objective, pass/fail criteria in the Solicitation to determine which proposals would advance for potential prototype OT award.  *Id*. § 1.2.  A proposal would be evaluated as "Acceptable" if it met the criteria for the vessel design, manufacturing readiness, and a plan for executing an on-water test event.  *Id*. § 4.1.  Acceptable proposals would advance to "Phase 2."  *Id*. § 1.2.

4.      In Phase 2, RAS would invite companies whose proposals were evaluated to be of merit to negotiate the terms of a prototype OT agreement governing the prototype project.  *Id.*  The Solicitation placed no restriction on the number of offerors who could receive a prototype OT following Phase 2 negotiations.  Instead, RAS emphasized its "intent is to qualify as many MUSV vendors as we can."

5.      Each company awarded a prototype OT would participate in an on-water "MUSV Test Event" to be completed by September 30, 2026, after which RAS could award follow-on production contracts or transactions to the successful participants, under 10 U.S.C. § 4022(f).  Ex. 1 (Solicitation) §§ 1.2, 4.1.  Participation in the Test Event costs the Government almost nothing: offerors build their proposed USVs at their own expense and earn a financial award only if an offeror successfully completes the Test Event and submits a report documenting compliance with every test criterion.  *Id*. § 1.2.

6.      Saildrone submitted a timely proposal in Phase 1 that satisfied or exceeded every mandatory acceptability criterion.  *See* Ex. 8 (Saildrone MUSV Proposal, or "Proposal").  That is no surprise: a decade of designing, operating, and deploying USVs made Saildrone uniquely

qualified for a prototype OT.  *Id*. at 12.[1]  Saildrone is the only USV manufacturer to achieve full American Bureau of Shipping ("ABS") class certification across its operational fleet.  *Id*.  Such certification is a benchmark of structural fitness that the Solicitation made a condition of acceptability.  Ex. 1 (Solicitation) § 3.2.2.  More than seventy Saildrone vessels are deployed worldwide for the Navy, U.S. Coast Guard ("USCG"), National Oceanic and Atmospheric Administration ("NOAA"), allied governments, and commercial customers.  Ex. 8 (Proposal) at 3.  It operates the world's largest fleet of contractor-owned, contractor-operated USVs that has completed over 2.5 million mission nautical miles since 2012, all over the planet, including in the Mediterranean, Red Sea, Arabian Gulf, Baltic Sea, Atlantic, Southern Ocean, Pacific, and the Bering and Chukchi seas.  *Id*. at 2, 10.  In 2025 alone, the fleet accumulated 10,217 drone-days at sea across 19 operational missions.  *Id*. at 2.

7.    Saildrone leveraged that experience to develop "SPECTRE," an MUSV satisfying each acceptability criterion.  Before proposals were due, this multi-year development effort by Saildrone was already validated and certified on key metrics—through computational fluid dynamics analysis, scale-model tank testing completed in January 2026, and ABS Approval in Principle awarded in December 2025.  *Id*. at 12, 15.  Saildrone partnered with established shipbuilder Fincantieri Marine Group ("FMG") for production.  *Id*. at 1. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████  *Id*. at 25-26.  Additionally, Saildrone ordered all long-lead-time components for the first SPECTRE in late 2025, supporting fielding in fiscal year 2027.  *Id*. at 15.

---

[1] Pincites to the Proposal refer to PDF pagination.

8. Despite these qualifications, Saildrone first learned from a public news article that RAS had selected seven other awardees. Only after Saildrone inquired did RAS notify Saildrone, in a four-sentence email, that its "proposal was not selected for further consideration under this solicitation," offering no explanation tied to the criteria.

9. Saildrone asked the RAS Contracting and Agreement Officers three times in writing for a debrief. Only after Saildrone's third request, on June 8, did RAS say that it was "working to provide feedback." On June 12, RAS provided Saildrone a three-page debriefing ("Debriefing"), which represented that RAS found Saildrone's Proposal ███████████ ███████████. *See* Ex. 17 (Debriefing). Those findings resulted from a fundamentally flawed evaluation.

10. First, RAS rated Saildrone ███████████████████████████ ████████████████████████████ on the belief that ███████████ ████████████████████████. Ex. 17 (Debriefing) at 1-2. This is false. As detailed in Saildrone's proposal, SPECTRE is fully compliant with all requirements. RAS's conclusion otherwise was based on RAS's ████████████████████████████ ████████████████████████. *See* Ex. 7 ███████████████████; Ex. 17 (Debriefing) at 1-2. Saildrone's alternative interpretation ███████████ was logical and reasonable based on ███████████████████████████



███████████ Ex. 7 (Solicitation Attachment J-8). ███████████████

███████████████████████████████ *Id.* ███████████

████████████████████████████████████

██████  That reading is confirmed by the arithmetic in ████████ Saildrone submitted: ██

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████ Accordingly, the numbers RAS ████████████

████████████████████████ in fact describe the vessel's ██████████████

███████████. RAS's illogical interpretation would mean ████████████████

██████████████████████████████████████████████████████████████████

███████████████████████. Compounding the error, the Solicitation did not define ██

██████████████████████████████████████████████████████████████████

██████████████████████. At a minimum, RAS acted arbitrarily and capriciously by failing to seek clarification.

11.    Second, RAS rated Saildrone ████████████████████████████, by ████████████████████████████████████████████. Ex. 17 (Debriefing) at 2-3.  The Solicitation required offerors to provide ████████████ ████████████████████████████. Ex. 1 (Solicitation) § ████. Saildrone did so.  Its Proposal identifies ████████████████████████████ ██████████████████████████████████████████████ ███████. Ex. 8 (Proposal) at 17-26. ██████████████████████, the Proposal also identified ██████████████████████████████████████████████ ██████████████████████████. *Id.* at 14-15.  RAS imposed unstated criteria while ignoring ████████████████████████████ ██████████████████████████████████—rendering its

████████████████████████████████████████████████
████████████████████████████████████

decision arbitrary and capricious.

12. Third, RAS rated Saildrone ███████████████████████████

████████████████████████████████████████████████████████

██████. Ex. 17 (Debriefing) at 3. But the Solicitation required only that offerors ███████

████████████████████████████████████████████████████████

██████—during the test. Ex. 1 (Solicitation) § ████. RAS thus evaluated Saildrone's Proposal

against ███████████████████ that the Solicitation did not disclose. ████████████

██████████████████████ the Solicitation actually made dispositive ████████████

██████████████████████████████████. *Id.* § 4.1. Saildrone satisfied

both.

13. RAS's selection of other offerors underscores the need for review. RAS accepted other proposals notwithstanding design-maturity, fielding, manufacturing-readiness, or test-readiness issues more significant than the issues RAS cited against Saildrone.

14. Finally, RAS's wrongful exclusion of Saildrone also undermines the competitive procedures of 10 U.S.C. § 4022(b)(2), which provides that "[t]o the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects." In particular, where the Solicitation imposed no numerical limit on the number of offerors that could advance, excluding Saildrone on a flawed evaluation cannot be reconciled with that mandate.

15. The public interest favors correcting these errors. The public has a strong interest in procurement integrity, fair competition, and agency adherence to stated evaluation criteria— interests vindicated only when agencies evaluate proposals according to the Solicitation's terms without imposing unclear or unstated criteria. Saildrone is already a significant element of the

██████████████████████████████████████████████████████

Navy's transition to an unmanned fleet, acting as a force multiplier that frees up manned assets for missions and enables persistent surveillance, deterrence, and maritime security. Including Saildrone furthers the public interest—allowing the American people to benefit from Saildrone's deep operational experience. Because advancement to the on-water Test Event imposes no material financial obligation on the Government, reevaluating Saildrone's Proposal consistent with the Solicitation and advancing Saildrone furthers the public interest at no meaningful cost to the public fisc.

16.    Saildrone seeks declaratory and injunctive relief directing RAS to reevaluate Saildrone's Proposal consistent with the Solicitation, reinstate Saildrone to the competition, and consider Saildrone for a prototype OT to participate in the on-water MUSV Test Event.

17.    On June 22, 2026, Saildrone provided the Department of Justice with a draft complaint substantially similar to this one and sought in good faith to resolve the matter short of litigation. RAS declined to take corrective action to reevaluate Saildrone's Proposal consistent with the Solicitation. This protest follows.

## PARTIES

18.    Plaintiff Saildrone, Inc. is a Delaware corporation with its principal place of business in California. Saildrone designs, builds, and operates uncrewed surface vessels for maritime defense and data-collection missions, and currently operates the world's largest contractor-owned, contractor-operated USV fleet, with more than seventy vessels deployed for the U.S. Government, allied governments, and commercial customers. Ex. 8 (Proposal) at 3.

19.    Defendant is the United States of America, acting by and through the Department of the Navy and the PAE RAS. The Solicitation was issued under PAE RAS authority, and the Solicitation identifies the PAE RAS "program manager and Agreement Officer" as the approving

officials.  Ex. 1 (Solicitation) § 6.

## JURISDICTION

20.    This Court has jurisdiction over this action under the Tucker Act.  28 U.S.C. § 1491(b)(1).  The Tucker Act provides that the Court of Federal Claims has jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  *Id.*  Although the Tucker Act does not define the term "procurement," the Federal Circuit has adopted the definition of "procurement" in 41 U.S.C. § 111 to determine whether a "procurement" has occurred pursuant to the Tucker Act.  *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008); *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 & n.4 (Fed. Cir. 2018).  Under 41 U.S.C. § 111, "the term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."

21.    RAS issued the subject Solicitation as a request for OT proposals under 10 U.S.C. § 4022.  As this Court has recognized, the fact that an acquisition is conducted through an OT does not mean the acquisition is not a "procurement" for purposes of Tucker Act jurisdiction.  To determine whether the Court has jurisdiction, the Court must "look at what the Government is seeking through the solicitation of proposals."  If the OT solicitation at issue is intended "to acquire for the benefit of the [agency] the goods and services proposed by" the offerors, then it is a procurement under 41 U.S.C. § 111 and the Court has jurisdiction under the Tucker Act.  Regardless of whether an agency issues a solicitation under OT or FAR authority, the Court has jurisdiction to review a "contract that seeks to acquire property or services for the Government."  As this Court has recognized, it "is the de facto forum for bid protests involving 'other transactions' (OTs) and 'other transaction agreements' (OTAs) awarded under 10 U.S.C. §§ 4021-22."

22. This is a procurement under 41 U.S.C. § 111 and the Tucker Act because it is an acquisition of property and services. Through the Solicitation, RAS sought to award one or more OT agreements for an on-water MUSV Test Event as a prelude to issuing production contracts or transactions to purchase a fleet of MUSVs to support the Navy's mission. Ex. 1 (Solicitation) § 1.1. The Navy later announced that it had selected seven companies' entries to advance to the at-sea testing phase, which is the work to be performed under the prototype OT agreements. The Court therefore has jurisdiction to hear this protest.

## STANDING

23. Saildrone is an interested party under 28 U.S.C. § 1491(b)(1), as it (1) is an "actual or prospective bidder[] or offeror[]," and (2) its "direct economic interest would be affected by the award of the contract or by the failure to award the contract." Saildrone is an actual offeror because it timely submitted its MUSV Proposal to RAS in response to the Solicitation but was notified of its non-selection. Its economic interest is affected by the award or failure to award the contract because "it had a 'substantial chance' of winning the contract." Saildrone has been harmed by the exclusion. But for RAS's flawed evaluation, Saildrone would have had a substantial chance of proceeding in the competition and receiving a prototype OT award.

## BACKGROUND

### I.    The Government Seeks Mature MUSVs for the Navy's "Golden Fleet"

24. On April 9, 2025, President Trump issued an executive order prioritizing enhancing the speed and flexibility of the defense acquisition system and directing acquisition-workforce reform by the Department of Defense, including the Navy. Exec. Order No. 14265, 90 Fed. Reg. 15621 (Apr. 9, 2025). He also announced the "Golden Fleet" initiative to expand and revitalize the Navy's ships. The Navy has since prioritized rapid acquisition of unmanned maritime

9

capabilities, including MUSVs—described by a Navy spokesperson as "the unmanned centerpiece of global fleet."

25.    Congress has allocated $2.1 billion for MUSV acquisition to operationalize the Golden Fleet initiative, underscoring the significance of the follow-on production opportunity. The MUSV marketplace Solicitation is part of that effort.

26.    The Navy has demonstrated its commitment to source unmanned vessels to modernize its fleets, including through its 30-year Shipbuilding Plan, issued in 2026, which "[f]or the first time" included a "combination of battle force ships, auxiliary ships and unmanned vessels." The Plan intends to reach a total fleet inventory of 39 MUSVs by FY27 and to more than double that number by FY31, as shown below.

**Table 1-1. Combined Total Naval Vessel Force**

| | Total Navy Vesssel Inventory | | | | |
|---|---|---|---|---|---|
| | FY27 | FY28 | FY29 | FY30 | FY31 |
| Battle Force Ships | 288 | 288 | 290 | 293 | 299 |
| Auxiliary Ships | 68 | 67 | 66 | 69 | 68 |
| Unmanned Vessels | 39 | 49 | 59 | 71 | 83 |
| **Total Vessel Inventory** | **395** | **404** | **415** | **433** | **450** |

27.    The White House's "America's Maritime Action Plan" indicates a preference for geographic diversity of shipbuilding in America, stating that robotic and autonomous systems "will play a central role in future conflicts" and recommending expanded geographic representation in Maritime Prosperity Zones as a policy action, including in the Great Lakes region.

28.    Accordingly, on March 26, 2026, RAS issued the Solicitation under 10 U.S.C. § 4022, seeking "technically mature solutions that satisfy the vessel and autonomy performance requirements" and for those solutions to complete an MUSV autonomy and vessel performance test by the end of fiscal year 2026. Ex. 1 (Solicitation) § 1.2. Proposals were due approximately three weeks later. *Id*. § 3.1.4.2.

10

29. The Solicitation sought to leverage private companies' investment in already-developed solutions to move quickly to on-water testing and potential production. As RAS Deputy Director Rebecca Gassler explained, because industry had already "built boats" and "built the technology," the Navy could "test the capability on water and go straight into production," saving approximately a year and delivering capability to the fleet faster. She added that sourcing USVs from the private market enables the Navy to "match the growing demand for unmanned systems across a range of missions." In short, RAS sought out mature MUSVs for production to deploy them quickly.

30. The Solicitation at issue had two phases: In Phase 1, companies would submit proposals demonstrating how they meet specified criteria regarding vessel design, manufacturing readiness, and a plan for executing the on-water Test Event. Ex. 1 (Solicitation) § 1.2.

31. In Phase 2, companies "evaluated to be of merit may be selected for potential award of a prototype OT," and invited to negotiate the terms of a prototype OT agreement. *Id.* The prototype OT work consists of a Post-Award Conference and the completion of the on-water MUSV Test Event, including a test report documenting successful compliance with all test criteria, no later than September 30, 2026. *Id.* The companies participating in Phase 2 are "invited to negotiate the terms" of the "prototype OT agreement" that govern "the prototype project." *Id.* Successful completion of the conference and Test Event entitles offerors to $15,010,000 and may make successful participants eligible for follow-on production. *Id.* § 5.0.

32. The Solicitation provided that the merits of the proposal submitted in Phase 1 would be evaluated based on objective criteria. *Id.* § 4.1. Per the Solicitation's "Proposal Evaluation Approach," an offeror's proposal would be deemed either "Acceptable" or "Unacceptable" on three evaluated criteria. *Id.* "If an offeror is found unacceptable in any of the criteria below the

11

offerors proposal will be deemed unacceptable and will not move forward for potential prototype OT award." *Id*.

33.    Criteria 1 consisted of a "Proposed Business Model," comprising the offerors' plan for a Contractor Owned Contractor Operated model and a Government Owned Government Operated model. *Id*. § 3.2.1. Each model had to include costs, pricing, and Data Rights Assertions across each model. *Id*. But Criteria 1 would be "for informational purposes" only and not considered as part of the evaluation of an offeror's acceptability. *Id*. § 4.1.

34.    Under Criteria 2, "Vessel Solution Design," offerors were to "propose an MUSV design that is a vessel with the ability to operate autonomously and carry containerized payloads," and demonstrate that the proposed design met or exceeded certain technical requirements for the vessel's range, payload capacity, ability to conduct fully autonomous operations, and ability to comply with appropriate ABS standards. *Id*. § 3.2.2. Two requirements are important in this action. For "Vessel Range," the MUSV needed to be able to travel at least 2,500 nautical miles at 25 knots while carrying a 25 MT load on the payload deck in specified sea conditions (NATO STANAG 4194 Sea State 4, or "SS4"). *Id*. (Threshold Requirement 1). For "Payload Capacity," the MUSV needed to be able to carry "Two (2) Forty-foot Equivalent Units (FEU) in accordance with Attachment J-4." *Id*. (Threshold Requirement 2). Attachment J-4, in turn, required that the vessel's deck was "capable of integrating two (2) Forty-Foot Equivalent Units (FEUs) that weigh 36.3 MT each," as well as various other requirements not relevant here. Ex. 3 (Solicitation Attachment J-4).

35.    Also in Criteria 2, the offeror had to demonstrate ability to provide a field-operational vessel by fiscal year 2027. Ex. 1 (Solicitation) § 3.2.2 (Threshold Requirement 9). As part of an offeror's response to Criteria 2, the Solicitation also asked offerors to provide a written

explanation of the offeror's autonomous capabilities and share "[h]istorical information about designing, operating, and validating autonomous systems, including demonstrations, and commercial/military applications in operation." *Id.* (Autonomous Capabilities Overview 3). Meeting or exceeding the threshold requirements was required; failure to do so would result in being deemed unacceptable. *Id.* § 4.1.

36.     The Solicitation provided that to show Criteria 2 compliance, the offeror had to submit a "Design Overview" including "[e]vidence of compliance with MUSV threshold requirements" and an overview of design features such as margins, structural design, and "[w]eight and stability." *Id*. § 3.2.2.  The offeror also had to summarize the production design in a RAS-provided Placemat Template, a blank data table consisting of labeled cells that the offeror was to populate with its own vessel data.  Ex. 7 (Solicitation Attachment J-8).  The Placemat contained no definitions, instructions, explanatory notes, or formulas for any of its fields.  *Id*.  The only Placemat fields the Solicitation tied to a substantive threshold were the vessel's range and payload capacity, and the only weight-and-stability benchmark it named was compliance with ABS class standards.  *Compare id*. *with* Ex. 1 (Solicitation) § 3.2.2.

37.     For Criteria 3, offerors had to demonstrate "manufacturing readiness to support the future production of MUSV," including workload, workforce, facilities, production, quality control, and supply chain and supplier management.  Ex. 1 (Solicitation) § 3.2.3.  For the supply chain component, the Solicitation required offerors to address key suppliers' financial health, capacity, and quality management; material lead time and mitigation strategies for long-lead-time materials; material inspection processes; supply-chain risks; and mitigation strategies.  *Id.* § 3.2.3.6.

38.    For Criteria 4, offerors had to demonstrate "the feasibility of the test schedule, including completion of the MUSV test plan and delivery of a test report on or before 30 September 2026," and "a test asset that is representative of the MUSVs used in the offerors proposed business models." *Id.* § 4.1.  The Solicitation also required offerors to provide an overview of planned test execution, including coordination with the Coast Guard, and to "[e]nsure the small and medium test contacts used during the test provide" an IMO number, sustained speed, and required refuel during testing.  *Id.* § 3.2.4.

39.    RAS would "assess proposals and provide notification of selection to proceed to prototype agreement negotiations or notification that a proposal was not selected to move forward." *Id.* § 4.1.1.  The Solicitation imposed no cap on the number of companies that could be selected to receive a prototype OT and move forward to the on-water MUSV Test Event.  According to Deputy Director Gassler, the intent was "to qualify as many MUSV vendors as we can."  Nor would advancing an offeror to the on-water MUSV Test Event impose more than a *de minimis* financial obligation on the Government: the $15,000,000 of the $15,010,000 award is earned only upon an offeror's successful completion of the Test Event.  *Id.* § 1.2.

40.    Following the completion of the Test Event, the Government could award a follow-on production contract or transaction to the successful participants.  *Id.* § 3.1.4.

## II.    Saildrone Is a Leader in Designing, Producing, and Deploying USVs

41.    Saildrone was founded in 2012 by Richard Jenkins in Alameda, California.  After breaking the world land-speed record for a wind-powered vehicle in 2008, Jenkins combined that propulsion technology with innovative autonomous-sailing technology to create Saildrone's first vessels.

14

42.      Saildrone began by building wind- and solar-powered uncrewed vessels to collect low-cost ocean data on months-long deployments in extreme environments.  Today, Saildrone operates the world's largest fleet of contractor-owned, contractor-operated USVs, with more than seventy vessels deployed worldwide and more than 2.5 million mission nautical miles logged since 2012.  In 2025 alone, Saildrone accumulated 10,217 drone-days at sea across 19 operational missions while maintaining greater than 70% annual uptime.  Ex. 8 (Proposal) at 2.

43.      Saildrone's Explorer, Voyager, and Surveyor classes perform maritime domain awareness, undersea detection and anti-submarine warfare, ocean mapping, and persistent intelligence, surveillance, and reconnaissance missions.  Saildrone is the only manufacturer of USVs to have achieved full ABS class certification across its operational fleet.  *Id.* at 12.

44.      Saildrone's expertise extends far beyond limited and simulated demonstrations. Saildrone has supplied uncrewed maritime capabilities to the U.S. Government for years, including for the Navy, USCG, and NOAA, and its USVs participated in Navy-sponsored exercises since 2020 advancing the operational employment and integration of unmanned systems and artificial intelligence in fleet operations.  These and other operations have allowed Saildrone to validate its autonomy and command-and-control system alongside the U.S. Navy and NATO.

45.      Saildrone has also successfully performed substantial Government contracts.  For example, Saildrone produced Voyager drones for the Department of Defense under an OT agreement that began as a $5.9 million prototype phase and grew to a $54.1 million production maximum award.  Saildrone also is successfully performing a three-year, $37 million Blanket Purchase Agreement with USCG for maritime domain awareness and operational safety.

46.      Saildrone's USVs operate continuously in complex environments integrated with the Fifth Fleet to provide persistent intelligence, surveillance, and reconnaissance data, despite

15

hostile interference.  Saildrone has also deployed a fleet of USVs with the Fourth Fleet and directly into routine, long-term operations.

### III.   Saildrone Exceeds the Solicitation's Requested Capabilities

47.    By the time RAS issued the Solicitation, Saildrone's proposed vessel—SPECTRE—had already been validated through computational fluid dynamics analysis and scale-model tank testing completed in January 2026, the gold standard in the industry for evaluating vessel capabilities.  Ex. 8 (Proposal) at 2, 15.  SPECTRE had also achieved ABS Approval in Principle in December 2025.  *Id.* at 12.  Saildrone began the manufacturing process by ordering long lead items in late 2025, including "███████████████████████████████████ ███████████████," scheduled for delivery to the build facility in Q3 2026.  *Id.* at 15.  Thus, Saildrone was positioned for field readiness in FY2027.

48.    As to Criteria 2, Saildrone demonstrated that SPECTRE met or exceeded every threshold requirement.  The Proposal explained that SPECTRE is a 52-meter MUSV with a top speed of approximately 30 knots and a range of 2,790 nautical miles at 25.3 knots while carrying a 25 MT payload.  *Id.* at 1.  The Proposal also stated SPECTRE could carry the required two-FEU payload and leveraged Saildrone's proven autonomy and command-and-control system.  *Id.* at 7, 10.

49.    Three of the threshold design requirements are ████████████████████████ ███████.  First, as to vessel range, Saildrone represented that SPECTRE exceeds the requirement, delivering "an endurance of 2,790 nautical miles at a speed of 25.3 knots, carrying a 25,000 kg payload, in Sea State 4 (head sea)."  *Id.* at 1.  Saildrone's design narrative confirmed that "[t]he vessel speed at full fuel load and 25 MT payload exceeds the required speed in sea state 4 (head seas) and ████████████████████████████," and that a calculated fuel-range margin

provides "███████████████████████" over and above "the required operational range of 2,500 nm at 25 knots." *Id.* at 12. Saildrone further represented that these performance parameters "result[ed] from extensive 1/7th scale, self-propelled model testing and [computational fluid dynamics] simulations in a multitude of sea states and load cases." *Id.* Saildrone's completed Placemat table corroborated the figure, reporting a range of 2,790 nm at 25 knots in the "██████ ██ 25 MT Payload" condition, and the General Arrangements drawing likewise listed "Range @ 25 kts, 25 T Payload ████████████, 2790 nm SS4 Head Sea." Ex. 11 (Proposal Attachment J-8 Placemat) at 2; Ex. 13 (Proposal SPECTRE General Arrangements) at 2-3.

50.    Second, as to payload capacity, Saildrone represented that SPECTRE is a vessel "purpose-built to carry two 40-foot containerized payloads," and its completed Placemat affirmatively reported a payload "Weight Capacity: █████"—exceeding the 72.6 MT requirement—together with "FEU Bays: 2" and a "Total Payload Area" of ████████████. Ex. 8 (Proposal) at 1; Ex. 11 (Proposal Attachment J-8 Placemat) at 2. The SPECTRE General Arrangements drawing depicted the payload deck physically configured for the required containers, including dedicated layouts for both payload configurations. *See generally* Ex. 13 (Proposal SPECTRE General Arrangements).

51.    Third, Saildrone also demonstrated compliance with applicable ABS standards as SPECTRE received ABS Approval in Principle in December 2025, a threshold requirement under the Solicitation. Ex. 1 (Solicitation) at 8; Ex. 8 (Proposal) at 12. Saildrone represented that SPECTRE "████████████████████████████████████████████████," that "[a]ll applicable ABS Class requirements are met and exceeded throughout the design," and that SPECTRE's ██████ exceeds ABS requirements with a margin. Ex. 8 (Proposal) at 12.

52.    Saildrone also demonstrated its ability to field SPECTRE in or before FY2027.

Saildrone partnered with an established shipbuilder, FMG, whose dedicated workforce, infrastructure, and production capacity would support delivery of ███ SPECTREs ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████. *Id.* at 3. As Saildrone stated in its Proposal, the "extreme maturity of the design, from performance through ████████████, to ABS approved structure, means we are ready to begin manufacturing at Fincantieri in Wisconsin immediately." *Id.* at 16.

53.    As to Criteria 3, Saildrone and FMG demonstrated manufacturing readiness across the categories identified in the Solicitation including workload, workforce, facilities, production, quality control, and supply chain and supplier management. Saildrone identified FMG's three shipyard facilities in Wisconsin, described FMG's available capacity and relevant production history, and identified additional suppliers for key SPECTRE components, including ████████ ██████████████████████████████████████████████████. *Id.* at 14, 17.

54.    Saildrone also addressed long-lead-time materials and supply-chain risk. The Proposal identified long-lead items including "████████████████████████████████ ████████████████████████." *Id.* at 15. It explained that to mitigate any issues with such parts, Saildrone has already ordered the major long-lead components for the first hull. *Id.* at 24. It also described Saildrone's mitigation strategies, including ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. *Id.* at 21, 24-25. In addition, Saildrone explained that "[t]o guarantee supply chain continuity, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████." *Id.* at 24. Saildrone

████████████████████████████████████████████████████████████ ████████████████████████

also set forth an additional backup plan for its hull production: ███████████
█████████████████████████████. *Id.* at 25.

55.     As to Criteria 4, Saildrone demonstrated the feasibility of its test schedule to meet
Criteria 4, including an earliest testing commencement date of ████████████████
████████████████████████—well before the September 30, 2026 deadline.
Saildrone identified a representative test vehicle using the same control system and ████████
█████████████████ and provided a timeline for USCG approvals in ████████
██. *Id.* at 27-28.  The Solicitation also contemplated that several test details would be provided
later, and when asked whether RAS would update the information listed as "to be provided at a
later date," RAS responded that it was not necessary for the submission of a proposal.  Ex. 16
(MUSV Q&A (Apr. 9, 2026)) at Item 12; *see also* Ex. 4 (Solicitation Attachment J-5) at 36 (safety
avoidance statistics); *id.* at 41 (data analysis criteria); *id.* at 45 (probability of successful
classification of contacts).  This reinforces that proposals were not required to include every final
detail to conduct the Test Event.

56.     Saildrone timely submitted its Proposal on April 17, 2026 and continued preparing
for the Test Event.  *See* Exs. 8-15 (Proposal and Attachments).

**IV.     RAS Erroneously Found Saildrone Unacceptable Under All Three Evaluated Criteria**

57.     Saildrone suspected RAS had rejected its Proposal after a news article reported that
the Navy selected seven entrants in the MUSV marketplace to advance to the next phase.  At that
time, Saildrone had not received any correspondence from RAS about the status of its Proposal.

58.     Four days later—having not heard from RAS—on May 26, 2026, Saildrone
contacted RAS in writing to ask for a status update.  Saildrone also requested a debrief if RAS had
not selected Saildrone to proceed.

59.     On May 27, RAS notified Saildrone that its Proposal had been "reviewed in accordance with the criteria set forth in the Solicitation" and "was not selected for further consideration." The notice provided no criterion-specific basis for Saildrone's exclusion. *Id*. Saildrone confirmed receipt that same day and requested a debrief. Saildrone specifically asked "to understand how Saildrone was evaluated against the criteria set forth in the Solicitation Guidance." RAS did not respond.

60.     On June 1, 2026, Saildrone followed up by email on its debrief request and RAS acknowledged receipt. Saildrone followed up again on June 8, 2026 and RAS responded that it was "working to provide feedback."

61.     On June 12, RAS provided a three-page debrief document explaining it found Saildrone's Proposal ████████████████████████████████████

██████████████████████████████████████████████████████████████

*See* Ex. 17 (Debriefing). On each, RAS's evaluation was either inaccurate, incomplete, departed from the Solicitation, or was otherwise arbitrary and capricious.

62.     RAS concluded that Saildrone was ██████████████████████ based on ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████     Ex. 17 (Debriefing) at 1. Saildrone's Proposal repeatedly and explicitly stated that SPECTRE satisfied those requirements. ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████

20

██████████████████████████████████████████████████████████████

██████████████████████████████████████

63.     RAS nonetheless found SPECTRE's design ███████████████ based on one ██████████████████████████████████. ████████████████ ████████████████████████████████████████████████. Ex. 17 (Debriefing) at 1. RAS ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████. *Id.* at 2.

64.     RAS's interpretation of Saildrone's Proposal does not withstand scrutiny. RAS's entire conclusion ████████████████████████████████████

████████████████████████████████████. RAS treated that number as █████

████████████████████████████████████████████████

████████████████████████████████████. Ex. 17 (Debriefing) at 1-2. ████████████████████████████████████

██████████████████████ Saildrone's Proposal repeatedly explains and states elsewhere that ████████████████████████████████████████████████

███████████████████. *See* Ex. 8 (Proposal) at 1, 7, 13; Ex. 13 (Proposal SPECTRE General Arrangements).

65.     RAS also found Saildrone ████████████████████████████

████████████████████████████████████. Ex. 17 (Debriefing) at 2-3. RAS stated that ████████████████████████████████████

████████████████████████████████████████████████

██████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at 2. On that basis

alone, RAS concluded that Saildrone's response ████████████████████. *Id.* at 2-3.

66.    The Solicitation asked offerors to demonstrate ████████████████

████████ Ex. 1 (Solicitation) § 4.1. ████████████████████

██████████████████████████████████████████████

█████████████████████████████ Instead, offerors were to provide a

Supply Chain and Supplier Management Plan for successful performance.

67.    Finally, RAS also found Saildrone ████████████████ because Saildrone

"████████████████████████████████████." Ex. 17 (Debriefing)

at 3.

68.    RAS's reasoning in the debrief does not track the standard the Solicitation

established RAS would use to evaluate ████████████████████████

██████████████████████████████████████████████

████████████████████████████. Ex. 1 (Solicitation) § 4.1. The

requirement instead was to ensure ████████████████████████

████████████████.

## V.    RAS Selected Seven Other Offerors to Advance to the On-Water MUSV Test Event

69.    RAS selected seven companies to advance to the on-water MUSV Test Event for a

chance at a follow-on production contract or transaction: Sea Machines; Leidos; Saronic

Technologies; Galliano Marine Services; PacMar Technologies; Birdon; and Huntington Ingalls

Industries.

████████████████████████████████████████████████

70.     Saildrone's Proposal reflected substantial real-world USV expertise.  Saildrone's vessels accumulated 10,217 drone-days at sea across 19 operational missions in 2025.  Ex. 8 (Proposal) at 2.  Saildrone has also logged more than 2.5 million mission nautical miles since 2012. *Id.*  Based upon publicly available information, certain companies selected to advance have not demonstrated comparable operational USV expertise.

71.     SPECTRE received ABS Approval in Principle before proposals were due.  Ex. 8 (Proposal) at 12.  Saildrone's Proposal also described completed computational fluid dynamics analysis and scale-model tank testing.  *Id.* at 2.  Based upon publicly available information, certain selected offerors have not demonstrated comparable design validation or ABS progress for their proposed MUSV entries.

72.     RAS nevertheless selected those offerors to advance while excluding Saildrone from further consideration.

## CAUSES OF ACTION

### COUNT I
### (RAS's Conclusion that Saildrone's Proposal Was ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Was Arbitrary and Capricious Because It Was Based Upon a Latent Ambiguity)

73.     Saildrone incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

74.     RAS concluded that Saildrone's Proposal was ▮▮▮▮▮▮▮▮▮▮▮▮ based upon a latently ambiguous term in the Solicitation and ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.

75.     "It is well established that procuring agencies 'must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.'"  *SSI*

*Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 745 (Fed. Cl. 2024) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004)).

76.    Ambiguous language in a solicitation precludes fair, equal, and intelligent competition.  *See ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188, 209-10 (Fed. Cl. 2018).

77.    Ambiguities may be patent or latent.  "A patent ambiguity is one that is so 'obvious, gross, or glaring that a contractor has a duty to inquire about it at the start.'"  *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 406 (Fed. Cl. 2022) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004)) (alterations adopted).  In contrast, a latent ambiguity exists where there is "'a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'"  *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (Fed. Cl. 1997) (internal quotation marks omitted)).

78.    It is inconsequential whether one interpretation of the Solicitation is more or less reasonable than another.  Rather, to show an ambiguity, "both interpretations must fall within a 'zone of reasonableness.'"  *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 240 (Fed. Cl. 2012) (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)).

79.    Here, RAS determined Saildrone's Proposal was ▮▮▮▮▮▮▮▮▮▮ based on its interpretation of ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.  Ex. 17 (Debriefing) at 1.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

80. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████.

81.    Saildrone's interpretation of the Government-furnished ████ was logical and reasonable based on ██████████ structure and positioning.  Specifically, the ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

That reading is confirmed by the arithmetic in the table: ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████    Accordingly, the numbers RAS read as proof ████████████████████

████████████████████████████████████████████.

82.    Saildrone's interpretation was consistent with its Proposal as a whole.  Saildrone represented in Table 2, "SPECTRE Meets All MUSV Threshold and Desired Attributes," that SPECTRE met the ████████████████████████████████████████.

Ex. 8 (Proposal) at 7.  Saildrone's ██████████ also separately reported ████████████

████████████████████████████████████████████████████

██████████.

25

████████████████████████████████████████████████████

████████████████████████████████████████████████████

83.    Elsewhere in Saildrone's Proposal, it affirmatively analyzed and validated SPECTRE's design and performance ████████████████—which RAS entirely ignored.  For example, the Proposal states that SPECTRE's performance parameters "result[] from extensive 1/7th scale, self-propelled model testing and CFD simulations in a multitude of sea states and load cases," and that, because of ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 8 (Proposal) at 12, 14. Saildrone's computational fluid dynamics analysis specifically modeled the hull at "████████ ████████," and its General Arrangements drawing identifies ████████████████████ ████████████████████████.  *Id.* at 14; Ex. 13 (Proposal SPECTRE General Arrangements).

84.    Saildrone only learned from the Debriefing that RAS had interpreted ████ ████████████████████████████████████████████████████████ ████████████████████.

85.    That undisclosed interpretation materially affected the evaluation.  RAS did not ████████████████████ because the Proposal lacked performance data ████████ ████████████.    It ████████████████████ because ████████████ ████████████████████████████.  *See* Ex. 17 (Debriefing) at 1-2.

86.    RAS's interpretation was not apparent from the Solicitation or the ████████ before proposals were submitted.  Saildrone's interpretation of the undefined term was reasonable. ████████████████████████ therefore reflected a latent ambiguity.

87.    As a result of that latent ambiguity, RAS evaluated Saildrone's Proposal under an interpretation of the Solicitation that Saildrone could not reasonably have known before proposal

████████████████████████████████████████████████████████████

submission.  RAS ███████████████████████████████████████████████████

███████████████████████████ .

88.    RAS's decision as to ████████ was arbitrary and capricious.

89.    But for RAS's reliance on this latent ambiguity, Saildrone had a substantial chance of proceeding in the competition and receiving a prototype OT award.

## COUNT II
## (RAS's Failure to Seek Clarification Concerning ████████████████████ ████████████ Was Arbitrary and Capricious)

90.    Saildrone incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

91.    Whether the undefined █████████████████████ is treated as latently ambiguous or as an apparent inconsistency in Saildrone's Proposal, RAS's decision not to seek clarification regarding the meaning of that field was arbitrary and capricious.

92.    The Court may review an agency's decision not to seek clarification of an offeror's proposal to determine whether it was arbitrary, capricious, or an abuse of discretion.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 512-13 (Fed. Cl. 2013).

93.    Clarifications are limited exchanges that allow offerors to explain aspects of a proposal or resolve apparent clerical errors, so long as the offeror is not permitted to revise the proposal or materially alter its technical approach.  *See BCPeabody*, 112 Fed. Cl. at 511-13.

94.    Where, as here, an apparent inconsistency within Saildrone's Proposal can be easily resolved by confirming the meaning of information already contained in the Proposal, an agency acts unreasonably by treating that inconsistency as dispositive without first seeking clarification.

95.    Saildrone's Proposal repeatedly demonstrated that SPECTRE ███████████ ████████████████████████████████████████. Ex. 8 (Proposal) at 7, 12-14. Saildrone's █████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████. RAS's contrary conclusion████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██

96.    At a minimum, a reasonable technical evaluator should have recognized that Saildrone may not have understood the undefined █████████████ in the same manner as RAS. RAS should have sought clarification, ████████████████████████████████ █████████████████████████.

97.    Notably, the Debriefing concedes that RAS recognized the █████████████ ████████████████████████████ Ex. 17 (Debriefing) at 2. But RAS did not seek clarification. It instead treated its own interpretation of ███████████████████ █████████████████████████████—which made clear that Saildrone met the █████████ ███████████████████████████████████████████████████ ███████████████.

98.    Clarification would not have allowed Saildrone to revise its technical approach or alter the capabilities of its proposed vessel. It would have confirmed how Saildrone used the undefined █████████ fields to report SPECTRE's capabilities and whether RAS's reading of

"█████████████" matched Saildrone's intended technical meaning as set forth in its Proposal, including the █████████████████████████████.

99.     RAS's failure to seek such clarification was arbitrary and capricious.

100.    But for RAS's failure to seek clarification, Saildrone had a substantial chance of proceeding in the competition and receiving a prototype OT award.

## COUNT III
### (RAS's Application of Unstated Criteria in Finding Saildrone's Proposal ███████████████████████ Was Arbitrary and Capricious)

101.    Saildrone incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

102.    "It is black letter law that agencies must evaluate offerors' proposals based on the evaluation criteria stated in the solicitation." *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (Fed. Cl. 2014).  An agency acts arbitrarily and capriciously when it materially departs from the solicitation's evaluation scheme.  *See 360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 184 (Fed. Cl. 2012); *Lab'y Corp. of Am. Holdings*, 116 Fed. Cl. at 650.  It "is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (Fed. Cl. 2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

103.    ███████ required offerors to ████████████████████████████████ ███████████████████████ Ex. 1 (Solicitation) § ████. ████████████████████████ ████████████████████████████████████████████████████ *Id.* § ████. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████

29

████████████████████████████████████████████████████ ████████████████████████

██████████████████████████████████████████████████

████████ . *Id.*

104.    To be ██████████████████ , a proposal had to demonstrate ████████████

████████████████ *Id.* § 4.1.   ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

that RAS required.

105.    Saildrone submitted a ██████████████████████████ .    Ex. 8

(Proposal) at 24-25.  Saildrone described how it █████████████████████

████ . *Id.* at 24.  It addressed ██████████████████████████

████████████████████ . *Id.*  Saildrone also addressed ████████████

████████ .    The Proposal explained that both Saildrone and FMG "██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████ ."

*Id.* at 24-25.  The Proposal further detailed that the company had ████████████

████████████████████████████ ."  *Id.* at 25.

106.    Saildrone's Proposal further explained that "FMG and Saildrone both enforce

██████████████████████████████████████████████████

██████████████████ spanning ████████████████████████

██████████████████████████████████████████████████

██████████████████████████ *Id.* at 24.  ██████████████████ , the

Proposal identified ████████████████████████████████████

████ . *Id.* at 14-15.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

107.    Saildrone also described ███████████████. Its Proposal identified ████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████. *Id.* at 21, 24-25.

108.    RAS nevertheless ███████████████████████ because ██████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████. Those requirements do not appear in ████████.

109.    The defect is compounded by what RAS ██████████████. Saildrone's Proposal

demonstrated █████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████. *Id.* at 18, 20-22, 24.  RAS did not find any of this deficient.

110.    By ignoring the stated Solicitation criteria in the debrief and instead focusing on a

██████████████████████████████████████████████, RAS evaluated Saildrone against unstated

criteria.  ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████.

111.    RAS's application of unstated criteria and failure to consider the contents of

Saildrone's Proposal in evaluating █████████ was arbitrary and capricious.

112.    But for RAS's unreasonable █████████ evaluation, Saildrone had a substantial

chance of proceeding in the competition and receiving a prototype OT award.

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

**COUNT IV**
**(RAS's Application of an Unstated Criterion in Finding Saildrone's Proposal** ██████████████████████ **Was Arbitrary and Capricious)**

113.    Saildrone incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

114.    Agencies must evaluate proposals according to the criteria stated in the solicitation. An agency acts arbitrarily and capriciously when it rejects a proposal based on a requirement the solicitation did not disclose.

115.    ████████ required offerors to ███████████████████████ ████████████████. Ex. 1 (Solicitation) § 4.1.

116.    The Solicitation also required offerors to ███████████████ ████████████████████████████████████████████████████ ████████████. *Id.* § ████.

117.    Saildrone provided a table identifying the specifications ███████████ ████████████████████████████████████████████████████ Ex. 8 (Proposal) at 27. ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████" that would ██████████████████████████ ████████████████████████████████. *Id.*

118.    RAS nevertheless ████████████████████████████████ because ████ ████████████████████████████████████████████████ Ex. 17 (Debriefing) at 3.



119.    But the Solicitation did not require companies ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████    Ex. 4 (Solicitation Attachment J-5) at 6-7.

120.    █████████████████████████████████████████████████████

████████████████████████ the Solicitation directed offerors to "[i]dentify allowed modifications"

and to "identify any assumptions used." Ex. 1 (Solicitation) § 3.2.1. Saildrone responded to those

instructions by identifying the requested information in its Proposal. For vessel modifications,

Saildrone stated that "Government vessel modifications are permitted subject to Saildrone review

to address items such as vessel safety, interference, preserve class, and insurance coverage and

warranty." Ex. 8 (Proposal) at 3. For assumptions, Saildrone identified commercial or

Government pier access with 4m draft as a key assumption for mission start and recovery. *Id.* ███

███████████████████████████████████████████████████████████

121.    RAS's stated ████████████ also did not track the ████████████

██████. That ████████████████████████████████████████████████

██████. Ex. 1 (Solicitation) § 4.1. It did not state that an offeror would ████████████

██████████████████████████████████████. And Saildrone's Proposal satisfied the

two acceptability measures. ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████                                ███████████████████



█████. Ex. 8 (Proposal) at 27. And it demonstrated ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ *Id.*

122. RAS therefore ██████ Saildrone based on a █████████████████████

requirement that the Solicitation did not disclose.

123. RAS's application of an unstated criterion in evaluating ██████ was arbitrary and

capricious.

124. But for RAS's unreasonable ████████ evaluation, Saildrone had a substantial

chance of proceeding in the competition and receiving a prototype OT award.

## COUNT V
## (RAS's Application of an Unreasonably Exacting
## Standard to Saildrone's Proposal Was Arbitrary and Capricious)

125. Saildrone incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

126. Agency evaluations must be rational and consistent with the solicitation. An

agency acts arbitrarily when it applies an unreasonably exacting standard to one offeror while

accepting comparable uncertainty, immaturity, or proposal-stage gaps from others. *See, e.g.*,

*CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 741 (Fed. Cl. 2014) (sustaining protest

where the agency relaxed requirements only for the awardee).

127. RAS applied that unreasonably exacting standard here. RAS ████████████

based on perceived deficiencies that either could have been resolved through clarification or were

not required by the Solicitation.

128.   At the same time, RAS selected seven other companies to advance to the on-water MUSV Test Event.  Based on publicly available information, certain selected companies have apparent and material issues regarding operational USV experience, design maturity, fielding readiness, manufacturing readiness, or ABS progress.

129.   Those issues matter under the Solicitation's acceptability criteria.  Criteria 2 required offerors to demonstrate an MUSV that could be field operational in FY2027.  It also required the vessel to meet the appropriate ABS standard and provide initial class.  A proposal based on a newly developed or unvalidated vessel concept presents obvious acceptability issues. RAS nevertheless advanced offerors with acceptability issues.

130.   The contrast is especially pronounced because RAS excluded Saildrone.  Saildrone has extensive operational USV experience, more than 2.5 million mission nautical miles logged since 2012, and 10,217 drone-days at sea across 19 operational missions in 2025.  SPECTRE also had ABS Approval in Principle, completed computational fluid dynamics analysis, and completed scale-model tank testing before proposals were due.

131.   RAS's decision to exclude Saildrone while advancing other offerors with apparent fielding, design-maturity, and ABS-compliance issues was arbitrary and capricious.

132.   But for that irrational evaluation, Saildrone had a substantial chance of proceeding in the competition and receiving a prototype OT award.

## COUNT VI
### (RAS Violated 10 U.S.C. § 4022 by Failing to Use Competitive Procedures to the Maximum Extent Practicable)

133.   Saildrone incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

134.    Section 4022(b)(2) provides that "[t]o the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects."  10 U.S.C. § 4022(b)(2).

135.    The Solicitation imposed no numerical limit on the number of offerors that could receive a prototype OT agreement.  RAS also stated that its intent was "to qualify as many MUSV vendors as we can."

136.    RAS did not use competitive procedures to the maximum extent practicable when it excluded Saildrone based on an irrational evaluation.  RAS failed to seek clarification regarding a latent ambiguity or inconsistency, ▮▮▮▮ Saildrone under unstated criteria, ignored information found in Saildrone's Proposal, and applied an unreasonably exacting standard to Saildrone while advancing other offerors with apparent acceptability concerns.

137.    RAS's flawed exclusion of Saildrone has and will materially undermine the competitive predicate for any follow-on production contract or transaction awarded without further competition under 10 U.S.C. § 4022(f).  RAS's conduct was arbitrary, capricious, and contrary to law.

138.    But for RAS's violation of § 4022, Saildrone had a substantial chance of proceeding in the competition and receiving a prototype OT award.

## SAILDRONE IS ENTITLED TO INJUNCTIVE RELIEF

139.    Saildrone is entitled to permanent injunctive relief.  Saildrone is likely to succeed on the merits because RAS's evaluation was arbitrary, capricious, and contrary to law, and inconsistent with the Solicitation's stated evaluation criteria.

140.    Saildrone is suffering irreparable harm.  RAS excluded Saildrone from the competition for a prototype OT agreement, the on-water MUSV Test Event, and the follow-on

production opportunity contemplated by the Solicitation and 10 U.S.C. § 4022(f). A "protester suffers irreparable harm" sufficient to warrant injunctive relief "if it is deprived of the opportunity to compete fairly for a contract."

141. The balance of equities favors Saildrone. Any harm to the Government from corrective action is limited. Saildrone would bear the cost of completing the Test Event, and the principal financial incentive is earned only after successful performance. By contrast, Saildrone will be excluded from a significant opportunity to compete for prototype testing and follow-on MUSV production, including procurement efforts supported by the $2.1 billion Congress allocated for Navy MUSV acquisition.

142. The requested injunction need not halt RAS's ongoing preparations with other offerors. Saildrone does not seek to delay the on-water MUSV Test Event for other participants while RAS conducts a lawful reevaluation of Saildrone's Proposal. The requested relief instead would require RAS to evaluate Saildrone lawfully and, if Saildrone is found acceptable, permit Saildrone to participate without disrupting the broader test schedule.

143. Saildrone also does not insist the Navy avoid moving forward with production, contracts, or transactions. However, because the funds for a prototype OT award and the number of MUSVs sought in the Navy's fleet are limited, and the Department of Defense has expressed publicly that its preference is to award these defense-related contracts by the end of September 2026, this Court should enjoin RAS from awarding more than $1.5 billion of the $2.1 billion allocated in follow-on production contracts or transactions unless and until RAS has completed lawful corrective action. Offering production contracts to other companies greater than this amount while Saildrone remains disqualified based on RAS's flawed evaluation will irreparably harm Saildrone's ability to receive a follow-on production contract or transaction.

144.    The public interest also favors injunctive relief.  The public has an interest in fair competitions, rational agency evaluations, and procurement integrity.  That interest is served when agencies follow their stated evaluation criteria and do not exclude offerors based on unresolved ambiguities or unstated requirements.  The public also has an interest in the Navy identifying the most capable vessels for prototype OT awards and potential follow-on production through a fair evaluation conducted under the Solicitation's stated criteria.

145.    An injunction requiring RAS to reevaluate Saildrone consistent with the Solicitation, and to reinstate Saildrone to the competition if appropriate under a lawful competition, would serve the public interest.  It would preserve the integrity of the procurement process while allowing the Navy to consider a mature, operationally proven MUSV solution for the Test Event.

## PRAYER FOR RELIEF

WHEREFORE, Saildrone respectfully requests that the Court:

a.    Grant judgment in Saildrone's favor;

b.    Declare that RAS's evaluation of Saildrone's Proposal and exclusion of Saildrone from further consideration were arbitrary, capricious, irrational, an abuse of discretion, and not in accordance with law;

c.    Enter permanent injunctive relief requiring RAS to reevaluate Saildrone's Proposal consistent with the Solicitation and the Court's decision;

d.    Order RAS, if Saildrone's Proposal is found acceptable under a lawful evaluation, to reinstate Saildrone to the competition for a prototype OT agreement and participation in the on-water MUSV Test Event;

e.    Enjoin RAS from awarding more than $1.5 billion of the $2.1 billion allocated in follow-on production contracts or transactions based on the challenged evaluation unless and until RAS has completed lawful corrective action;

f.    Award Saildrone its reasonable attorneys' fees and costs as permitted by law; and

g.    Grant such other and further relief as the Court deems just and proper.

Dated:    June 30, 2026                    Respectfully submitted,


                                           By: */s/ Laura M. King*

                                           SELENDY GAY PLLC
                                           Faith E. Gay
                                           Laura M. King
                                           1290 Avenue of the Americas
                                           New York, NY 10104
                                           Tel: 212-390-9000
                                           fgay@selendygay.com
                                           lking@selendygay.com

                                           NICHOLS LAW PLLC
                                           Carla Weiss
                                           655 15th Street NW, Suite 425
                                           Washington, DC 20005
                                           Tel: 202-846-9800
                                           cweiss@nicholslaw.com

                                           *Counsel for Plaintiff Saildrone, Inc.*