REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

BLUE WATER AUTONOMY, INC., *et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*,

and

HII UNMANNED SYSTEMS, INC., *et al.*,

*Defendant-Intervenors*.

Nos. 26-936, 26-944
Judge Philip S. Hadji

[redacted]

**PLAINTIFF SAILDRONE, INC.'S MOTION**
**FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]

## TABLE OF CONTENTS


INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 4

STATEMENT OF FACTS ........ 5

I. The Solicitation Seeks Rapid Acquisition of MUSVs for Naval Fleet Expansion ........ 5

II. RAS Rejected Saildrone's Proposal Despite the Company's Purpose-Built MUSV Meeting or Exceeding the Solicitation Criteria ........ 7

A. Saildrone [redacted] ........ 7

B. Saildrone's Proposal Demonstrated Robust Manufacturing Readiness ........ 9

C. Saildrone Planned to Complete the Test Event Early with a Representative Test Asset ........ 10

III. RAS Advanced Seven Offerors Whose Proposals Answered as Saildrone's Did—or Said Less ........ 11

STATEMENT OF JURISDICTION AND STANDING ........ 13

STANDARD OF REVIEW ........ 14

ARGUMENT ........ 15

I. RAS Applied One Standard to Saildrone and Another to Offerors It Advanced ........ 15

A. RAS Advanced an Offeror [redacted] ........ 16

B. RAS Advanced Offerors Whose [redacted] ........ 18

C. RAS Advanced Offerors [redacted] ........ 22

II. RAS Disqualified Saildrone Under Criteria the Solicitation Never Stated ........ 22

A. RAS Applied Unstated Criteria to Find Saildrone's [redacted] ........ 23

B. RAS Applied Unstated Criteria [redacted] ........ 26


[redacted]

III. RAS's [redacted] Rests on a Latent Ambiguity RAS Failed to Clarify During the Competition ....................28

A. The Record Demonstrates [redacted] Was Latently Ambiguous and Saildrone's Interpretation Was Reasonable ....................28

B. By Failing to Seek Clarification, RAS Improperly Treated its Irrational Interpretation of Saildrone's Proposal as Dispositive ....................30

IV. [redacted] Findings Fail, Rendering the Erroneous Evaluation Prejudicial ....................33

V. The Evaluation Defeats § 4022(b)(2) and the Competitive Predicate for the $2.1 Billion in Follow-On Awards ....................34

VI. Saildrone Is Entitled to Injunctive Relief....................35

A. Saildrone Will Suffer Irreparable Harm Absent a Permanent Injunction....................35

B. The Balance of Hardships Weighs in Favor of Granting Injunctive Relief....................37

C. The Public Interest Weighs in Favor of Granting Injunctive Relief....................38

CONCLUSION....................40

[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*22nd Century Techs., Inc. v. United States*,
176 Fed. Cl. 389 (Fed. Cl. 2025) .......... 24, 31

*360Training.com, Inc. v. United States*,
106 Fed. Cl. 177 (Fed. Cl. 2012) .......... 23

*Advanced Tech. Sys. Co. v. United States*,
177 Fed. Cl. 443 (Fed. Cl. 2025) .......... 19

*Alfa Laval Separation, Inc. v. United States*,
175 F.3d 1365 (Fed. Cir. 1999) .......... 14, 15

*Amazon Web Servs., Inc. v. United States*,
147 Fed. Cl. 146 (Fed. Cl. 2020) .......... 39

*ARxIUM, Inc. v. United States*,
136 Fed. Cl. 188 (Fed. Cl. 2018) .......... 28, 30, 32

*BayFirst Sols., LLC v. United States*,
102 Fed. Cl. 677 (Fed. Cl. 2012) .......... 22, 37

*BCPeabody Constr. Servs., Inc. v. United States*,
112 Fed. Cl. 502 (Fed. Cl. 2013) .......... 14, 31

*Blue Tech Inc. v. United States*,
155 Fed. Cl. 229 (Fed. Cl. 2021) .......... 28, 29

*CGS-SPP Sec. Joint Venture v. United States*,
158 Fed. Cl. 120 (Fed. Cl. 2022) .......... 29

*Distributed Sols., Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008) .......... 13

*E. W., Inc. v. United States*,
2012 WL 4465228 (Fed. Cl. Sept. 26, 2012) .......... 32

*eSimplicity, Inc. v. United States*,
162 Fed. Cl. 372 (Fed. Cl. 2022) .......... 14

*FCN, Inc. v. United States*,
115 Fed. Cl. 335 (Fed. Cl. 2014) .......... 36

[redacted]

*Gemini Tech Servs., LLC v. United States*,
176 Fed. Cl. 461 (Fed. Cl. 2025) .......... 14, 15, 33

*GTA Containers, Inc. v. United States*,
103 Fed. Cl. 471 (Fed. Cl. 2012) .......... 39

*HP Enter. Servs., LLC v. United States*,
104 Fed. Cl. 230 (Fed. Cl. 2012) .......... 28, 30, 35, 36

*HPI/GSA 3C, LLC v. Perry*,
364 F.3d 1327 (Fed. Cir. 2004).......... 29

*Hydraulics Int'l, Inc. v. United States*,
161 Fed. Cl. 167 (Fed. Cl. 2022) .......... 34, 35

*Indep. Rough Terrain Ctr., LLC v. United States*,
172 Fed. Cl. 250 (Fed. Cl. 2024) .......... 13, 14

*KWR Constr., Inc. v. United States*,
124 Fed. Cl. 345 (Fed. Cl. 2015) .......... 33

*L-3 Commc'ns EOTech, Inc. v. United States*,
83 Fed. Cl. 643 (Fed. Cl. 2008) .......... 17, 39

*Lab'y Corp. of Am. Holdings v. United States*,
108 Fed. Cl. 549 (Fed. Cl. 2012) .......... 35

*Lab'y Corp. of Am. Holdings v. United States*,
116 Fed. Cl. 643 (Fed. Cl. 2014) .......... 22, 23, 25, 28

*Off. Design Grp. v. United States*,
951 F.3d 1366 (Fed. Cir. 2020).......... 15, 16

*Overstreet Elec. Co. v. United States*,
47 Fed. Cl. 728 (Fed. Cl. 2000) .......... 38

*Palantir USG, Inc. v. United States*,
129 Fed. Cl. 218 (Fed. Cl. 2016) .......... 34

*Palantir USG, Inc. v. United States*,
904 F.3d 980 (Fed. Cir. 2018).......... 14

*Raytheon Co. v. United States*,
175 Fed. Cl. 281 (Fed. Cl. 2025) .......... 13

*RTD Middleburg Heights, LLC v. United States*,
172 Fed. Cl. 656 (Fed. Cl. 2024) .......... 15

[redacted]

*Samsara Inc. v. United States*,
169 Fed. Cl. 311 (Fed. Cl. 2024) ............................................................ 15, 22, 27, 37

*Serco Inc. v. United States*,
81 Fed. Cl. 463 (Fed. Cl. 2008) ............................................................................ 37

*SMS Data Prods. Grp., Inc. v. United States*,
853 F.2d 1547 (Fed. Cir. 1988)............................................................................ 34

*Springfield Parcel C, LLC v. United States*,
124 Fed. Cl. 163 (Fed. Cl. 2015) .......................................................................... 35

*Steel Point Sols., LLC v. United States*,
180 Fed. Cl. 463 (Fed. Cl. 2026) .......................................................................... 19

**<u>Statutes</u>**

5 U.S.C. § 706..................................................................................................... 14

10 U.S.C. § 3453.................................................................................................. 34

10 U.S.C. § 2377.................................................................................................. 34

10 U.S.C. § 4022.............................................................................. 1, 4, 5, 6, 34, 35

28 U.S.C. § 1491.......................................................................................... 13, 14

[redacted]

## INTRODUCTION

Saildrone, Inc. ("Saildrone") is a global leader in autonomous unmanned surface vessels ("USVs"). Saildrone operates more than seventy contractor-owned, contractor-operated vessels deployed worldwide for the U.S. Navy, the U.S. Coast Guard ("USCG"), the National Oceanic and Atmospheric Administration, allied governments, and commercial customers—and has logged more than 2.5 million mission nautical miles since 2012. Its partnership with the Navy is not new: for over a decade, Saildrone's USVs have operated with the Navy's Fourth and Fifth Fleets in complex environments, accumulating 10,217 drone-days at sea across 19 operational missions in 2025 alone.

Looking to advance the Navy's autonomous ship capabilities, the Navy Portfolio Acquisition Executive for Robotic and Autonomous Systems ("RAS") set out to qualify as many shipbuilders as it could to compete for the $2.1 billion Congress appropriated for MUSV production. Specifically, in March 2026, RAS issued Solicitation No. N00024-26-R-6326 (the "Solicitation") under the Navy's other transaction ("OT") authority, 10 U.S.C. § 4022, to find "technically mature solutions" for Medium Unmanned Surface Vessels ("MUSVs"). The Solicitation proceeded in two phases. In "Phase 1," RAS evaluated proposals against objective, pass/fail criteria and rated each one "acceptable" or "unacceptable," with an unacceptable rating on any criterion disqualifying the offeror. In "Phase 2," offerors found acceptable would negotiate a prototype OT award to compete in an on-water MUSV Test Event—with no cap on how many could advance, and with offerors bearing the full cost of building and testing their own vessels. Companies that successfully completed the Test Event would be eligible for follow-on production contracts under 10 U.S.C. § 4022(f). Tapping into the industry's existing capabilities meant the process would move fast—from Solicitation issuance to proposal submission in three weeks, and

[redacted]

to prototype testing and follow-on production contracts within five months.

That timeline presented no issues for Saildrone. For years, it had been building a vessel named SPECTRE that had anticipated the Navy's precise needs. SPECTRE was the product of a multi-year, self-funded development program, validated through Computational Fluid Dynamics ("CFD") analysis and 1/7th-scale self-propelled model testing completed in January 2026 and granted American Bureau of Shipping ("ABS") Approval in Principle in December 2025. Before proposals were due, Saildrone had confirmed that the "extreme maturity of the design" meant it was "ready to begin manufacturing at Fincantieri in Wisconsin immediately."

Yet RAS eliminated Saildrone at Phase 1—before a single vessel touched the water—on [redacted]—RAS held Saildrone to after-the-fact requirements the Solicitation never announced, then declined to apply those requirements consistently.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]. This imposed an unstated criterion: [redacted]

[redacted]

[redacted]

[redacted] That is an arbitrary and capricious evaluation. Two principles govern, and neither is in doubt: an agency must evaluate proposals against the disclosed criteria,

[redacted]

and it must apply those criteria evenhandedly. RAS did neither. Congress directed that "[t]o the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects," 10 U.S.C. § 4022(b)(2). An evaluation that thins an uncapped field through undisclosed standards and uneven application does not merely fail the arbitrary-and-capricious test—it separately defeats the requirements and purpose of the statute that authorized this procurement and the $2.1 billion in public monies for follow-on production that flows from it.

Only an injunction can redress these prejudicial errors. Absent relief, Saildrone will lose the ability to compete in the Test Event and for the $2.1 billion in follow-on production. The relief Saildrone requests is narrow. Saildrone does not ask this Court to cancel any awards, unwind an agreement, halt the procurement, or delay the awardees executing the Test Event. It asks only that its Proposal be evaluated under the criteria the Solicitation actually stated and as RAS applied them to the awardees; that Saildrone be allowed to compete in the Test Event; and that the Court enjoin RAS from awarding more than $1.5 billion of the $2.1 billion in follow-on production until RAS completes lawful corrective action. That relief forfeits no appropriated dollars and disturbs neither the awardees' preparations nor the Government's production schedule. The public interest favors correcting these errors. The public has a strong interest in procurement integrity, fair competition, and agency adherence to stated evaluation criteria—interests vindicated only when agencies evaluate proposals according to the Solicitation's terms without imposing unclear or unstated criteria. What Saildrone seeks is not an award. It seeks the competition it was promised.

## QUESTIONS PRESENTED

1. Whether RAS's disparate treatment of Saildrone's Proposal [redacted] was irrational, arbitrary, capricious, and in violation of Section 4022(b)(2).

2. Whether RAS's conduct was irrational, arbitrary, capricious, and in violation of

[redacted]

Section 4022(b)(2) when RAS applied unstated criteria [redacted].

3. Whether RAS's exclusion of Saildrone based on latent ambiguities in the Solicitation and its failure to clarify Saildrone's Proposal was irrational, arbitrary, capricious, and in violation of Section 4022(b)(2).

## STATEMENT OF FACTS

### I. The Solicitation Seeks Rapid Acquisition of MUSVs for Naval Fleet Expansion

The Solicitation is intended to advance the Navy's efforts to modernize its fleet through rapid acquisition of mature unmanned maritime vessels. RAS issued it on March 26, 2026, under 10 U.S.C. § 4022, seeking "technically mature solutions that satisfy the vessel and autonomy performance requirements" and requiring those solutions "to complete an MUSV autonomy and vessel performance test by the end of fiscal year 2026"—i.e., September 30, 2026. Tab 7a at 92. Proposed vessels could be "new construction and/or converted vessels," with identical submission requirements for either type. Tab 7a at 92. The Solicitation conditioned the $15,000,000 prototype award ("CLIN 0002")[1] on a "Test complete and MUSV Test Report Submitted … no later than 9/30/2026," and stated that proposals remain "valid until September 30, 2026." Tab 7a at 93, 97. The Statement of Work likewise required the offeror to "accomplish the MUSV Test Event and submit the test report no later than September 30, 2026."[2] Tab 7d at 114. Proposals were due April 17, 2026, roughly three weeks after issuance. Tab 7 at 85-86.

The Solicitation proceeded in two phases. In "Phase 1," companies submitted proposals

---

[1] The Solicitation also conditions a $10,000 amount ("CLIN 0001") on attending a "Post-Award Conference." Tab 7a at 92-93.

[2] During the pendency of this action, awardees are preparing for and participating in the on-water Test Event. *See* Tab 57 at 1593. [redacted]

demonstrating three evaluated topics: "Vessel Solution Design (Criteria 2)," "Manufacturing readiness to support the future production of MUSV (Criteria 3)," and a "plan for test execution to complete an on-water MUSV Test Event (Criteria 4)." Tab 7a at 92, 98, 101-02. Each of those items would be evaluated on objective pass/fail criteria, with rejection on any disqualifying the offeror. Tab 7a at 102. As part of Criteria 2, all offerors had to submit a summary of the MUSV production design in a "Placemat" template furnished by the Government. Tab 7a at 98; Tab 7i at 170. This J-8 Placemat provided fields for each offeror to describe its vessel's characteristics. *See* Tab 7i at 170. Many fields involved mathematical calculations to demonstrate aspects of the vessel's weight and payload capacity. RAS did not define those fields or provide instructions for how offerors should respond to individual fields.

In "Phase 2," offerors received a prototype OT award and will compete in an on-water Test Event. Tab 7a at 92; *e.g.*, Tab 90; Tab 104a; Tab 104b (Birdon's award documents). Participation in the Test Event costs the Government almost nothing because offerors bear the cost to develop vessels and to execute the Test Event. Tab 7a at 92, 102. Companies that successfully completed the Test Event would be eligible for follow-on production contracts under 10 U.S.C. § 4022(f). Tab 7a at 92, 102-04. The Solicitation imposed no cap on the number of companies that could receive a prototype OT award. Tab 7a at 92, 103. Indeed, RAS's former Deputy Director confirmed the intent was "to qualify as many MUSV vendors as we can." Am. Compl. ¶ 39.

Congress appropriated $2.1 billion for MUSV acquisition, which the Navy intends to use to create its expected fleet of 39 MUSVs by FY2027 and to more than double that by FY2031. Am. Compl. ¶¶ 25-26; Tab 5 at 78. More importantly, the Government has stated it intends to use those funds within the next few months. Am. Compl. ¶ 153. Within the parameters of the Solicitation, the Government can proceed to negotiations for follow-on MUSV production

[redacted]

contracts even before the September 30 deadline for the Test Event. *See* Tab 7a at 104-05.

## II. RAS Rejected Saildrone's Proposal Despite the Company's Purpose-Built MUSV Meeting or Exceeding the Solicitation Criteria

Saildrone timely submitted its Proposal on April 17, 2026. Tab 41 at 1188. Saildrone was uniquely situated to respond. It has longstanding partnerships with the U.S. Navy, USCG, National Oceanic and Atmospheric Administration, allied governments, and commercial customers to deploy vessels worldwide, and currently operates seventy contractor-owned, contractor-operated vessels. Tab 41 at 1189-90. Saildrone is not a newcomer to government contracting. For over a decade, Saildrone's USVs have participated in Navy-sponsored exercises and have been integrated with the Fourth and Fifth Fleets for long-term operations in complex environments. Tab 41 at 1199. By the time RAS issued the Solicitation, Saildrone had already developed SPECTRE—a 52-meter MUSV satisfying each acceptability criterion—and validated it through CFD analysis and scale-model tank testing completed in January 2026 (the gold standard for evaluating vessel capabilities), as well as receiving ABS Approval in Principle in December 2025. Tab 41 at 1189, 1199, 1202. Saildrone would meet the Solicitation's production requirements through its partnership with shipbuilder Fincantieri Marine Group ("FMG"). Tab 41 at 1204-13.

Saildrone reached out to RAS on May 26, 2026 to ask about the status of its Proposal, having learned days prior from a news article that RAS selected seven awardees. Am. Compl. ¶¶ 57-58. RAS emailed Saildrone on May 27, 2026 that SPECTRE would not move to the next round for testing. Tab 97l at 2343. On June 12, 2026, and after three written requests, Am. Compl. ¶¶ 59-60, RAS provided Saildrone with an undated three-page Debriefing explaining that it had rated Saildrone's Proposal [redacted], Tab 103a at 2402-04.

### A. Saildrone [redacted]

Criteria 2, "Vessel Solution Design," required offerors to demonstrate a design that met [redacted]

threshold requirements for range (2,500 nm at 25 knots carrying a 25 MT payload in Sea State 4), a payload capacity for two Forty-foot Equivalent Units ("FEUs") weighing 36.3 MT each, autonomous operations, ABS class compliance, and fielding by FY2027. Tab 7a at 98-99; Tab 7e at 117. Saildrone's Proposal demonstrated that SPECTRE met or exceeded these requirements. The Proposal reported [redacted] with the vessel "purpose-built to carry two 40-foot containerized payloads" and dedicated deck layouts for both configurations. Tab 41 at 1189; Tab 41c at 1220.

Saildrone also submitted the J-8 Placemat for SPECTRE. [redacted]

[redacted]

[redacted]

**B. Saildrone's Proposal Demonstrated Robust Manufacturing Readiness**

Criteria 3 required a demonstration of "Manufacturing Readiness." Offerors had to provide information about workload, workforce, facilities, production, quality control, and supply chain and supplier management. Tab 7a at 101-02. The supply chain component sought information about key suppliers' financial health, capacity, and quality management; material lead time and mitigation strategies for long-lead-time materials; material inspection processes; supply-chain risks; and mitigation strategies. Tab 7a at 102.

Saildrone's Proposal responded in detail to each category. Saildrone's primary shipbuilder, FMG, operates three Wisconsin shipyard facilities [redacted]

[redacted]

[redacted] Saildrone explained that it had already ordered materials for the first hull—scheduled for delivery to the build facility in Q3 2026. [redacted]

RAS's contemporaneous evaluation [redacted]

### C. Saildrone Planned to Complete the Test Event Early with a Representative Test Asset

Criteria 4 considered the test schedule and whether offerors had a representative test asset. Saildrone's Proposal stated it [redacted]

[redacted]

## III. RAS Advanced Seven Offerors Whose Proposals Answered as Saildrone's Did—or Said Less

RAS received 25 MUSV proposals and evaluated seven proposals as acceptable, awarded each acceptable company a prototype OT, and advanced them to the on-water MUSV Test Event: Birdon America Inc. ("Birdon"); Galliano Marine Service, LLC ("Galliano"); HII Unmanned Systems, Inc. ("HII"); Leidos, Inc. ("Leidos"); PacMar Technologies ("PacMar"); Saronic Technologies ("Saronic"); and Sea Machines Robotics, Inc. ("Sea Machines"). Tab 57 at 1577.

[redacted]

| Purported Deficiency | Saildrone's Proposal | Awardee's Proposal |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

[redacted]

| Purported Deficiency | Saildrone's Proposal | Awardee's Proposal |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

[redacted]

| Purported Deficiency | Saildrone's Proposal | Awardee's Proposal |
| --- | --- | --- |
| [redacted] | [redacted] | [redacted] |

## STATEMENT OF JURISDICTION AND STANDING

The Court has jurisdiction to adjudicate this protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), which provides that this Court "shall have jurisdiction to render judgment" in a bid protest "by an interested party" that is "in connection with a procurement or a proposed procurement." Procurement includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 288 (Fed. Cl. 2025) (quoting *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008)). Whether an OT solicitation or award is "in connection with" a procurement depends on the "agency's demonstrated intent, actions to date, and intentions moving forward." *Id.* at 294.

Here, the Solicitation's stated purpose is acquisition, as RAS issued it to "accelerate the design, development, and demonstration of [MUSVs]," seeking "technically mature solutions," Tab 7a at 92-93, that could move "straight to procurement" and create "a direct path to production," ECF No. 74 ¶ 20. RAS required each offeror to price vessels for the "option to buy" or "a block buy" of 5 and 10 vessels, Tab 7a at 97-98, and to demonstrate readiness to produce MUSV vessels by FY27, Tab 7a at 100. What the Government "is seeking through the solicitation of proposals" is a fleet of vessels and attendant services for its own direct use—the hallmark of a procurement.

[redacted]

*Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 258 (Fed. Cl. 2024).[3]

Saildrone is an interested party under 28 U.S.C. § 1491(b)(1), as it is an "actual or prospective bidder whose direct economic interest would be affected by the award of the contract" or by the failure to award the contract. *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 507 (Fed. Cl. 2013) (citation modified). Saildrone is an actual offeror because it timely submitted its Proposal in response to the Solicitation but was notified of its non-selection. Its economic interest is affected by the award or failure to award the contract because "it had a substantial chance of winning the award." *Id.* (citation modified). Saildrone has been harmed. But for RAS's flawed evaluation, Saildrone would have had a substantial chance of proceeding in the competition and receiving a prototype OT award.

**<u>STANDARD OF REVIEW</u>**

The Court of Federal Claims reviews bid protests pursuant to the standards of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* 28 U.S.C. § 1491(b)(4). The Court must determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 378 (Fed. Cl. 2022) (citation modified). The Court must set aside agency action when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 990 (Fed. Cir. 2018). To prevail, a protestor must also demonstrate prejudice by showing that, "but for" the agency's error, the protestor had "a substantial chance" of receiving the award. *Gemini Tech Servs., LLC v. United States*, 176 Fed. Cl. 461, 469 (Fed. Cl.

[3] Nothing included in or excluded from this brief waives or forfeits any arguments in opposition to motions to dismiss for lack of jurisdiction filed pursuant to the Court's order. ECF No. 18.

[redacted]

2025) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

## ARGUMENT

RAS held Saildrone to requirements the Solicitation never announced and then declined to apply those requirements evenhandedly—which independently violated the two most basic constraints on an agency evaluation. An agency "must evaluate proposals and make awards based on the criteria stated in the solicitation," *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (Fed. Cl. 2024), and it "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria," *RTD Middleburg Heights, LLC v. United States*, 172 Fed. Cl. 656, 669 (Fed. Cl. 2024) (citation modified). RAS did neither. [redacted] These errors each prejudiced Saildrone and cannot stand. Saildrone is entitled to a permanent injunction requiring RAS to reevaluate its Proposal under the criteria the Solicitation actually stated and as RAS applied them to awardees, and, if Saildrone is found acceptable, to restore it to the competition to participate in the on-water Test Event and compete on equal terms as existing awardees for follow-on production contracts.

### I. RAS Applied One Standard to Saildrone and Another to Offerors It Advanced

To demonstrate disparate treatment, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Once such deficiencies are identified, "a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering

[redacted]

with the agency's broad discretion in these matters." *Id.* The Administrative Record reveals that RAS advanced many offerors' proposals that were substantively indistinguishable from Saildrone's [redacted] This alone requires the Court to sustain Saildrone's protest.

**A. RAS Advanced an Offeror [redacted]**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] *See L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 652-53 (Fed. Cl. 2008) (finding disparate treatment and the evaluation "fundamentally irrational" where agency waived "a mandatory requirement of the solicitation for the benefit of only one offeror"). [redacted]

[redacted]

**B. RAS Advanced Offerors Whose [redacted]**

[redacted] RAS engaged in disparate treatment in reaching that conclusion.

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted] This is a classic case of disparate treatment.

[redacted]

This Court's review is limited to the rationalization that Saildrone's Proposal was [redacted] The Court should not reach RAS's additional, post-hoc grounds of unacceptability [redacted], which are after-the-fact rationalizations found nowhere in the contemporaneous record. In its written Debriefing [redacted]

It is "well-established and noncontroversial" that "post hoc rationalizations that are a part of the administrative record should not be relied upon as the basis for reviewing an agency's decision." *Steel Point Sols., LLC v. United States*, 180 Fed. Cl. 463, 471 (Fed. Cl. 2026). Here, the "debrief can be viewed as a precursor to an impending protest" where "the agency may be using the debrief as a final attempt to offer an explanation to ward off a potential protest ground that is raised by a disappointed offeror's debrief questions." *Advanced Tech. Sys. Co. v. United States*, 177 Fed. Cl. 443, 455 (Fed. Cl. 2025). The Debriefing post-dated RAS's decision by nearly a month. Tab 57 at 1573 (Final Report dated May 13, 2026); Tab 103a at 2403 (metadata reflecting document creation on June 12, 2026). Because RAS raised [redacted] only in the Debriefing, the Court should limit its review on [redacted] to the reason RAS gave contemporaneous with its decision—[redacted] *See Advanced Tech. Sys.*, 177 Fed. Cl. at 455 ("[T]he government cannot rely on the justification provided in a post-award debrief to attempt to supply an unprovided contemporaneous rationale for a decision made at the time of award.").

[redacted]

Regardless, RAS's post-hoc rationalization was permeated by disparate treatment, too. As summarized below, [redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | **Rating** |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | Unacceptable |
| [redacted] | [redacted] | [redacted] | [redacted] | Acceptable |
| [redacted] | [redacted] | [redacted] | [redacted] | Acceptable |
| [redacted] | [redacted] | [redacted] | [redacted] | Acceptable |
| [redacted] | [redacted] | [redacted] | [redacted] | Acceptable |

[redacted]

[redacted]

RAS treated Saildrone worse than other awardees for saying the same thing. RAS's post-hoc Debriefing faulted Saildrone [redacted]

- [redacted]
- [redacted]
- [redacted]

Saronic, Birdon, Galliano, and PacMar's proposals are substantially similar to Saildrone's. [redacted] The Court should confine its review to the reason RAS gave contemporaneous with its decision. But the post-hoc rationale fails on its own terms, too.

[redacted]

[redacted] *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 691 (Fed. Cl. 2012) (finding disparate treatment where agency scored materially indistinguishable past-performance records positively for awardee and negatively for protestor).

**C. RAS Advanced Offerors** [redacted]

RAS rated Saildrone [redacted] Several awardees also did not provide [redacted]

## II. RAS Disqualified Saildrone Under Criteria the Solicitation Never Stated

"It is black letter law that agencies must evaluate offerors' proposals based on the evaluation criteria stated in the solicitation," and when an evaluation "differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis." *Lab'y Corp. of Am. Holdings v. United States* ("*LabCorp*"), 116 Fed. Cl. 643, 650 (Fed. Cl. 2014). While an agency possesses discretion to evaluate proposals, this discretion "is not without its limits." *Samsara*, 169 Fed. Cl. at 319. The evaluation "must be consistent with the factors and procedures outlined in the solicitation." *LabCorp*, 116 Fed. Cl. at 650. [redacted], RAS [redacted] by applying requirements that the Solicitation did not disclose. Even aside [redacted]

from RAS's disparate treatment, *supra* Part I, the application of unstated criteria independently renders the evaluation arbitrary and capricious and mandates reevaluation.

### A. RAS Applied Unstated Criteria to Find Saildrone's [redacted]

[redacted]

The words chosen for a Solicitation have consequences. For example, in *360Training.com, Inc. v. United States*, the agency disqualified an applicant based on the "*organization's*" probation status, though the eligibility requirement reached only whether "the individual *trainers* must be in good standing." 106 Fed. Cl. 177, 193-94 (Fed. Cl. 2012) (emphasis added). Because the solicitation did "not disclose the applicant organization's probation status as an eligibility requirement," the disqualification "was arbitrary and capricious and it lacked a rational basis." *Id.* at 194. Those principles apply here and bind RAS to the words it used. *LabCorp*, 116 Fed. Cl. at 651 (evaluation irrational where agency relied on "unidentified evaluation factor inconsistent with the RFQ").

[redacted]

Moreover, RAS's flawed interpretation of the requirement that [redacted] RAS's post-hoc reasons for unacceptability [redacted] are not properly before the Court for the reasons discussed *supra* Part I.B.

Regardless, Saildrone's Proposal met the post-hoc criteria, too. [redacted] *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 398-99 (Fed. Cl. 2025) (plaintiff's disparate evaluation argument was another way to advance the claim it met the criteria). Even so, Saildrone's Proposal specifically [redacted]

RAS also concluded post-hoc [redacted] The application of unstated criteria to Saildrone is made more evident by the fact that other awardees [redacted]

Similarly, in response to Saildrone's explanation of [redacted]

[redacted]

[redacted] adds requirements that are not contained within the Solicitation.

Simply put, [redacted], based on the Solicitation materials and as compared to awardees' responses, was more than sufficient for RAS to find Saildrone acceptable [redacted] Accordingly, the reasoning in RAS's Debriefing "differs significantly from the process disclosed in the solicitation," and thus "lacks a rational basis." *LabCorp*, 116 Fed. Cl. at 650 (quotation omitted).

These errors are underscored by what RAS did not question. [redacted] RAS found none of it deficient. Its decision turned entirely [redacted] Either basis—applying unstated criteria or treating Saildrone differently—is independently fatal [redacted]

[redacted]

**B. RAS Applied Unstated Criteria** [redacted]

[redacted]

But RAS evaluated the submission [redacted], concluding Saildrone [redacted] In excluding Saildrone on this ground, RAS sought more from Saildrone than the Solicitation required. Where RAS wanted proposal-stage identification, it said so—directing offerors to "***[i]dentify*** allowed modifications" and to "***identify*** any assumptions used," Tab 7a at 98, which Saildrone did, Tab 41 at 1190. [redacted] RAS wrote something different: [redacted]

Saildrone responded to this requirement. [redacted]

[redacted]

*Samsara* is directly on point. There, USPS sought devices to monitor its vehicles. 169 Fed. Cl. at 316. Monitoring required on-board diagnostics through an OBDI data port. *Id.* USPS assigned a weakness to Samsara's proposal because no OBDI cable was available for its device. *Id.* at 320. Samsara argued that this determination was arbitrary and capricious because "the Solicitation did not require offerors to demonstrate any OBDI devices at the time of award." *Id.* (citation modified). The court agreed, reasoning that the assigned weakness regarding the OBDI cable was based "solely on Samsara's lack of an existing OBDI cable," whereas the solicitation, statement of work, and Q&A spoke only of a bidder's "***capability to develop***" OBDI cables. *Id.* at 321-22 (emphasis added).

So too here. [redacted]

The application of unstated criteria is underscored by many awardees' proposals, which either did not provide this information, *see supra* Part I.C, or acknowledged that [redacted]

[redacted]

[redacted]

By rejecting Saildrone over an identification requirement the Solicitation did not impose, RAS evaluated the Proposal against an undisclosed criterion. *See LabCorp*, 116 Fed. Cl. at 650.

**III. RAS's [redacted] Rests on a Latent Ambiguity RAS Failed to Clarify During the Competition**

RAS's rejection [redacted] must be set aside. First, [redacted] which was latently ambiguous, and Saildrone's interpretation was reasonable. Second, [redacted]

**A. The Record Demonstrates [redacted] Was Latently Ambiguous and Saildrone's Interpretation Was Reasonable**

The interpretation of a solicitation is a question of law the Court reviews de novo. *ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188, 198 (Fed. Cl. 2018). Ambiguous language in a solicitation precludes fair, equal, and intelligent competition. *See id.* at 209-10. A solicitation is ambiguous when its language is "susceptible to more than one reasonable interpretation." *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 237 (Fed. Cl. 2021). The competing readings need not be equally persuasive; both need only fall within a "zone of reasonableness." *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 240 (Fed. Cl. 2012). This Court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Blue Tech*, 155 Fed. Cl. at 237. Ambiguities can be patent or latent. A patent ambiguity is one so "obvious, gross, or glaring" that it triggers a duty to inquire before

[redacted]

bidding, *id.* at 238 (brackets omitted); a latent ambiguity on the other hand is "a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification," *CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 130 (Fed. Cl. 2022).

*HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327 (Fed. Cir. 2004) is instructive. There, the Government requested that the plaintiff submit various cost estimates, including a "Cost per zone," on a fill-in-the-blank form that did not define the term "zone." *Id*. at 1330-31. The parties disagreed on the meaning of "zone." *Id.* at 1334-35. Based on the "language" of the documents and "uncertainty in the industry on the meaning of the term," the Federal Circuit held that both the Government's and the plaintiff's interpretations were reasonable. *Id.*

Here, the [redacted]

[redacted]

[redacted] The existence of two reasonable readings renders the term ambiguous.

This ambiguity in [redacted] was latent because RAS's interpretation was not apparent from the Solicitation materials before proposals were submitted. [redacted] There was nothing to alert Saildrone that RAS had another interpretation. Thus, the [redacted] ambiguities must be construed against RAS under the *contra proferentem* rule that applies to latent ambiguities, and RAS's interpretation cannot stand to [redacted]. *See HP Enter.*, 104 Fed. Cl. at 242-43 (holding a single "awkwardly drafted" sentence latently ambiguous because it contained no language to put a bidder on notice that the agency required more definitive information). RAS's conclusion that Saildrone's Proposal [redacted] on this basis was therefore arbitrary and capricious.

**B. By Failing to Seek Clarification, RAS Improperly Treated its Irrational Interpretation of Saildrone's Proposal as Dispositive**

[redacted] RAS's refusal to seek clarification was arbitrary and capricious. This Court's precedent is clear that an agency's treatment of an offeror's submission is "scrutinized for fundamental fairness." *ARxIUM*, 136 Fed. Cl. at 202. Fairness required the

[redacted]

Government to seek clarification before disqualification here. That is especially the case here [redacted]

Clarifications merely allow offerors to explain aspects of a proposal or resolve apparent clerical errors; they do not open the door to revising the proposal or materially altering its technical approach. *See BCPeabody*, 112 Fed. Cl. at 511. A contracting officer abuses her discretion by failing to seek a clarification about the basis for rejecting a proposal when that failure is not "reasonable and rational" based on the information available to the contracting officer. *See id.* at 511-12. For example, in *BCPeabody Construction Services*, the agency rejected a proposal as technically unacceptable over a copying error, even though the contracting officer knew what the offeror intended and knew the underlying qualification was met. 112 Fed. Cl. at 506-07. The court held it unreasonable to treat a readily resolvable error as dispositive while ignoring information the agency already had. *Id.* at 511-13.

That is exactly what RAS did here, and its failure to seek clarification renders its evaluation fundamentally unfair. [redacted] RAS was "obligated to give Plaintiff's proposal a fair reading." *22nd Century*, 176 Fed. Cl. at 398. Read in its entirety, [redacted]

[redacted]

[redacted]

[redacted] *E. W., Inc. v. United States*, No. 11-455C, 2012 WL 4465228, at *1 (Fed. Cl. Sept. 26, 2012) (agency acted arbitrarily by ignoring graphics and other responsive information).

[redacted] *Cf. ARxIUM*, 136 Fed. Cl. at 197 (agency abuses its discretion when it "offer[s] an explanation for its decision that runs counter to the evidence before [it]"). It was arbitrary and

[redacted]

capricious for RAS to allow the overwhelming evidence within Saildrone's Proposal to be subsumed by a single, seemingly contrary—from RAS's point of view—[redacted]

### IV. [redacted] Findings Fail, Rendering the Erroneous Evaluation Prejudicial

Prejudice requires only a "substantial chance it would have received the contract award but for" RAS's errors—not proof that the protestor was "next in line for award." *Gemini Tech Servs.*, 176 Fed. Cl. at 469. When a solicitation makes an award turn on clearing stated requirements, a protestor establishes prejudice by showing a substantial chance of clearing that threshold but for the alleged evaluation errors. *Cf. KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 348-49, 355 (Fed. Cl. 2015) (demonstrating prejudice where government contemplated making three to five IDIQ awards, entered four contracts, and but for the agency's error on one of three criteria, plaintiff "had a substantial chance of receiving a contract under the solicitation").

Here, the Solicitation established that acceptability on Criteria 2, 3, and 4 was the path to Phase 2. *See* Tab 7a at 102. RAS was screening for competence—at no cost and with no limit on the number of participants that could advance—and it advanced every offeror that passed. *See* Tab 57 at 1577-78. [redacted]

There is accordingly no independent impediment that would have kept Saildrone out of Phase 2 notwithstanding RAS's evaluation errors. Saildrone has shown prejudice. Evaluated under the criteria the Solicitation stated and as RAS applied them to the awardees, Saildrone had a substantial chance of being found acceptable and advancing to the MUSV Test Event.

[redacted]

## V. The Evaluation Defeats § 4022(b)(2) and the Competitive Predicate for the $2.1 Billion in Follow-On Awards

By narrowing the field and excluding Saildrone through an irrational and unfair evaluation, RAS has compromised the competitive foundation on which the Navy's $2.1 billion follow-on MUSV opportunity rests. Section 4022(b)(2) provides that, "[t]o the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects." 10 U.S.C. § 4022(b)(2). That command is mandatory. A "contracting officer d[oes] not have unbridled discretion" because the word "shall" "denotes the imperative" and the word "practicable" means "'possible to practice or perform' or 'capable of being put into practice, done, or accomplished: feasible.'" *Cf. SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547, 1553-54 (Fed. Cir. 1988) (interpreting regulation requiring that "the contracting officer shall obtain competition to the maximum extent practicable for the repurchase … "). The word "maximum" was a "deliberate choice by Congress" and thus requires the agency not to "ignore or superficially comply" with its obligation to use competitive procedures. *Cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 267, 269 (Fed. Cl. 2016) (interpreting language in 10 U.S.C. § 2377(a), now 10 U.S.C. § 3453, that "[t]he head of an agency shall ensure that, to the maximum extent practicable …"). In this context, the agency's obligation to maximize competitive procedures precludes it from, at a minimum, rendering an evaluation that is arbitrary and capricious because the agency applied unstated evaluation criteria or applied the criteria unevenly. *See Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 182 (Fed. Cl. 2022) (evaluating, in an OT bid protest asserting claims grounded in § 4022, whether agency "inappropriately waived or relaxed" solicitation requirements).

As explained in Parts I-III, *supra*, RAS violated its obligation to maximize competitive procedures by applying unstated criteria and advancing offerors who provided substantially the

[redacted]

same or even lesser responses [redacted] while finding Saildrone unacceptable. The consequences of RAS's error reach beyond the Test Event. The prototype-phase competition is the predicate for any follow-on production awarded "without the use of competitive procedures." 10 U.S.C. § 4022(f)(2); *see also Hydraulics*, 161 Fed. Cl. at 176. The Solicitation itself reinforced the competition the statute demands. It imposed no limit on the number of prototype OTs, and RAS announced its "intent is to qualify as many MUSV vendors as we can." ECF No. 73 ("Am. Compl.") ¶ 39. With no cap on awardees, negligible cost, and an express goal of qualifying as many vendors as possible, excluding a qualified, proven offeror on a flawed evaluation cannot be reconciled with the statute's command to maximize competition. Tab 7a at 92, 104. RAS's actions undermined both the OT prototype statute and this Solicitation's intended structure.

## VI. Saildrone Is Entitled to Injunctive Relief

A permanent injunction is warranted where, as here, "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of the hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.'" *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 194 (Fed. Cl. 2015) (citation modified). For the reasons explained, Saildrone will prevail on the merits, and easily satisfies the remaining requirements for injunctive relief.

### A. Saildrone Will Suffer Irreparable Harm Absent a Permanent Injunction

A plaintiff suffers irreparable harm when it lacks "an adequate remedy in the absence of an injunction." *Lab'y Corp. of Am. Holdings v. United States*, 108 Fed. Cl. 549, 568 (Fed. Cl. 2012). "[E]conomic harm suffered from the loss of an opportunity to fairly compete for a government contract constitutes, in many if not most cases, irreparable harm." *HP Enter.*, 104

[redacted]

Fed. Cl. at 245 n.13; *see id.* at 245 (collecting cases). Further, "the loss of the contract represents not only irreparable injury in terms of lost profit, but also in terms of lost experience working with the government." *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 385 (Fed. Cl. 2014). Saildrone will suffer such harm absent a permanent injunction directing the Government to take all steps necessary for its immediate participation in the Test Event and enjoining the Government from awarding more than $1.5 billion in follow-on production contracts.

The harm here is extreme. This Solicitation is the Navy's entry into an unmanned fleet and towards the autonomous systems that will play a central role in future conflicts, transforming the Navy for years to come. Without an injunction, Saildrone loses the opportunity to perform follow-on production contracts for the Navy, earn the revenue and profits resulting from contract performance, ensure its technology and products are widely used by the Navy in this Solicitation and future USV efforts, and gain additional experience working with the Government. Indeed, a core component of this Solicitation was showcasing one's vessel and providing RAS with performance data. Tab 7a at 103; Tab 7f at 124-63. Successful Test Event participants become eligible for follow-on production in a fleet the Navy plans to grow to 39 MUSVs by FY2027 and more than double by FY2031. Am. Compl. ¶¶ 25-26; *see also* Tab 5 at 78. Awardees thus stand to capture not only a share of the $2.1 billion appropriated for MUSVs but the incumbency advantages that come with being first in a nascent market. *HP Enter.*, 104 Fed. Cl. at 245 (incumbent's "loss of competitive advantage in the follow-on procurement" constituted irreparable harm). Moreover, by its operational record, Saildrone is the field's most proven competitor. Its exclusion from the Test Event suggests to the Navy, allied governments, and commercial customers that Saildrone is no longer a leader in its field, when its exclusion actually resulted from a flawed evaluation.

[redacted]

### B. The Balance of Hardships Weighs in Favor of Granting Injunctive Relief

"This court tends to weigh the balance of hardships factor in favor of the protestor who has succeeded on the merits, unless specific facts counsel otherwise." *BayFirst*, 102 Fed. Cl. at 696. No facts counsel otherwise here—the balance of hardships tips decisively in Saildrone's favor.

Saildrone's requested relief imposes virtually no burden on the Government. To the extent the Government argues it will be harmed by delay, this Court has recognized that "only in an exceptional case" would "delay alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." *Samsara*, 169 Fed. Cl. at 332 (bracket omitted). Importantly, extending the Government's timeline for spending appropriated MUSV funds to account for corrective action, including the time to allow Saildrone to complete the Test Event if awarded a prototype OT, is the *only* way to protect fair competition. "[D]elay and administrative burdens associated with" requiring reevaluation of Saildrone's Proposal and "requiring the agency to take curative actions are, of course, problems of defendant's own making." *Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (Fed. Cl. 2008). And those burdens "may be ameliorated by a properly-framed injunction that … is narrowly tailored to the problems encountered." *Id.*

The relief sought is narrowly tailored. Saildrone does not ask this Court to cancel any award, halt the procurement, delay the Test Event for awardees, or interrupt RAS's ongoing preparations with participants. No completed performance would be unraveled, and no awardee would lose its agreement. The relief sought costs the Government almost nothing: it pays nothing for participation in the on-water MUSV Test Event beyond a *de minimis* $10,000 payment for attending a conference, and the $15,000,000 fee is earned only after the company successfully completes the Test Event. Tab 7a at 92-93, 104. Reserving a portion of the $2.1 billion is a temporary measure that preserves Saildrone's ability to fully and fairly compete for a follow-on

[redacted]

production contract or transaction while leaving the Government free to contract with others.

The harm to Saildrone meaningfully exceeds that potential burden. Even if the Government desires immediate production of MUSVs, awardees could not possibly build the 39-vessel fleet in the next few months. The Solicitation itself contemplated phased production, requesting modeling for purchase of five and ten vessels. Tab 7a at 97; Tab 7h at 168. A fleet of that scale could not be built in the few months remaining in the fiscal year. As a result, the short time it takes RAS to reevaluate Saildrone's Proposal and allow it a full and fair opportunity to compete in the Test Event for a follow-on production contract will not impair RAS's ability to allocate funds for future fleet production or build its autonomous fleet. If anything, the relief advances the Government's objectives, given Saildrone's demonstrated readiness to meet the minimum vessel production demands, as well as surge requests. *See* Tab 41 at 1204-13.

### C. The Public Interest Weighs in Favor of Granting Injunctive Relief

This Solicitation will shape the Navy's unmanned fleet for years to come, and the public has every interest in ensuring that outcome is decided by fair, rule-bound competition. The public interest overwhelmingly favors injunctive relief. "[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (Fed. Cl. 2000). Likewise, there is a "manifest" public interest in ensuring the Government follows proper contracting procedures. *See id.* An agency that announces its intent "to qualify as many MUSV vendors as we can," Am. Compl. ¶ 39, and then disqualifies the field's most proven USV provider under criteria it never published and never applied to anyone else, disserves the public interest it invoked.

[redacted]

The public's interest in a fair and competitive procurement process demands reevaluation of Saildrone's Proposal. No alternative will adequately protect the fairness and integrity of the procurement process. RAS indicated its intent "to qualify as many MUSV vendors as we can." Am. Compl. ¶ 39. "[T]hat goal is furthered by ensuring that all [acceptable] proposals are included" in the Government's assessment of follow-on production contracts. *L-3 Commc'ns*, 83 Fed. Cl. at 661. Having additional qualified shipbuilders competing for MUSV production advances—rather than undermines—the Government's national security goals to field a robust MUSV fleet in the next year. *Cf. Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 158 (Fed. Cl. 2020) (noting in bid protest implicating national security that ensuring "the procurement was properly conducted … serves the same ends as those that defendant has thus far worked so hard to achieve").

The public interest reaches further. The public has a strong interest in the "integrity" of a maximally competitive process for this privately funded naval development program. *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 494 (Fed. Cl. 2012) (granting injunctive relief where "the interests of national defense and national security d[id] not prevail over upholding the integrity of the procurement process"). Because offerors design, build, and test their vessels at their own expense, the Government obtains the best available unmanned-surface-vessel technology at no development cost to taxpayers. Tab 7a at 92-93, 104. Excluding the field's most operationally proven competitor on a flawed evaluation deprives the public of that benefit and risks the sub-optimal use of the billions of dollars of public monies appropriated for this purpose.

Granting relief serves the public interest in developing a diverse and resilient naval industrial base. *See* Am. Compl. ¶ 27 (expressing White House preference for geographic diversity in American shipbuilding, including in the Great Lakes region). Saildrone's Proposal supplies that

[redacted]

diversity, and diversity among the shipyards and maritime-technology suppliers serving the Navy bolsters national security. A broader supplier base reduces dependence on a handful of incumbent yards, guards against single points of failure, and preserves the surge capacity the Navy will need to field the explosive growth of the unmanned fleet. Am. Compl. ¶¶ 25-26. Saildrone would build SPECTRE with FMG at its Wisconsin shipyards, expanding the unmanned-vessel supplier base into the Great Lakes region and supporting skilled manufacturing jobs there. Tab 41 at 1204. [redacted] Fostering competition, procurement integrity, geographic diversification, and industrial resilience serves the public interest well beyond Saildrone's own stake in this procurement.

## CONCLUSION

For the foregoing reasons, this Court should grant Saildrone's motion for judgment on the administrative record and grant the following relief:

(1) Declare that RAS's evaluation of Saildrone's Proposal and exclusion from further consideration were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

(2) Enter permanent injunctive relief requiring RAS to reevaluate Saildrone's Proposal consistent with the Solicitation, RAS's application of the Solicitation's requirements to the awardees, and the Court's decision;

(3) Order RAS, if Saildrone's Proposal is found acceptable under a lawful evaluation, to reinstate Saildrone to the competition for a prototype OT agreement and participation in the on-water MUSV Test Event;

(4) Direct RAS to take all necessary steps to ensure that Saildrone can compete equally and fairly with the awardees, including enjoining RAS from awarding more than $1.5 billion of the $2.1 billion allocated in follow-on production contracts or transactions unless and until RAS has completed lawful corrective action;

(5) Award Saildrone its reasonable attorneys' fees and costs as permitted by law; and

(6) Grant such other and further relief as the Court deems just and proper.

[redacted]

Dated: August 10, 2026

Respectfully submitted,

By: */s/ Laura M. King*

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2026, I caused a copy of this motion to be served by electronic mail on counsel of record for all parties as identified below in accordance with RCFC 5(b) and the Court's Amended General Order No. 2026-01:

Alexander Orlando Canizares
Vinson & Elkins LLP
acanizares@velaw.com

*Counsel of Record for Plaintiff Blue Water Autonomy, Inc.*

Douglas G. Edelschick
United States Department of Justice
douglas.edelschick@usdoj.gov

*Counsel of Record for Defendant United States of America*

John Hunter Bennett
Covington & Burling LLP
hbennett@cov.com

*Counsel of Record for Defendant-Intervenor HII Unmanned Systems, Inc.*

Jon W. Burd
Wiley Rein LLP
jburd@wiley.law

*Counsel of Record for Defendant-Intervenor Saronic Technologies, Inc.*

Michael J. Anstett
Fried, Frank, Harris, Shriver & Jacobson LLP
michael.anstett@friedfrank.com

*Counsel of Record for Defendant-Intervenor Leidos, Inc.*

[redacted]

Dated: August 10, 2026

Respectfully submitted,

By: */s/ Laura M. King*

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]