[redacted]

# In the United States Court of Federal Claims

**BID PROTEST**
(Filed: August 10, 2026)

**BLUE WATER AUTONOMY, INC., *et al.*,**

*Plaintiffs,*

v.

**THE UNITED STATES**,

*Defendant,*

and

**HII UNMANNED SYSTEMS, INC., *et al.*,**

*Defendant-Intervenors.*

Case Nos. 26-936, 26-944

Judge Philip S. Hadji

[redacted]

**Redacted Version**

## PLAINTIFF BLUE WATER AUTONOMY, INC'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND SUPPORTING MEMORANDUM

Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com

*Lead Attorney for Plaintiff Blue Water Autonomy, Inc.*

*Of Counsel:*

Tyler E. Robinson
Christopher M. O'Brien
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: trobinson@velaw.com
Email: cobrien@velaw.com

[redacted]

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INTRODUCTION** ........ 1

**QUESTIONS PRESENTED** ........ 4

**STATEMENT OF THE CASE** ........ 4

**I. Statement of Facts** ........ 4

**A. The Navy's "Acquisition Strategy Shift" From its Modular Attack Surface Craft ("MASC") Competition to MUSV** ........ 4

**B. The MUSV Solicitation** ........ 6

**C. Blue Water Timely Submits its Proposal** ........ 10

**D. The Navy's Evaluation and Award Decision** ........ 12

**E. Nearly a Month Later, the Navy Provides a Debriefing to Blue Water** ........ 14

**ARGUMENT** ........ 16

**I. Legal Standard** ........ 16

**II. The Navy's Evaluation Record of Blue Water is Insufficient to Provide for Judicial Review** ........ 17

**III. The Navy's Evaluation of Blue Water Under Criteria 2 Was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to the Competition Required by Statute** ........ 21

**A. The Navy's Finding That Blue Water is Unacceptable Under Criteria C2-1 is Contrary to the Solicitation and the Navy's Own Findings** ........ 21

**B. The Navy's *Post Hoc* Rationales in its Debriefing For Finding Blue Water Unacceptable Under Criteria 2 Are Irrational, Arbitrary and Capricious** ........ 23

**C. The Navy Improperly Used Unstated Evaluation Criteria to Arbitrarily Hold Blue Water to a Different Standard** ........ 28

**D. The Navy Failed to Use Competitive Procedures In Violation Of 10 U.S.C. § 4022(b)(2)** ........ 30

**E. Blue Water Was Prejudiced By The Navy's Arbitrary And Capricious Evaluation Under Criteria 2** ........ 32

**IV. The Navy's Evaluation Under Criteria 4 Applied Unstated Evaluation Criteria, Departed From The Terms Of The Solicitation, And Violated 10 U.S.C. § 4022** ........ 32

**A. The Navy's Evaluation Under Criteria 4 Lacks A Rational Basis** ........ 33

**B. The Navy's Flawed Evaluation Constitutes A Failure To Use Competitive Procedures In Violation Of 10 U.S.C. § 4022(b).** ........ 38

**C. The Navy's Irrational Evaluation Under Criteria 4 Prejudiced Blue Water** ........ 38

[redacted]

**V. Blue Water Is Entitled To Permanent Injunctive Relief** ........................................ 39
**CONCLUSION** ........................................................................................................... 40

[redacted]

## TABLE OF AUTHORITIES

**Cases**

*22nd Century Techs., Inc. v. United States*,
176 Fed. Cl. 389 (2025) .......... 26

*360Training.com, Inc. v. United States*,
106 Fed. Cl. 177 (2012) .......... 22, 28, 33

*ACC Constr. Co. v. United States*,
No. 10-720C, 2011 WL 7102301 (Fed. Cl. Dec. 29, 2011) .......... 20

*Advanced Tech. Sys. Co. v. United States*,
177 Fed. Cl. 443 (2025) .......... 17, 18, 20, 21

*Air Borealis Ltd. P'ship v. United States*,
167 Fed. Cl. 370 (2023) .......... 23

*Ala. Aircraft Indus., Inc.—Birmingham v. United States*,
586 F.3d 1372 (Fed. Cir. 2009) .......... 16, 33

*Arch Chems., Inc. v. United States*,
64 Fed. Cl. 380 (2005) .......... 18

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004) .......... 16, 21

*Banknote Corp. of Am., Inc. v. United States*,
56 Fed. Cl. 377 (2003) .......... 21, 22, 37

*Bannum, Inc. v. United States*,
404 F.3d 1356 (Fed. Cir. 2005) .......... 16

*BayFirst Sols., LLC v. United States*,
102 Fed. Cl. 677 (2012) .......... 18

*Bluewater Mgmt. Grp., LLC v. United States*,
150 Fed. Cl. 588 (2020) .......... 22

*Caddell Constr. Co. v. United States*,
111 Fed. Cl. 49 (2013) .......... 40

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 17

*Citizens to Pres. Overton Park v. Volpe*,
401 U.S. 402 (1971) .......... 17, 20

*CliniComp Int'l v. United States*,
117 Fed. Cl. 722 (2014) .......... 17

*Cosette Pharms., Inc. v. United States*,
179 Fed. Cl. 740 (2025) .......... 25

[redacted]

*Dell Fed. Sys., L.P. v. United States*,
906 F.3d 982 (Fed. Cir. 2018) .......... 39

*DigiFlight, Inc. v. United States*,
165 Fed. Cl. 588 (2023) .......... 17

*E.W., Inc. v. United States*,
No. 11-455C, 2012 WL 4465228 (Fed. Cl. Sept. 26, 2012) .......... 24

*Fort Carson Support Servs. v. United States*,
71 Fed. Cl. 571 (2006) .......... 20

*Frawner Corp. v. United States*,
161 Fed. Cl. 420 (2022) .......... 22, 29, 37

*Fulcra Worldwide, LLC v. United States*,
97 Fed. Cl. 523 (2011) .......... 28

*Glenn Def. Marine (Asia), PTE Ltd. v. United States*,
720 F.3d 901 (Fed. Cir. 2013) .......... 16

*Golden IT, LLC v. United States*,
177 Fed. Cl. 118 (2025) .......... 18

*IAP Worldwide Servs., Inc. v. United States*,
159 Fed. Cl. 265 (2022) .......... 20, 39, 40

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) .......... 16

*Lab'y Corp. of Am. Holdings v. United States*,
116 Fed. Cl. 643 (2014) .......... 17, 18

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 16, 17

*Off. Design Grp. v. United States*,
951 F.3d 1366 (Fed. Cir. 2020) .......... 37

*OTI Am., Inc. v. United States*,
68 Fed. Cl. 646 (2018) .......... 32, 39

*Palantir USG, Inc. v. United States*,
129 Fed. Cl. 218 (2016) .......... 30, 38, 39

*Palantir USG, Inc. v. United States*,
904 F.3d 980 (Fed. Cir. 2018) .......... 17, 30

*Raytheon Co. v. United States*,
121 Fed. Cl. 135 (2015) .......... 18

[redacted]

*Redland Genstar, Inc. v. United States*,
39 Fed. Cl. 220 (1997) ........ 37

*Rig Masters, Inc. v. United States*,
70 Fed. Cl. 413 (2006) ........ 20

*Samsara Inc. v. United States*,
169 Fed. Cl. 311 (2024) ........ 22, 29, 37

*Sierra Club v. Gorsuch*,
715 F.2d 653 (D.C. Cir. 1983) ........ 17

*SMS Data Prods. Grp., Inc. v. United States*,
853 F.2d 1547 (Fed. Cir. 1988) ........ 30, 38

*Sys. Stud. & Simulation, Inc. v. United States*,
152 Fed. Cl. 20 (2020) ........ 18

*Tech Sys., Inc. v. United States*,
98 Fed. Cl. 228 (2011) ........ 23, 24, 26

*Telesto Grp., LLC v. United States*,
176 Fed. Cl. 711 (2025) ........ 30, 38

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005) ........ 17, 19

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) ........ 37

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) ........ 33

*WHR Grp., Inc. v. United States*,
115 Fed Cl. 386 (2014) ........ 40

**Statutes**

5 U.S.C. § 706 ........ 16

10 U.S.C. § 4022 ........ 1, 33, 38

10 U.S.C. § 4022(a) ........ 30, 31

10 U.S.C. § 4022(b) ........ 30

10 U.S.C. § 4022(b)(2) ........ 3, 30, 38

10 U.S.C. § 4022(e)(5) ........ 7, 29, 31

28 U.S.C. § 1491(b)(4) ........ 16

National Defense Authorization Act for Fiscal Year 2026,
Pub. L. No. 119-60, 139 Stat. 718 (2025) ........ 31, 39

[redacted]

## Other Authorities

Department of the Navy, U.S. Navy Shipbuilding Plan 28 (May 2026),
https://bit.ly/45fcL0R........................................................................................................ 6

## Rules

RCFC 52.1 ........................................................................................................................ 1, 16

[redacted]

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, Plaintiff, Blue Water Autonomy, Inc. ("Blue Water"), respectfully requests that the Court grant its motion for judgment on the administrative record.

**INTRODUCTION**

This protest arises out of the Department of the Navy's ("Navy" or the "Agency") flawed and unequal evaluation of Blue Water in connection with the Navy's Request for Prototype Proposals No. N00024-26-R-6326 (the "RPP" or "Solicitation") for Medium Unmanned Surface Vessels ("MUSVs"). The Navy's Portfolio Acquisition Executive ("PAE"), Robotic and Autonomous Systems ("PAE RAS") sought to award one or more prototype other transaction agreements ("OTAs") under the authority of 10 U.S.C. § 4022 to perform an MUSV autonomy and on-water vessel performance test in anticipation of a follow-on procurement. Blue Water—a robotics-first maritime autonomy company focused on developing autonomous ships for open-ocean use by the Navy—was excluded from further consideration for a prototype OT agreement. The Navy irrationally determined that Blue Water's proposal was "Unacceptable" under two evaluation criteria and denied it the opportunity to conduct an at-sea test. Because the Navy's determination to exclude Blue Water from consideration was arbitrary, capricious, and not in accordance with statute, and because the Navy's errors caused substantial prejudice to Blue Water, the Court should sustain this protest and award permanent injunctive relief as set forth below.

It is black-letter law that an agency must articulate and document its evaluation decisions and that it is the ***contemporaneous*** record that is what matters for judicial review. The contemporaneous record contains no technical evaluations, worksheets, or other substantive analysis of Blue Water's proposal. The Navy's decision to exclude Blue Water relies on its rating

[redacted]

of Blue Water's proposal as "Unacceptable" under RPP Criteria 2, Vessel Solution Design, and Criteria 4, Test Execution, but neither of these ratings is justified. The only contemporaneous documentation of the Navy's evaluation of Blue Water consists of sparse and conclusory notations in two documents (Tab 57 and Tab 114) that fail to provide for meaningful judicial review. They also contradict the terms of the RPP, are refuted by the Navy's own findings, and disregard information in Blue Water's proposal.

The Navy's three-page debriefing to Blue Water issued nearly a month after its award decision includes entirely new rationales that appear nowhere in the evaluation record. Such *post hoc* reasoning is insufficient to justify an agency's actions under this Court's case law, and the Court should disregard the debriefing altogether. But even if the Court considers it, the Navy's debriefing further establishes the arbitrary and capricious nature of the Navy's evaluation. The Navy found that Blue Water [redacted] the "Vessel Range" sub-criterion under Criteria 2 based on [redacted] But the Navy found Blue Water passed the "Vessel Range" sub-criterion, as evidenced by its proposal. The Navy's rating is also inconsistent with the RPP, according to which an offeror is Unacceptable if its proposed MUSV design meets or exceeds nine stated Threshold Requirements—none of which [redacted] The Navy thus improperly applied unstated evaluation criteria to Blue Water by elevating new terms to the Acceptable/Unacceptable criteria. Further, the Navy's contemporaneous findings refute its rating that Blue Water's vessel [redacted]. The Navy found that Blue Water ***passed*** the requirement that it be capable of fielding an operational vessel in FY 2027, and credited Blue Water with being able to field five to ten operational vessels in FY 2027. And for Criteria 3, it rated Blue Water Acceptable, *i.e.*, it "fully demonstrates feasibility and manufacturing readiness[.]" *Id.* The Navy's irrational, after-the-fact arguments thus fail.

[redacted]

The Navy's Criteria 4 evaluation of Blue Water is equally unsustainable. In support of its Unacceptable rating for Blue Water under Criteria 4, the Navy asserted in its debriefing that the Blue Water test vessel's [redacted] differed from those of Blue Water's proposed production vessel and thus were not "representative." But neither of those criteria is contained in the Navy's own Test Plan, Attachment J-5, which told offerors that it contained "all test criteria," methodologies, scenarios, and data-collection requirements for MUSV prototype testing. The test plan required by Attachment J-5 evaluates autonomy, perception, vessel safety, and navigation capabilities—not [redacted]. Blue Water's test vessel [redacted] that the test plan is to actually evaluate. By disqualifying Blue Water based on vessel differences that the RPP did not identify as evaluation criteria, the Navy improperly applied an unstated standard. The Navy also treated Blue Water unequally. While the Navy found that Blue Water's [redacted] was "unrepresentative" of Blue Water's proposed vessel, it ignored the fact that Leidos [redacted] from Leidos's test vessel and instead rated Leidos as Acceptable under Criteria 4. The Navy's disparate evaluation thus cannot stand.

The Navy's evaluation and exclusion of Blue Water also violated 10 U.S.C. § 4022(b)(2), which requires the use of competitive procedures to the maximum extent practicable for prototype OT agreements. Although the Navy declared that MUSV would be conducted as a full and open competition, it contravened the statutory mandate in § 4022(b)(2) by departing from the RPP's terms, applying undisclosed evaluation criteria, disregarding material information in Blue Water's proposal, and evaluating Blue Water using a different standard compared to other offerors. These actions deprived Blue Water of the level playing field that competitive procedures require and undermined the statutory and competitive foundation of the MUSV prototype competition.

[redacted]

Blue Water was prejudiced by these errors. The Navy rated Blue Water Acceptable under Criteria 1 and 3, but the erroneous Criteria 2 and Criteria 4 ratings unfairly denied Blue Water the opportunity to proceed to the next phase of the competition. Had the Navy evaluated Blue Water under the RPP's stated requirements and treated it equally as required under basic competitive procedures, Blue Water would have had a substantial chance of receiving an OT award.

The Court should therefore grant Blue Water's motion, set aside the Navy's evaluation and exclusion decision, and enter a permanent injunction as requested below.

## QUESTIONS PRESENTED

1. Whether the Navy's assignment of an "Unacceptable" rating to of Blue Water's proposal under Criteria 2 was arbitrary and capricious and otherwise contrary to law.
2. Whether the Navy's assignment of an "Unacceptable" rating to Blue Water's proposal under Criteria 4 was arbitrary and capricious and otherwise contrary to law.
3. Whether the Navy's determination to exclude Blue Water from the OTA competition was contrary to 10 U.S.C. § 4022 and Section 130 of the FY 2026 National Defense Authorization Act ("NDAA").
4. Whether Blue Water was prejudiced by the Navy's actions.
5. Whether permanent injunctive relief to remedy the Navy's errors is appropriate.

## STATEMENT OF THE CASE

### I. Statement of Facts

#### A. The Navy's "Acquisition Strategy Shift" From its Modular Attack Surface Craft ("MASC") Competition to MUSV

The Navy initiated the Modular Attack Surface Craft ("MASC") program in July 2025 as part of a generational investment in unmanned surface vessels ("USVs") and fleet modernization

[redacted]

effort that moved away from large USV programs to focus on medium-sized USVs. AR 71. On July 31, 2025, the Navy released the MASC OTA solicitation, seeking to develop low-cost, rapidly deployable uncrewed vessels capable of carrying large, modular containerized payloads. *See id.*

Blue Water submitted a proposal for MASC and in November 2025, the Navy notified Blue Water that it was one of seven companies down-selected for the final phase of award. *Id.* Blue Water proposed its Liberty vessel [redacted]. Compl. ¶¶ 3, 31. The Navy initially intended to award an agreement to Blue Water and six other companies by the end of February 2026. Tab 5, AR 71; Tab 85 ("Phase III") (reflecting Blue Water as among the seven Phase III MASC offerors). But after deciding to pause the MASC program, the Navy announced in March 2025 that MASC was being cancelled altogether. Tab 5, AR 71–72. Almost immediately, the Navy announced MUSV. AR 72–73.

The MUSV solicitation arose out of the Navy's "acquisition strategy shift" consisting of "a strategic shift in [its] acquisition approach for unmanned surface vessels to accelerate the delivery of warfighting capability to the Fleet." Tab 5, AR 73. The Navy's "primary goal" is to award a prototype OT agreement "to one or more companies to perform a comprehensive MUSV autonomy and vessel performance test by the end of fiscal year 2026." Tab 5, AR 72. The MUSV prototype competition is intended to serve "as a direct, competitive down-select for a potential multi-vessel production and/or service contract with delivery of a production vessel in FY27." *Id.*

Under MUSV, the Navy plans "to have vessels available for Navy leasing or procurement in fiscal year 2027" and "to procure as many MUSV vessels in different configurations as required to meet Fleet needs." AR 78. The Navy's FY 2027 shipbuilding plan calls for "[a]ggressively pursuing advancements" in unmanned, semi-autonomous, and autonomous naval systems and commits "to build at scale USVs and [Unmanned Undersea Vehicles] to meet fleet demands."

[redacted]

Department of the Navy, U.S. Navy Shipbuilding Plan (May 2026) at 28.[1] According to the Navy, its "acquisition strategy for MUSV is directly related to the Navy's objective of revitalizing the defense and shipbuilding industrial base" and will use OT authority to "provide opportunities for new shipbuilding entrants" and new shipyards. *Id.* at 31. The plan calls for the delivery of 39 MUSVs in FY 2027 (including 36 MUSVs "procured in FY26[,]"), and the Navy intends to build its inventory of MUSVs to more than 80 by FY 2031. *Id.* at 56.

The Navy decided that MUSV would be conducted under "Full and Open competition for Prototype OT(s) for autonomy and performance testing." Tab 3, AR 53. The Navy relied on MASC for market research, noting that "[p]roposal submissions resulting from the MASC competition indicate there are multiple companies that can perform related autonomy and vessel performance requirements." AR 60; AR 77 (the Navy is "no longer interested in paying industry to build prototypes" and instead wants to leverage industry investments in "quickly tailoring existing solutions to meet the Navy's needs").

**B. The MUSV Solicitation**

On March 26, 2026, the Navy issued the MUSV RPP calling for the award of prototype OTAs for MUSVs that satisfy the Navy's vessel and autonomy requirements for transporting containerized payloads. Tab 7, AR 85–86; Tab 7a, AR 92; Tab 14.1, AR 251. The Solicitation defines "prototype project" as "proof of concept or model," a "pilot or novel application of commercial technologies for defense purposes," "agile development activity," and the "creation, design, development, demonstration of technical or operational utility, or combinations of the foregoing," and explains that a prototype "may be physical, virtual, or conceptual in nature." Tab

[1] Available at: https://bit.ly/45fcL0R (last accessed on Aug. 8, 2026).

[redacted]

14.1, AR 253; *see also* 10 U.S.C. § 4022(e)(5). The RPP is explicit that "MUSVs may be new construction and/or converted vessels." Tab 14.1, AR 251, 254.

The "competitive procedures" for the Solicitation consist of a two phase process: Phase 1 – proposals would be evaluated against the criteria specified in Section 4; and Phase 2 – companies would be selected for potential award of a prototype OT and invited to negotiate the terms of a prototype OT agreement. AR 251. Proposals needed to address four criteria: (1) Proposed Business Model; (2) Vessel Solution Design; (3) Manufacturing Readiness to Support Future Production of MUSV; and (4) A Plan for Test Execution to Complete an On-Water MUSV Test Event. AR 257.

**i. RPP Elements**

Criteria 1, as outlined in Section 3.2.1 (Proposed Business Model), requests pricing and delivery timelines under two alternative business models, a Contractor owned and Contractor operated ("COCO") model and a Government owned and Government operated ("GOCO") model. AR 257–58. For both business models, the MUSVs must "meet or exceed the threshold requirements and may meet or exceed the desired attributes." AR 257.

Criteria 2, Vessel Solution Design, requires a "summary of the MUSV production design and the test vessel" and offerors are directed to "propose an MUSV design that is a vessel with the ability to operate autonomously and carry containerized payloads." AR 258. Criteria 2 distinguishes between "MUSV Threshold Requirements" and "MUSV Desired Attributes." AR 258–59. The MUSV "***shall meet*** or exceed" nine Threshold Requirements" including "Vessel Range: 2500 nm [nautical miles] at 25 knots while carrying a 25 MT [metric ton] load on the payload deck in NATO STANAG 4194 Sea State 4" and "Field operational vessel in FY27." AR 258–59 (emphasis added). The RPP also lists nine "Desired Attributes" that, unlike the Threshold

[redacted]

Requirements, an MUSV "***may*** meet or exceed[.]" AR 159. The Desired Attributes include an offeror's "ability to field five (5) and ten (10) operational MUSVs in FY27" and that an offeror's autonomous system solution "enables integration with third party applications, modular upgrades, and component-level interoperability." AR 259.

Offerors were required to provide an overview of their vessel's autonomous capabilities and characteristics. AR 259–60. Under the heading "Vessel Characteristics Overview," the Solicitation directs offerors, among other things, to provide "[e]vidence of compliance with MUSV threshold requirements and desired attributes" and a "[d]esign history/maturity overview," and to "[d]emonstrate [that] maturity of the design enables fielding operational vessels in FY [2027]." AR 260.

For Criteria 3 (Manufacturing readiness to support the future production of MUSV), the Solicitation directs each offeror to "demonstrate it is ready to produce MUSV vessels to accomplish the offerors proposed business models in section 3.2.1., i.e., Model 1 and Model 2." AR 261. Offerors are further instructed to provide manufacturing and production details, including the "[m]aximum production capacity of proposed design per year for five (5) years." AR 261.

Criteria 4 focuses on testing. The Solicitation directs each offeror to "detail its planned execution of the scope in Attachment J-1 MUSV Statement of Work" by providing, among other things, a description of the vessel in placemat format, the earliest date for testing, a description of how the test asset is "representative of the MUSVs used in the offerors proposed business models in section 3.2.1," and how the small and medium test contacts will provide International Maritime Organization numbers, sustained speed, and required refueling. AR 262.

[redacted]

**ii. Evaluation Criteria**

Section 4 of the RPP describes the Government's evaluation approach. Criteria 1 is stated to be for informational purposes only, while Criteria 2–4 are evaluated on an Acceptable/Unacceptable basis. AR 262–63. An "Unacceptable" finding under any of the four criteria will result in the proposal being deemed unacceptable overall. AR 262.

The RPP explains that the Navy will assess proposals and notify offerors of selection to proceed or otherwise that its proposal was not selected to move forward. AR 262–63. The Acceptable/Unacceptable rating is narrowly defined in the RPP. For Criteria 2, an offeror is "Acceptable" if it "demonstrates the proposed MUSV Design ***meets or exceeds the threshold requirements***." *Id.* (emphasis added). A rating of "Unacceptable" is only assigned where the offeror "does not demonstrate the proposed MUSV Design meets all of the ***threshold requirements***." AR 263 (emphasis added). For Criteria 3, the Acceptable/Unacceptable rating turns on whether the offeror "fully demonstrates feasibility and manufacturing readiness (workload, workforce, facilities, production, quality control, and supply chain and supplier management plan specified in Section 3.2.3)" in executing its business model(s). *Id.* For Criteria 4, a rating of Acceptable or Unacceptable depends on whether the offeror "demonstrates the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrates a test asset that is representative of the MUSVs used in the offerors proposed business models in 3.2.1." *Id.*

The SOW in Attachment J-1 requires that the contractor "successfully complete the MUSV Test Event and meet or exceed all test criteria in Attachment J-5" and "perform the MUSV Test Event in accordance with [Attachment] J-5 MUSV test plan," with the test event and report completed by September 30, 2026. Tab 18, AR 335, 337. The SOW further provides for a Post

[redacted]

Award Conference during which the contractor outlines the details for the on-water test and requests approval from the Navy to use a test MUSV. AR 335 (§ 3.1), 337 (§ 7.2). Attachment J-5, the Test Plan, "establishes the objectives and measures of success for the Test and Evaluation (T&E) of the surrogate MUSV" system, and explicitly states that it "addresses ***all test criteria, methodologies, scenarios, and data collection requirements*** for MUSV prototype testing." Tab 16b, AR 277–78 (emphasis added).

Testing is organized into three phases—PSA Testing, COLREGS & Safety Scenarios, and Long Duration Mission—each evaluating autonomy, perception, and navigation capabilities. AR 278–317. The Navy's stated intention for testing was to "[e]valuate on-water autonomy testing on surrogate vessel, showing COLREG compliance" and to conduct "[e]ndurance validation, autonomy regression testing, and mission profile execution on production representative vessel." Tab 3, AR 56, 59.

**iii. The Navy Responds to Industry Questions**

On April 9, 2026, the Navy released responses to industry questions about the RPP. *See* Tab 14, AR 244–45; Tab 15, AR 266–69. Multiple offerors asked the Navy to define what makes a test vessel "representative" for purposes of the Test Plan, including which subsystems must match the production vessel. *See* Tab 55, AR 1570–71; Tab 15, AR 266–69. In each instance, the Navy declined to identify specific subsystem-matching requirements and instead directed offerors to the Test Plan and the SOW's post-award approval process for test vessels. AR 266, 268.

**C. Blue Water Timely Submits its Proposal**

Blue Water timely submitted a proposal to deliver its Liberty vessel [redacted]. *See* Tab 24, AR 439. Blue Water's proposal explains that [redacted]

[redacted]

[redacted] *Id.*

Blue Water explains that [redacted] and its [redacted] AR 443, 453; *see also* AR 439 ([redacted]), AR 449 (describing [redacted]). Blue Water [redacted] AR 450. In line with the Navy's desire for "modular upgrades," Tab 14.1, AR 259, Blue Water's [redacted] AR 452.

With respect to fielding an operational vessel in FY 2027, Blue Water explains: "The first Liberty vessel is currently under construction at [redacted], [redacted] AR 447. It further highlights that [redacted] *Id.*; *see also* AR 439, 442, 443, 447. In Section 3 of its proposal, Blue Water [redacted]

[redacted] AR 455.

For Criteria 4, Blue Water proposed [redacted] AR 465. As Blue Water explained, [redacted] *Id.* Indeed, [redacted] AR 465–66; *see also* Tab 24e, AR 487; Tab 24g, AR 491. The proposal explains that [redacted] AR 465. In particular, Blue Water's proposed test vessel [redacted] *See* Tab 24e, AR 487; Tab 24g, AR 491. Additionally, for the [redacted], the test vessel [redacted]. Tab 24, AR 449, 465–66; Tab 24e, AR 487; Tab 24g, AR 491.

**D. The Navy's Evaluation and Award Decision**

The Navy finalized its evaluation and made its award decision on May 13, 2026, selecting seven offerors to participate in at-sea testing: (1) Sea Machines Robotics, Inc. ("Sea Machines"); (2) Leidos, Inc. ("Leidos"); (3) Saronic Technologies ("Saronic"); (4) Galliano Marine Services, LLC ("Galliano"); (5) PacMar Technologies ("PacMar"); (6) Birdon America Inc. ("Birdon"); and (7) HII Unmanned Systems ("HII"). Tab 57, AR 1573, 1577. Two weeks later, on May 27, 2026,

[redacted]

the Navy informed Blue Water that it was not selected for testing. Tab 97d, AR 2327. The exact timing of the Navy's determination to exclude Blue Water is unclear from the record.

The Navy's contemporaneous documentation of its evaluation shows Blue Water was rated Unacceptable overall due to being rated Unacceptable under Criteria 2 and Criteria 4. AR 1577; AR 1585. Blue Water was rated Acceptable under Criteria 1 and 3. Tab 57, AR 1586.

The contemporaneous evidence of the Navy's evaluation of Blue Water is limited to just two documents: Tabs 114 and 57. The record contains no technical evaluations and no documents analyzing Blue Water's proposal in any detail, technical or otherwise. What little evidence exists shows that for Criteria 2, the Navy rated Blue Water Unacceptable under sub-criteria C2-1, "Vessel Range," which requires the vessel be capable of traveling 2500 nautical miles at 25 knots with a 25 MT load. Tab 57, AR 1581, 1585–86. The sole contemporaneous evidence of Navy's rationale for finding that Blue Water [redacted] the "Vessel Range" requirement are sparse notations. Tab 114 ([redacted]), AR 3031; Tab 57, AR 1586 ([redacted]).

The Navy found that Blue Water passed every other sub-criteria under Criteria 2, including the threshold requirement to "Field operational vessel in FY [2027]" and the desired attribute to "field five (5) and ten (10) operational MUSVs" in FY 2027. Tab 114, AR 3031; Tab 57, AR 1585; Tab 14.1, AR 259.[2] The Navy also found Blue Water to be Acceptable for Criteria 3. Such

[2] Blue Water received a "Pass" rating on eight of the nine "Desired Attributes" for Criteria 2. Tab 114 ("Criteria – Design."). Curiously, the column x in the spreadsheet titled "Desired Attributes" shows that several awardees were credited for having more "Desired Attributes" than the spreadsheet indicates they actually received. For example, the spreadsheet says Leidos received [redacted] Desired Attributes (column X, row 12), but it received a "Pass" for only [redacted] such Desired Attributes ([redacted]). Saronic received [redacted] Desired Attributes in column x but it "Passe[d]" only [redacted] ([redacted]). The Navy's apparent inflation of Desired Attributes for awardees in Tab 114 is yet another indication of unequal treatment.

[redacted]

a finding necessarily means Blue Water demonstrated manufacturing readiness to support the production of MUSVs, including between five and ten vessels per year for five years. Tab 114, AR 3032; Tab 57, AR 1582, 1585. For Criteria 4, the Navy rated Blue Water unacceptable based on the assertion that [redacted] due to [redacted] Tab 57, AR 1586; Tab 114, AR 3033.

**E. Nearly a Month Later, the Navy Provides a Debriefing to Blue Water**

Nearly one month later, on June 12, 2026, the Navy provided Blue Water an undated three-page debriefing stating that Blue Water was deemed Unacceptable under Criteria 2 and Criteria 4. *See* Tab 101a, AR 2382.[3] None of the Navy's rationales in the debriefing are reflected anywhere in the contemporaneous record apart from the cryptic, incomplete references noted above.

In explanation for its Unacceptable finding under Criteria 2, the Navy states in its debriefing that it found that [redacted] of Blue Water's "[redacted] is likely insufficient to support operational FY [2027] capability," citing the RPP "Vessel Characteristics Overview" directives that offerors should provide "[d]esign history/maturity overview" and "[d]emonstrate maturity of the design enables fielding of operational vessels in FY [2027]." AR 2382. According to the Navy's debriefing, [redacted]. *Id.*

The Navy's debriefing asserts that [redacted], but according to the Navy that [redacted]

[3] The index to the Administrative Record indicates "undated" as the date of the Navy's debriefing to Blue Water. Tab 0 at 8. The document itself curiously bears no date. Tab 101a, AR 2383–84. Nevertheless, the metadata to Tab 101a shows a "Created" date of June 12, 2026, which is when the Navy sent Blue Water an email, appended as Exhibit A, that it has omitted from the administrative record.

[redacted]

[redacted] because [redacted] *Id.* The Navy acknowledges that Blue Water proposes [redacted] but claims Blue Water [redacted] to optimize for unmanned operations [redacted] AR 2382–83. The Navy also asserts in the debriefing that [redacted] AR 2383. Based on these assertions, the Navy concluded [redacted] *Id.* At no point in the debriefing does the Navy mention the "Vessel Range" sub-criteria that it documented Blue Water as [redacted] in the contemporaneous evaluation. *Compare* Tab 101a, AR 2382–83, *with* Tab 57, AR 1586 *and* Tab 114, AR 3031.

For Criteria 4, the debriefing cites various reasons for rating Blue Water's proposal Unacceptable that appear nowhere in the contemporaneous record. It states that Blue Water's proposed test vessel was not "representative" of the production vessel because of [redacted]. Tab 101a, AR 2383–84. Specifically, the debriefing states that [redacted] AR 2384. It also states [redacted], and hypothesizes that [redacted]. AR 2384.

[redacted]

## ARGUMENT

### I. Legal Standard

In resolving a motion for judgment on the administrative record under Rule 52.1, the Court considers whether the moving party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1356, 1356–57 (Fed. Cir. 2005). The Court resolves issues of law and decides all necessary issues of fact based on the record. *Id.* at 1355–56.

This Court reviews bid protests under the Administrative Procedure Act ("APA") standards set forth in 5 U.S.C. § 706, which requires that an agency's decision be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (*cited in* 28 U.S.C. § 1491(b)(4)); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The Court may set aside an agency's action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001). A protester must also establish prejudice by showing that "there was a 'substantial chance' it would have received the contract award but for the errors[.]" *Bannum*, 404 F.3d at 1353.

An agency action lacks a rational basis and is therefore arbitrary and capricious when the agency "fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Ala. Aircraft Indus., Inc.—Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This Court has recognized that an agency's actions are arbitrary and capricious where the agency has failed to follow the terms of its solicitation. *See CliniComp Int'l v. United States*, 117

[redacted]

Fed. Cl. 722, 741 (2014) (an agency's "failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis" (citation omitted)). "Further, it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curium)). The agency must "articulate the reasons for its procurement decision including a rational connection between the facts found and the choices made." *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 652 (2014) ("Besides violating the RFQ, the VA insufficiently documented its technical evaluation."); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## II. The Navy's Evaluation Record of Blue Water is Insufficient to Provide for Judicial Review

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked *when it took the action*.'" *Advanced Tech. Sys. Co. v. United States*, 177 Fed. Cl. 443, 455 (2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *see Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971) (*post hoc* rationalizations do not constitute the record under APA review). Further, "[f]or agency action to be upheld, it must not only be explainable; it must also be explained." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 994 (Fed. Cir. 2018) (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 660-61 (D.C. Cir. 1983)); *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 609 (2023) (an "agency must explain its action with sufficient clarity to permit 'effective judicial review.'" (quoting *Timken*, 421 F.3d at 1355)). An agency fails this standard when "[its] findings or decisions are conclusory

[redacted]

or unexplained in the administrative record" because "the APA requires the government to show its work." *Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 136 (2025) (citation omitted).

This Court has oft noted it "must be wary of 'post-hoc rationale,' or 'any rationale that departs from the rationale provided at the time the procuring agency made its decision.'" *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015)). Indeed, unlike "[d]ocuments that pre-date or are contemporaneous with the relevant decision,' '[t]hose created after-the-fact are suspect, as courts . . . recognize that they must reject 'post hoc rationalizations' as a basis for the agency action." *Id.* (quoting *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 386 (2005)). Further, it "is well understood that the Court cannot review the agency's technical ratings through the lens of post-hoc rationalizations." *Lab'y Corp.*, 116 Fed. Cl. at 653 (citing *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 685 (2012)). "A conclusory rationale is not sufficient for purposes of APA review, as a Court must 'know what [an agency's] decision means before the duty becomes [the Court's] to say whether it is right or wrong." *Advanced Tech. Sys.*, 177 Fed. Cl. at 455–56. As explained in *BayFirst*, the Court "cannot approve technical ratings that run counter to the evidence in the record" and must review such technical ratings "not through the lens of post-hoc rationalizations, but by examining the contemporaneous evaluation record." 102 Fed. Cl. at 685. The Court may not affirm an "improperly justified evaluation rating simply because a rational basis for that evaluation rating might otherwise exist." *Id.*; *see also id.* at 687 n.13.

Here, the sparse record of the "decision-making process contemporaneous to the agency's decision" refutes the Navy's exclusion of Blue Water. *Advanced Tech. Sys.*, 177 Fed. Cl. at 455. The only contemporaneous evidence of the Navy's evaluation of Blue Water's proposal consists of bare and conclusory statements in two documents: Tab 57 and Tab 114. The Navy's RPP

[redacted] Results slides at Tab 57 contain color-coded charts indicating Blue Water's rating as "Unacceptable" under Criteria 2 and 4, Tab 57 at AR 1577, and specifically under C2-1 of Criteria 2 and C4-2 under Criteria 4. *Id.* at 1585; *see also id.* at 1590 (identifying Blue Water as "Unacceptable" under Criteria 2 without explanation); *id.* at 1592 (same for Criteria 4). AR 1586 excerpted below states: "Unacceptable 2-1 – [redacted] under Criteria 2 and "Unacceptable 4-2 – [redacted] under Criteria 4."

| Submission | Criteria 1 | Criteria 2 | Criteria 3 | Criteria 4 |
| --- | --- | --- | --- | --- |
| Blue Water | Acceptable - Delivered all required data in J-7 attachment. | [redacted] | Acceptable – Delivered all required data. Demonstrated capacity via Conrad shipbuilding. | [redacted] |

AR 1586.

Similarly cryptic and incomplete statements are repeated in an Excel file that was belatedly added to the record. Tab 114 at AR 3031, 3033 (Tab "Criteria 2 – Design," Cell E5 indicating [redacted]; Tab "Criteria 4 – Test," Row 3, Column E indicating [redacted]).

These bare and conclusory entries fail to "explain [the Navy's] action with sufficient clarity to permit 'effective judicial review.'" *Timken*, 421 F.3d at 1355. Nothing in Tab 57 or Tab 114 explains what [redacted] means, how that applies to Blue Water's proposed approach, or what aspects of Blue Water's design were deemed [redacted] and why. Nor is there any explanation for the Navy's determination that Blue Water's test vessel was "[redacted] under Criteria 4 apart from cursory notations indicating, without explanation, that [redacted] Tab 114 at AR 3033, attributes that are not related to the test criteria that offerors were required to meet.

[redacted]

The Navy's justifications in its debriefing provided to Blue Water weeks after the challenged decisions were made cannot cure this patent deficiency. Courts "must look to the decision-making process contemporaneous to the agency's decision, not *post hoc* justifications crafted for subsequent litigation." *Advanced Tech. Sys.*, 177 Fed. Cl. at 455. The Government thus "cannot rely on [a] justification provided in a post-award debrief to attempt to supply an unprovided contemporaneous rationale for a decision made at the time of award." *Id.* (citing *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 591–92 (2006) (while debriefings might yield party admissions, "any new explanations of the evaluation process made post-award are the sort of '*post hoc* rationalizations' that courts reject when offered by the government in bid protest cases" (citation omitted))); *see also IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 317 (2022) ("[T]he Court will not rely on the debriefing materials to make some sort of harmless error guess in favor of the government."); *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) (debriefing materials are "*post hoc* rationalizations" that the Court "cannot accept . . . as the basis for the decision"); *ACC Constr. Co. v. United States*, No. 10-720C, 2011 WL 7102301, at *2 (Fed. Cl. Dec. 29, 2011) (an "inadequate debriefing has no connection to a protester's chance of receiving an award already made"). In short, the Court routinely recognizes that debriefings are not reliable substitutes for contemporaneous evaluation evidence.

This Court should find so again here. The Navy's debriefing is not the technical evaluation at the time it was made and is not properly considered under the APA standard. *Overton Park*, 401 U.S. at 419. The Navy issued its debriefing to Blue Water on June 12, 2026, nearly a month after its decision to award prototype OTs to seven offerors, Tab 57, and undefined period of time after the actual technical evaluation was conducted. At the time of debriefing, the "overall tone of the agency-bidder relationship begins to shift from a cooperative competition to a potentially

[redacted]

adversarial dispute" and an agency "may be using the debrief as a final attempt to offer an explanation to ward off a potential protest ground that is raised by a disappointed offeror's debrief questions." *Advanced Tech. Sys.*, 177 Fed. Cl. at 455. Such is the case here.

Because the contemporaneous record cannot substantiate the Navy's rationale for excluding Blue Water or the Navy's compliance with statutory requirements, and because the Navy's debriefing materials cannot provide the substantive explanation for the Navy's actions, the Court should grant Blue Water's motion.

## III. The Navy's Evaluation of Blue Water Under Criteria 2 Was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to the Competition Required by Statute

"Even if a debrief could reflect the contemporaneous decision-making of an agency at the time of procurement" (which it cannot), the Navy's debriefing only emphasizes its errors in finding Blue Water Unacceptable for Criteria 2 and fails for several reasons. *Advanced Tech. Sys.*, 177 Fed. Cl. at 455 n.3. First, the Navy's assertion that Blue Water's [redacted] sufficient to field an operational vessel by FY 2027 is inconsistent with the stated evaluation criteria and contradicted by the Navy's explicit finding that Blue Water satisfied the requirement to field an operational vessel. Second, the Navy's purported findings apply unstated evaluation criteria that are found nowhere in Criteria 2. Third, in reaching this conclusion, the Navy disregards information in Blue Water's proposal and is generally antithetical to the concept of a "prototype" that is inherent to the MUSV transaction.

### B. The Navy's Finding That Blue Water is Unacceptable Under Criteria C2-1 is Contrary to the Solicitation and the Navy's Own Findings

"It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345. Although an agency may consider elements that are intrinsic to

[redacted]

stated evaluation criteria, "an agency's discretion to conduct its technical evaluation is not without its limits." *Id.* at 387; *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443 (2022). Chief among these limits, the evaluation "must be consistent with the factors and procedures outlined in the solicitation" and the agency "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 614 (2020) (citation omitted); *Banknote Corp.*, 56 Fed. Cl. at 383. And an agency's application of unstated evaluation criteria is arbitrary and capricious. *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024).

The Navy departed from the RPP's evaluation by finding Blue Water Unacceptable under criteria C2-1, "Vessel Range," based on a conclusory statement that the [redacted] Tab 114, AR 3031; Tab 57, AR 1581, 1585–86. The Solicitation provides for either an "Acceptable" or "Unacceptable" rating for Criteria 2 based solely on whether the offeror meets or exceeds the nine Threshold Requirements: (i) vessel range; (ii) payload capacity; (iii) autonomous performance; (iv) emissions control; (v) refueling; (vi) interior reservation; (vii) meeting ABS standards; (viii) seakeeping; and (ix) "Field operational vessel in FY27." Tab 14.1, AR 258–59, 262–63. There is no threshold requirement pertaining to [redacted] and the vessel range requirement only concerns capability of travelling 2,500 nautical miles at 25 knots with a 25 MT load. *See id.* The Navy's criticisms are not based on "Threshold Requirements" and are thus contrary to the RPP and an impermissible application of unstated evaluation criteria. *See 360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 189 (2012) (evaluation was irrational for improperly elevating "critical elements" into eligibility criteria).

The Navy's rating is further undermined by the fact that Blue Water satisfied the C2-1 requirement as its proposal narrative and MUSV Placemat, Tab 24e, AR 487, illustrate that its

[redacted]

vessel has a range of 2500 nautical miles at 25 knots with a 25 MT payload. Tab 24, AR 445 ([redacted]); Tab 24e, AR 487. The Navy's evaluation documents show that the Navy reviewed Blue Water's Placemat, *see* Tab 114, AR 3031, but nowhere does the Navy even acknowledge, much less attempt to rebut, Blue Water's demonstration that the Liberty vessel's range meets C2-1's "Vessel Range" requirements. The Navy ignored information in Blue Water's proposal showing the requirement is met, and its rating is thus arbitrary and capricious. Indeed, an award may be arbitrary and capricious "if the agency were to misunderstand factual information in a proposal that is not open to interpretation, or make findings that are internally inconsistent." *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247 (2011). And the Government may not misinterpret or ignore information in an offeror's proposal or make findings that are internally inconsistent. *Air Borealis Ltd. P'ship v. United States*, 167 Fed. Cl. 370, 385 (2023) ("When the government misinterprets a proposal, its decision may be arbitrary or capricious. . . . That is especially true when the misinterpretation has the effect of adding a criterion that does not appear in the solicitation or results in disparate treatment" (citation omitted)).

### C. The Navy's *Post Hoc* Rationales in its Debriefing For Finding Blue Water Unacceptable Under Criteria 2 Are Irrational, Arbitrary and Capricious

To the extent that the Court considers the Navy's *post hoc* debriefing rationale for its Criteria 2 rating (which it should not), the debriefing still does not support the Navy's evaluation. In the debriefing, the Navy makes a new argument that Blue Water was unacceptable because "[t]he evaluation of [redacted] is likely insufficient to support operational FY [2027] capability." Tab 101a, AR 2382–83 (emphasis added). The Navy further argues in its debriefing that: [redacted]

[redacted]

[redacted] *Id.* Conspicuously absent from the debriefing is any reference to the "Vessel Range" Threshold Requirement ostensibly serving as the basis for the Navy's Unacceptable rating in the contemporaneous evaluation. *See id.* Such a yawning gap in the evaluation record is itself sufficient for the Court to grant Blue Water's motion. But aside from the Navy advancing an entirely new rationale in the debriefing, the problems with the belated justifications are myriad.

***First***, the Navy's claims that the [redacted] and that Blue Water [redacted] are contradicted by its own evaluation conclusions and evidence in the contemporaneous record. As shown in Tabs 57 and 114, the Navy's cursory explanations for its Unacceptable rating of Blue Water under Criteria 2 did not "indicate[]" anything whatsoever about Blue Water's ability to "support operational FY 2027 capability" much less indicate that such ability was [redacted] *Id.* The Navy's passing notation "Unacceptable [C]2-1" does not mention any such criteria. Tab 57, AR 1586.

Even more problematic for the Government, the Navy's claim in its debriefing that Blue Water's [redacted] is "[redacted] support operational FY 2027 capability" is incompatible with the Navy's actual evaluation under Criteria 2 and Criteria 3. *See Tech Sys.*, 98 Fed. Cl. at 247 (decision may be arbitrary and capricious if based on "findings that are internally inconsistent"); *see also E.W., Inc. v. United States*, No. 11-455C, 2012 WL 4465228, at *1 (Fed. Cl. Sept. 26, 2012) (finding agency's evaluation irrational where it was "the product of inconsistent subjective

[redacted]

judgments"); *Cosette Pharms., Inc. v. United States*, 179 Fed. Cl. 740, 759 (2025) (arbitrary competitive range determination where the agency's reasoning was internally inconsistent).

Specifically, the Navy's debriefing is refuted by its documented finding that Blue Water ***satisfied*** the requirement to "[f]ield [an] operational vessel in FY [2027]" set forth in Criteria C2-9. Tab 57, AR 1581, 1585; *see also* Tab 14.1, AR 259. The evaluation record denotes "pass" in cell M5 corresponding to this requirement. Tab 114, AR 3031; Tab 57, AR 1585. The debriefing also neglects to mention that Blue Water satisfied the "Desired Attribute" to "field five (5) and ten (10) operational MUSVs in FY [2027]." Tab 114, AR 3031 (column O); *see* Tab 14.1, AR 259. Each of these findings is fully supported by Blue Water's proposal, which repeatedly explains how Blue Water and its shipyard, [redacted], are capable of producing [redacted] operational MUSV vessels in FY 2027—and thus can satisfy the Navy's requirements. *See* Tab 24, AR 439 ("[redacted]), AR 442 (Blue Water "and [redacted] can produce [redacted] in 2027"); *see also* AR 443, 447 (same). No evidence in the record indicates otherwise.

The Navy's conjecture in its debriefing that Blue Water's [redacted] Tab 101a, AR 2382–83 (emphasis added) is also contradicted by the Navy's evaluation findings under Criteria 3. Under Criteria 3, the Navy evaluated whether offerors demonstrated the "feasibility and manufacturing readiness" to support the production of up to 10 MUSVs, including the "[m]aximum production capacity of proposed design per year" under criteria C3-1. Tab 14.1, AR 261, 263; Tab 57, AR 1582. The debriefing fails to mention that the Navy found Blue Water "Acceptable" for every requirement under Criteria 3, ***expressly finding*** that it ***"demonstrated capacity via*** [redacted]" Tab 57, AR 1585–86; Tab 114, AR

[redacted] 3032. The Navy's conclusion that Blue Water satisfied Criteria 3's "feasibility and manufacturing readiness" is supported by the record. *See* Tab 24, AR 447 ("BWA is scheduled to field five operational MUSVs in FY27 through partnership with [redacted] and can scale production [redacted] (See Criteria 3) in FY27."), AR 455–64 (describing Blue Water's manufacturing readiness plan and construction schedule to produce up to [redacted]s in FY 2027).

The Navy's [redacted] rationale also ignores or misinterprets information in Blue Water's proposal that is not open to interpretation: Liberty [redacted] *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 397 (2025) (sustaining protest where the Government "conceded" that "the Agency was obligated to consider" statements in the protester's proposal but "also conceded that there is no evidence that the Agency did so"); *Tech Sys.*, 98 Fed. Cl. at 247 (an award may be arbitrary and capricious "if the agency were to misunderstand factual information in a proposal that is not open to interpretation, or make findings that are internally inconsistent"). Notwithstanding the Navy's findings, Blue Water's proposal explains in Section 2.2.4 that [redacted]. Tab 24, AR 453. Such modifications are [redacted]. AR 453, AR 439. It further explains: [redacted]

[redacted] *Id.* Such operation and testing reaffirms that Blue Water's vessel [redacted], refuting the Navy's contrary findings.

***Second***, the Navy's *post hoc* rationale for excluding Blue Water under Criteria 2 is contrary to the evaluation scheme for rating proposals set forth in the RPP. The debriefing states that section 3.2.2 of the RPP "requires proposals to provide 'Design history/maturity overview and previous employment if any,' and to 'Demonstrate maturity of the design enables fielding of operational vessels in FY27.'" Tab 101a, AR 2382. These references appear in items four and nine in the "Vessel Characteristics Overview" portion of Section 3.2.2, which lists nine items that offerors "shall provide" related to their vessel designs. *See* Tab 14.1, AR 260. But critically, these provisions are irrelevant to an offeror's acceptability under Criteria 2 because the items listed in the "Vessel Characteristics Overview" section are ***not Threshold Requirements***. *See id.* at AR 258–60. As noted above, under Criteria 2, an offeror "will be deemed unacceptable" and thus "not move forward for potential prototype OT award," only if the offeror "does not demonstrate the proposed MUSV Design ***meets all of the threshold requirements***." (emphasis added). The nine "Threshold Requirements" are in a separate section from the "Vessel Characteristics Overview" section, and the first item listed in the latter section is an instruction to provide "[e]vidence of compliance with MUSV threshold requirements and desired attributes." *Id.* at 260.

Also contrary to the Navy's debriefing assertions, the RPP does not call for an assessment of [redacted] of a vessel's meeting requirements; at the Acceptability phase, it simply calls for a pass/fail (Acceptable or Unacceptable) determination. Tab 14.1, AR 258–59, 262–63. To the extent that the Navy treated "Vessel Characteristics Overview" information as relevant to whether Blue Water was Acceptable/Unacceptable, the Navy deviated from the RPP and elevated certain evaluation criteria without disclosing as much to offerors, thereby depriving Blue Water of

[redacted]

a fair chance to compete for the award. *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 539 (2011) ("If an agency commits itself to a particular methodology in the solicitation, it must follow that methodology."); *see also 360Training.com*, 106 Fed. Cl. at 186.

### D. The Navy Improperly Used Unstated Evaluation Criteria to Arbitrarily Hold Blue Water to a Different Standard

The Navy's putative criticisms of Blue Water in its debriefing regarding [redacted] are deviations from the terms of the RPP and hold Blue Water's proposal to unstated, arbitrary evaluation criteria. Tab 101a, AR 2382–84.[4]

In any event, these criticisms are groundless. There is no requirement in the RPP (much less a Threshold Requirement) that an offeror's vessel [redacted], nor any Threshold Requirement relating to [redacted]. *See* Tab 14.1, AR 258–59. The Solicitation expressly provides that "MUSVs ***may be new construction*** and/or converted vessels." AR 251 (emphasis added), 259 ("[f]or conversions of existing vessels, all converted vessels [must] have the same or similar architecture"), 260 (permitting offerors to "convert existing vessels in lieu of new construction to provide MUSV capability"). The RPP does not require that vessels be [redacted], nor are there any Threshold Requirements that the vessels [redacted] *See* AR 258–63. Rather, offerors had to provide a "[p]roduction strategy plan" that included a "build strategy plan, shipyard facility scheduling, module laydown plan, and scheduling" to produce the ***prototype*** vessel. AR 261–62. Declaring Blue Water's vessel "Unacceptable" on the basis that [redacted]

---

[4] There is no evidence of the Navy's criticisms reflected anywhere in the contemporaneous evaluation documents. *See* Tabs 57 & 114. That is reason alone to disregard such after-the-fact justifications as explained above.

[redacted], is a blatant a violation of the RPP, the purpose of which was to field a new class of autonomous vessels for the Navy, not only pre-fabricated existing vessels. The Navy's actions constitute an improper application of unstated evaluation criteria and are arbitrary and capricious. *Samsara Inc.*, 169 Fed. Cl. at 319.

Moreover, the Navy's arbitrary and unexplained conception of [redacted] is contrary to the definition of "prototype project" set forth in the Solicitation and statutory requirements related to MUSVs. The RPP's definition of "prototype project" includes a "proof of concept or model," a "pilot or novel application of commercial technologies for defense purposes," "agile development activity," and the "creation, design, development, demonstration of technical or operational utility, or combinations of the foregoing." Tab 14.1, AR 253; *see also* 10 U.S.C. § 4022(e)(5) (defining "prototype project" for OTs). Nowhere within the RPP did the Navy require that offerors propose only a vessel that [redacted] *See* Tab 14.1. The entire purpose of the OT prototype phase is to identify viable vessels for further production. Tab 14.1, AR 253 ("A prototype may be physical, virtual, or conceptual in nature"). The RPP expressly allows test vessels that are "representative of the MUSVs" proposed by the offeror. *See* AR 253, 259–63; *see also* Tab 16b, AR 278 (calling out "Surrogate or Representative Prototype"). There would be no need to convert existing vessels or provide a "representative" vessel if the RPP required vessels that have already [redacted] Thus, "it was arbitrary and capricious for [the Navy] not to disclose" an apparent evaluation criterion prior to accepting bids, especially one that it articulates for the first time in a debriefing. *Frawner*, 161 Fed. Cl. at 449–50.

[redacted]

**E. The Navy Failed to Use Competitive Procedures In Violation Of 10 U.S.C. § 4022(b)(2)**

In addition to lacking a rational basis for all the reasons set forth above, the Navy's anticompetitive evaluation under Criteria 2 was also not in accordance with law; namely, the requirement of 10 U.S.C. § 4022(b)(2) for the Navy to use "competitive procedures" to the maximum extent practicable. *See Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 735 (2025) (concluding protesters may maintain challenges to an agency's compliance with the terms of a prototype OT solicitation and other program-related documents which "are integral to the statutory and regulatory integrity of the OT"); *see also SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547, 1553–54 (Fed. Cir. 1988) (interpreting "shall . . . to the maximum extent practicable" to mean the contracting officer was required to conduct a reprocurement "in the most competitive manner feasible"); *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 269 (2016) ("The word 'maximum' in the phrase 'to the maximum extent practicable,' therefore, should not be ignored and read out of the statute. Given the congressional choice of the word 'maximum,' even when coupled with words like 'practicable' and 'appropriate,' agencies cannot ignore or superficially comply with the requirement…."), *aff'd*, 904 F.3d 980.

The Navy issued the MUSV RPP pursuant to 10 U.S.C. § 4022, which mandates: "To the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects under subsection (a)." 10 U.S.C. § 4022(b). The Navy seeks to enter into OT agreements to carry out prototype projects authorized by 10 U.S.C. § 4022(a) based on its evaluation decision, meaning the Navy is required by statute to use "competitive procedures" to the "maximum extent practicable" in conducting its evaluation. 10 U.S.C. § 4022(b)(2).

[redacted]

Although the Navy's own program plan proclaimed that it would conduct a "Full and Open competition," Tab 3, AR 53, any competitive underpinnings for this program were lost when the Navy departed from and contradicted the terms of the Solicitation, applied unstated evaluation criteria, and ignored information in Blue Water's proposal. A "competition" where the playing field is skewed in favor of some, and to the detriment of others, is no competition at all.

As noted above, the Navy's statement in its debriefing that Blue Water's proposed prototype vessel was [redacted] is contrary to the definition of a "prototype project" set forth in 10 U.S.C. § 4022(e)(5) and the RPP. Tab 14.1, AR 253; 10 U.S.C. § 4022(e)(5) (defining "prototype project" for OTs). The Navy's debriefing faults Blue Water for [redacted], which departs from the purpose and intent of a "prototype project" and effectively demands an existing commercially available solution. Such a requirement is patently inconsistent with the RPP and the authority granted under 10 U.S.C. § 4022(a) to carry out "prototype projects," and the Navy's actions thereby constitute a violation of law.

Also, to the extent that the Navy found that Blue Water's vessel was problematic simply because [redacted], its actions are inconsistent with the FY 2026 NDAA.[5] Section 130 of the FY 2026 NDAA requires that USVs be "purpose-built unmanned vessels engineered to operate without human support systems or operational requirements intended for crewed vessels." Pub. L. No. 119-60, § 130, 139 Stat. 718, 757–58 (2025). A "purpose-built"

---

[5] Blue Water's proposal explains that [redacted] Tab 24, AR 453. [redacted]s.

[redacted]

vessel necessarily requires modifications to meet the Navy's requirements, and Blue Water's vessel meets this standard.

### F. Blue Water Was Prejudiced By The Navy's Arbitrary And Capricious Evaluation Under Criteria 2

For these reasons, the Navy's evaluation of Blue Water under Criteria 2 lacks a rational basis and is therefore arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. As a result of the Navy's improper and irrational evaluation, Blue Water was eliminated from consideration for an OT award and thereby prejudiced. In particular, because the Solicitation required offerors to receive an "Acceptable" rating in all three evaluated criteria to receive an award, Blue Water was deemed ineligible for award based on the Navy's arbitrary and capricious evaluation finding that it was Unacceptable under Criteria 2 and Criteria 4. But for this error, Blue Water would have a substantial chance of an OT award, and thus protest ground should be sustained. *See OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 658 (2018) (prejudice by improper exclusion from competitive range where record showed protester was "a strong competitor").

## IV. The Navy's Evaluation Under Criteria 4 Applied Unstated Evaluation Criteria, Departed From The Terms Of The Solicitation, And Violated 10 U.S.C. § 4022

As explained above, the Navy's lack of documentation for its rating of Blue Water as Unacceptable for Criteria 4 is reason alone to sustain this protest. But here again, even if the Court considers the Navy's debriefing arguments, they do not support the Navy's Unacceptable rating. In asserting that [redacted] of Blue Water's proposed test vessel rendered the vessel not "representative" for purposes of testing the autonomy and perception systems, the evaluation as described in the debriefing relied upon unstated evaluation criteria, arbitrary and unsupported evaluation conclusions, and a misreading of Blue Water's proposal. These flaws demonstrate the Navy's failure to utilize competitive procedures in

[redacted]

violation of 10 U.S.C. § 4022. Accordingly, the Navy's actions against Blue Water should be set aside.

### A. The Navy's Evaluation Under Criteria 4 Lacks A Rational Basis

An agency's analysis must be consistent with the terms of the solicitation. *Ala. Aircraft Indus.*, 586 F.3d at 1375–76. "So long as the agency considers the appropriate factors and its decision evinces rational reasoning, the Court will defer to the agency's decision." *360Training.com*, 106 Fed. Cl. at 191 (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1369 (Fed. Cir. 2009)). However, an agency is entitled to no deference where it "fails to provide a reasoned explanation for its decision which is in accord with material facts contained in the administrative record." *Id.* (internal quotation marks and citation omitted)).

Here, the Navy's determination that Blue Water's surrogate was not "representative" due to [redacted] is not consistent with the terms of the Solicitation. The RPP's evaluation criteria for Criteria 4 provides that an Acceptable rating will be assigned where "the Offeror demonstrates the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrates a test asset that is representative of the MUSVs used in the offerors proposed business models in 3.2.1." Tab 14.1, AR 263.

During the Q&A phase, multiple questions sought clarification of what makes a test vessel "representative" so that offerors could calibrate their approach. *See* Tab 15, AR 266–68 (Qs 4, 13, 16, 49). One offeror asked "how does the Government define 'representative' with respect to the test asset" and, "[i]n particular, which subsystems or performance characteristics must match the proposed production MUSV, and which may differ without impacting evaluation?" AR 268. Another noted that "representativeness" in a surrogate vessel involves inherent tradeoffs and that

[redacted]

only the final production vessel can be optimized for "sensors, onboard control systems, speed, range and other vessel dynamics all at the same time," and asked "[w]hat characteristics or performance criteria are important to making the MUSV Test Event surrogate vessel 'representative'?" AR 266. Each time, the Navy refused to identify which subsystems must match the production vessel and instead pointed offerors to the RPP's test-related attachments, stating: the "Test vessel ***shall be able to perform the test plan as written in the J-5 Attachment***" and "Section 7 of the J-1 Attachment discusses the approval process for test USVs." AR 266 (emphasis added); AR 268. Thus, the Navy did not (and, in fact, refused to) identify which subsystems must match the production vessel and which may differ without impacting evaluation and instead pointed offerors to the J-1 Attachment and SOW Section 7.

The SOW in Attachment J-1 reinforces this framework. Section 7 requires that the contractor "successfully complete the MUSV Test Event and meet or exceed all test criteria in Attachment J-5" and "perform the MUSV Test Event in accordance with [Attachment] J-5 MUSV test plan." Tab 18, AR 337. It further provides for a Post Award Conference during which the contractor outlines the details for the on-water test and requests approval from the Navy to use a test MUSV. AR 335, 337 (§ 7.2). The Navy specifically cited this Post-Award Conference in Section 7 during Q&As when asked about the term "representative." AR 266, 268. The Navy unreasonably failed to consider the post-award approval process under Section 7 of the SOW as an alternative to excluding Blue Water altogether. Attachment J-5 states that testing consists of: (i) Perception and Situation Awareness; (ii) COLREGS compliance and Vessel Safety; and (iii) Long-duration mission capabilities. Tab 16b, AR 278. The scope section is explicit that the "Test Plan ***addresses all test criteria***, ***methodologies, scenarios, and data collection requirements*** for

[redacted]

MUSV prototype testing." *Id.* (emphasis added). Thus, the Test Plan contains "all test criteria" and is comprehensive.

Critically, none of the "test criteria, methodologies, scenarios, and data collection requirements" for MUSV testing in the Test Plan calls for testing of [redacted]. *See generally* Tab 16b, AR 277–322. The System and Test Asset Description and Limitations section identifies the USV Autonomy System, USV Test Vessel (Surrogate or Representative), Contact Vessels, and Go/No Go Criteria. AR 278. The USV Autonomy System requires a brief description of the autonomy system architecture and components, including the Autonomy Control System, Perception Suite, and Machinery Control System, and identifies the following key capabilities for evaluation: autonomous navigation, contact tracking, obstacle avoidance, collision avoidance, mission planning, and remote monitoring. *Id.* The USV Test Vessel (Surrogate or Representative Prototype) section lists the following testing assets to be evaluated: test vessel length, max speed/propulsion, sensor suite, and placemat. *Id.*

The Navy's assertion that Blue Water's test vessel [redacted] were not representative is a departure from those stated evaluation criteria. [redacted] are not listed as assets to be evaluated in the testing. *See id.* The testing is organized into three phases, none of which evaluates [redacted]: (i) the PSA test assesses whether the vessel's perception systems can detect, track, and classify small and medium contacts, AR 282–94; (ii) the COLREGS test evaluates the autonomy system's ability to execute collision-avoidance maneuvers and navigate safely through simulated traffic and obstacle courses, AR 294–312; and (iii) the Long Duration Mission test assesses whether the vessel can autonomously navigate through 25 distinct waypoint legs while managing different obstacles, AR 312–17.

[redacted]

Throughout, the vessel must operate safely. AR 280. Each phase tests autonomy, perception, and navigation performance; not the physical characteristics of [redacted].

Contrary to the Navy's evaluation, Blue Water's test vessel was demonstrably "able to perform the test plan as written in the J-5 Attachment." Tab 15, AR 266. Blue Water's proposal explains that its test vessel's [redacted] as its Liberty vessel, [redacted] Tab 24, AR 465–66. These are the characteristics to be tested according to the test plan, thus making Blue Water's test vessel a representative prototype consistent with the RPP. *See* Tab 16b, AR 277–80. The [redacted] appears in Attachment J-5 only as a component the offeror must describe and in a safety condition providing that the autonomy system must not drive machinery into an unsafe state. *See* Tab 16b, AR 279–80. There is no requirement that the test vessel's [redacted] itself be representative of the production vessel's [redacted]. Also, the Navy's concern about the [redacted] is inconsistent with its desired attribute of component interoperability as [redacted] demonstrates the interoperability of the system.

Attachment J-5 refers to the USV Test Vessel and "Surrogate or Representative Prototype," and does not contemplate that the exact production vessel will be used as the Test Vessel. AR 278; Tab 16b. Indeed, unless a test vessel matched the production vessel's size, weight, power, and sustained speed at range, no offeror's [redacted] would be exactly "representative" of its [redacted]. A representativeness standard that no one could meet cannot be the standard. Its after-the-fact application to Blue Water is thus irrational and contrary to a competitive process.

The Navy's assessment of Blue Water as Unacceptable under Criteria 4 is thus a flagrant departure from the terms of the RPP using impermissible, unstated evaluation criteria to

[redacted]

prematurely disqualify an offeror and deny it an opportunity to carry out an at-sea test. *See Frawner Corp.*, 161 Fed. Cl. at 449–50 ("it was arbitrary and capricious for the agency not to disclose [an] evaluation criterion to offerors in the Solicitation prior to accepting bids"); *Samsara*, 169 Fed. Cl. at 319 (agency improperly used an unstated evaluation).

Further, the record demonstrates that the Navy unfairly held Blue Water to a higher standard than other offerors. It is axiomatic that an agency "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp.*, 56 Fed. Cl. at 383. Leidos, one of the awardees, [redacted] Tab 37, AR 984 ([redacted]); *see also* Tab 37c, AR 1023 ([redacted]). Despite Leidos's [redacted], the Navy took no issue with Leidos's proposal under Criteria 4, and said nothing about Leidos's [redacted]. Tab 114, AR 3033; Tab 57, AR 1577. Thus, to the extent that the test and production vessels must have the same [redacted] to satisfy the RPP's testing requirements, the Navy treated Blue Water unequally by waiving the requirement for Leidos but not for Blue Water. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) ("A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors"); *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 234 (1997) ("agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently").

For these reasons, the Court should declare the Navy's evaluation decision to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

[redacted]

### B. The Navy's Flawed Evaluation Constitutes A Failure To Use Competitive Procedures In Violation Of 10 U.S.C. § 4022(b).

By departing from the stated criteria, ignoring information in Blue Water's proposal, and treating offerors unequally, the Navy has failed to use competitive procedures as required by 10 U.S.C. § 4022(b). Because the Navy seeks to enter into OT agreements based on its evaluation, it is required by statute to use "competitive procedures" to the "maximum extent practicable." 10 U.S.C. § 4022(b)(2). Further, the Navy decided that MUSV would use "Full and Open competition for Prototype OT(s) for autonomy and performance testing." Tab 3, AR 53.

The Navy undermined competition and contravened its statutory mandate by departing from, and contradicting, the terms of the Solicitation, applying unstated evaluation criteria, ignoring information in Blue Water's proposal, and treating Blue Water differently than other offerors. A competition requires a level playing field and a common set of rules; features that are not present when the agency applies unstated evaluation criteria or engages in unequal treatment. Accordingly, the Navy's arbitrary and capricious actions in its evaluation of Blue Water means that competitive procedures were not utilized in violation of 10 U.S.C. § 4022. *See Telesto*, 176 Fed. Cl. at 735; *see also SMS Data Prods.*, 853 F.2d at 1553–54; *Palantir*, 129 Fed. Cl. at 269.

### C. The Navy's Irrational Evaluation Under Criteria 4 Prejudiced Blue Water

As explained, the Navy's *post hoc* rationale for finding Blue Water Unacceptable under Criteria 4 is dependent on unstated evaluation criteria, a departure from the stated evaluation criteria, violates 10 U.S.C. § 4022, and is arbitrary and capricious. As a result of the Navy's improper and irrational evaluation, Blue Water was substantially prejudiced. In particular, because the Solicitation required offerors to receive an "Acceptable" rating in all three evaluated criteria to be considered for further evaluation and to receive an award, Blue Water was deemed ineligible

[redacted]

for award based on the Navy's arbitrary and capricious evaluation under Criteria 4. But for this error, Blue Water would have a substantial chance of an OT award. *OTI Am.*, 68 Fed. Cl. at 658.

**V. Blue Water Is Entitled To Permanent Injunctive Relief**

The Court must consider four factors when assessing a request for permanent injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds relief; (3) whether the balance of hardships to the respective parties favors granting injunctive relief; and (4) whether the public interest is served in granting injunctive relief. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 990-91 (Fed. Cir. 2018).

Blue Water has established that it succeeds on the merits of its protest because, as described above, the Navy acted arbitrarily, capriciously, and in violation of the law in its evaluation of Blue Water. It departed from the Solicitation, applied unstated evaluation criteria, disregarded information in Blue Water's proposal, and engaged in unequal treatment, contravening the OT statute and FY 2026 NDAA Section 130 and thereby unjustifiably excluding Blue Water.

Notwithstanding the Government's voluntary stay through October 30, 2026, ECF No. 16, the Navy has asserted that it will not wait for all testing to be completed before starting to award production contracts. Compl. Ex. 8, ECF No. 1-1 at 122. Blue Water does not seek to block the Navy from testing awardees' vessels or moving forward with production contracts. But Blue Water will be irreparably harmed if the Navy is permitted to complete the current phase of the MUSV OTA competition without remedying its errors. If not reversed, the Navy's improper decision will cause Blue Water to lose out on a significant business opportunity, which will reduce its resources and harm its ability to compete for OTA awards and other contracting awards. *IAP Worldwide Servs.*, 159 Fed. Cl. at 323 (quoting *Palantir*, 129 Fed. Cl. at 291) ("a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract"). But for

[redacted]

injunctive relief, Blue Water will lose the opportunity to meaningfully obtain the production contract it seeks. Compl. Ex. 11, ECF No. 1-1 at 210–14 (Decl. of Rylan Hamilton). And due to the early-stage nature of USV technology, Blue Water will face a materially higher barrier when competing for production contracts or other USV efforts unless it can complete testing similar to other awardees and, provided that test is successful, negotiate a follow-on MUSV contract. *See id.*

In considering the balance of hardships, the balance of hardships weighs heavily in favor of Blue Water, which will suffer demonstrable irreparable harm if it loses out on this significant business opportunity due to an unfair and irrational evaluation. *See WHR Grp., Inc. v. United States*, 115 Fed Cl. 386, 404 (2014). The Government, by contrast, will suffer limited hardship in being required to follow the law and reasonably evaluate Blue Water's proposal. The public interest is best served through the grant of the injunction, as it will ensure that the Navy will not be permitted to irrationally and unreasonably deviate from its own competitive terms in evaluating an offeror, and instead must award the OT award through a fair and lawful competition. Where a "contract award violated procurement regulations and involved arbitrary and capricious behavior," then "[t]he public interest in preserving the integrity of the procurement system . . . weighs in favor of granting injunctive relief." *IAP Worldwide Servs.*, 159 Fed. Cl. at 323 (cleaned up).

Accordingly, a permanent injunction is warranted. Blue Water thus requests that the Court permanently enjoin the Navy from completing the testing phase until its evaluation errors are corrected, Blue Water is able to conduct its test, and, subject to a successful test, is able to compete for and obtain a follow-on MUSV production contract with appropriate funding.

## CONCLUSION

For these reasons, Blue Water respectfully requests that this Court grant judgment in favor of Blue Water and grant the relief requested in its complaint and as set forth herein.

[redacted]

Respectfully submitted,

s/Alexander O. Canizares
Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com

*Lead Attorney for Plaintiff*
*Blue Water Autonomy, Inc.*

*Of Counsel:*
Tyler Robinson
Christopher M. O'Brien
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: trobinson@velaw.com
Email: cobrien@velaw.com

August 10, 2026

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2026, I electronically filed the foregoing Motion for Judgment on the Administrative Record under seal with the Clerk of the Court using the CM/ECF system, which will send notification of such to counsel of record. Pursuant to the Court's Amended General Order No. 2026-01, I hereby certify that a true and correct copy was also emailed to the following parties this 10th day of August, 2026:

Counsel for Defendant United States:

Douglas Glenn Edelschick
Natalee A. Allenbaugh
U.S. Department of Justice - Civil Division Post Office Box 480
Ben Franklin Station
Washington, DC 20044
Tel.: (202) 353-9303
douglas.edelschick@usdoj.gov
Natalee.allenbaugh@usdoj.gov

Counsel for Co-Plaintiff Saildrone, Inc.:

Faith E. Gay
Laura M. King
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com
lking@selendygay.com

Carla Weiss
NICHOLS LAW PLLC
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: (202) 846-9800
cweiss@nicholslaw.com

Counsel for Defendant-Intervenor Saronic Technologies, Inc.:

Jon W. Burd
Cara L. Sizemore
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel.: (202) 719-7172
jburd@wiley.law
csizemore@wiley.law

[redacted]

Counsel for Defendant-Intervenor HII Unmanned Systems, Inc.:

J. Hunter Bennett
Kayleigh M. Scalzo
Jason A. Carey
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-5424
hbennett@cov.com
kscalzo@cov.com
jcarey@cov.com

Counsel for Defendant-Intervenor Leidos, Inc.:

Michael J. Anstett
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
Tel.: (202) 639-7390
Michael.anstett@friedfrank.com

Respectfully submitted,

*s/ Alexander O. Canizares*
Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com
*Counsel for Blue Water Autonomy, Inc.*