[redacted]

# In the United States Court of Federal Claims

**BID PROTEST**

(Filed: August 24, 2026)

**BLUE WATER AUTONOMY, INC., *et al.*,**

*Plaintiffs,*

v.

**THE UNITED STATES,**

*Defendant,*

and

**HII UNMANNED SYSTEMS, INC., *et al.*,**

*Defendant-Intervenors.*

Case Nos. 26-936, 26-944

Judge Philip S. Hadji

[redacted]

**Redacted Version**

**PLAINTIFF BLUE WATER AUTONOMY, INC'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

*Of Counsel:*

Tyler E. Robinson
Christopher M. O'Brien
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: trobinson@velaw.com
Email: cobrien@velaw.com

Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com

*Lead Attorney for Plaintiff Blue Water Autonomy, Inc.*

[redacted]

# Table of Contents


INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 4

ARGUMENT ........ 4

II. Standard of Review ........ 4

III. This Court Possesses Subject Matter Jurisdiction Over Blue Water's Complaint ........ 5

A. The Tucker Act ........ 5

B. DoD's Statutory Authority to Award OTs ........ 8

C. This Court's Case Law Supports a Finding of Jurisdiction in This Case ........ 12

D. The Court Should Find That it Has Jurisdiction Because the Navy's MUSV Transaction is a "Procurement" and "in Connection With" a Procurement ........ 15

E. That a Follow-on Production Contract May Not Occur is Irrelevant ........ 20

F. The Government's Arguments in Opposition to Jurisdiction Are Meritless ........ 21

1. The Government Misconstrues *Hymas* ........ 21

2. The Government's Recitation of the Legislative History of OTs is Unavailing. ........ 24

3. *Telesto* was wrongly decided and does not offer a useful or correct framework for resolving the Government's motion ........ 26

4. Requiring that OT-related protests be brought in district court is inconsistent with the text and purpose of the ADRA ........ 29

5. Blue Water has Alleged Statutory Violations in Connection with a Procurement Sufficient to Confer Jurisdiction Under the Tucker Act. ........ 30

CONCLUSION ........ 31

[redacted]

# Table of Authorities

**Cases**

*AgustaWestland N. Am., Inc. v. United States*,
880 F.3d 1326 (Fed. Cir. 2018)........ 6

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986)........ 10

*Christianson v. Colt Indus. Op. Corp.*,
486 U.S. 800 (1988)........ 32

*Distributed Solutions, Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008)........ passim

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed. Cir. 2001)........ 5

*Henke v. United States*,
60 F.3d 795 (Fed. Cir. 1995)........ 4

*HVF W., LLC v. United States*,
148 Fed. Cl. 45 (2020)........ 24

*Hydraulics Int'l, Inc. v. United States*,
161 Fed. Cl. 167 (2022)........ passim

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016)........ passim

*Independent Rough Terrain Center, LLC v. United States* (*IRTC*),
172 Fed. Cl. 250 (2024)........ 11, 20

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
781 F.2d 879 (Fed. Cir. 1985)........ 5

*Joint Venture of Comint Sys. Corp. v. United States*,
100 Fed. Cl. 159 (2011)........ 23

*Kinemetrics, Inc. v. United States*,
155 Fed. Cl. 777 (2021)........ passim

*MD Helicopters Inc. v. United States*,
435 F. Supp. 3d 1003 (D. Ariz. 2020)........ 9, 12, 16

[redacted]

*Palantir USG, Inc. v. United States*,
129 Fed. Cl. 218 (2016) ... 24

*Percipient.AI, Inc. v. United States*,
153 F.4th 1226 (Fed. Cir. 2025) ... 28

*RAMCOR Servs. Grp., Inc. v. United States*,
185 F.3d 1296 (Fed. Cir. 1999) ... 5, 29

*Raytheon Co. v. United States*,
175 Fed. Cl. 281 (2025) ... passim

*Resource Conservation Grp., LLC v. United States*,
597 F.3d 1238 (Fed. Cir. 2010) ... 5, 6, 28

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) ... 4

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ... 4

*SEKRI, Inc. v. United States*,
34 F.4th 1063 (Fed. Cir. 2022) ... 5

*Space Expl. Techs. Corp. v. United States*,
No. 19-7927, 2020 WL 7344615, (C.D. Cal. Sept. 24, 2020) ... 26

*Space Exploration Technologies Corp v. United States* (“*SpaceX*”),
144 Fed. Cl. 433 (2019) ... passim

*Strategi Consulting, LLC v. United States*,
No. 26-450, 2026 WL 2166765 (Jul. 24, 2026) ... 20

*Sys. Application & Techs., Inc. v. United States*,
691 F.3d 1374 (Fed. Cir. 2012) ... 5, 27

*Telesto Grp., LLC v. United States*,
176 Fed. Cl. 711 (2025) ... passim

*Traynor v. Turnage*,
485 U.S. 535 (1988) ... 10

**Statutes**

10 U.S.C. § 1491(b)(2) ... 11

10 U.S.C. § 2371 ... 7

[redacted]

10 U.S.C. § 2371a ........ 13

10 U.S.C. § 2371b ........ 8, 24

10 U.S.C. § 2371b(a)(1) ........ 24

10 U.S.C. § 4021 ........ passim

10 U.S.C. § 4022 ........ passim

28 U.S.C. § 1491 ........ passim

31 U.S.C. § 6305(1) ........ 12

41 U.S.C. § 111 ........ 6

41 U.S.C. § 403(2) ........ 6

41 U.S.C. §§ 7101–09 ........ 28

**Legislative History**

S. Rep. No. 106-292, § 708, at 324, 114 Stat. 1030 (2000) ........ 9

S. Rep. No. 115-125, at 189, 190 (2017) ........ 24

S. Rep. No. 114-49, at 165 (2015) ........ 24, 26

**Other Authorities**

FY 2022 NDAA, Pub. L. 117-81, § 1701(u) ........ 8

Jonathan R. Cantor, *Bid Protests and Procurement Reform: The Case for Leaving Well Enough Alone*, 27 Pub. Cont. L.J. 155, 155 (1997) ........ 23

National Aeronautics and Space Act of 1985. Pub. L. 85-568 ........ 7

National Defense Authorization Act ("NDAA") for Fiscal Year ("FY") 1994, Pub. L. 103-160 § 845(a) ........ 8

Office of the Undersecretary of Defense for Acquisition and Sustainment, Other Transactions Guide at 4–5 (ver. 2.0) (Jul. 2023) ........ 23

**Rules**

RCFC 12(b)(1) ........ 4

[redacted]

Plaintiff Blue Water Autonomy, Inc. ("Blue Water") respectfully requests that the Court deny the Government's motion to dismiss Blue Water's complaint for lack of subject matter jurisdiction. Def. Mot. to Dismiss, ECF No. 75 ("Def. MTD").

## INTRODUCTION

The Department of the Navy ("Navy") Portfolio Acquisition Executive for Robotic and Autonomous Systems ("RAS") issued Request for Prototype Proposals No. N00024-26-R-6326 (the "RPP" or "Solicitation") seeking prototype Medium Unmanned Surface Vessels ("MUSVs") as part of an effort to "***procure*** as many MUSV vessels in different configurations as required to meet Fleet needs." Tab 5, AR 78 (emphasis added). The Navy's objective is clear: identify successful prototype MUSVs during Phases 1 and 2 of the Solicitation so that the Navy can rapidly acquire them and build a new fleet consistent with its acquisition strategy. Having begun a process to determine its needs with the stated goal of procuring MUSVs, the Navy's flawed evaluation and exclusion of Blue Water is within the Court's Tucker Act jurisdiction.

In the absence of guidance from the United States Court of Appeals for the Federal Circuit, this case presents the Court with the latest opportunity to reaffirm the scope of its jurisdictional authority to entertain bid protests involving prototype Other Transactions ("OTs") or OT awards ("OTAs") by the Department of Defense ("DoD") under DoD's OT statute, 10 U.S.C. §§ 4021–22. The Federal Circuit has explained that the Tucker Act's bid protest jurisdiction under section 1491(b)(1) applies to ***all stages*** of procurement or proposed procurement, and that where the Government's purpose is to initiate a process for determining a need for acquiring goods or services, and where it utilizes its prototype OT authority to further such a process, a nexus to procurement exists sufficient to confer jurisdiction.

[redacted]

Such is the case here. Contrary to the Government's strained arguments, the text and purpose of the Tucker Act, 28 U.S.C. § 1491(b)(1), the legislative history and text of 10 U.S.C. §§ 4021–4022, and the controlling case law interpreting the Tucker Act all support jurisdiction over Blue Water's bid protest. As the Government does not dispute, the Navy has publicly, and repeatedly, announced that it is using its prototype OT authority as part of its acquisition strategy for a direct path to production and procurement of MUSVs on an accelerated timeline. The Navy is prepared to draw upon $1.9 billion obligated for the procurement of MUSVs to buy 30 MUSVs in the first year. The Navy's RPP for MUSVs is the first step in its "acquisition strategy," evaluating offerors on their ability to produce at least five MUSVs per year to meet the Navy's autonomy and other requirements. The Navy expressly advised offerors that it contemplated awarding direct, non-competitive follow-on production contracts to successful participants pursuant to 10 U.S.C. § 4022(f). Absent the relief sought in this case, Blue Water would be unable to compete in such a follow-on production contract because it was irrationally excluded by the Navy as Unacceptable (and thus would not be a successful participant). All of this is "in connection with" a procurement or a proposed procurement within the meaning of the Tucker Act, notwithstanding the fact that OTs are different from traditional FAR-based procurement contracts, cooperative agreements, and grants.

The Government urges dismissal of Blue Water's complaint based upon a syllogism: prototype OTs are "*not* procurements", the Court's bid protest jurisdiction is "limited to procurements;" therefore, the Court lacks jurisdiction. Def. MTD at 1. The Government overreaches. The Government's proposed bright-line rule that all OTAs are "non-procurements" categorically excluded from bid protest jurisdiction under § 1491(b) has been consistently rejected

[redacted]

by this Court, and for good reason. It finds no support in the statute's text or the precedent in this Circuit and is refuted by the case law.

The Government focuses at length on the legislative history of OTs in support of its broad argument that they are "non-procurements" immune from this Court's review. Yet, the Government cites no evidence that Congress intended to shield "other transactions" from Tucker Act jurisdiction, and none exists. Although the Government disclaims any argument that OTs are beyond any judicial review, it urges the Court to adopt an unworkable standard whereby protests challenging an agency's use of its prototype OT authority would have to be brought in district courts around the country under the Administrative Procedure Act ("APA") or, alternatively, in this Court under 28 U.S.C. § 1491(a)(1), which does not allow for injunctive relief.

These arguments are meritless. Contrary to the Government's arguments, finding jurisdiction in this case is not inconsistent with the text or purpose of the OT statutes, 10 U.S.C. §§ 4021-4022. Just because OTs are different from ("other than") traditional procurement contracts, grants, and cooperative agreements does not mean that the Court is powerless to review them or that district courts should hear them instead. The OT statute expressly contemplates that prototype OTs may be used in ways that meet the definition of "procurement" adopted by the Federal Circuit in *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) and its progeny. The statute expressly allows DoD to award follow-on production contracts to successful prototype participants under 10 U.S.C. § 4022(f) and section 4022(a) contemplates the use of prototype OTs to advance acquisitions.

The Government's reliance on *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) is unpersuasive. That case did not examine OTs and its description of section 1491(b)(1)'s jurisdictional scope is consistent with holding that the Court has jurisdiction in this case. *Hymas*

[redacted]

dealt with a particular type of cooperative agreement that bears no resemblance to the Navy's MUSV competition and production procurement here. Unlike the cooperative agreement in *Hymas*, the Navy seeks prototype MUSVs with the stated goal of buying (lots of) them if they are acceptable and pass an on-water test. And, citing 10 U.S.C. § 4022(f), the Navy's RPP states that it may award follow-on production contracts to successful participants in the prototype phase. That is procurement defined—solicitation, evaluation, purchase.

The Government's other arguments are likewise without merit. Its reliance on the Court's opinion in *Telesto* is unavailing, and that decision was wrongly decided. Further, the Government fails to establish that Blue Water's statutory violation argument is beyond the Court's jurisdiction.

Accordingly, this Court should reject the Government's arguments and hold that the Court possesses subject matter jurisdiction over Blue Water's amended complaint.

## **<u>QUESTIONS PRESENTED</u>**

1. Whether the Navy's public statements, conduct in holding the MASC competition and MUSV competition, and the language of the RPP demonstrate that the Navy has determined a need for MUSVs.
2. Whether the MUSV OT is part of the Navy's acquisition strategy for the procurement of MUSVs.
3. Whether Blue Water has established by a preponderance of the evidence that the Court possesses subject-matter jurisdiction over Blue Water's complaint.

## **<u>ARGUMENT</u>**

### **I. Standard of Review**

When this Court's jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds*

[redacted]

*v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inference in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The Court may "consider . . . evidentiary matters outside the pleadings" when deciding a Rule 12(b)(1) motion. *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

## II. This Court Possesses Subject Matter Jurisdiction Over Blue Water's Complaint

As explained below, the text, history, and purpose of the Tucker Act, DoD's OT statutory authority, as well as the relevant precedent of the Federal Circuit and this Court all establish that this Court possesses jurisdiction to review Blue Water's allegations within the broad scope of the Tucker Act, and that the Government's contrary argument that OTs are categorically excluded from this Court's bid protest jurisdiction are baseless and should be rejected.

### A. The Tucker Act

The Tucker Act, as amended by the Administrative Dispute Resolution Act ("ADRA") of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75, "expressly waives sovereign immunity for claims against the United States in bid protests." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012). Accordingly, the Court of Federal Claims

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). The ADRA terminated the jurisdiction of federal district courts over bid protests and, after a five-year sunset period, conferred "exclusive jurisdiction upon the Court of Federal Claims over bid protests against the government." *SEKRI, Inc. v. United States*, 34 F.4th

[redacted]

1063, 1070 (Fed. Cir. 2022); *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 287–88 (2025) (reciting ADRA's legislative history); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) ("[T]o prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims.").

The Tucker Act's waiver "covers a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs.*, 691 F.3d at 1380; *Res. Conservation Group, LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010) (stating that 1491(b)(1) "in its entirety is exclusively concerned with procurement solicitations and contracts"). The Federal Circuit has explained that a "narrow application of section 1491(b)(1) does not comport with the [Tucker Act's] broad grant of jurisdiction over objections to the procurement process." *Sys. Application & Techs.*, 691 F.3d at 1381. The Federal Circuit has also recognized that the "operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999).

The Tucker Act does not define "procurement" or "proposed procurement." 28 U.S.C. § 1491. Thus, the Federal Circuit has held that it is appropriate to adopt the definition of "procurement" from 41 U.S.C. § 111) (formerly 41 U.S.C. § 403(2)) when determining the bounds of this Court's jurisdiction. *See Distrib. Sols.*, 539 F.3d at 1345; *Res. Conservation Grp.*, 597 F.3d at 1242–44.[1]

[1] The definition of "procurement" in 41 U.S.C. § 111 is derived from "statutory provisions related to the establishment of the Office of Federal Procurement Policy in the Office of Management and Budget" that "give overall direction for federal procurement policies, regulations, procedures, and forms." *Distrib. Sols.*, 539 F.3d at 1345.

[redacted]

As defined in 41 U.S.C. § 111, procurement "includes ***all stages of the process*** of acquiring property or services, ***beginning with the process for determining a need*** for property or services and ending with contract completion and closeout." *Distrib. Sols.*, 539 F.3d at 1345 (first emphasis added)). The Federal Circuit has repeatedly reaffirmed this conception of "procurement" announced in *Distributed Solutions* to interpret the Tucker Act—even after its 2016 decision in *Hymas* relied on by the Government. Def. MTD at 13 (citing *Hymas*, 810 F.3d 1324–25; *see AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330–31 (Fed. Cir. 2018) ("In *Distributed Solutions*[,] we held that it was appropriate to use the definition of 'procurement' set forth in 41 U.S.C. § 403(2)."). Accordingly, to establish jurisdiction under section 1491(b)(1), a contractor need only "demonstrate that the government at least initiated a procurement, or initiated 'the process for determining a need' for acquisition and assistance solutions for [the property or services]." *Distrib. Sols.*, 539 F.3d at 1346.

Noting that section 1491(b)(1) "includes both actual procurements and proposed procurements[,]" the Federal Circuit explained in *Distributed Solutions* that "the phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'" *Id.* at 1346. Applying this definition, the Court held that the trial court had jurisdiction to review the Government's issuance of a Request for Information ("RFI") seeking responses from software vendors for a potential software acquisition because the Government used the RFI to "solicit information from outside vendors, and then used this information to determine the scope of services required by the government." *Id.* at 1342–46.

Notably, the fact that the Government ultimately did not elect to procure the software (it decided instead to direct a contractor to select software vendors) was irrelevant. Indeed, "[w]hile

[redacted]

the government ultimately decided not to procure software itself from the vendors, but rather to add that work to its existing contract with [one of its existing prime contractors], ***the statute does not require an actual procurement***." *Id.* (emphasis added). Rather, the Tucker Act "explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.' A proposed procurement, like a procurement, begins with the process for determining a need for property or services." *Id.* As explained below, this case is on all fours with *Distributed Solutions* and its progeny.

**B. DoD's Statutory Authority to Award OTs**

The National Aeronautics and Space Administration ("NASA") began using OTs during the 1950s pursuant to the National Aeronautics and Space Act of 1985. Pub. L. 85-568. Congress then extended the ability to enter into such "other transactions" to several other agencies. *See Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 175–76 (2022) (recounting history of OTs). In 1989, Congress provided DoD OT authority for research projects codified in 10 U.S.C. § 2371. In 1994, Congress provided OT authority for the Defense Advanced Research Projects Agency ("DARPA") to carry out OTs for "prototype projects that are directly relevant to weapons or weapon systems proposed to be acquired or developed by the Department of Defense." National Defense Authorization Act ("NDAA") for Fiscal Year ("FY") 1994, Pub. L. 103-160 § 845(a). In 2015, Congress made such prototype OT authority permanent and codified it at 10 U.S.C. § 2371b. Effective January 1, 2022, DoD's OT authority for prototype projects previously codified at 10 U.S.C. § 2371b was transferred to 10 U.S.C. § 4022. FY 2022 NDAA, Pub. L. 117-81, § 1701(u).

Section 4022(a) of title 10 of the United States Code provides that DoD

> may, under the authority of section 4021 of this title, carry out prototype projects that are ***directly relevant*** to enhancing the mission effectiveness of personnel of the Department of Defense or improving platforms, systems, components, or materials ***proposed to be acquired*** or developed by the

[redacted]

> Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces.

10 U.S.C. § 4022(a) (emphasis added). Section 4021 provides that DoD and military departments "may enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects." 10 U.S.C. § 4021(a). Section 4022 also states that "competitive procedures shall be used when entering" prototype OT agreements to "the maximum extent practicable." 10 U.S.C. § 4022(b)(2).

Pursuant to 10 U.S.C. § 4022(f), a prototype OT entered into under section 4022 "may provide for the award of a follow-on production contract or transaction to the participants in the transaction." A follow-on production contract can be awarded directly to the successful participants in the prototype phase of an OT without any competition provided that (1) "competitive procedures were used" for the "selection of parties for participation in the transaction" and (2) the participants in the transaction "successfully completed the prototype project[.]" 10 U.S.C. § 4022(f)(2)(A)–(B); *see also id.* § 4022(f)(5) (follow-on production contracts or transactions may be awarded using prototype OTs, procurement contracts under chapter 137 of title 10, "or under such procedures, terms, and conditions as the Secretary of Defense may establish by regulation").

OTs are "generally not subject to" federal laws and regulations limited in applicability to contracts, grants, or cooperative agreements; and they are "not required to comply with the Federal Acquisition Regulation (FAR) and its supplements." 32 C.F.R. § 3.2; *see Raytheon*, 175 Fed. Cl. at 289–90 ("Congress granted the military OT authority under 10 U.S.C. §§ 4021–4022 to provide a more flexible method to facilitate research, development, and prototyping than via traditional procurement contracts") (citing S. Rep. No. 106-292, § 807, at 324, 114 Stat. 1030 (2000)). But "OTAs' exemption from the FAR does not necessitate exemption from the Tucker Act."

[redacted]

*Hydraulics*, 161 Fed. Cl. at 178 (noting that *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 785 (2021), and *MD Helicopters v. United States*, 435 F. Supp. 3d 1003, 1013 (D. Ariz. 2020) "do not align with the government's interpretation" of the OT statutes).

The OT statutes broadly authorize DoD's use of prototype OTs as an acquisition tool. 10 U.S.C. § 4022(a). A "prototype project" is defined to include a "proof of concept, model, or process, including a business process" and "a pilot or novel application of commercial technologies for defense purposes" that, if successful, may lead to a production contract. 10 U.S.C. § 4022(e). DoD's own guidance regarding OTs recognizes that they may be used to acquire items and services to support Government-unique needs. *See* Department of Defense, Office of the Under Secretary of Defense for Acquisition and Sustainment, Report to Congress, Recommendations on Use of Other Transaction Authority, Jan. 2022, at 2 ("OTs allow innovative business practices and provide the agility to acquire covered items and services."), available at https://www.acq.osd.mil/asda/dpc/cp/policy/docs/pa/Recommendations%20on%20Use%20of%20Other%20Transaction%20Authority%20(FY%202022%20NDAA,%20Sec%20824).pdf (last accessed Aug. 24, 2026); *id.* at 8 (DoD "finds nothing in section 4022 prohibiting OT agreements for prototyping of services or acquisition of services. . . . [T]he Department sees [no] need to amend section 4022 to authorize OTs for the acquisition of services.").[2] The connection to

[2] The statute provides that OT agreements awarded under 10 U.S.C. § 4022 "shall be treated as a Federal agency procurement for the purposes of" the Procurement Integrity Act, chapter 21 of title 41. 10 U.S.C. § 4022(h). DoD, Other Transactions Guide, July 2023 Version 2.0 at https://www.acq.osd.mil/asda/dpc/cp/policy/docs/guidebook/DoD%20OT%20Guide%20(July%202023)%20-%20508%20Update_11Jul2025.pdf at 15 (last accessed August 23, 2026) ("OT agreements awarded under the authority of 10 U.S.C. 4022 are ***considered Federal agency procurements*** and are subject to the ethics requirements of the Procurement Integrity Act in Chapter 21 of Title 41, U.S.C. (PIA)" (emphasis added).

[redacted]

procurement is reinforced by the authorization to "provide for prototypes or follow-on production items to be provided to another contractor as Government-furnished equipment." § 4022(g).

Notably, the Government does not dispute that Congress did not exempt DoD's prototype OTs and agreements from judicial review. Def. MTD at 28. Indeed, 10 U.S.C. §§ 4021–4022 and its legislative history are silent as to bid protests and contain no language precluding or limiting judicial review of the Government's evaluation and awards of prototype OTs. *See Hydraulics*, 161 Fed. Cl. at 178 ("[T]he government agrees §§ 4021 and 4022 are silent on jurisdiction; the government's position is based upon its own reading between the lines, not an express provision of law or statement from Congress.").[3] There is no evidence, much less "clear and convincing evidence," sufficient to overcome the strong presumption of judicial review. *See Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (citation omitted); *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670–73 (1986) (there is a strong presumption of judicial review of administrative action, which may be overcome only by clear and convincing evidence of contrary legislative intent). The question is whether such protests are properly brought in this Court as Congress directed for all other "bid protests against the government," *SEKRI*, 34 F.4th at 1070, or in district court as a new bid protest exception under the Administrative Procedure Act ("APA"). Def. MTD at 28. As explained below, as with all other bid protests this Court is the proper forum for resolving this case, and Blue Water has established jurisdiction by a preponderance of the evidence.

[3] *See also Hydraulics*, 161 Fed. Cl. 167 n.1 (noting that DoD's 2018 Other Transactions guide acknowledges that "[p]rotests to the U.S. Court of Federal Claims are . . . possible but are a rare occurrence") (citing DoD, Other Transactions Guide (2018), at 37, https://www.dau.edu/pdfviewer/Source/Guidebooks/OtherTransactions-(OT)-Guide.pdf. DoD has subsequently removed this language from its OT Guide.

[redacted]

### C. This Court's Case Law Supports a Finding of Jurisdiction in This Case

Although different judges on this Court have opined on the subject of protests involving OTs with varying conclusions, the case law is relatively consistent in finding that jurisdiction extends to OTs in appropriate circumstances. In analyzing the contours of Tucker Act jurisdiction for purposes of OTs, several decisions of this Court have applied the *Distributed Solutions* framework to resolve whether particular OTs are "in connection with a procurement" and thus fall within section 1491(b)(1)'s scope. *See Raytheon*, 175 Fed. Cl. at 293; *Independent Rough Terrain Center, LLC v. United States*, 172 Fed. Cl. 250, 256–60 (2024) ("*IRTC*"); *Hydraulics*, 161 Fed. Cl. 167; *Kinemetrics*, 155 Fed. Cl. 777; *cf. Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711 (2025).

The case law recognizes that whether a "procurement" or "proposed procurement" exists turns on whether the Government is using an OT in "determining" its needs. At one end of the spectrum of cases, the Court in *IRTC*, 172 Fed. Cl. at 256–60, held that a follow-on production contract issued under the Army's OT authority was a "procurement" for purposes of section 1491(b)(2), regardless of whether the follow-on production contract sought was under OT authority or under FAR authority.

In *Kinemetrics*, the Court found jurisdiction over a post-award protest challenging the Air Force's technical evaluation under its Commercial Services Offering ("CSO") authority. 155 Fed. Cl. at 785. The Court found jurisdiction because the resulting procurement contract awarded to the awardee was not "separate and distinct" from the challenged technical evaluation in which Kinemetrics was evaluated. *Id.* Notably, the CSO authority is under the same statute as the OT authority (10 U.S.C. § 2371a, now 10 U.S.C. § 4022(a)). The Court had no problem finding that the case was "in connection with a procurement" and described the CSO as a "relatively novel

[redacted]

procurement method." *Id.* at 780, 784. *Kinemetrics* demonstrates that a transaction "other than" a traditional procurement contract, grant, or cooperative agreement under section 4022(a) may nevertheless be "a procurement" in the broader sense (even if not governed by the FAR) where the agency is specifically trying to acquire something (seismic equipment for nuclear treaty compliance). *Id.* at 780, 784–85. *Kinemetrics* shows that section 4022 is not divided into "procurements" and "non-procurements" as the Government wrongly contends. Rather, the Court must examine the Government's purpose when assessing whether jurisdiction is established.

In *Hydraulics*, this Court held that the Army's prototype OT for Avian Ground Power Unit prototypes used to service military helicopters was part of the Army's process for determining a need for acquisition and thus within the Court's Tucker Act jurisdiction. 161 Fed. Cl. at 176–77.

By contrast, in *Space Exploration Technologies Corp v. United States* ("*SpaceX*"), the Court held that the Air Force's solicitations seeking to develop a commercial market for space launch services was not a procurement. 144 Fed. Cl. 433, 434–37 (2019); *cf. Hymas*, 810 F.3d at 1328 (cooperative farming agreements "cannot be construed as procurement contracts because the agency did not intend to acquire farming 'services' for the 'direct benefit or use of the United States Government'") (quoting 31 U.S.C. § 6305(1)).

Distinguishing this Court's decision in *SpaceX*, the United States District Court for the District of Arizona in *MD Helicopters*, dismissed an APA suit challenging the Army's award of OTs for the design and development of next-gen military helicopters, holding that the case belonged in the Court of Federal Claims. 435 F. Supp. 3d at 1006–07. The district court in that case "focused on the direct link between the down-select process adopted by the Army, wherein the anticipated follow-on procurement contract to be awarded would be limited to the pool of successful prototype program participants." *Id.* at 1012–13. According to the Court, such conduct

[redacted]

"relates far more directly to an eventual procurement" than was the case in *SpaceX*. *Id.* at 1013. On that basis, the ADRA precluded an APA claim. *Id.*

This Court's decision in *Raytheon* is particularly persuasive. There, this Court examined the history and purpose of DoD's OT statutes, the ADRA, and the developing case law "with an eye toward articulating a predictive forum selection standard for challenging these ill-defined and oft-evolving prototype projects." 175 Fed. Cl. at 284. Noting that it sought to "streamline the litigation of these jurisdictional issues in future cases" subject to Congress or the Federal Circuit providing guidance, the Court concluded that the Court of Federal Claims is the "de facto forum" for reviewing OTs and OTAs under the Tucker Act. *Id.* In an effort to "synthesiz[e]" the Court's case law and develop an "appropriate and more predicable jurisdictional framework[,]" the Court held that assessing jurisdiction "simply requires an evaluation of the federal agency's immediate endgame." *Id.* at 293. The Court thus applied a "working definition of OTs and OTAs falling within this Court's exclusive bid protest jurisdiction under the Tucker Act: an acquisition instrument other than a traditional procurement vehicle intended to provide the government with a direct benefit in the form of products or services." *Id.* Applying that standard, the Court in *Raytheon* held that the DoD Missile Defense Agency's ("MDA") Broad Agency Announcement ("BAA") calling for white papers on basic and applied research related to the development of a new Glide Phase Interceptor ("GPI") satisfied the "jurisdictional hook of 'procurement solicitations and contracts' required under the Tucker Act." *Id.*

In *Telesto*, the Court adopted a similar test to the one articulated in *Raytheon* and *Hydraulics*, focusing on the purpose of the Government's use of its prototype OT authority. 176 Fed. Cl. at 731. But, respectfully, the *Telesto* Court erred in adopting an arbitrary standard for determining when, during the process of an OT, a procurement can be found to exist that is defined

[redacted]

entirely by the Government's announcement that it intends to use a follow-on production contract, which, in addition to ceding control of the jurisdictional inquiry to the Government, is contrary to the standard established in *Distributed Solutions*. *See Telesto*, 161 Fed. Cl. at 733–34. The Court also erred in declaring a "jurisdictional blackout" during the prototype phase and adopting an overly narrow and rigid articulation of jurisdiction that would unnecessarily divide jurisdiction between this Court and the district courts in an unworkable fashion contrary to the ADRA. *See id.* at 733.

**D. The Court Should Find That it Has Jurisdiction Because the Navy's MUSV Transaction is a "Procurement" and "in Connection With" a Procurement**

Applying these principles to this case, the conclusion is clear: the Court has jurisdiction over Blue Water's protest allegations challenging the Navy's evaluation of Blue Water under § 1491(b)(1). In July 2025, the Navy initiated the Modular Attack Surface Craft ("MASC") program as part of a generational investment in USVs and fleet modernization focusing on medium-sized USVs. Pl. Mot. Judgment on Admin. Record ("MJAR") at 5, ECF No. 77 (citing Tab 5, AR 71). The Navy announced in March 2026 that MASC was being canceled but MUSV was being initiated. Tab 5, AR 71–72. It announced the MUSV RPP on March 26, 2026. Tab 7, AR 85-86; Tab 7a, AR 92; Tab 14.1, AR 251. Starting with MUSV (if not with the MASC transaction), the Navy initiated the process of "determining a need for property or services"—specifically, a need to acquire MUSVs—with plans to award production contracts, thus satisfying the jurisdictional requirement that there exist a disputed award or proposed award of a contract in connection with a procurement or proposed procurement. *Distrib. Sols.*, 539 F.3d at 1345.

The Government fails to rebut any of the factual allegations in Blue Water's amended complaint or evidence in the record demonstrating that the Navy intends to move directly from the prototype phase into follow-on production after the on-water tests of vessels. *See* Am. Compl. ¶¶

[redacted]

20–21, ECF No. 74 (reciting facts demonstrating the Navy's production plans for MUSV). The MUSV Solicitation is part of the Navy's "acquisition strategy shift" consisting of a "strategic shift in [its] acquisition approach for unmanned surface vessels to accelerate the delivery of warfighting capability to the Fleet." Tab 5, AR 73; Pl. MJAR at 5, ECF No. 77. The Navy's use of the term "acquisition" is telling: it seeks to procure items for the Fleet.

In contrast with the cooperative agreement in *Hymas*, the Navy is using its prototype OT authority to select and test MUSVs using evaluation criteria focusing on fielding production vessels in FY 2027. The MUSV prototype competition is intended to serve "as a ***direct, competitive down-select*** for a potential multi-vessel production and/or service contract with delivery of a production vessel in FY27." Tab 5, AR 72 (emphasis added). Successful participants in the prototype phase could be eligible for a follow-on production contract. Under MUSV, the Navy plans "to have vessels available for Navy leasing or ***procurement*** in fiscal year 2027" and "to ***procure*** as many MUSV vessels in different configurations as required to meet Fleet needs." AR 78 (emphasis added). The Navy told Blue Water it expected to "award follow-on production OTs ASAP (hopefully within 1-2 months of success)." Am. Compl. ¶ 20, Ex. 7 at 1. The Government's "immediate end game" is thus to identify MUSVs for procurement on a rapid timeline to meet DoD's needs. *Raytheon*, 175 Fed. Cl. at 293.

The MUSV prototype competition seeks prototypes of autonomous MUSVs that can carry containerized payloads and can be tested by the end of FY 2026, *i.e.*, by September 30, 2026. Pl. MJAR at 5; Am. Compl. ¶ 2; Tab 14.1 at AR 251–52. The Navy's Solicitation evidences its intent to conduct tests of vessels so that it could rapidly acquire them. The RPP sought "technically mature solutions to satisfy the [Navy's] vessel and autonomy performance requirements" and to complete an on-water test by the end of FY 2026. Tab 14.1 at AR 251. The Solicitation's criteria

[redacted]

reinforce that procurement is the Government's objective. In Phase 1, the Navy evaluated proposals against pass/fail criteria and rated them as either Acceptable or Unacceptable, focusing on "Vessel Solution Design (Criteria 2)," "Manufacturing readiness to support the future production of MUSV (Criteria 3)," and a "plan for test execution to complete an on-water MUSV Test Event (Criteria 4)." Tab 14.1 at AR 257. In Phase 2, offerors found Acceptable would receive an OT award and compete in an on-water MUSV Test Event. Tab 14.1 at 264–65. Companies that successfully complete the Test Event would be eligible for follow-on production contracts under 10 U.S.C. § 4022(f). Tab 14.1 at AR 257.

Following testing, the Navy contemplates moving directly to award follow-on production contracts or transactions to successful prototype project participants so that vessels can be operational and fielded in FY 2027. Am. Compl. ¶ 2; Tab 14.1 at AR 257. The RPP states: "In accordance with 10 U.S.C. 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the ***successful prototype participants***." Tab 14.1 at AR 257 (emphasis added). Absent the relief sought in this protest, Blue Water would not be eligible for a follow-on production contract because it was unfairly rated Unacceptable and excluded from further competition. It follows that Blue Water would not be an interested party with requisite standing to challenge any future follow-on production contract limited to successful participants from the prototype phase. In this regard, the Navy has ***already made*** a "connection to a procurement or a proposed procurement" by declaring in the Solicitation that it may award a follow-on production contract to successful participants in Phases 1 and 2, and then deciding that Blue Water was not among those successful participants. *See Hydraulics*, 161 Fed. Cl. at 178 ("Both this court and the District of Arizona have held where an OTA can result in the exclusion of a bidder for consideration of 'a follow-on production,' the

[redacted]

OTA is 'in connection with a procurement or a proposed procurement.'") (citing *Kinemetrics*, 155 Fed. Cl. at 875; *MD Helicopters*, 435 F. Supp. 3d at 1013)). Thus, the Court has jurisdiction under section 1491(b)(1).

The Navy's RPP and its surrounding context reinforce the connection to procurement. Relying on its predecessor MASC competition for market research, the Navy stated its goal of initiating the MUSV OT competition using "Full and Open competition for Prototype OT(s) for autonomy and performance testing." Tab 3, AR 53; *id.* at AR 77 (stating goal of "quickly tailoring existing solutions to ***meet the Navy's needs***") (emphasis added). The MUSV prototype phase is thus like the Army's "down-select process" in *MD Helicopters*, "wherein the anticipated follow-on procurement contract to be awarded would be limited to the pool of successful prototype program participants." *Raytheon*, 175 Fed. Cl. at 292 (citing *MD Helicopters*, 435 F. Supp. 3d at 1012–13). And it is unlike *SpaceX*, wherein the solicitation seeking prototypes was "separate and distinct" from any possible follow-on procurement for launch vehicles. 144 Fed. Cl. at 442; *see also Hydraulics*, 161 Fed. Cl. at 178 (distinguishing *SpaceX* on a similar basis); *Raytheon*, 175 Fed. Cl. at 294 (same).

The Navy has repeatedly stated its intentions to move quickly into follow-on production contracts. Under MUSV, the Navy plans "to have vessels available for Navy leasing or procurement in fiscal year 2027" and "***to procure*** as many MUSV vessels in different configurations as required to meet Fleet needs." Tab 5 at AR 78 (emphasis added). The Navy's FY 2027 shipbuilding plan calls for "[a]ggressively pursuing advancements" in unmanned, semi-autonomous, and autonomous naval systems and commits "to build at scale USVs and [Unmanned Undersea Vehicles] to meet fleet demands." Department of the Navy, U.S. Navy Shipbuilding

[redacted]

Plan (May 2026) at 28.[4] The Navy's "acquisition strategy for MUSV is directly related to the Navy's objective of revitalizing the defense and shipbuilding industrial base[.]" *Id.* at 31. The plan calls for the delivery of 39 MUSVs in FY 2027 (including 36 MUSVs "procured in FY26[,]") and the Navy intends to more than double that inventory by FY 2031. *Id.* at 56.

The Navy's senior acquisition official stated publicly that the Navy has $2.1 billion for the MUSV family of vessels, of which $1.9 billion is obligated for the procurement of MUSV, and the Navy intends to move directly to procurement and obligate production funds this year. Pl. Am. Compl. ¶ 20 (citing Ex. 8 at 5 and Ex. 10 at 12-13) ("we just closed the [MUSV] solicitation Friday, and we are going through the proposals now . . . and are aiming for approximately 30 [MUSVs] ***in the first buy***, and we will open the marketplace for additional requirements as we receive them") (emphasis added). The Navy's then-PAE stated publicly that the Navy intends to go "***straight to procurement***" and obligate production funds "this year," describing the effort as a "***direct path to production***." Am. Compl. ¶ 20 (citing Ex. 8 at 4) (emphasis added). The Government makes no attempt to challenge any of these unrebutted facts establishing a connection to procurement.

There is ample evidence that the Navy has determined a need for MUSVs and that the prototype OT is one stage in acquiring MUSVs. Because the Navy initiated "the process for determining a need for property or services" prior deciding to use the OT authority, there was a "procurement or proposed procurement" to which Tucker Act jurisdiction attached before the Navy decided to use its OT authority, rather than a FAR-based contract. *Distrib. Sols.*, 539 F.3d at 1345 ("'procurement' includes all stages of the process of acquiring property or services, ***beginning with the process for determining a need for property or services***" (additional

[4] Available at: https://bit.ly/45fcL0R (last accessed on Aug. 8, 2026).

[redacted]

emphasis added)). The issuance of the MUSV RPP was a subsequent "stage in the process" of acquiring MUSVs that occurred after the Navy determined its need for MUSVs, and is thus squarely "in connection with" a "procurement" under *Distributed Solutions*. *Id.*

**E. That a Follow-on Production Contract May Not Occur is Irrelevant**

The Government asserts that it has not yet decided whether to pursue a follow-on production contract, "has not procured or acquired *anything* at this point," and has not decided whether it will use a services model. Def. MTD at 27 (emphasis in original). This is irrelevant. The Federal Circuit has recognized that the Tucker Act does not require an actual procurement for jurisdiction purposes, so it is immaterial whether a procurement has already occurred. *Distrib. Sols.*, 539 F.3d at 1346 ("the statute does not require an actual procurement"); *see also Hydraulics*, 161 Fed. Cl. at 177; *Strategi Consulting, LLC v. United States*, No. 26-450, 2026 WL 2166765 (Jul. 24, 2026) (declining to dismiss protest of SBIR Phase III contract and rejecting argument that there is no "procurement"). In fact, jurisdiction does not depend on whether the Government ultimately carries out a future production contract. The Government's argument is squarely refuted by *Distributed Solutions*, in which the Federal Circuit held that by issuing an RFI, the Government initiated the process for determining a need for property or services, which was sufficient to establish jurisdiction under section 1491(b)(1), and it did not matter that the agency later determined not to conduct an actual procurement. *Id.* ("The statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'"). It likewise does not matter whether the Navy later decides to procure the MUSVs at all, procure them as products, or procure them using a services model, because all fit within the definition of a procurement. *Id.* ("'procurement' includes all stages of the process of ***acquiring property or services***" (emphasis added)).

[redacted]

### F. The Government's Arguments in Opposition to Jurisdiction Are Meritless

#### 1. <u>The Government Misconstrues *Hymas*</u>

The Government erroneously contends that OTAs are categorically excluded from this Court's bid protest jurisdiction under § 1491(b), based on an overbroad reading of *Hymas*. Def. MTD at 12–24. This Court has consistently rejected the Government's similar arguments in past cases and should do so again here. *See Hydraulics*, 161 Fed. Cl. at 178 ("The government believes it is 'conceivable' no court could ever review an agency's OTA."); *IRTC*, 172 Fed. Cl. at 259–60 ("If, as the Government argues, all solicitations issued pursuant to OT authority are not procurements, and thus beyond the Court's jurisdiction, then the "in connection with a procurement" analysis conducted by the courts in these cases would have been unnecessary."); *Raytheon*, 175 Fed. Cl. at 291 (defendant argues "[i]n support of exempting this class of contracting vehicles from this Court's bid protest jurisdiction under the Tucker Act . . . ."); *Telesto*, 176 Fed. Cl. at 730 (declining to adopt the Government's position that Telesto's protest was beyond the Court's jurisdiction based on *Hymas*); *see also* Def. MTD at 20, ECF No. 54, *SpaceX*, 144 Fed. Cl. 433.

*Hymas* involved cooperative farming agreements ("CFAs") whereby farmers would be allowed to raise commercial crops in National Wildlife Refuges in exchange for reserving a portion of their crops to feed migratory birds and wildlife. 810 F.3d at 1314–15. There was no acquisition of property or services by the Government; rather, the Government allowed farmers to use public land so long as certain conditions were met. *Id.* Further, the agency "did not use formal procurement procedures or solicit full and open competition before it awarded [the CFAs]," but rather a "priority selection system that gave preference to previous cooperators with a successful record of farming designated areas within the refuge." *Id.* at 1315. The CFAs at issue were not

[redacted]

procurement contracts "because the agency did not intend to acquire farming 'services' for the direct benefit or use of the United States Government." *Id.* at 1328 (citation omitted).

The Government contends that the use of cooperative agreements in *Hymas* was the basis for the Federal Circuit's conclusion that the Court of Federal Claims did not possess Tucker Act jurisdiction over the bid protest. Def. MTD at 15–16. According to the Government, this Court only possesses Tucker Act jurisdiction to hear "bid protests that are 'exclusively' concerned with procurement solicitations and contracts, not cooperative agreements, not grants, and not OTs," and that "[b]ecause the Navy exercised its non-procurement authority to award prototype OTs for this project, the Court does not possess jurisdiction to entertain these bid protests regarding that non-procurement action." *Id.* at 23. The Government is wrong on all counts.

The Government conveniently ignores that the Federal Circuit's analysis in *Hymas* centered on the principal ***purpose*** of the cooperative agreement in that particular case. *See* Def. MTD at 13–24.[5] The Court found that Tucker Act jurisdiction was lacking over the protest because the CFAs' principal purpose was to "assist private farmers to promote wildlife conservation," not to acquire farming services for the Government's benefit. *Hymas*, 810 F.3d at 1328. As explained above, the Navy's principal purpose here is entirely different: to prepare for MUSV production and acquisition. Notably, at no point in its motion does the Government state what it believes the purpose of the MUSV program to be. *See generally* Def. MTD.

[5] The Government expends several pages of its motion arguing that OTs and cooperative agreements are not procurement contracts. *See* Def. MTD at 17–21. But just because a prototype OT is different from a traditional FAR-based contract does not mean it is not "in connection with a procurement" or a "proposed procurement" within the scope of the Tucker Act. *Id.* at 23. The "relevant inquiry requires the [c]ourt to look at what the [g]overnment is seeking' to obtain, i.e., a product or service." Am. Compl. at 7. The Navy's MUSV RPP "initiated the process for 'determining a need for property or services' that will result in multiple production contracts, thus satisfying the jurisdictional nexus to a procurement or proposed procurement. *Id.* at 6–9.

[redacted]

The unique purpose of the CFAs in *Hymas* being to "assist private farmers to promote wildlife conservation" makes *Hymas* readily distinguishable from Blue Water's protest. 810 F.3d at 1328. In contrast to *Hymas*, where no products or services were being acquired by the Government, here, the Navy's entire purpose of the prototype OT is to select and test prototype MUSVs that meet the Navy's Fleet requirements for procurement. For that reason alone, *Hymas* is not controlling.

The Government's attempt to lump OTs together with cooperative agreements under the category of "non-procurements" fails. The Government contends that OTs should be treated the same as cooperative agreements and grants for jurisdictional purposes because "OTs have been statutorily set apart from procurements by Congress." Def. MTD at 15–16, 18–20. The Government fails to mention that OTs have also been statutorily set apart from cooperative agreements and grants in section 4021 itself: "transactions (***other than*** contracts, ***cooperative agreements, and grants***)." 10 U.S.C. § 4021 (emphasis added). OTs are materially different from cooperative agreements and grants, because, as noted above, they can be used to procure items and services for DoD's benefit. The Government also cites *Bader v. United States*, 97 F.4th 904, 915 (Fed. Cir. 2024), for the proposition that "OTs have been statutorily set apart from procurements by Congress, as the Federal Circuit recently recognized." Def. MTD at 16. But *Bader*, a retirement pay case and not a bid protest, does not help the Government. It merely stated that the FAR "does not apply" to OTs without saying anything about the Tucker Act or "procurement." 97 F.4th at 915. The cases the Government relies upon thus do not control the jurisdictional analysis here.

[redacted]

2. The Government's Recitation of the Legislative History of OTs is Unavailing.

The Government's lengthy description of the legislative history of OTs and Congress's efforts to expand their use within DoD is of little help to the Court on the jurisdictional issue. A review of the history of OTs confirms that there is no tension between this Court's jurisdiction to hear an objection to the Navy's evaluation and award decision under the MUSV Solicitation, and the purpose of OT authority of providing a "flexible contracting method" to "streamline ***acquisition*** of innovative research and technology from the private sector." S. Rep. No. 115-125, at 189, 190 (2017); S. Rep. No. 114-49, at 168 (2015) (emphasis added). In fact, this Court's review of allegations of arbitrary and capricious conduct in connection with an agency's exercise of OT authority ***advances*** Congress's goal of enticing non-traditional firms into the defense market and "ensuring that innovative private-sector companies are willing to contract with DOD," Def. MTD at 6 (citing S. Rep. No. 114-49, at 165 (2015)), because "[t]he purpose of bid protests is to 'protect the integrity of the procurement process and to safeguard protester rights,' by providing a mechanism for review of agency action." *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168 (2011) (quoting Jonathan R. Cantor, *Bid Protests and Procurement Reform: The Case for Leaving Well Enough Alone*, 27 Pub. Cont. L.J. 155, 155 (1997)); *see also* Office of the Undersecretary of Defense for Acquisition and Sustainment, Other Transactions Guide at 4–5 (ver. 2.0) (Jul. 2023). Bid protests of OTs provide confidence to private-sector companies that the process is fair, accountable, and that alleged improprieties are subject to review by judges with expertise in government contracting. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) ("[t]he Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."); *HVF W., LLC v. United States*, 148 Fed. Cl. 45, 57 (2020) (noting an injunction "to preserve the fairness of competition

[redacted]

for government contracts … is not of minor import" because that "is the function of the court's bid protest jurisdiction").

The Court's jurisdiction to review agency action does not mean that OTs are subject to the FAR or the Competition in Contracting Act's pricing and full and open competition requirements—irrespective of the Navy voluntarily choosing to utilize full and open competition for MUSV. *See* Tab 3, AR 53; *see also* Def. MTD at 18. OTAs awarded under § 4022 are already subject to the Procurement Integrity Act. 10 U.S.C. § 4022(h). Reviewing OT-related actions under § 4022 properly ensures that an agency is held accountable for prejudicial errors when it improperly exercises its authority under § 4022 in furtherance of the agency's acquisition strategy.

Moreover, the history of DoD OTs shows that Congress always intended that OTs could be used as a "stage of the federal contracting acquisition process." *Distr. Sols.*, 539 F.3d at 1346. For example, DARPA's 1993 OT authority was granted to "carry out prototype projects . . . [for] weapons or weapon systems proposed ***to be acquired*** or developed by the Department of Defense." Def. MTD at 4 (quoting NDAA for Fiscal Year 1994, Pub. L. No. 103-160, § 845, 107 Stat. 1547, 1721-22 (1993) (1994 NDAA) (emphasis added)). This authority was later expanded beyond the acquisition of weapons or weapon systems to "platforms, systems, components, or materials ***proposed to be acquired*** or developed" by DOD. 10 U.S.C. § 2371b(a)(1) (Supp. III 2015) (emphasis added). Indeed, the legislative history of the OT statute in Section 2371b (now section 4022) is explicit that DoD's OT authorities "should be used to their maximum extent . . . in order to streamline ***acquisition*** of innovative research and technology from the private sector." S. Rep. No. 114-49, at 168 (emphasis added). That intention is now reflected explicitly in § 4022(a), which authorizes "prototype projects that are directly relevant to . . . improving platforms, systems,

[redacted]

components, or materials ***proposed to be acquired*** or developed by the Department of Defense" 10 U.S.C. § 4022(a) (emphasis added)).

Thus, there is no question that Congress intended that OTs could be part of the acquisition process. Because agencies are afforded flexibility in how to use OT authority, *see* Def. MTD at 4–9 (explaining the gradual expansion of OT authority and how "Congress has continued to endorse the use of OTs in a wide range of circumstances"), whether a particular OT is part of the acquisition process is fact specific inquiry. Indeed, one agency may use OTA authority to create a commercial market for space launch activities that is not "in connection with a procurement," *See SpaceX*, 144 Fed. Cl. at 434–47, while another agency may use OTA authority as a down-select tool to award an IDIQ for the acquisition of seismic equipment that is "in connection with a procurement." *See Kinemetrics*, 155 Fed. Cl. at 780, 785.

3. *Telesto* was wrongly decided and does not offer a useful or correct framework for resolving the Government's motion.

The Government argues that this Court's decision in *Telesto* "further supports dismissal" of the plaintiffs' protests. Def. MTD at 24–25. Asserting that *Telesto* "accept[ed] the main thrust of [the Government's] arguments, *id.* at 25, the Government argues that, as in *Telesto*, this Court should decline to review claims about technical evaluations during the prototype phase of an OT for lack of jurisdiction, during which there is an "effective jurisdictional blackout" in this Court. *Id.* at 25-26 (citing *Telesto*, 176 Fed. Cl. at 720, 733).

The Government's reliance on *Telesto* is misplaced. In the first place, the Court in *Telesto* did not adopt the Government's argument based upon *Hymas* and instead adopted a purpose-type test in order to examine whether jurisdiction under the Tucker Act could be found. In *Telesto*, the Court concluded that it is necessary to assess the principal purpose of an agency's underlying OT in evaluating bid protest jurisdiction. 176 Fed. Cl. at 731. The Court determined the principal

[redacted]

purpose of the program at issue was the development of a prototype software solution that integrates five disparate Army systems into one singular system, which the agency intended to procure if the developed prototype met the Army's requirements. *Id.* at 732. . Also, the Court in *Telesto* found it can review whether the agency complied with the terms of the OT documents as that bears on competition, and Blue Water meets that standard. *Telesto*, 161 Fed. Cl. at 735 ("Telesto may also maintain a challenge to the Army's compliance with the terms of the PPON and other program-related documents, because these documents are integral to the statutory and regulatory integrity of the OT."); Am. Compl. at ¶¶ 121–129, 140–64.

Departing from the other decisions from this Court examining OT-related protests, however, the *Telesto* Court concluded it did not have jurisdiction over an OT protest during the prototyping phase and that jurisdiction only attached at the production stage. *Id.* at 734. The Court announced that there is a "jurisdictional blackout" during the prototyping phase of an OT and that "there is no authority to review an agency's conduct of the prototyping phase or the agency's evaluations of the participants' performance at various stages of that phase." *Id.* at 733, 734.

Respectfully, *Telesto* was wrongly decided in two respects. First, *Telesto* relied on an untenable framework that conflicts with *Distributed Solutions*, in which the Federal Circuit was explicit that there does not need to be an actual procurement for Tucker Act jurisdiction to attach. For the Court to find that bid protest jurisdiction attaches at the production stage, the agency must necessarily have already determined its need, at which point a procurement "begins." *Distrib. Sols.*, 539 F.3d at 1346. Thus, the intermediate prototyping stage is logically "in connection with" a procurement or proposed procurement. *Telesto* ignores that implication.

Second, *Telesto* adopts an unworkable standard. It concluded that certain prototype phase claims could be brought at the Court of Federal Claims (those alleging statutory or regulatory

[redacted]

violations), while others can only be heard in federal district court under the APA. *See Telesto*, 176 Fed. Cl. at 734–35. Under this standard, a disappointed offeror in a prototype phase of an OT seeking to vindicate its rights would have to file simultaneous protests in district court and the Court of Federal Claims based on a single OT solicitation.[6] Such piecemeal litigation would be contrary to the ADRA's purpose of consolidating jurisdiction over bid protests in the Court of Federal Claims. Requiring would-be protesters to pursue two claims at the same time in different fora, one under the Tucker Act and one under the APA, is neither justified nor desirable. Such claim-splitting could run afoul of 28 U.S.C. § 1500, which removes this Court's jurisdiction over "any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or process against the United States. . . ." It would also invite the significant risk of a district court and this Court reaching divergent decisions (on likely significant different timelines, given the busy dockets of many district courts) regarding the lawfulness of an agency's conduct in a single prototype transaction. Such an interpretation of the Tucker Act is inconsistent with the Federal Circuit's precedent establishing that "in connection with a procurement" should be interpreted broadly. *Sys. Application & Techs.*, 691 F.3d at 1380.

Finally, *Telesto* is readily distinguishable from the Navy's MUSV competition. In *Telesto*, there was no solicitation for the OT, only a statement of need and notice document that invited parties to participate in "a multi-year process of research and development" for a product that the Army "may" eventually acquire. 176 Fed. Cl. at 733. Here, however, rather than a multi-year invitation for research and development, the Navy issued a solicitation for mature prototype

[6] Underscoring the challenges of litigating APA protests in district courts, the *SpaceX* case was transferred from this Court to the United States District Court for the Central District of California, where the APA action ultimately took nearly a year to be resolved on the merits. *Space Expl. Techs. Corp. v. United States*, No. 19-7927, 2020 WL 7344615, at *19 (C.D. Cal. Sept. 24, 2020).

[redacted]

designs for a "direct, competitive down-select" to production contracts for the Navy to begin acquiring MUSVs as early as next year. Tab 5, AR 72–73.

Accordingly, the Court should decline to follow *Telesto*, which is unpersuasive authority.

4. Requiring that OT-related protests be brought in district court is inconsistent with the text and purpose of the ADRA

The Government latches onto the *Telesto* decision's faulty OT jurisdiction framework to contend that all bid protests of OTs should be brought in district courts under the APA or, alternatively, in this Court under 28 U.S.C. § 1491(a)(1). *See* Def. MTD at 28. The Government disclaims any argument that it is seeking to shield OTs from judicial review, but the rule it proposes would lead to unnecessary confusion and disparate outcomes contrary to the ADRA, which was "motivated by a concern with forum shopping and fragmentation of government contract law." *Res. Conservation Grp.*, 597 F.3d at 1243. The Court need not invite "jurisdictional ping-pong" between the district courts and this Court in protests involving OTs, especially given DoD's increasing reliance such instruments. *Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 818 (1988).

In *Raytheon*, the Court aptly rejected a similar argument, explaining that "the government generally seeks to present OTA awardees (and prospective awardees) with a binary choice: seek injunctive relief through an APA challenge to the agency action in federal district court or file a breach of contract claim in this Court under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, where relief is largely limited to monetary damages." *Raytheon*, 175 Fed. Cl. at 291.[7] As discussed above, nothing supports the Government's position that OTs are categorically excluded from

[7] Contrary to the Government's characterization of *Raytheon* as having a "glaring flaw" that the case "relied upon a presumption of judicial review to find jurisdiction," Def. MTD at 28, this quotation illustrates that was not the case.

[redacted]

section 1491(b); rather, the Court must look at the principal purpose of the OT program and determine whether it is "in connection with" a procurement or proposed procurement.

5. Blue Water has Alleged Statutory Violations in Connection with a Procurement Sufficient to Confer Jurisdiction Under the Tucker Act.

The Government makes a circular argument that, because, according to the Government, section 4022 is not a "procurement" statute, Plaintiffs' allegations that the Navy violated section 4022 fail to allege a violation of a statute or regulation in connection with a procurement or proposed procurement for purposes of the Tucker Act. Def. MTD at 24. The Government's reading of § 1491(b) is untenable. The Federal Circuit has interpreted the third prong of § 1491(b) broadly, reasoning "'[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction under the third part." *Percipient.AI v. United States*, 153 F.4th 1226, 1239 (Fed. Cir. 2025) (en banc) (citing *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (internal quotations omitted)). As explained above, the OT statute is in connection with a procurement based on the facts of this protest. Blue Water has alleged that the Navy was required under § 4022(b)(2) to utilize competitive procedures to the maximum extent practicable, and the Navy failed to do so by failing to follow the terms of the RPP, applying unstated evaluation criteria, engaging in disparate treatment, and ignoring information in Blue Water's Proposal. *See* Am. Compl. at ¶¶ 121–29, 157–64. That satisfies even the *Telesto* framework, whereby the Court explained that the OT documents "establish the competitive framework for the OT, and those documents must reflect compliance with the applicable statutes and regulations." *Telesto*, 176 Fed. Cl. at 735. On that basis, the Court held the plaintiff could maintain a challenge to the agency's compliance with its OT documents "because these documents are integral to the statutory and regulatory integrity of the OT." *Id.* Blue Water satisfies this standard.

[redacted]

## CONCLUSION

For these reasons, Blue Water respectfully requests that the Court deny the Government's motion to dismiss.

Respectfully submitted,

s/Alexander O. Canizares
Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com

*Lead Attorney for Plaintiff*
*Blue Water Autonomy, Inc.*

*Of Counsel:*
Tyler Robinson
Christopher M. O'Brien
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: trobinson@velaw.com
Email: cobrien@velaw.com

August 24, 2026

[redacted]

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I electronically filed the foregoing Plaintiff Blue Water Autonomy, Inc.'s Response to Defendant's Motion to Dismiss under seal with the Clerk of the Court using the CM/ECF system, which will send notification of such to counsel of record. Pursuant to the Court's Amended General Order No. 2026-01, I hereby certify that a true and correct copy was also transmitted to the following parties this 24th day of August, 2026:

Counsel for Defendant United States:

Douglas Glenn Edelschick
Natalee A. Allenbaugh
U.S. Department of Justice - Civil Division Post Office Box 480
Ben Franklin Station
Washington, DC 20044
Tel.: (202) 353-9303
douglas.edelschick@usdoj.gov
Natalee.allenbaugh@usdoj.gov

Counsel for Co-Plaintiff Saildrone, Inc.:

Faith E. Gay
Laura M. King
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com
lking@selendygay.com

Carla Weiss
NICHOLS LAW PLLC
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: (202) 846-9800
cweiss@nicholslaw.com

Counsel for Defendant-Intervenor Saronic Technologies, Inc.:

Jon W. Burd
Cara L. Sizemore
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel.: (202) 719-7172
jburd@wiley.law
csizemore@wiley.law

[redacted]

Counsel for Defendant-Intervenor HII Unmanned Systems, Inc.:

J. Hunter Bennett
Kayleigh M. Scalzo
Jason A. Carey
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-5424
hbennett@cov.com
kscalzo@cov.com
jcarey@cov.com

Counsel for Defendant-Intervenor Leidos, Inc.:

Michael J. Anstett
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
Tel.: (202) 639-7390
Michael.anstett@friedfrank.com

Respectfully submitted,

*s/ Alexander O. Canizares*
Alexander O. Canizares
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6581
Facsimile: (202) 639-6604
Email: acanizares@velaw.com
*Counsel for Blue Water Autonomy, Inc.*