REDACTED VERISION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| BLUE WATER AUTONOMY, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant*,<br><br>and<br><br>HII UNMANNED SYSTEMS, INC., *et al.*,<br><br>*Defendant-Intervenors*. | Nos. 26-936, 26-944<br>Judge Philip S. Hadji<br><br>[redacted] |

**PLAINTIFF SAILDRONE, INC.'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]

# TABLE OF CONTENTS


INTRODUCTION ..... 1

QUESTION PRESENTED ..... 5

BACKGROUND ..... 5

ARGUMENT ..... 11

I. Saildrone's Challenge to RAS's Evaluation Must Be Heard by This Court ..... 12

- A. This Court Is the Exclusive Venue for Objections to OTs Connected to Proposed Procurements ..... 13
  - 1. The Text of the Tucker Act Forecloses the Government's Reading ..... 13
  - 2. This Court Has Repeatedly Rejected the Government's Reliance on *Hymas* ..... 18
  - 3. Whether Objections Are in Connection with a Proposed Procurement Is a Fact-Specific Inquiry ..... 20
- B. Saildrone's Objections Are in Connection with a Proposed Procurement ..... 24
  - 1. The Navy Had Determined It Needed to Acquire MUSVs for Its Direct Benefit and Resolved to Obtain Them When Issuing the Solicitation ..... 25
  - 2. The Prototype OT Is a Necessary Step Towards the Proposed Procurement ..... 28

II. *Telesto*'s Temporal Limitation Does Not Reach This Solicitation ..... 29

- A. *Telesto* Addressed Iterative Technical Judgments, Not Threshold Compliance With a Solicitation's Stated Criteria ..... 30
- B. *Telesto*'s Temporal Test Cannot Be Administered Here and Would Allow the Agency to Insulate Its Conduct From Review ..... 32
- C. Saildrone's Statutory Claim Is Reviewable Under Any Framework ..... 34

III. The Government's Rule Would Place a $2.1 Billion Acquisition Beyond Any Court's Review ..... 37

CONCLUSION ..... 39


[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bader v. United States*,
97 F.4th 904 (Fed. Cir. 2024) .......... 17

*Cleveland Assets, LLC v. United States*,
883 F.3d 1378 (Fed. Cir. 2018).......... 36

*CliniComp Int'l, Inc. v. United States*,
117 Fed. Cl. 722 (Fed. Cl. 2014) .......... 38

*CMS Cont. Mgmt. Servs. v. Massachusetts Hous. Fin. Agency*,
745 F.3d 1379 (Fed. Cir. 2014).......... 22

*Distributed Sols., Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008).......... *passim*

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed. Cir. 2001).......... 17

*Frantzis v. McDonough*,
104 F.4th 262 (Fed. Cir. 2024) .......... 14

*Henke v. United States*,
60 F.3d 795 (Fed. Cir. 1995).......... 11

*Hydraulics Int'l, Inc. v. United States*,
161 Fed. Cl. 167 (Fed. Cl. 2022) .......... *passim*

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016).......... *passim*

*Indep. Rough Terrain Ctr., LLC v. United States*,
172 Fed. Cl. 250 (Fed. Cl. 2024) .......... *passim*

*Kinemetrics, Inc. v. United States*,
155 Fed. Cl. 777 (Fed. Cl. 2021) .......... 19, 23, 28

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015).......... 37

*MD Helicopters, Inc. v. United States*,
435 F. Supp. 3d 1003 (D. Ariz. 2020) .......... *passim*

[redacted]

*Nat'l Ass'n. of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2017) .......... 16

*Progress for Bakersfield Veterans, LLC v. United States*,
158 Fed. Cl. 574 (Fed. Cl. 2022) .......... 36

*Protect Lake Pleasant, LLC v. McDonald*,
609 F. Supp. 2d 895 (D. Ariz. 2009) .......... 38

*PSEG Nuclear, LLC v. United States*,
465 F.3d 1343 (Fed. Cir. 2006) .......... 34

*Raytheon Co. v. United States*,
175 Fed. Cl. 281 (Fed. Cl. 2025) .......... *passim*

*Space Expl. Techs. Corp. v. United States*,
144 Fed. Cl. 433 (Fed. Cl. 2019) .......... *passim*

*Space Expl. Techs Corp. v. United States*,
2020 WL 7344615 (C.D. Cal. Sept. 24, 2020) .......... 38

*Strategi Consulting, LLC v. United States*,
2026 WL 2166765 (Fed. Cl. July 24, 2026) .......... 22, 24

*Sys. Application & Techs. Inc., LLC v. United States*,
100 Fed. Cl. 687 (Fed. Cl. 2011) .......... 12

*Sys. Application & Techs. Inc., LLC v. United States*,
691 F.3d 1374 (Fed.Cir. 2012) .......... 12, 14, 29

*Telesto Grp., LLC v. United States*,
176 Fed. Cl. 711 (Fed. Cl. 2025) .......... *passim*

*VanDesande v. United States*,
673 F.3d 1342 (Fed. Cir. 2012) .......... 33, 34

**<u>Statutes</u>**

10 U.S.C. § 4021 .......... *passim*

10 U.S.C. § 4022 .......... *passim*

28 U.S.C. § 1491 .......... *passim*

41 U.S.C. § 111 .......... *passim*

[redacted]

**Regulations**

32 C.F.R. § 3.1 .......... 32

32 C.F.R. § 3.2. .......... 6

**Legislative History**

142 Cong. Rec. S6155 (1996) .......... 7, 18, 34, 39

H.R. Rep. No. 104-841 (1996) .......... 7

Pub. L. No. 104-320 (1996) .......... 7

S. Rep. No. 106-292 (2000) .......... 6

S. Rep. No. 115-125 (2017) .......... 4

S. Rep. No. 118-188 (2024) .......... 7

**Other Authorities**

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (4th ed.).. 12

Fed. R. Civ. P. 12(b)(1) .......... 12

RCFC 12(b)(1) .......... 11

U.S. Dep't of Def., Procurement and Acquisition Categories: PROCURE (last accessed Aug. 24, 2026) .......... 26

U.S. Gov't Accountability Off., GAO-25-107546, Other Transaction Agreements: Improved Contracting Data Would Help DOD Assess Effectiveness 1, 21 (2025) .......... 6, 7

[redacted]

## INTRODUCTION

Jurisdiction in this Court does not turn on the instrument the Navy chose. It turns on what the Navy is doing with it. The Government asks the Court to hold that a prototype other transaction ("OT") under 10 U.S.C. § 4022 can never be connected to a procurement, because the statute defines an OT as something "other than" a contract. On that reading, the inquiry ends once the Navy pursues an OT: the Court categorically does not possess jurisdiction over OTs at all—regardless of whether the prototype OT is a step towards the Government procuring a good or service. The Tucker Act asks a different question: whether the objection is "in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Answering it "simply requires an evaluation of the federal agency's immediate endgame." *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 293 (Fed. Cl. 2025). The Navy's endgame here is not in doubt.

The Navy described this Solicitation as "a direct, competitive down-select for a potential multi-vessel production and/or service contract with delivery of a production vessel in FY27," Tab 5 at 72, one that would tap into existing industry solutions so the Navy could go "straight into production," Am. Compl. ¶ 29; Tab 5 at 77. The Navy abandoned its prior unmanned surface vessel prototyping effort because "[redacted]" Tab 5 at 77. It sought "technically mature solutions," Tab 7a at 92, and it asked offerors to price in "block buy[s]" of five and ten vessels, Tab 7a at 98. [redacted]. ECF No. 52-1 ("Criteria 1," "Sheet1," and "Brief_Tables" tabs), AR 3029-30, 3036 (emphasis added). It marked its evaluation results "[redacted]." Tab 57 at 1573. It set out to qualify as many builders as it could to compete for $2.1 billion Congress appropriated for Medium Unmanned Surface Vessels ("MUSV") production and [redacted]

[redacted]. Am. Compl. ¶¶ 25-26; Tab 3 at 52. The prototype OTs are the sole gateway to MUSV acquisition, because only prototype participants are eligible for follow-on production. The Government's motion does not confront any of these facts. They compel one conclusion: Saildrone's protest is "in connection with" a proposed procurement.

The Government answers that "the Navy has not procured or acquired anything at this point." That is beside the point. The Tucker Act reaches a *proposed* procurement, and the record establishes that the Navy is already in the process of acquiring vessels. Agencies that have not decided whether to buy do not price vessels in blocks of ten. They do not [redacted] And they do not promise delivery of a production vessel in FY27. The Navy determined its need, told the market it intended to fill that need by purchase, and built a competition whose only gate to that purchase is a prototype OT. That is a *procurement* in every sense the Federal Circuit has given the word: "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citation modified).

Saildrone's position is narrow. It does not contest the Navy's authority to use OT authority for this project. It does not argue that the Solicitation should have been conducted under full Federal Acquisition Regulation ("FAR") procedures. The single question is whether this Court may review an OT that functions as the gating procedure for an anticipated procurement the Navy has already resolved to make. The answer is yes.

This Court is the exclusive venue for objections to an OT connected to a proposed procurement, and Saildrone's objections are such objections. The text of the Tucker Act forecloses the Government's reading, which collapses the distinction between contracts and procurements, violating the canon of surplusage. *Hymas* does not carry the weight the Government places on it.

[redacted]

*Hymas* construed different statutory definitions, said nothing about OTs, and no decision of this court addressing OT protest jurisdiction has read it to place OTs categorically beyond review. The case law instead considers two factors. Objections to an OT are "in connection with" a procurement or proposed procurement when (1) the agency has begun the process for determining a need to acquire specific property or services for its direct benefit prior to or contemporaneous with the solicitation, and (2) the OT is a necessary step in the process by which the agency will ultimately acquire those products or services. Saildrone's objection satisfies both. The Administrative Record establishes that the Navy had determined a need to acquire MUSVs for its direct benefit before it issued the Solicitation. And the prototype OT is the only path to the production the Navy intends, because follow-on production is limited to prototype participants and no separate path exists for the offerors RAS excluded.

This court has repeatedly held that challenges to prototype OTs fall within its jurisdiction as objections "in connection with a procurement." One decision has deviated from that norm, and the Government asks the Court to follow it in the alternative. *Telesto* imposed a jurisdictional blackout during the prototype phase, holding that an OT becomes connected to a proposed procurement only once the agency has completed the prototyping phase and then decided to acquire the successful prototype through follow-on production. *Telesto* was wrong to graft a temporal condition onto Section 1491(b)(1). But the Court need not reach that question, because *Telesto* does not reach this case even if correctly decided.

*Telesto*'s test assumes two sequential phases with a decision point between them. This Solicitation has no such boundary. Its express terms permit the Navy to move an awardee to production "prior to the conclusion of a prototype project," and the Navy told a competitor it expected "to award follow-on production OTs ASAP (hopefully within 1-2 months of success)."

[redacted]

Blue Water Am. Compl. ¶ 20. Seven offerors advanced, and the Navy may move any one of them to production while the others are still testing. So *Telesto*'s trigger will never arrive on a fixed date. It arrives when the agency says so—which lets an agency facing a protest withhold its declaration of success until the protest is dismissed, then award. *Telesto*'s concern was also different in kind. It declined to review a company's challenge to iterative technical judgments made across a seven-step development process, not an agency's threshold compliance with the pass/fail criteria it published. And even on its own terms, *Telesto* preserved review of compliance with the OT statutes throughout the prototype phase. That is where Saildrone's claim under 10 U.S.C. § 4022(b)(2) sits.

The Government's rule cannot be the law, because of what follows from it. Congress has made OTs a principal vehicle for defense acquisition, directing that agencies possess "authority to use OTAs with the most flexible possible interpretation." S. Rep. No. 115-125, at 190 (2017). Yet under the Government's reading, how an agency runs a competition that allocates $2.1 billion in appropriated production dollars remains unreviewable, so long as the agency uses an OT as the gating step. The Government answers that district courts remain open, but the only district court to confront this framework held it had no jurisdiction over precisely this kind of phased down-select, because exclusion at an early phase was "outcome-determinative" of eligibility for production. Congress does not lightly commit agency action to unreviewability. The Government identifies no text withdrawing that review.

Jurisdiction here also produces the right result on the merits. RAS eliminated Saildrone at Phase 1—before a single vessel touched the water—[redacted]

[redacted]. Tab 57 at 1587; Tab 41 at 1201. [redacted]. Tab 41c at 1220; Tab 43 at 1346. [redacted]. Tab 7a at 102; Tab 23 at 425. An evaluation that thins an uncapped field through undisclosed standards defeats the very statute the Navy invoked. 10 U.S.C. § 4022(b)(2). The Court should deny the motion.

**QUESTION PRESENTED**

1. Whether Saildrone has advanced non-frivolous allegations to support this Court's exclusive jurisdiction under 28 U.S.C. § 1491(b) to adjudicate Saildrone's bid protest.

**BACKGROUND**

Congress recently allocated $2.1 billion for the acquisition of MUSVs as part of broader efforts to expand and revitalize the Navy's ships. Am. Compl. ¶ 25; Tab 5 at 78. The Navy has since prioritized rapid acquisition, describing MUSVs as "the unmanned centerpiece" of that initiative. Am. Compl. ¶ 24; Tab 3 at 52. On March 26, 2026, the Navy's Portfolio Acquisition Executive for Robotic and Autonomous Systems ("RAS") issued the Solicitation under the OT authority of 10 U.S.C. § 4022, seeking "technically mature solutions that satisfy the vessel and autonomy performance requirements." Tab 7a at 92. RAS tied the effort to the end of the fiscal year. The Department of Defense ("DOD") has stated publicly that its preference is to award the MUSV acquisition OTs by the end of September 2026. Tab 5 at 72.

[redacted]

The OT statutes, 10 U.S.C. §§ 4021 and 4022, authorize the DOD to enter into "other transactions," that is, transactions that are not traditional "contracts, cooperative agreements, and grants." 10 U.S.C. § 4021(a). An agency may enter into an OT (1) to carry out "basic, applied, and advanced research projects," *id.*, and (2) to "carry out prototype projects that are directly relevant to" other defense-related goals, such as "improving" items that are "proposed to be acquired" by DOD, *id.* § 4022(a)(1). The statute also contemplates that an agency may use an OT as a lead-in to production, specifying that a prototype OT "may provide for the award of a follow-on production contract or transaction to the participants in the transaction." *Id.* § 4022(f)(1).

The statutory scheme balances flexibility with competition. For instance, OTs are "generally not subject" to the FAR or the procurement statutes tied to FAR-based contracts, 32 C.F.R. § 3.2; this allows DOD to attract small business and non-traditional defense contractors who otherwise may not participate in government contracting, U.S. Gov't Accountability Off., GAO-25-107546, *Other Transaction Agreements: Improved Contracting Data Would Help DOD Assess Effectiveness* 1, 21 (2025) [https://perma.cc/U64Z-QHE4] ("GAO Report"). Congress nonetheless maintained certain guardrails. The statute requires that "[t]o the maximum extent practicable, competitive procedures shall be used" when agencies enter into prototype OTs. 10 U.S.C. § 4022(b)(2). The follow-on production pathway is available only if "competitive procedures were used" to select the prototype awardees and the awardees "successfully completed the prototype project." *Id.* § 4022(f)(2).

Congress expected DOD to use this authority to facilitate a broad range of projects. The Senate Armed Services Committee explained that OT authority is intended to ensure DOD "continue[s] to have the flexibility to use innovative contractual instruments that provide access to [commercial] technology." S. Rep. No. 106-292 § 807 (2000). More recently, the Committee

[redacted]

noted that it "believes OTAs provide the Department of Defense additional flexibility over Federal Acquisition Regulation-based contracting for certain types of research, prototyping, and production efforts." S. Rep. No. 118-188 § 801 (2024).

Over the last decade, DOD's obligations through OTs for prototyping and production have increased significantly, growing from $1.8 billion in fiscal year 2016 to over $18 billion in fiscal year 2024. GAO Report at 1, 8. At no point has Congress suggested—amid this explosive growth of OTs comprising multi-billion-dollar awards—that such procurements are categorically exempt from this court's exclusive bid-protest jurisdiction, even as Congress has expanded OT authority to further "liberalize DOD's use of OTs for prototyping efforts." Mot. Dismiss at 5. Passed in 1996, the Administrative Dispute Resolutions Act ("ADRA") channeled bid protests to the Court of Federal Claims, Pub. L. No. 104-320, § 12(a)-(d), 110 Stat. 3870, 3874-75 (1996), "to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum," 142 Cong. Rec. S6155, S6156 (daily ed. June 12, 1996) (statement of Sen. William Cohen); *see also* H.R. Rep. No. 104-841, at 10 (1996) (Conf. Rep.) ("It is the intention [of Congress] to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims."). None of the Congressional modifications of OT authority since 1996 have touched on this court's jurisdiction to entertain OT bid protests, *see* Mot. Dismiss at 3-10, even as this court has repeatedly confirmed it has such jurisdiction.

Against this statutory backdrop, RAS issued the Solicitation to leverage private companies' existing investments in already-developed solutions and to move rapidly to production. A senior RAS official explained that the Navy planned to "test the capability on water and go straight into production." Am. Compl. ¶ 29. By tapping an industry that had already "built boats" and "built

[redacted]

the technology," the Navy could save approximately a year and deliver capability to the fleet faster. *Id.*; Tab 5 at 71-72, 77. That rapid development would allow RAS to make the prototype OTs a "direct path to production." Blue Water Am. Compl. ¶ 20.

The Solicitation adopted a compressed timeline. RAS issued the Solicitation on March 26, 2026; companies had to submit proposals three weeks later; [redacted] Tab 3 at 54, 56. RAS anticipates making production awards about a month after the Test Event. Tab 3 at 55. The Navy confirmed that timeline to Plaintiff Blue Water Autonomy, Inc., stating in writing that "under the prototype OT, we expect to … award follow-on production OTs ASAP (hopefully within 1-2 months of success)." Blue Water Am. Compl. ¶ 20 (alteration in original); *see also* Tab 5 at 78 ("[T]he Navy plans to work with Industry to have vessels available for Navy leasing or procurement in fiscal year 2027."); Tab 3 at 52 [redacted]).

The aggressive timeline would allow the Navy to fulfill its goal of obligating MUSV production funds by September 30, 2026, Am. Compl. ¶ 153; Blue Water Am. Compl. ¶ 20, while rapidly building its autonomous fleet. The Navy's 30-year Shipbuilding Plan called for 36 MUSVs to be procured in FY2026 for delivery in FY2027 and to reach a total fleet inventory of 39 MUSVs by FY2027. Am. Compl. ¶ 26; Blue Water Am. Compl. ¶ 23. RAS separately stated that it was "aiming for approximately 30 [MUSVs] in the first buy." Blue Water Am. Compl. ¶ 20. By 2031, the Navy plans to more than double the MUSV fleet, projecting a total of 83 unmanned vessels. Am. Compl. ¶ 26.

[redacted]

This Solicitation is the pathway to MUSV production. As the Navy put it, "[t]his competition serves as a direct, competitive down-select for a potential multi-vessel production and/or service contract with delivery of a production vessel in FY27." Tab 5 at 72. The Navy previously pursued prototypes of unmanned surface vessels through the Modular Attack Surface Craft ("MASC") program beginning in July 2025. Tab 5 at 71. But the Navy scrapped the program in early 2026 and replaced it with this MUSV Solicitation because [redacted]." Tab 5 at 77. The Navy further stated that it "[redacted]." Tab 5 at 77. The Navy intended to skip the exploratory research and development with this Solicitation: "[redacted] quickly tailoring existing solutions to meet the Navy's needs." Tab 5 at 77.

The Solicitation had two phases. In "Phase 1," companies submitted proposals demonstrating how they met specified criteria, graded on a pass/fail basis. Tab 7a at 92. For example, offerors had to demonstrate design maturity such that offerors could field at least one operational vessel in FY27 with the preference that offerors could field five to ten MUSVs. Tab 7a at 99. RAS also asked for information about capacity for surge production above 10 vessels, Tab 7a at 98, and a detailed showing of manufacturing readiness across categories such as manpower, facilities, and production strategy, Tab 7a at 101. An offeror that could not demonstrate production readiness—regardless of the quality of its design—would be deemed unacceptable. *See* Tab 7a at 102-03.

[redacted]

The vessels also had to meet the Navy's unique needs. The proposed vessels had to carry containerized military payloads per Government-specified size, weight, power, and cooling requirements, and to function under conditions such as restricting radio frequencies while operating autonomously. Tab 7a at 98-99. Desired attributes furthered military objectives, such as the vessel executing pre-planned maneuvers without communication for five days. Tab 7a at 99. "[redacted]." Tab 5 at 78.

Companies that met all proposal requirements were awarded a prototype OT agreement. Tab 7a at 92. The prototype OT consisted of a Post-Award Conference and successful completion of the on-water MUSV Test Event no later than September 30, 2026. Tab 7a at 92-93. In each [redacted]." *E.g.*, Tab 104a at 2420.

Participating in Phase 1 and Phase 2 of the Solicitation and being awarded a prototype OT was the sole pathway to follow-on production eligibility. Upon successful completion of the at-sea demonstration, [redacted] Tab 5 at 72, 77, 78. [redacted]" *E.g.*, Tab 88a at 1947. No separate or subsequent procurement existed through which excluded offerors could compete for MUSV production. Am. Compl. ¶ 151; Tab 5 at 72, 77.

Beyond the three graded criteria, RAS also sought information about government-operated and contractor-operated business models. Tab 7a at 97-98. That information included pricing, delivery timelines, operational rates, sustainment terms, and fleet-scale production capacity for a

[redacted]

"block buy" of 5 or 10 vessels to be owned and operated by the government or the contractor. Tab 7a at 97-98. [redacted]. ECF No. 52-1 at AR 3029-30 (emphasis added). [redacted]. ECF No. 52-1 at AR 3036.

Saildrone, a global leader in operational uncrewed surface vessels, timely submitted its Proposal on April 17, 2026. Am. Compl. ¶ 56; Tab 41 at 1188. Although Saildrone's proposed vessel SPECTRE met the Solicitation criteria and had been validated through external testing before proposals were due, Tab 41 at 1189, 1194-1216, RAS found Saildrone's Proposal [redacted], Tab 57 at 1587. Saildrone filed this bid protest, on June 30, 2026, challenging RAS's evaluation as arbitrary, capricious, and contrary to law. It filed an Amended Complaint on August 10, 2026, adding a disparate treatment claim based on the Administrative Record. ECF No. 73. Blue Water Autonomy, Inc. separately filed a protest and amended its complaint on August 10. ECF No. 74. The Government moved on August 10 to dismiss both protests for lack of subject matter jurisdiction, asserting that bid protests regarding prototype OTs are categorically beyond this Court's Tucker Act jurisdiction. ECF No. 75.

## ARGUMENT

When deciding whether to dismiss a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), "the Court must accept all factual allegations as true" and construe them in the plaintiff's favor. *Indep. Rough Terrain Ctr., LLC v. United States* ("*IRTC*"), 172 Fed. Cl. 250, 255 (Fed. Cl. 2024) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "A complaint need only contain an allegation

[redacted]

of a non-frivolous claim made under a federal law in order to defeat a motion to dismiss for lack of subject matter jurisdiction." *Distributed Sols.*, 539 F.3d at 1345 n.1 (citation modified); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (4th ed.) ("[I]f the allegation of the district court's jurisdiction is insufficient or entirely lacking but there are facts pleaded in the complaint from which the court's jurisdiction may be inferred, then the motion to dismiss under Rule 12(b)(1) motion also must be denied."). When the "defendant challenges the factual basis to the court's jurisdiction," the court may "look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction." *Sys. Application & Techs. Inc., LLC v. United States*, 100 Fed. Cl. 687, 702-03 (Fed. Cl. 2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012).

## I. Saildrone's Challenge to RAS's Evaluation Must Be Heard by This Court

Saildrone's Amended Complaint and Motion for Judgment on the Administrative Record assert the Government violated applicable law in connection with a procurement or proposed procurement when it misevaluated Saildrone's Proposal, imposed unstated criteria and departed from the Solicitation's terms, and when it engaged in indisputable disparate treatment. The plain language of the Tucker Act and precedent from the Federal Circuit and this court, as well as the structure of the Solicitation and OT at issue here, all support the same conclusion: this Court has jurisdiction and this Court should deny the Government's Motion to Dismiss.

The Tucker Act, 28 U.S.C. § 1491, "expressly waives sovereign immunity for claims against the United States in bid protests" and confers the Court of Federal Claims exclusive jurisdiction to adjudicate "a broad range of potential disputes arising during the course of the procurement process." *Sys. Application*, 691 F.3d at 1380. The Government's Motion to Dismiss for lack of subject matter jurisdiction seeks to undercut that authorization.

[redacted]

The Government's position is categorical: prototype OTs are not procurement contracts, so this Court's bid-protest jurisdiction never reaches them. Its argument rests on two analytical failures. First, it makes the instrument dispositive, reading distinct statutory text out of the Tucker Act and conflating OTs with non-traditional contracts. Second, it asks the wrong legal question. It treats the Navy's undisputed authority to use OTs as dispositive of this Court's jurisdiction, when the correct question is whether this particular OT, functioning as the sole gateway to an anticipated $2.1 billion acquisition, is "in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

### A. This Court Is the Exclusive Venue for Objections to OTs Connected to Proposed Procurements

This Court has jurisdiction under Section 1491(b)(1) to review a Solicitation and OT that operates as the gating step for an anticipated procurement. Three points establish that proposition. First, the text of the Tucker Act forecloses the Government's reading: the statute reaches disputes in connection with a procurement. Second, *Hymas* does not compel a categorical exemption for OTs. It construed definitions that do not reach OTs, and it treated the agency's authority to issue the solicitation through a particular vehicle as the beginning of the analysis—not the end of it. Third, whether a particular OT is in connection with a proposed procurement is a fact-specific inquiry into the agency's purpose and the instrument's function within an acquisition. Saildrone does not challenge the Navy's authority to use an OT, contest the propriety of that choice, or ask this Court to graft FAR procedures onto this OT. Saildrone asks this Court to review an OT that operates as the prerequisite step to a defined production acquisition.

#### 1. The Text of the Tucker Act Forecloses the Government's Reading

The Tucker Act confers exclusive jurisdiction on this court "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals

[redacted]

for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The statute creates three distinct jurisdictional categories—solicitations for contracts, awards of contracts, and violations of law—each of which need only be in connection with a procurement. *Raytheon*, 175 Fed. Cl. at 288. The Government agrees. *See* Mot. Dismiss at 12 n.2. Nothing in the plain language of Section 1491(b)(1) exempts violations of law "in connection with a procurement or proposed procurement" merely because the violations involve an OT. "The concluding phrase 'in connection with a procurement or proposed procurement' applies to each jurisdictional prong, giving this Court 'broad' authority 'over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.'" *Raytheon*, 175 Fed. Cl. at 288 (quoting *Sys. Application*, 691 F.3d at 1380-81).

The Government reads "contract" as synonymous with "procurement," collapsing the two and rendering one surplusage. *See, e.g.*, *Frantzis v. McDonough*, 104 F.4th 262, 265 (Fed. Cir. 2024) (rejecting "statutory interpretation" that would "violate the presumption against surplusage"). Procurement as used in the Tucker Act means "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols.*, 539 F.3d at 1345-46 (emphasis added) (importing the definition of "procurement" from 41 U.S.C. § 111). The critical question is whether the Government is acquiring something for its own use from the transaction. And procurement encompasses the entire *process* of acquiring property or services, not merely the final instrument. Nor need that process have ripened: because the statute reaches awards "in

[redacted]

connection with a procurement or a *proposed procurement*," the Tucker Act "does not require an actual procurement. "The statute explicitly contemplates the ability to protest … pre-procurement decisions." *Distributed Sols.*, 539 F.3d at 1346. Accordingly, when OTs are "part of the [agency's] 'process for determining a need for acquisition,' then they are in connection with a proposed procurement." *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 176 (Fed. Cl. 2022) (quoting 41 U.S.C. § 111). That is what makes this court the "de facto forum for bid protests involving … OTs." *Raytheon*, 175 Fed. Cl. at 284 (citation modified).

The Government's contrary reading rests on a misnamed statute. The Government calls 10 U.S.C. § 4001(b) "the OT statute," but it is not. Mot. Dismiss at 19. That provision authorizes DOD to perform "research and development projects" by six separate means:

> The Secretary of Defense or the Secretary of a military department may perform research and development projects—
>
> (1) by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31 [the Federal Grant and Cooperative Agreement Act ("FGCAA")];
>
> …
>
> (5) by transactions (other than contracts, cooperative agreements, and grants) entered into pursuant to section 4021 or 4022 of this title;
>
> …[.]

10 U.S.C. § 4001(b). Subsection (b)(1) cross-references the FGCAA. Subsection (b)(5) does not. The Government nonetheless borrows the FGCAA's definition of "procurement contract" from the first subsection, applies it to the OTs authorized by the fifth, and concludes that OTs cannot be in connection with a procurement under the Tucker Act. Mot. Dismiss at 9, 19. The statute will not bear that weight. Subsection (b)(5) supplies no cross reference to the FGCAA and no definition of OT. *See* 10 U.S.C. § 4001(b)(5). It describes OTs only in the negative—not contracts, not cooperative agreements, not grants. One cannot reflexively borrow the FGCAA's definitions of

[redacted]

what an instrument *is* to fix the meaning of what an instrument is not. Reading OTs through a statute that never mentioned them yields an interpretation "unmoored from the statutory text" of 10 U.S.C. §§ 4021 and 4022. *Nat'l Ass'n. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2017).

Hence the Government's invented phrase, "non-procurement OTs." Mot. Dismiss at 12, 19, 21-22, 29-30. The OT statute defines OTs as transactions "other than contracts, cooperative agreements, and grants." 10 U.S.C. § 4021(a). That text distinguishes OTs from *contracts*—not from procurements. The Government's coinage smuggles in the conclusion that OTs sit categorically outside "procurement" as the Tucker Act uses that word, which is wholly unsupported by the statute's text. *See IRTC*, 172 Fed. Cl. at 258 ("[T]hat the statutory OT provisions describe OT agreements as something other than a procurement contract (or cooperative agreement or grant) does not mean the statute is describing OT agreements as something other than a procurement as defined by 41 U.S.C. § 111. *Hymas* did not hold as much." (citation modified)).

The OT statute's own terms refute the invented "non-procurement OTs" label. The OT statute expressly incorporates the Procurement Integrity Act—a statute that governs ethics in *procurements*. 10 U.S.C. § 4022(h) ("An agreement entered into under the authority of this section shall be treated ***as a Federal agency procurement*** for the purposes of chapter 21 of title 41." (emphasis added)). It requires that "competitive procedures shall be used when entering into agreements to carry out the prototype projects," *id*. § 4022(b)(2)—a term of art drawn from the Competition in Contracting Act, undisputedly a procurement statute, *see id*. §§ 3201 *et seq*. The OT statute requires, too, for OTs exceeding $100 million, a written determination by the "head of contracting activity" that the statutory requirements will be met, and that the use of the OT authority is "essential" for the success of the project, *id*. § 4022(a)(2)(A); and for OTs exceeding

[redacted]

$500 million, a written determination from the "senior *procurement* executive" that the requirements will be met and that the use of OT authority is "essential to meet critical national security objectives," plus thirty days' advance notice to the congressional defense committees, *id*. § 4022(a)(2)(B). And it conditions follow-on production contracts on the use of competitive procedures, linking the prototype phase to subsequent acquisition that follows. *Id*. § 4022(f). It further authorizes follow-on production "[c]ontracts and [t]ransactions" alike, *id.*—which on the Government's reading is a contradiction on its own terms because a follow-on production OT would be an instrument categorically incapable of being part of an acquisition. Congress does not write a statute in the vocabulary of procurement to describe instruments it means to place beyond procurement.[1]

Section 4022's vocabulary defeats the Government's categorical rule—the assertion that no OT can ever be connected to a procurement. Congress wrote Section 4022 in procurement vocabulary, so an OT cannot be excluded from Section 1491(b)(1) by definition. Whether any

[1] The Government claims that FAR exclusion demonstrates "OTs have been statutorily set apart from procurements by Congress, as the Federal Circuit recently recognized." Mot. Dismiss at 16 (citing *Bader v. United States*, 97 F.4th 904, 915 (Fed. Cir. 2024)). Not true. The Federal Circuit merely observed—in a case that did not involve bid-protest jurisdiction under the Tucker Act—that while OTs are excluded from FAR, OTs "do not exempt government employees from generally applicable ethics regulations." *Bader*, 97 F.4th at 915. FAR exclusion for OTs intended to be and designed as the pathway to procurement does not—and was never meant to—eliminate the minimum safeguard that an agency's failure to follow its own solicitation and to treat like proposals similarly remains subject to judicial review. *See Hydraulics*, 161 Fed. Cl. at 178 ("OTAs' exemption from the FAR does not necessitate exemption from the Tucker Act."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 & n.7, 1083-84 (Fed. Cir. 2001) (exercising § 1491(b)(1) jurisdiction over bid protest challenging competitive USPS award notwithstanding that USPS was "exempted from all federal procurement laws," and confirming that regulatory exemptions do not operate as jurisdictional bars where the agency conducted a competitive selection process to determine who obtains government business).

[redacted]

particular OT is "in connection with" a procurement still turns on the facts of that OT, as discussed *infra* Part I.A.3.

The Government's own recitation of the history of OT authority also confirms the point. By the Government's account, Congress expanded OT authority beginning in 1993 and accelerating after 2015 into expressly acquisition-adjacent territory: prototype projects for systems "proposed to be acquired," follow-on production without further competition, and a statutory preference for using OTs in prototyping. *Id.* at 3-8. Congress legislated each expansion against the backdrop of ADRA, which channeled bid protests to this court "to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum." 142 Cong. Rec. at S6156. Nowhere in that history did Congress suggest that a multi-billion dollar per year acquisition vehicle should be exempt from judicial review. An authority that has grown from a narrow exception into a preferred gateway to acquisition cannot remain categorically separate from procurement or evade judicial review.

### 2. This Court Has Repeatedly Rejected the Government's Reliance on *Hymas*

Contrary to the Government's argument, *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) said nothing about OTs. Its holding turned on statutory definitions that do not reach them.

The protest in *Hymas* challenged cooperative farming agreements ("CFAs") under which farmers grew crops on public land to feed wildlife, receiving no payment but retaining part of the yield. *Id.* at 1314-15. The Federal Circuit held the court lacked bid-protest jurisdiction because the CFAs were cooperative agreements and not procurement contracts, as the FGCAA specifically defines those terms—a conclusion compelled by Congress's decision to define cooperative agreements and procurement contracts separately. *Id.* at 1325, 1329.

[redacted]

Those definitions decided the case because of what the agency was doing. A cooperative agreement transfers a thing of value to the recipient to carry out a public purpose of support or stimulation; a procurement contract acquires property or services for the direct benefit or use of the United States Government. The CFAs did the former. Nothing flowed to the agency, and the principal purpose was assistance. *Id.* at 1318, 1328-29. Here the Navy is doing the opposite. It is acquiring property or services for its own direct benefit and use—vessels built to its performance requirements, funded by an appropriation for MUSV production.

The Government nonetheless applies those FGCAA definitions mechanically to OTs. As *Hydraulics* explains, "the Federal Circuit in *Hymas v. United States* found cooperative agreements do not fall under the Tucker Act but said nothing of OTAs or when an [OT or] OTA is in connection with a proposed procurement." *Hydraulics*, 161 Fed. Cl. at 179 (citing *Hymas*, 810 F.3d at 1330). That distinction is dispositive. Neither the statute nor *Hymas* supports indiscriminately importing *Hymas*'s holding with respect to cooperative agreements and applying it to the OT context. Every Court of Federal Claims decision to address whether and how *Hymas* applies to answer whether an OT is "in connection with" a procurement has rejected the Government's theory or declined to apply *Hymas*.[2]

---

[2] *IRTC*, 172 Fed. Cl. at 258 (rejecting the Government's argument that *Hymas* should be extended to hold that OT agreements are "something other than a procurement as defined by 41 U.S.C. § 111" and determining that "the relevant inquiry requires the Court to look at what the Government is seeking through the solicitation of proposals"); *Raytheon*, 175 Fed. Cl. at 293 (proffering independent definition of OTs and OTAs that fall within this court's exclusive bid-protest jurisdiction that rejects the Government's mechanical reading of *Hymas*); *Hydraulics*, 161 Fed. Cl. at 179 (court "unpersuaded" by Government's *Hymas* argument); *Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 731 (Fed. Cl. 2025) (*Hymas*'s "conclusion" regarding "cooperative agreements … is not dispositive of the jurisdictional question for OTs"); *see also Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 785 (Fed. Cl. 2021) (holding OT solicitation was "in connection with" a procurement without mentioning *Hymas*); *MD Helicopters, Inc. v. United States*, 435 F. Supp. 3d 1003, 1011, 1013 (D. Ariz. 2020) (citing *Hymas* merely for the [redacted]

The Government's fallback reading of *Hymas* fares no better. The Government contends the Tucker Act demands only that the agency have the authority to enter into the OT and properly construe the contracting instrument. Mot. Dismiss at 15-16. But *Hymas* set out three hurdles, not two. The Federal Circuit explained:

> [W]e must first decide whether the [agency] has statutory authority to enter into cooperative agreements. If it does not, then the [agency] could only have negotiated procurement contracts subject to Tucker Act review. If it did have the authority, we must next decide whether the [agency] properly construed the CFAs as cooperative agreements, rather than procurement contracts. If we find that the [agency] correctly concluded that the CFAs are not procurement contracts, ***then we must resolve whether the Claims Court's subject matter jurisdiction under the Tucker Act extends to cooperative agreements.***

*Hymas*, 810 F.3d at 1317-18 (emphasis added). The Navy clears the first two hurdles. No one contests that it had the authority to initiate the OT or that it construed them as OTs. Mot. Dismiss at 15-16. The third hurdle is the one the Government cannot clear, and it is the only one this Motion presents: whether the Tucker Act reaches this OT. The Government's argument conflates the agency's power to choose a particular instrument with this court's power to review how the agency used it.

### 3. Whether Objections Are in Connection with a Proposed Procurement Is a Fact-Specific Inquiry

Contrary to the Government's argument that the Navy's choice of instrument is categorically dispositive, whether the protest is "in connection with a procurement or a proposed

---

proposition that the ADRA grants exclusive jurisdiction over bid protests involving "procurement solicitations and contracts" to the Court of Federal Claims and dismissing a bid protest for lack of jurisdiction in district court); *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 442-45 (Fed. Cl. 2019) (not applying *Hymas* to determine whether the OT prototype solicitation was "in connection with" a procurement contract but applying *Hymas* to conclude the prototype-phase agreement was a non-procurement contract falling outside Court of Federal Claims' jurisdiction).

[redacted]

procurement" turns on facts, not instruments. Two questions govern: whether the agency has begun the process for determining a need to acquire specific property or services for its direct benefit prior to or contemporaneous with the Solicitation, and whether the OT is a necessary step in the process by which the agency will ultimately acquire those products or services. Both follow from the statutory text. Because "procurement" reaches "all stages of the process of acquiring property or services," *Distributed Sols.*, 539 F.3d at 1345-46, the question is whether the OT is connected to any stage of the federal acquisition process.

The first question looks to the nature of the government's request. Because determining the need for property or services starts the procurement process, *Distributed Sols.*, 539 F.3d at 1345-46, an OT must be designed to assist in determining that need to fall within the Tucker Act's reach. *E.g.*, *Hydraulics*, 161 Fed. Cl. at 177-78 ("Every aspect of the [OT] in this case is specifically tailored towards determining the Army's need for property—upgraded AGPUs." (citation modified)); *Raytheon*, 175 Fed. Cl. at 294 (protesting award that allowed competitor to continue to participate in a program for missile defense development to fulfill congressional mandate). The connection must also be close, substantively and temporally, between the agency's decision to acquire property or services and the solicitation. Assessing "the jurisdictional divide simply requires an evaluation of the federal agency's immediate endgame," which turns on "the agency's demonstrated intent, actions to date, and intentions moving forward." *Raytheon*, 175 Fed. Cl. at 293-94. The solicitation itself supplies much of that evidence. *IRTC*, 172 Fed. Cl. at 258 ("[T]he relevant inquiry requires the Court to look at what the Government is seeking through the solicitation of proposals."). And when "the products or services to be developed and acquired are unique to the federal government and otherwise ill-suited for acquisition and use by the general

[redacted]

public," the agency has demonstrated its intent to acquire particular property for the government's direct benefit. *Raytheon*, 175 Fed. Cl. at 294.

That inquiry mirrors the Federal Circuit's analysis in *Hymas*. Whether the agency should have used cooperative agreements or procurement contracts to acquire farming services for the public's interest turned on a factual analysis of "the principal purpose of the relationship," and the evidence demonstrated that the agency had not entered into the agreements "to obtain a service from the farmers" (a procurement contract), "but rather negotiated with them to provide assistance that would further" Congress's wildlife conservation goals (a cooperative agreement). 810 F.3d at 1327-29. *Telesto* read *Hymas* the same way. *Cf. Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 731 (Fed. Cl. 2025) ("Consistent with the governing test announced by the Federal Circuit in *Hymas* and distilled further in [] recent precedents in this court, the resolution of the motion to dismiss for lack of jurisdiction requires an analysis of the EBS-C program's 'principal purpose.'"). Asking whether the agency had begun the process for determining a need to acquire property or services for its direct benefit therefore "*respect[s] the concinnity* between" statutes, Mot. Dismiss at 13 (emphasis in brief) (quoting *Hymas*, 810 F.3d at 1327), while a rule keyed to the instrument does not.[3] *See, e.g.*, *Strategi Consulting, LLC v. United States*, 2026 WL 2166765, at *1, 7-9 (Fed. Cl. July 24, 2026) (concluding protest was in connection with procurement by rejecting government's characterization of its actions as "internal development" and instead applying a functional inquiry centered on the agency's conduct). The Government never explains why

[3] The Government also cites, for example, *CMS Contract Management Services v. Massachusetts Housing Finance Agency*, for the proposition that "'agencies escape the requirements of federal procurement law' when using a non-procurement contract." Mot. Dismiss at 14 (quoting 745 F.3d 1379, 1381 (Fed. Cir. 2014)). *CMS* said nothing about OTs or non-traditional instruments generally, and the court's analysis was limited to the implications of "using *a cooperative agreement*." *CMS*, 745 F.3d at 1381 (emphasis added).

[redacted]

*Raytheon*, *IRTC*, and *Hydraulics* are incompatible with *Hymas*,[4] Mot. Dismiss at 28-30, when each applies a fact-intensive analysis evoking the principal-purpose analysis.

The second question is whether the OT is a necessary step in the acquisition process. When participation in a solicitation is a prerequisite to eligibility for a production contract for the particular property or services the government seeks, the OT is an essential step of the government's acquisition. *E.g.*, *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 785 (Fed. Cl. 2021) (finding Tucker Act jurisdiction where disqualification from consideration for follow-on production contract demonstrated solicitation had a "direct effect" on the award); *MD Helicopters Inc. v. United States*, 435 F. Supp. 3d 1003, 1013 (D. Ariz. 2020) (holding jurisdiction exclusive to Court of Federal Claims where "a decision excluding" an offeror "from any phase of the FARA CP program would be outcome-determinative because only entities that are selected for the preceding phase of the FARA CP program shall be eligible for any subsequent phases, and thus any eventual procurement" (citation modified)).

*SpaceX* identified one potential boundary. The OT challenged there was "separate and distinct" from the procurement, because the procurement phase was a "fully open competition" for interested offerors, not limited to the three companies awarded prototype OTs. *Space Expl. Techs. Corp. v. United States* ("*SpaceX*"), 144 Fed. Cl. 433, 442, 444 (Fed. Cl. 2019). Unlike here, exclusion from an OT in *SpaceX* foreclosed nothing. What distinguishes an acquisition pursued through an OT where this court has jurisdiction is a "direct and interlinked path from research, to

---

[4] The Government incorrectly asserts that "*Telesto* properly declined to follow" these cases' "flawed reasoning." Mot. Dismiss at 28. *Telesto* itself acknowledged that its "conclusion departs" only "modestly from" these cases, 176 Fed. Cl. at 733, and concluded that *Hymas* did not "control the outcome to the jurisdictional question" because "[t]he enhancement of the OT authority granted to the Defense Department" has "separated OTs from their statutory placement alongside cooperative agreements," *id.* at 731.

[redacted]

development, to production, to government purchase." *Raytheon*, 175 Fed. Cl. at 293. That line also preserves Congress's intent to encourage expanded OT use and attract new market entrants. Prototype OTs that are genuinely disconnected from any procurement remain beyond this court's bid-protest jurisdiction. Only those OTs functioning as a necessary step in a specific, already-determined procurement process fall within the Tucker Act's reach—a line that protects flexibility in acquisition vehicles without insulating multi-billion-dollar acquisition decisions from any judicial review at all.

**B. Saildrone's Objections Are in Connection with a Proposed Procurement**

The Government asks the wrong question. It frames the issue as whether the Navy has yet acquired anything, insisting that this Solicitation and these OTs are "not for acquiring" MUSVs "and not for producing them," Mot. Dismiss at 10, and that "the Navy has not procured or acquired anything at this point," *id.* at 27 (emphasis omitted). But a procurement begins with "the process for determining a need for property or services," *Distributed Sols.*, 539 F.3d at 1345-46, and it is "immaterial whether the potential procurement [] ever occurs, so long as the Government initiated the process for determining a need for acquisition," *Hydraulics*, 161 Fed. Cl. at 179 (citation modified). The Government's framing would defer jurisdiction until relief becomes impossible—after the $2.1 billion is obligated to the seven offerors RAS advanced. Nor does the Government's characterization of its own conduct control. *Strategi Consulting, LLC*, 2026 WL 2166765, at *1, 7-9 (rejecting government's characterization of its actions as "internal development" and applying a functional inquiry centered on the agency's conduct). On this record, both questions that govern are answered: the Navy had already determined it needed MUSVs and resolved to obtain them when it issued the Solicitation, and the OT is the only route to that acquisition.

[redacted]

**1. The Navy Had Determined It Needed to Acquire MUSVs for Its Direct Benefit and Resolved to Obtain Them When Issuing the Solicitation**

The Government's evidence of the Navy's intent is a recital in the Solicitation. *See* Mot. Dismiss at 2 (citing Tab 14.1 at 257-58). That recital states that either potential business model—whether the Navy buys MUSVs or obtains them as a service—the object is "the delivery of MUSV capabilities." Tab 14.1 at 257-58. RAS's own statements, its pre-solicitation schedule, and the Solicitation's specifications all say the same thing: the Navy had determined its need to acquire MUSVs for its direct benefit before the Solicitation.

The need determination preceded the Solicitation. The Navy scrapped the MASC prototyping program in early 2026 because its front-row view of the industry showed that "[redacted]." Tab 5 at 77. Congress had appropriated $2.1 billion for MUSV acquisition, Am. Compl. ¶ 25; *cf. Raytheon*, 175 Fed. Cl. at 284-85 (responding to Congressional interest and appropriations with prototype request), and [redacted]," Tab 3 at 52. By March 20, 2026—before the Solicitation issued—RAS had set an aggressive schedule: solicit proposals for three weeks, [redacted], test on the water for three months, and make follow-on production awards one month later. Tab 3 at 54-55. That compressed, production-oriented timeline is the antithesis of a multiyear developmental posture, and the Navy adopted it because it planned "to work with Industry to have vessels available for Navy leasing or procurement in fiscal year 2027." Tab 5 at 78.

The Solicitation then operationalized the Navy's determination. It announced that RAS was "seeking to accelerate the design, development, and demonstration of" MUSVs and advised

[redacted]

offerors that "[i]n accordance with 10 U.S.C. § 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the successful prototype project participants." Tab 7a at 92, 97. It required that offerors field the proposed vessel within the next fiscal year. Tab 7a at 99. And RAS said publicly that it planned to "test the capability on water and go straight into production." Am. Compl. ¶ 29; Tab 5 at 77. RAS's "immediate endgame" is MUSV acquisition by FY27, *Raytheon*, 175 Fed. Cl. at 293—not knowledge on a shelf.

The Solicitation's terms confirm as much because "the relevant inquiry requires the Court to look at what the Government is seeking through the solicitation of proposals." *IRTC*, 172 Fed. Cl. at 258. RAS required every offeror to price an "option to buy" and a "block buy" of five and ten vessels, Tab 7a at 97-98, [redacted], ECF No. 52-1 ("Criteria 1," "Sheet1," and "Brief_Tables" tabs), AR 3029-30, 3036 (emphasis added). [redacted]. RAS also sought "technically mature solutions that satisfy the vessel and autonomy performance requirements"; supplied detailed lists of requirements serving the Navy's military objectives—functionally turning the Solicitation into an order form; and demanded a detailed showing of manufacturing readiness. Tab 7a at 92, 95-102.

[redacted]." Tab 57 at 1573. That designation covers "[m]aterial and information relating to, or associated with, the acquisition and procurement of goods and services." U.S. Dep't of Def., *Procurement and Acquisition Categories: PROCURE* (last accessed Aug. 24, 2026) [https://perma.cc/E2DX-PT6V]. [redacted]

[redacted]

[redacted]." *E.g.*, Tab 104a at 2420. RAS used the vocabulary of procurement when it was administering the competition.

The vessels themselves supply independent evidence of direct benefit. They will be purpose-built for the Navy's operational requirements. As in *Raytheon*, *MD Helicopters*, *Kinemetrics*, *Hydraulics*, and *IRTC*—all cases where the court concluded jurisdiction over the OT bid protest was exclusively vested in the Court of Federal Claims—the property sought is "unique to the federal government and otherwise ill-suited for acquisition and use by the general public." *Raytheon*, 175 Fed. Cl. at 294 (collecting cases).

The Government's remaining response is that "[t]he Navy has not even decided whether to acquire any MUSVs at all or to use a services model." Mot. Dismiss at 27. That assertion cannot be reconciled with what RAS said and did. But it fails on its own premise, for two independent reasons.

First, the Navy need never acquire a single vessel. It is "immaterial whether the potential procurement [] ever occurs, so long as the Government initiated the process for determining a need for acquisition, and that acquisition might occur via procurement." *Hydraulics*, 161 Fed. Cl. at 179 (citation modified). The Navy initiated that process. The jurisdictional hook is satisfied, and the Government's speculation about what it may ultimately decide is beside the point.

Second, the Navy's choice between buying and leasing is a choice of *how* it will obtain MUSVs, not whether it will. Either way, property or services flow to the Navy, which is what the Tucker Act reaches. The Act covers the acquisition of property "or services," 41 U.S.C. § 111, and the Navy stated that it "plans to work with Industry to have vessels available for Navy leasing or procurement in fiscal year 2027," Tab 5 at 78. That is what separates this Solicitation from instruments held outside the Tucker Act's reach. In *Hymas*, nothing flowed to the agency at all:

[redacted]

the farmers received no payment and retained the yield, so the principal purpose was assistance rather than acquisition. 810 F.3d at 1328. And in *SpaceX*, it was "undisputed that the Air Force will provide funding to develop launch service prototype vehicles under the LSAs," but equally undisputed that "the Air Force will not purchase or own the[] prototypes." 144 Fed. Cl. at 444. Here, RAS intends to use the very vessels proposed in Phase 1 for its military needs.

**2. The Prototype OT Is a Necessary Step Towards the Proposed Procurement**

Winning a prototype OT is the only route to MUSV production. Companies whose Phase 1 proposals are "evaluated to be of merit" advance to the prototype award and complete the on-water Test Event, and only that pool of prototype awardees is eligible for MUSV production contracts. Tab 7a at 92. The Navy was clear: "[redacted]." Tab 5 at 72, 77. Exclusion from the prototype OT is therefore exclusion from production, and there is no separate or subsequent procurement through which an excluded offeror could compete for MUSV production. RAS said so itself: this Solicitation is "a direct path to production." Blue Water Am. Compl. ¶ 20. That is precisely the structure this court and others have held sufficient for Tucker Act jurisdiction. *See Raytheon*, 175 Fed. Cl. at 293-94 (finding jurisdiction in this court where exclusion at prototype phase disqualified company from follow-on production); *Hydraulics*, 161 Fed. Cl. at 179 (same); *Kinemetrics*, 155 Fed. Cl. at 785 (same); *MD Helicopters*, 435 F. Supp. at 1013 (same); *IRTC*, 172 Fed. Cl. at 253, 260 (jurisdiction over follow-on production solicitation where agency "limited its selection process for the follow-on production phase" to the two prototype participants); *cf. SpaceX*, 144 Fed. Cl. at 443-44 (no jurisdiction where protested OT was "separate and distinct" from the procurement).

[redacted]

The scale of what follows confirms this step matters. The Navy seeks an autonomous fleet of 39 MUSVs by next fiscal year—roughly 30 in the initial buy—and 83 by FY2031. Am. Compl. ¶ 26; Blue Water Am. Compl. ¶¶ 20, 23; *see also* Tab 5 at 78 ("Q. How many MUSVs is the Navy procuring? A. The Navy plans to procure as many MUSV vessels in different configurations as required to meet Fleet needs."). Building that fleet will take time. *E.g.*, Tab 3 at 60 ([redacted]). And this Solicitation is the only pathway.

Construed in Saildrone's favor, the Amended Complaint and the Administrative Record establish the Navy's intent, actions to date, and intentions moving forward: a funded, prioritized, and accelerated acquisition for "technically mature" MUSV solutions measured against the Navy's own performance requirements available only to successful prototype participants. That evidence points in one direction—that this protest is "in connection with a procurement or proposed procurement," and that the Court has jurisdiction. *Sys. Application*, 691 F.3d at 1380-81.

## II. *Telesto*'s Temporal Limitation Does Not Reach This Solicitation

Part I establishes that the Solicitation and the prototype OTs are in connection with a proposed procurement. That should end the inquiry. The Government's fallback is to ask this Court to follow *Telesto* in the alternative and defer review until the Navy declares a prototype successful and commits to production. Mot. Dismiss at 25-27.

This Court should decline. *Telesto* stands alone. It "depart[ed]" from *Hydraulics* and *Raytheon*, which located jurisdiction in the agency's intent at the outset rather than in a later production decision. *Telesto*, 176 Fed. Cl. at 733. Nothing in Section 1491(b)(1) conditions jurisdiction on an agency's post-solicitation declarations, and this Court is not bound to import one. But the Court need not decide whether *Telesto* was right, because *Telesto* does not reach this case for three reasons. First, its holding responded to a concern absent here—judicial second

[redacted]

guessing of iterative technical judgments in a multi-year developmental program. Second, its temporal test cannot be administered on a Solicitation that permits production before prototyping concludes, and it would let the Navy decide, through the timing of its own declaration, whether its conduct is reviewable at all. Third, even on its own terms, *Telesto* preserved jurisdiction over the statutory claim that Saildrone pleads. This Court should decline the Government's invitation to follow the one decision that departed from the rest, and to extend it to facts its reasoning does not fit.

### A. *Telesto* Addressed Iterative Technical Judgments, Not Threshold Compliance With a Solicitation's Stated Criteria

*Telesto* involved a multi-year, multi-phase, multi-step prototype OT for an enterprise software solution. 176 Fed. Cl. at 720-21. The challenge centered on the seven-step prototype competition within the first two of three phases, where production would proceed in parallel with phase three—itself requiring the participants to "continue to develop the prototype project 'until all of the functional capabilities are moved into production,'" likely concluding in 2032. *Id.* at 719, 721-22. Participants were graded through iterative technology demonstrations on adjectival ratings from "unacceptable" to "excellent"; successive down-selections turned on comparative assessments of complex sprint performances, and the final award decision required the Army to weigh one participant's "excellent" rating on a human-centered design sprint against the other's "good" rating on a data-migration sprint. *See id.* at 721-24, 744. The Army also did not know at the outset what software it wanted. The parties were engaged in solution discovery during the first phase and only a trial prototype during the second. *See id.* at 721.

Against that backdrop, the court rejected the Government's categorical argument that prototype OTs lie beyond this court's jurisdiction, and rejected the contention that OTs resemble the cooperative agreement in *Hymas*: the EBS-C program was "very different from the principal

[redacted]

purpose of the cooperative agreement that the Federal Circuit found in *Hymas* to be beyond the scope of section 1491(b)(1)'s protest jurisdiction" because through "the EBS-C program, the Army seeks a solution to a specific, technical need" that it intends to acquire once it is successfully developed. *Id.* at 720, 730-32. The OT could fall within the Tucker Act because "from the outset," it anticipated acquisition "to meet its particularized needs." *Id.* at 732. What the court declined to review was narrower: the Army's value-based and technical judgments within "a multi-year process of research and development" because "the prototyping phase" had not "concluded." *See id.* at 722-24, 733. *Telesto* drew its line where the agency's own knowledge ran out. The court deferred because "deference to an agency's technical expertise and judgment is even greater in a developmental or prototyping project, when the agency does not even fully know its needs or how to meet them." *Id.* at 745. On the other side of that line, review remained available: jurisdiction "to review an agency's continued compliance with the terms of the PPON, or similar document establishing the ground rules for an OT, is a necessary corollary to the jurisdiction to ensure the initial compliance of an OT with applicable statutes and regulations." *Id.* at 738. So *Telesto* withholds review of an agency's judgment about *what* it needs. It preserves review of the agency's compliance with the rules it published.

Saildrone's claims sit on the reviewable side of that line. RAS knew its needs, published them, and sought "technically mature solutions" that already existed in the commercial marketplace. Tab 7a at 92. It concluded that [redacted] Tab 5 at 77. It then graded proposals against objective pass/fail criteria [redacted], imposed no cap on the number of awardees, *see* Tab 7a at 102-03, Tab 3 at 54, 56, and the former Deputy Director of RAS stated it intended "to qualify as many MUSV vendors as we can," Am.

[redacted]

Compl. ¶ 39. Saildrone challenges RAS's determination that its Proposal was [redacted] under those stated, checklist criteria—not a comparative judgment about prototype performance. *Compare* Tab 7a at 98-103, *with Telesto*, 176 Fed. Cl. at 721 (selecting "best solution" for Step 7); *id.* at 724 (comparing offers on a scale of "met," "acceptable," "good," and "excellent"). Saildrone challenges disparate treatment, application of unstated criteria, reliance on a latent ambiguity, and a failure to seek clarification. *See* Am. Compl. ¶¶ 76-148. Those are the claims this Court routinely adjudicates, and they fall within the review *Telesto* expressly preserved.

Two further differences matter. *Telesto* contemplated a multi-year research cycle with production running in parallel with later prototype phases, 176 Fed. Cl. at 721; RAS will move from Solicitation issuance to production awards in *seven months*. Tab 3 at 54-56. And *Telesto* doubted whether the program before it was a permissible use of OT authority at all, observing that 32 C.F.R. § 3.1 limits prototype OTs to weapons and weapon systems, and that a business-software system may not qualify. 176 Fed. Cl. at 735 n.10. That doubt explains the court's caution: it was reluctant to review an OT that it was not convinced should have been an OT at all. No such doubt exists here. The MUSVs are naval platforms built to carry containerized military payloads under Government-specified constraints, Tab 7a at 95-102, sought to meet an Urgent Operation Need validated by the Deputy Chief of Naval Operations, Tab 3 at 52.

### B. *Telesto*'s Temporal Test Cannot Be Administered Here and Would Allow the Agency to Insulate Its Conduct From Review

*Telesto* held that an OT becomes "in connection with a … proposed procurement" only "once the Army [has] completed the prototyping process and [has] determined both that the process was successful and that it would acquire the successful prototype through a follow-on production contract." 176 Fed. Cl. at 733. That test presupposes two sequential phases with a decision point between them. This Solicitation has no such boundary.

[redacted]

By the Solicitation's express terms, an "approving official" may determine that a prototype OT awardee has successfully completed the prototype project and move to production, which "can occur prior to the conclusion of a prototype project." Tab 7a at 104. Production and prototyping therefore overlap by design. The Navy confirmed as much in writing, telling a competitor that "under the prototype OT, we expect to … award follow-on production OTs ASAP (hopefully within 1-2 months of success)." Blue Water Am. Compl. ¶ 20 (alteration in original). Seven offerors advanced, and the Navy may move any one of them to production while the others are still testing. Asking whether "the prototyping process" has "concluded," *Telesto*, 176 Fed. Cl. at 733, has no determinate answer on this record.

Worse, the test invites the agency to supply one. If jurisdiction attaches only when the agency declares a prototype successful and commits to production, the agency can manipulate the timing of its declaration to insulate its evaluation from judicial review. An agency facing a protest can defer that declaration until the protest is dismissed for want of jurisdiction, then proceed to award. The incentive runs exactly backward: the more consequential the exclusion, and the closer the agency is to obligating funds, the greater its reason to withhold the determination that would permit review. The Government's own position illustrates the problem. It argues that "the Navy has not yet determined that any prototype is successful," Mot. Dismiss at 27, even though the Navy structured the competition to conclude by September 30, 2026 with the intent to obligate production OTs from the $2.1 billion appropriated for MUSVs a month later, Tab 3 at 54-56; Am. Compl. ¶ 153. Under that reasoning, review would become available only once it could no longer matter.

That is not how jurisdiction works. It is well established that "neither a court nor the parties has the power to alter a federal court's statutory grant of subject matter jurisdiction." *VanDesande*

[redacted]

*v. United States*, 673 F.3d 1342, 1350 (Fed. Cir. 2012). ADRA channeled protests into one venue "to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum," 142 Cong. Rec. at S6156, and Section 1491(b)(1) reaches objections in connection with a *proposed* procurement precisely so that protests need not await an executed contract. *See Distributed Sols.*, 539 F.3d at 1346 ("Procurement" begins not with a contract award but with the "process for determining a need" and "explicitly contemplates the ability to protest … pre-procurement decisions," meaning the Tucker Act "does not require an actual procurement"). *Hydraulics* made the same point directly: it is "immaterial whether the potential procurement … ever occurs, so long as the government has initiated the process for determining a need for acquisition." 161 Fed. Cl. at 179 (internal quotation marks and citations omitted). A temporal rule that defers jurisdiction to a moment of the agency's choosing cannot be squared with the law. *See also, e.g.*, *PSEG Nuclear, LLC v. United States*, 465 F.3d 1343, 1350 (Fed. Cir. 2006) (rejecting agency conduct could "unilaterally confer jurisdiction" to the federal courts of appeals at the exclusion of the Court of Federal Claims).

### C. Saildrone's Statutory Claim Is Reviewable Under Any Framework

Even if *Telesto*'s temporal limitation applied—which it does not—Count VI would survive. *Telesto* retained jurisdiction to review an agency's "compliance with applicable statutes" and with "the terms" of the "program-related documents, because these documents are integral to the statutory and regulatory integrity of the OT." 176 Fed. Cl. at 735. Saildrone alleges that RAS violated 10 U.S.C. § 4022(b)(2)'s requirement to use competitive procedures "to the maximum extent practicable" because RAS failed to apply the terms of the Solicitation as stated and equally across offerors. Am. Compl. ¶¶ 143-48. That falls precisely within the contours of the type of claim *Telesto* preserved.

[redacted]

The Government's contrary reading of *Telesto* is mistaken. The Government suggests this type of claim proceeded in *Telesto* only because "the Army had determined that a prototype OT awardee was *successful* and that the Army *would* acquire the successful prototype through a follow-on production contract." Mot. Dismiss at 26. The Army made no such determination. The awardee that advanced received an invitation to proceed to Step 7, where production was not anticipated until many years in the future in 2032, and the court explained that step was not a production award. *Telesto*, 176 Fed. Cl. at 721, 734. No production decision informed the court's analysis regarding the justiciable claim, so the Government's observation that "the Navy has not yet commenced a follow-on production," Mot. Dismiss at 27, is beside the point.

The Government's remaining objections fare no better. It argues that Section 4022(b)(2) "expressly govern[s] prototype OTs, which are non-procurement actions," so "[a]ny alleged violation" of the statute "cannot be in connection with a procurement or proposed procurement, because these provisions do not govern procurements." Mot. Dismiss at 24. Read the two provisions together. Section 4022(b)(2) required competitive procedures for the very awards RAS made. Section 4022(f)(2) makes compliance with that requirement the precondition to awarding follow-on production without any further competition. So, if RAS did not use competitive procedures to the maximum extent practicable in Phase 1, the Navy may not lawfully award the production it has planned without competition again. A statute that determines whether a production award may be made noncompetitively is not a statute that "do[es] not govern procurements." Mot. Dismiss at 24. The Government's conclusion depends on a label the statute does not support. *See supra* Part I.A.1. *Telesto* did not question the point, treating Sections 4021 and 4022 as "statutes applicable to this OT." 176 Fed. Cl. at 735.

[redacted]

*Cleveland Assets, LLC v. United States*, 883 F.3d 1378 (Fed. Cir. 2018) does not help the Government. That case concerned an appropriations statute—a funding-approval mechanism that said nothing about how the agency must run its procurement. *Id.* at 1381-82; *see also* Mot. Dismiss at 24 (citing *Progress for Bakersfield Veterans, LLC v. United States*, 158 Fed. Cl. 574, 579-80 (Fed. Cl. 2022) (dismissing claims where statutes merely provided mechanism for agency to record lease obligations, mandated material to be included in project's prospectus, and governed initial lease amount authorization)). Section 4022(b)(2), by contrast, governs the competitive process by which the Government selects participants in the OT, and compliance with it is the statutory precondition to awarding follow-on production without further competition. 10 U.S.C. § 4022(f)(2). A statute that gates eligibility for billions of dollars in production is not "tangentially related to a government procurement." *Cleveland Assets*, 883 F.3d at 1381.

That linkage is Congress's design, and it confirms what only the Government disputes: follow-on *production* contracts can be procurements. *See* Mot. Dismiss at 30 ("*Rough Terrain* and *Telesto* construed this Court's jurisdiction too broadly because a *follow-on production OT* is still a non-procurement OT – not a procurement or proposed procurement."). *IRTC* rejected that position, and explained why it proves too much: on the Government's reading, every OT bid protest decision analyzing whether a protest was "in connection with a procurement" performed an "unnecessary" step, because a follow-on production contract could never be a procurement in the first place. 172 Fed. Cl. at 260-61. *Telesto* said the same directly. "Under the commonly understood meaning of the term" procurement—i.e., the broad definition in 41 U.S.C. § 111—"the decision to acquire a successful prototype at the conclusion of an OT conducted pursuant to 10 U.S.C. § 4022(f) is a 'procurement.'" 176 Fed. Cl. at 734.

[redacted]

The Government's last objection misreads Saildrone's claim. It asserts that Saildrone "cannot" allege that the Navy violated Section 4022(f)(2) "at this preliminary stage." Mot. Dismiss at 26 n.7. Saildrone alleges no such violation. Saildrone's claim is that "RAS's flawed exclusion of Saildrone has undermined and will continue to materially undermine the competitive predicate for any follow-on production contract or transaction awarded without further competition under 10 U.S.C. § 4022(f)." Am. Compl. ¶ 147. The claim is about the competition RAS has already run, not about a production award it has not yet made. Because compliance under § 4022(b)(2) is a prerequisite to that production, Saildrone's challenge to the competitive procedures RAS used is squarely "in connection with" it.

## III. The Government's Rule Would Place a $2.1 Billion Acquisition Beyond Any Court's Review

The Government does not dispute that irrational agency conduct is presumptively reviewable. It argues instead that review lies elsewhere: in this Court under § 1491(a)(1) for bid-preparation costs, or in a district court under the Administrative Procedure Act ("APA"). Mot. Dismiss at 28 & n.8. That answer fails on its own terms. Neither forum is available to Saildrone, and the Government bears a "heavy burden" to establish that Congress meant to foreclose review altogether. *Raytheon*, 175 Fed. Cl. at 290 (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)); *accord IRTC*, 172 Fed. Cl. at 257.

Start with the district court, which is not a viable forum. The only district court to consider a similarly structured solicitation held that it lacked jurisdiction. In *MD Helicopters*, an offeror excluded from a phased prototype OT—where exclusion from any phase foreclosed eligibility for every later phase and the eventual production award—filed suit in district court under the APA. 435 F. Supp. 3d at 1013. The court dismissed, holding that the challenged OT "took place within the 'process of determining a need for acquisition'" and fell within this court's exclusive bid-

[redacted]

protest jurisdiction. *Id.* at 1013. The Government's only response to that decision is a footnote asserting that *MD Helicopters* "was wrongly decided." Mot. Dismiss at 28 n.9. The Government nevertheless seeks to send Saildrone to the same forum, while conceding that the only court to have received such a protest refused it.[5]

Section 1491(a)(1) is no answer either. The Government concedes that relief under that provision is limited to bid-and-proposal-preparation costs and that "equitable relief is not available." Mot. Dismiss at 28 n.8. Saildrone does not seek proposal costs. It seeks re-evaluation under the criteria the Solicitation stated, the opportunity to compete in the Test Event, and eligibility for the follow-on production awards that flow from it. A remedy that cannot restore Saildrone to the competition is no remedy for exclusion from it.

The result is that the Government's rule would leave RAS's conduct unreviewable anywhere. Saildrone presses claims that RAS applied criteria the Solicitation never disclosed and indefensibly evaluated Saildrone against standards it did not apply to the seven offerors it advanced. Am. Compl. ¶¶ 76-148. That conduct "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 741 (Fed. Cl. 2014) (citation omitted). And it is conduct that will determine who shares

---

[5] The two other decisions the Government offers are inapposite. *See* Mot. Dismiss at 28-29 n.9. The first, *Space Exploration Technologies Corp. v. United States*, 2020 WL 7344615, at *1 (C.D. Cal. Sept. 24, 2020), reached the district court only by transfer from this court, *SpaceX*, 144 Fed. Cl. at 446, and only because the OT there was so distinct from any specific follow-on production effort that it was not "in connection with" a procurement—the distinction Part I.B.2 addresses. The second, *Protect Lake Pleasant, LLC v. McDonald*, is a case from the District of Arizona that pre-dated the OT bid protest in *MD Helicopters* and involved a concession agreement, not an OT, and turned on "alleged improprieties in the RFP process" that were too attenuated from the concession agreement. 609 F. Supp. 2d 895, 911-12, 915 (D. Ariz. 2009). Neither case suggests that a district court would entertain this protest.

[redacted]

in $2.1 billion of appropriated production funds the Navy will obligate within months. Am. Compl. ¶ 153. Congress channeled protests to this court to build "a uniform national law on bid protest issues," 142 Cong. Rec. at S6156, not to create a category of multi-billion-dollar acquisitions that no court may review. The Government has not carried its heavy burden.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Government's Motion to Dismiss.

Dated: August 24, 2026

Respectfully submitted,

By: */s/ Laura M. King*

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2026, I caused a copy of this Opposition to Defendant's Motion to be served by electronic mail on counsel of record for all parties as identified below in accordance with RCFC 5(b) and the Court's Amended General Order No. 2026-01:

Alexander Orlando Canizares
Vinson & Elkins LLP
acanizares@velaw.com

*Counsel of Record for Plaintiff Blue Water Autonomy, Inc.*

Douglas G. Edelschick
United States Department of Justice
douglas.edelschick@usdoj.gov

*Counsel of Record for Defendant United States of America*

John Hunter Bennett
Covington & Burling LLP
hbennett@cov.com

*Counsel of Record for Defendant-Intervenor HII Unmanned Systems, Inc.*

Jon W. Burd
Wiley Rein LLP
jburd@wiley.law

*Counsel of Record for Defendant-Intervenor Saronic Technologies, Inc.*

Michael J. Anstett
Fried, Frank, Harris, Shriver & Jacobson LLP
michael.anstett@friedfrank.com

*Counsel of Record for Defendant-Intervenor Leidos, Inc.*

[redacted]

Dated: August 24, 2026

Respectfully submitted,

By: */s/ Laura M. King*

SELENDY GAY PLLC
Faith E. Gay
Laura M. King
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lking@selendygay.com

NICHOLS LAW PLLC
Carla Weiss
655 15th Street NW, Suite 425
Washington, DC 20005
Tel: 202-846-9800
cweiss@nicholslaw.com

*Counsel for Plaintiff Saildrone, Inc.*

[redacted]