[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

| | |
|---|---|
| BLUE WATER AUTONOMY, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HII UNMANNED SYSTEMS, INC., *et al.*,<br><br>Defendant-Intervenors. | Consol. Case Nos. 26-936, 26-944<br>(Judge Hadji)<br><br>[redacted]<br><br>Redacted Version |

DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CORINNE A. NIOSI
Assistant Director

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
NATALEE A. ALLENBAUGH
Trial Attorney
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant United States

Of Counsel:
GWENDOLYN IACI
Supervisory Associate Counsel
EMILY RUBINO
Attorney Advisor
BENJAMIN DEARDEN
Attorney Advisor
NAVSEA Office of Counsel
1333 Isaac Hull Avenue, Bldg 197
Washington Navy Yard, D.C. 20376

August 24, 2026

[redacted]

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

Questions Presented ..... 1

STATEMENT OF THE CASE ..... 2

A. Requirements of the Solicitation ..... 3

B. The Navy's Evaluation of Blue Water ..... 5

C. The Navy's Evaluation of Saildrone ..... 7

ARGUMENT ..... 9

I. Standards of Review ..... 9

A. Standard For Procurement Challenges ..... 9

B. Standard for Judgment on the Administrative Record ..... 10

C. Standard for Interpreting a Solicitation ..... 11

D. Standard for Waiver of Challenges to Solicitation Terms or Agency Interpretations ..... 11

II. Blue Water's Challenges Fail ..... 13

A. Navy's Evaluation of Blue Water is Sufficient for Judicial Review ..... 13

B. Navy Rationally Evaluated Criteria 2 ..... 15

1. The Navy Rationally Found Blue Water's Proposal Unacceptable Under C2-1 ..... 16

2. The Navy's Evaluation of Blue Water's Novel Design Was Not Contrary to the Solicitation ..... 19

C. Navy Rationally Evaluated Criteria 4 ..... 20

1. The Navy's Evaluation was Rational ..... 20

2. Any Challenge to Navy's Definition of "Representative" is Barred by Blue & Gold – Patent Ambiguity ..... 23

3. Blue Water's Disparate Treatment Claim Is Meritless ..... 23

D. The Navy's Criteria 2 and Criteria 4 Evaluations Complied with Law ..... 28

E. Blue Water's Protest Failes Because It Cannot Show Prejudice ..... 28

III. Saildrone's Challenges Fail ..... 29

A. The Navy's Criteria 2 Evaluation was Rational ..... 29

1. The Navy's Criteria 2 Evaluation Reflects No Disparate Treatment ..... 29

2. The Solicitation Contains No Latent Ambiguity ..... 35

3. The Navy Was Not Obligated to Engage in Clarifications ..... 37

B. Criteria 3 & 4 ..... 40

CONCLUSION ..... 40

[redacted]

# TABLE OF AUTHORITIES

**Cases**

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
586 F.3d 1372 (Fed. Cir. 2009) .......... 22

*AshBritt, Inc. v. United States*,
87 Fed. Cl. 344 (2009) .......... 22

*Axiom Res. Mgmt., Inc. v. United States*,
564 F.3d 1374 (Fed. Cir. 2009) .......... 9, 10

*Bader v. United States*,
97 F.4th 904 (Fed. Cir. 2024) .......... 38

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .......... 10

*Banknote Corp. of Am. v. United States*,
56 Fed. Cl. 377 (2003) .......... 16

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004) .......... 9, 10, 11, 16, 28

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) .......... 10

*BCPeabody Constr. Servs., Inc. v. United States*
112 Fed. Cl. 502 (2013) .......... 39, 40

*Benchmade Knife Co. v. United States*,
79 Fed. Cl. 731, 740 (2007) .......... 18, 22

*Blue & Gold Fleet, L.P. v. United States*,
492 F.3d 1308 (Fed. Cir. 2007) .......... 11, 23, 28

*Coastal Intern. Sec., Inc. v. United States*,
93 Fed. Cl. 502 (2010) .......... 16

*COMINT Sys. Corp. v. United States*,
700 F.3d 1377 (Fed. Cir. 2012) .......... 12

*Constellation W., Inc. v. United States*,
125 Fed. Cl. 505 (2015) .......... 38

*D & S Consultants, Inc. v. United States*,
101 Fed. Cl. 23 (2011) .......... 13, 15

[redacted]

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ........ 13

*DynCorp Int'l, LLC v. United States*,
10 F.4th 1300 (Fed. Cir. 2021) ........ 13

*E.W. Bliss Co. v. United States*,
77 F.3d 445 (Fed. Cir. 1996) ........ 16

*Gemini Tech Servs. LLC v. United States*,
177 Fed. Cl. 227 (2025) ........ 39

*Honeywell, Inc. v. United States*,
870 F.2d 644 (Fed. Cir. 1989) ........ 10

*IBM Corp. v. United States*,
119 Fed. Cl. 145 (2016) ........ 14

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) ........ 9, 10

*Inserso Corp. v. United States*,
961 F.3d 1343 (Fed. Cir. 2020) ........ 12, 13, 36

*K-Con, Inc. v. Sec'y of Army*,
908 F.3d 719 (Fed. Cir. 2018) ........ 12, 36

*KACE Co., LLC v. United States*,
167 Fed. Cl. 192 (2023) ........ 40

*Local 814, Int'l Bhd. of Teamsters v. NLRB*,
546 F.2d 989 (D.C. Cir. 1976) ........ 14

*ManTech Advanced Sys. Int'l, Inc. v. United States*,
141 Fed. Cl. 493 (2019) ........ 38

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 13

*NVT Techs., Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004) ........ 11, 35, 37

*Office Design Group v. United States*,
951 F.3d 1366 (Fed. Cir. 2020) ........ 24, 29

*Oracle Am., Inc. v. United States*,
975 F.3d 1279 (Fed. Cir. 2020) ........ 1

*Per Aarsleff A/S v. United States*,
829 F.3d 1303 (Fed. Cir. 2016) ........ 12, 36

[redacted]

*Portfolio Disposition Mgmt. Group LLC v. United States*,
64 Fed. Cl. 1 (2005) .......... 22

*Precision Standard, Inc. v. United States*,
69 Fed. Cl. 738 (2006) .......... 22

*Safeguard Base Operations, LLC v. United States*,
989 F.3d 1326 (Fed. Cir. 2021) .......... 11, 38

*Space Expl. Techs. Corp. v. United States*,
144 Fed. Cl. 433 (2019) .......... 38

*Technatomy Corp. v. United States*,
180 Fed. Cl. 752 (2026) .......... 18, 22, 38

*Telesto Group, LLC v. United States*,
176 Fed. Cl. 711 (2025) .......... 16, 23, 28

*Turner Constr. Co. v. United States*,
645 F.3d 1377 (Fed. Cir. 2011) .......... 14

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) .......... 9, 10

*Your Info., Inc. v. United States*,
170 Fed. Cl. 601 (2024) .......... 12

**Statutes**

5 U.S.C. § 706 .......... 9, 10

10 U.S.C. § 4022 .......... 1, 2, 3, 28

28 U.S.C. § 1491 .......... 9

**Regulations**

32 C.F.R. § 3.2 .......... 38

48 C.F.R. § 15.306 .......... 37, 38

**Rules**

Rule 52.1 .......... 1, 10

[redacted]

Pursuant to Rule 52.1 of the Court's Rules, defendant, the United States, respectfully submits this cross-motion for judgment on the administrative record and response to the motions for judgment on the administrative record filed by plaintiffs Blue Water Autonomy, Inc. (Blue Water) and Saildrone, Inc. (Saildrone).

## INTRODUCTION

Plaintiffs Blue Water and Saildrone commenced these bid protests purporting to challenge evaluations by the United States Department of the Navy (Navy) that the plaintiffs' respective prototype proposals for medium unmanned surface vessels (MUSVs) were not technically acceptable under Request for Prototype Proposals No. N00024-26-R-6326 (the RPP), and thus did not qualify for testing under a prototype other transaction agreement (OTA) pursuant to 10 U.S.C. § 4022. The Navy selected seven proposals for OTAs for prototype testing, but the plaintiffs' proposals were not among them. The United States has separately filed a motion to dismiss for lack of jurisdiction, but even if the Court determines that it possesses jurisdiction, the protests are without merit because plaintiffs merely second-guess the Navy's expert technical judgments. Further, if this Court finds an error in the Navy's evaluation of Blue Water's proposal, it would not be prejudicial, because a single unacceptable finding renders the entire proposal unacceptable, and Blue Water's proposal failed under two separate evaluation criteria.

## QUESTIONS PRESENTED

1. If jurisdiction exists, whether the Navy had a rational basis for rating Blue Water's proposal "Unacceptable" under Criteria 2 and 4, and if so, whether the Navy rationally evaluated Blue Water's proposal differently from that of a successful offeror, Leidos, Inc., (Leidos) differently under Criteria 4 because the proposals are substantively distinguishable.

[redacted]

2. Whether any alleged evaluation error prejudiced Blue Water.
3. If jurisdiction exists, whether the Navy had a rational basis for rating Saildrone's proposal "Unacceptable" under Criteria 2, and if so, whether the Navy rationally evaluated Saildrone's proposal differently from that of a successful offeror, Sea Machines Robotics, Inc., (Sea Machines) under Criteria 2 because the proposals are substantively distinguishable.

## STATEMENT OF THE CASE

I. Factual Background

In early 2026, the Navy's Portfolio Acquisition Executive for Robotic and Autonomous Systems (PAE RAS) announced that, "to accelerate the design, development, and demonstration of" MUSVs, the Navy was "seeking proposals for *technically mature* solutions that satisfy the vessel and autonomy performance requirements" in the solicitation. AR 251 (emphasis supplied). These "MUSVs must provide autonomous carrying capacity of containerized payloads while possessing the attributes defined" by the Navy. *Id.* In the RPP, the Navy stated that the "primary purpose of this solicitation is to award a prototype other transaction (OT) agreement pursuant to 10 U.S.C. § 4022 to one or more offerors to perform an MUSV autonomy and vessel performance test." *Id.* The RPP explained that the competitive process consists of two phases. *Id.* In phase 1, companies may submit proposals in response to the RPP, and the Navy will evaluate them against criteria set forth in the RPP. *Id.* In phase 2, companies whose proposals the Navy evaluates as being "of merit may be selected for potential award of a prototype OT and invited to negotiate the terms of a prototype OT agreement governing the prototype project," which agreement "will consist of a Post-Award Conference (CLIN 0001) and completion of an on-water MUSV Test Event (0002) no later than 30 September 2026." *Id.* The Navy will *not* pay companies for costs associated with phases 1 and 2. *Id.* If a company passes

[redacted]

phases 1 and 2 and successfully negotiates a prototype OT agreement, the Navy will provide $15 million in funding for prototype testing as part of that prototype OT. AR 251-52. The RPP further states: "In accordance with 10 U.S.C. § 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the successful prototype project participants." AR 257.

II. <u>The Phase 1 Selection Process</u>

A. <u>Requirements of the Solicitation</u>

The Solicitation Guidance – an attachment to the solicitation announcement that "provide[d] information on how to respond to [the] solicitation and the guidelines for proposals, AR 87, 90 – explained that the Navy was "seeking proposals for technically mature solutions that satisfy the vessel and autonomy performance requirements set forth herein and for those solutions to complete an MUSV autonomy and vessel performance test by the end of fiscal year 2026." AR 251. Phase 1 of the competitive procedures specified that the proposals shall be submitted in accordance with Section 3 of the Guidance and will be evaluated "against the criteria as specified in Section 4" of that guidance. AR 251.

Before proposals were due, the Navy provided an opportunity for the industry to submit questions or comments about the solicitation and noted that the "[i]nformation contained in the Government's responses to offerors' questions shall not supersede any information contained in the solicitation." AR 255.

The solicitation guidance required each proposal to contain a proposed business model (Criteria 1); a vessel design solution (Criteria 2), manufacturing readiness to support production of MUSC (Criteria 3); and a plan for rest execution to complete an on-water MUSV Test Event (Criteria 4). AR 257. The solicitation guidance explained if the Navy finds a proposal

[redacted]

unacceptable under any of Criteria 2, 3, or 4, then the proposal will be found unacceptable and will not move forward, although the solicitation guidance explained that Criteria 1 was for information purposes only. AR 262. Criteria 2 and 4 are most relevant in this protest and are discussed further below.

Criteria 2, Vessel Solution Design, requires offerors to "provide a summary of the MUSV production design and the test vessel, if proposed for testing purposes, using the provided Attachment J-8 Placemat Template." AR 258 (discussing AR 169-170). The J-8 Placemat Template was a fillable Excel spreadsheet. AR 169. Offerors would be evaluated on an acceptable or unacceptable basis. AR 262-263. For Criteria 2, offerors were to "propose a MUSV design that is a vessel with the ability to operate autonomously and carry containerized payloads." AR 258. The threshold requirements for the MUSV included requirements as to vessel range, payload capacity, autonomous performance, emissions control, refueling, interior reservation, American Bureau of Shipping standards, seakeeping, and field operational timeline. AR 258-259. The solicitation guidance also listed several desired attributes of the proposed MUSV. AR 259. The offerors were required to include a design overview in their proposals that included: an autonomous capabilities overview, a vessel characteristics overview, and conversion specific information, if relevant. AR 259-61. The vessel characteristic overview was required to provide information regarding nine elements:[1]

> "1. Evidence of compliance with MUSV threshold requirements and desired attributes [,] 2. Overview of vessel performance and design features . . . [,] 3. Overview of vessel 3D design models if any, maturity of the design(s) [,] 4. Design history/maturity overview and previous employment in any[,] 5. System architecture design information to illustrate how system addresses security standards . . . [,] 6. Description of pathway to achieve

[1] In the AR, the nine elements of criteria 2 are often referenced criteria 2-1, criteria 2-2, and so forth, or as C2-1, C2-2, and so forth. We use the same nomenclature in this brief.

[redacted]

> government cybersecurity authorization and compliance with CNSSP No. 28 Cybersecurity of Unmanned National Security Systems[,] 7. Overview of the sustainment concept for the vessel(s)[,] 8. Overview of the in port transit and mooring concept for the vesels(s)[, and] 9. Demonstrate maturity of the design enables fielding of operational vessels in FY27."

AR 260. A proposal would be found acceptable under criteria 2 if "the Offeror demonstrates the proposed MUSV Design meets or exceeds the threshold requirements." AR 263.

Criteria 4, On-Water MUSV Test Event Plan, required offerors to "detail its planned execution of the scope in Attachment J-1 MUSV Statement of Work," and required in relevant part: "1. A description of the test vessel in placemat format, as provided in Attachment J-8 Placemat Template," and "2. Describe how the test asset is *representative* of the MUSVs used in the offeror's proposed business models in section 3.2.1., i.e., Model 1 and Model 2."[2] AR 262 (emphasis added). Like Criteria 2, Criteria 4 would be evaluated on an acceptable / unacceptable basis. AR 263. A company would be found acceptable under Criteria 4 if "the Offeror demonstrates the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrates a test asset that is representative of the MUSV used in the offerors proposed business models in 3.2.1." AR 263.

B. <u>The Navy's Evaluation of Blue Water</u>

The Navy evaluated Blue Water's proposal as unacceptable, finding both Criteria 2 and Criteria 4 unacceptable, insofar as Blue Water failed Criteria 2-1 because of [redacted][3]

---

[2] In the AR, the elements of criteria 4 are often referenced criteria 4-1, criteria 4-2, and so forth, or as C4-1, C4-2, and so forth. We use the same nomenclature in this brief.

[3] The Navy debrief noted that Blue Water also failed separate requirements in 2-9 ("Field operational vessel in FY27") due to the same [redacted] problem, but the Navy inadvertently omitted that additional failure from the evaluation spreadsheet. *See* AR 2382 [redacted] Although an additional failure related to

[redacted]

and failed Criteria 4 because the test vessel was not representative of the proposed design solution. AR 1577, AR 1581 [redacted] AR 1585-86 [redacted] AR 1583 [redacted] AR 1586 (finding that the "[t]est vessel is not representative"). In its debrief to Blue Water, the Navy explained that it had found Blue Water's proposal unacceptable under Criteria 2 because [redacted]. AR 2382; *see also* AR 251 [redacted]. The Navy added that [redacted]. AR 2382. The Navy further explained that [redacted] AR 2382. The Navy also noted that [redacted] AR 2383. In sum, the Navy found [redacted]

criteria 2-9 would be relevant during any reevaluation of Blue Water's proposal, we need not and do not rely on that separate ground here.

[redacted]

[redacted] AR 2383.

Turning to Criteria 4, the Navy assessed that Blue Water's "[t]est vessel is not representative," AR 1586, as further explained in its debrief to Blue Water. AR 2382. As explained in the debrief, Blue Water's proposal [redacted] AR 2382. The Navy's technical assessment disagreed with Blue Water's claim, reasoning that [redacted] AR 2382. [redacted] AR 2382. Further, the Navy had determined that [redacted] AR 2384. [redacted] AR 2384. The Navy reasoned that [redacted] AR 2384.

C. The Navy's Evaluation of Saildrone

The Navy evaluated Saildrone's proposal as unacceptable, finding it unacceptable on Criteria 2, Criteria 3, and Criteria 4. AR 1577, AR1587 [redacted]

[redacted]);

AR 1587 [redacted] AR 1587 [redacted]

However, as explained further below, the Navy no longer contends that Saildrone failed to meet the requirements of Criteria 3 and 4.

The Navy found Saildrone's proposal unacceptable under criteria 2-1 and 2-2 because the [redacted] AR 1587, and explained this finding in the debrief. AR 2402. The Navy explained that [redacted] AR 2402. The Navy elaborated on this problem as follows:

[redacted]

AR 2402. Additionally, the Navy noted [redacted]. AR 2402-03. The Navy concluded that, [redacted]

[4] FEU means a Forty-foot Equivalent Unit, which is the space of a single 40-foot long standard metal shipping container, which, in turn, is equal to two 20-foot containers.

[redacted]

[redacted] and rated Saildrone's proposal unacceptable for Criteria 2. AR 2403.

The Navy selected seven of 25 proposals in prototype phase 1 to move on to prototype phase 2, but the plaintiffs were not among them. AR 1575, 1577. These protests followed.

## ARGUMENT

### I. Standards of Review

#### A. Standard For Procurement Challenges

The Administrative Procedure Act (APA) supplies the standard of review in bid protests. 28 U.S.C. § 1491(b)(4); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The APA standard asks whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The Court must not overturn the challenged decision unless it (1) "lacked a rational basis;" or (2) "involved a violation of regulation or procedure." *Axiom*, 564 F.3d at 1381 (quoting *Impresa*, 238 F.3d at 1332); *Banknote*, 365 F.3d at 1351 (same).

When "a challenge is brought on the first ground, the test is 'whether the … agency provided a coherent and reasonable explanation of its exercise of discretion, and the [protestor] … bears a heavy burden of showing that the award decision had no rational basis.'" *Banknote*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332-33). This standard is "highly deferential." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009). The rational basis standard recognizes a zone of acceptable results and requires that the agency's decision is the result of a process that "considered the relevant factors" and is "within the bounds of

[redacted]

reasoned decision-making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *accord Weeks Marine*, 575 F.3d at 1369 (agency actions "evincing rational reasoning and consideration of relevant factors" are upheld). When the Court finds a rational basis for an agency's action, it "stay[s] its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). "'When a challenge is brought on the second ground, the [protestor] … must show a clear and prejudicial violation of applicable statutes or regulations.'" *Axiom*, 564 F.3d at 1381 (quoting *Impresa*, 238 F.3d at 1333); *Banknote*, 365 F.3d at 1351 (same). To demonstrate prejudice in the context of a post-award challenge, the protestor "must show that there was a substantial chance it would have received the contract award absent the alleged error." *Banknote*, 365 F.3d at 1351 (internal quotation marks and citation omitted).

B. Standard for Judgment on the Administrative Record

Rule 52.1 provides that any party "may move for partial or other judgment on the administrative record filed with the court." RCFC 52.1(b). "Summary judgment standards are not pertinent to judicial review upon an administrative record." RCFC 52.1 rules committee's note (June 20, 2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005)). Instead, Rule 52.1 is "designed to provide for trial on a paper record, allowing factfinding by the trial court." *Bannum*, 404 F.3d at 1356 (interpreting RCFC 56.1, the predecessor to RCFC 52.1). "'The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Axiom*, 564 F.3d at 1379 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)).

[redacted]

C. Standard for Interpreting a Solicitation

Interpretation of a solicitation is a question of law. *Banknote*, 365 F.3d at 1353. "The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts." *Id.* at 1353 n.4; *accord Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021). Interpretation begins with the plain language. *Banknote Corp.*, 365 F.3d at 1353. If the solicitation terms are clear and unambiguous, they must be given their plain and ordinary meaning, and the Court may not resort to extrinsic evidence to interpret them. *Id.* The Court must consider the solicitation as a whole and give reasonable meaning to all its terms. *Id.*; *Safeguard*, 989 F.3d at 1344. A solicitation is ambiguous "only if its language is susceptible to more than one reasonable interpretation." *Id.* (quoting *Banknote Corp.*, 365 F.3d at 1353). The question of whether a solicitation is ambiguous is a question of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

D. Standard for Waiver of Challenges to Solicitation Terms or Agency Interpretations

"[W]here a government solicitation contains a patent *ambiguity*, the government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (internal quotations omitted, emphasis added). "This doctrine was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *Id.* at 1313-14 (internal quotation omitted). For similar reasons, a plaintiff that "has the opportunity to object to

[redacted]

the terms of a government solicitation containing a patent *error* and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id*. at 1313 (emphasis added).

"[T]he reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). "The same policy underlying *Blue & Gold* supports its extension to all pre-award situations," and "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." *Id*.; *accord Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020); *FYI - For Your Info., Inc. v. United States*, 170 Fed. Cl. 601, 618 (2024) ("It applies to any challenge to a procurement that could have been – and thus should have been – raised as a solicitation challenge, but was not.").

A patent *error* is "an obvious omission, inconsistency or discrepancy of significance." *Inserso*, 961 F.3d at 1349 (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016)). A patent *ambiguity* is present when the solicitation contains facially inconsistent provisions that would place a reasonable offeror on notice and prompt the offeror to rectify the inconsistency by inquiring of the Government. *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018). An error or ambiguity is patent whenever it "could have been discovered by reasonable and customary care." *Inserso*, 961 F.3d at 1349. But an error or ambiguity is latent if it is "hidden or concealed," "not apparent on the face of the document," and not discoverable through "reasonable and customary care[.]" *Per Aarsleff*, 829 F.3d at 1312 (citation omitted). The question of whether an ambiguity is patent or latent is an issue of law. *Id.* In determining

[redacted]

whether it was patent or latent, offerors are "charged with knowledge of law and fact appropriate to the subject matter." *Inserso*, 961 F.3d at 1350 (quoting *Per Aarslef*, 829 F.3d at 1314).

II. Blue Water's Challenges Fail

A. Navy's Evaluation of Blue Water is Sufficient for Judicial Review

Blue Water's leading argument is a strained one – contending that the Navy's debrief is a post-hoc rationalization and the Navy's technical decision is insufficient to enable judicial review. BWA Brief at 16. Blue Water is incorrect.

Review in a bid protest is highly deferential, and "an explicit explanation is not necessary where the agency's decisional path is reasonably discernable." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021); *accord Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action," *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 21 (2020) (cleaned up), this Court has distinguished between "*post hoc* rationalizations" and "further explanation[s] of the process used by the agency." *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011), *aff'd without op.*, 484 F. App'x 558, 559 (Fed. Cir. 2012).[5]

Moreover, this Court has distinguished between "*post hoc* rationalizations" and "further explanation[s] of the process used by the agency." *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011), *aff'd without op.*, 484 F. App'x 558, 559 (Fed. Cir. 2012). A *post hoc* rationalization is "a new rationale for an old decision." *Id.* at 35 n.11 (citation omitted).

[5] If that explanation is insufficient, a court can remand for the agency to provide a fuller explanation or to take a new agency action. *Regents*, 591 U.S. at 21. This amplified explanation must elaborate on the original reasons, not add new ones. *Id.*

[redacted]

Although the Court may view *post hoc* rationalizations "with skepticism," further explanations of the agency's evaluation process are "properly considered by this Court in determining that the [decision at issue] was rational." *Id.* at 36. Accordingly, this Court has held that a deciding official's further explanations of the evaluation process in response to GAO questions "do not constitute *post hoc* rationalizations." *Id.* at 35-36; *accord IBM Corp. v. United States*, 119 Fed. Cl. 145, 162 n.15 (2016) (holding that CO statement before GAO was properly considered as further explanation and was not a *post hoc* rationalization). Indeed, "[c]ourts reviewing bid protests routinely consider post-award . . . analyses and consider evidence developed in response to a bid protest." *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011); *see also Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) ("The '*post hoc* rationalization' rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning;" instead, "[i]t is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decision[-]makers.").

Here, the Navy's debrief to Blue Water merely provides further explanation of the reasons identified in the evaluation results. As indicated in the evaluation results (a PowerPoint slide deck), the Navy found Blue Water unacceptable because, in its technical judgment, it found that Blue Water did not meet Criteria C2-1 for Vessel Range, "2500 nm at 25 knots while carrying a 25 MT load on the payload deck in NATO STANAG 4194 Sea State 4." AR 1581, AR 1585. The agency stated in the results slide deck that category 2-1 was rated unacceptable for Blue Water because [redacted] AR 1586. In the debrief, the Navy simply elaborated on why it had found that Blue Water had failed to demonstrate [redacted]. AR2382. Similarly with Criteria 4,

[redacted]

the evaluation results slide deck noted that the Navy had found Blue Water unacceptable in the C4-2 category requiring the offeror to "[d]escribe how the test asset is representative of the MUSVs used in the offeror's proposed business models in section 3.2.1., i.e., Model 1 and Model 2." AR 1583. The Navy noted in the results slide deck that Blue Water's proposal was unacceptable in this area because the "[t]est vessel is not representative." AR 1586. In the debrief, the Navy further explained its technical judgment that did not agree with Blue Water's claim that [redacted] AR 2383.

The debrief does not provide new reasons for the Navy's actions but rather it provides further explanation for the Navy's previously stated reasons. Thus, contrary to Blue Water's argument, BWA Brief at 20, there is no basis for the Court to ignore the debrief. *D & S Consultants*, 101 Fed. Cl. at 35 (recognizing difference between "*post hoc* rationalizations" and "further explanation[s] of the process used by the agency"). The Navy's course heading is reasonably discernable and sufficient to enable judicial review. Blue Water's arguments to the contrary elevate form over substance and pointlessly ask the Court to remand for the Navy to provide the further explanation that it already has provided in the debrief. These attenuated arguments underscore the protest's lack of merit.

B. Navy Rationally Evaluated Criteria 2

Blue Water alleges that the Navy's evaluation as to Criteria 2 is inconsistent with the stated evaluation criteria and contradicts the Navy's own findings, that the Navy applied unstated evaluation criteria, and that the Navy disregarded information in Blue Water's proposal and improperly evaluated this "prototype" MUSV transaction. BWA Brief at 21. Blue Water is incorrect and merely disagrees with the Navy's rational evaluation, which is insufficient under

[redacted]

the deferential standard of review. This deference is great when a plaintiff challenges "the minutiae of the procurement process in such matters as technical ratings." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "This deference to an agency's technical expertise and judgment is even greater in a developmental or prototyping project," as is the case here. *Telesto Group, LLC v. United States*, 176 Fed. Cl. 711, 745 (2025) (collecting cases).

1. <u>The Navy Rationally Found Blue Water's Proposal Unacceptable Under C2-1</u>

Blue Water argues that the Navy applied unstated evaluation criteria when it found Blue Water unacceptable under the criteria C2-1 because the design [redacted]. BWA Brief at 22. Blue Water argues that [redacted] are not part of the threshold requirements related to the vessel range requirement. *Id.* This strained argument is inconsistent with the standard of review for an unstated evaluation criteria claim and ignores the RPP's requirement to include a [redacted] in its proposal. AR 259.

When reviewing such a claim, an agency may consider elements that, while not explicitly stated in the solicitation, are intrinsic to the stated factors. *Coastal Intern. Sec., Inc. v. United States*, 93 Fed. Cl. 502, 531 (2010) ("[A] [s]olicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.") (citation omitted). In fact, the Court of Federal Claims has recognized that agencies have "great discretion in determining the scope of an evaluation factor." *Id.* (citation omitted). Accordingly, to prevail in a protest alleging that an agency departed from the stated evaluation criteria, the protestor must demonstrate that the "agency used a significantly different basis in evaluating the proposals than was disclosed." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386-87 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

[redacted]

In this case, the RPP required offerors to include a design overview in their proposals. That included a "Vessel Characteristics Overview," which, in turn, required the offeror to provide an "[o]verview of vessel 3D design models if any, maturity of the design(s)," and "[d]esgin history/maturity overview and previous employment if any." AR 260. Further, the Vessel Characteristics Overview was required to "[d]emonstrate maturity of the design enables fielding of operational vessels in FY27." AR 260. Therefore, the evaluation of "maturity" was not only a specifically enumerated requirement, but also was fundamental to the other stated evaluation factors.

Further, Blue Water's argument reveals a misunderstanding of the RPP. Blue Water argues that the Navy ignored its statements in its proposal that its proposed solution met the C2-1 criteria. BWA Brief at 23. However, merely completing all the required information and *claiming* that they suffice do not render a proposal acceptable. The proposal still has to be *evaluated*. The Proposal Evaluation Approach section of the solicitation guidance notes that a proposal will be found acceptable under Criteria 2 (Vessel Solution Design) if "the Offeror *demonstrates* the proposed MUSV Design meets or exceeds the threshold requirements." AR 263 (emphasis added). The Navy found Blue Water's proposal failed to *demonstrate* this, and was unacceptable under this criteria, because in the Navy's technical judgment the design was [redacted] AR 1586.

The Navy expanded upon this technical judgment call in the debrief, explaining that [redacted]" AR 2382. The Navy explained that although a [redacted]

[redacted]

[redacted] AR 2382. Further, [redacted]. AR 2383. The Navy concluded that Blue Water's proposed vessel had [redacted] AR 2383. These are matters that fall squarely within the Navy's technical expertise and the standard of review does not permit the Court to second-guess them. *See Technatomy Corp. v. United States*, 180 Fed. Cl. 752, 777 (2026) (when the agency has "exercised its technical judgment … based on the record before it," "'the Court may not substitute its judgment for that of the agency'") (quoting *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 740 (2007)).

Nevertheless, Blue Water argues that the debrief adds a new reason that the proposal was unacceptable under C2-9 Field Operational in FY27 and does not mention C2-1 Vessel Range. BWA Brief at 23. The debrief discussed two issues: [redacted] AR 2382. The solicitation guidance not only lists threshold requirements but also lists required information that would be used to determine if those requirements were met. AR 258-260. Contrary to Blue Water's assertion that these requirements are "irrelevant to an offeror's acceptability under Criteria 2," BWA Brief at 27, the required information about [redacted] was how an offeror would demonstrate its acceptability under Criteria 2. [redacted] is mentioned three times in the list of nine requirements of the Vessel Characteristics Overview. AR 260.

[redacted]

Blue Water further argues that using the Vessel Characteristics Overview to determine the probability that the threshold requirements were met is inconsistent with the solicitation's acceptable/unacceptable binary evaluation. BWA Brief at 27. This argument misses the target. Offerors were required to demonstrate that their solutions met the threshold criteria. The required vessel characteristics overview was how they were required to do so. Ultimately, the Navy was not satisfied with Blue Water's demonstration regarding the [redacted], as explained above. The Navy also had its doubts that Blue Water would [redacted], but that does not matter here, because Blue Water failed at a previous hurdle: the Navy rationally determined based on an expert technical evaluation that Blue Water's proposed solution was not [redacted] to meet the Navy's requirements.

Next, Blue Water argues that the Navy's findings as to the [redacted] is inconsistent with the Navy's rating of the proposal as acceptable under Criteria 2-9, i.e., satisfying the desired attribute of five and ten operational MUSVs in FY27, and Criteria 3 – Manufacturing. BWA Brief at 25. While these findings are inconsistent, that is only because the Navy intended to mark Blue Water as having also failed Criteria 2-9, but inadvertently did not do so. That is irrelevant for purposes of this case because Blue Water failed Criteria 2-1.

2. The Navy's Evaluation of Blue Water's Novel Design Was Not Contrary to the Solicitation

Blue Water argues that the Navy's criticism of the [redacted] are deviations from stated evaluation criteria and therefore arbitrary. BWA Brief at 28. Blue Water asserts that there is no requirement that the proposed solutions [redacted] and that the solicitation expressly allows new construction or a converted vessel, and therefore, therefore the Navy's criticisms of [redacted]

[redacted]

[redacted] are inconsistent with the solicitation and the definition of "prototype project" in the solicitation and statutory requirements related to MUSVs. BWA Brief at 28-29.

This argument misunderstands the Navy's evaluation and critique. The Navy evaluated whether proposals demonstrated that their solutions could meet the Navy's requirements on the Navy's tight timeline. The Navy did not say that vessels were required to be [redacted] or that [redacted]. In Blue Water's specific case, the [redacted] did not persuade the Navy's technical evaluators that Blue Water could meet the specific requirements for this OT. AR 2382-2383. This determination and evaluation is not inconsistent with the solicitation or the concept of a prototype project.

C. <u>Navy Rationally Evaluated Criteria 4</u>

1. <u>The Navy's Evaluation was Rational</u>

Blue Water argues that the Navy's determination that Blue Water's proposed surrogate test vessel was not representative of Blue Water's proposed solution vessel because of differences in the [redacted] is not consistent with the solicitation because [redacted] are not listed as assets to be evaluated during the testing." BWA Brief at 33, 35. This argument does not hold water.

The solicitation required offerors to "[d]escribe how the test asset is representative of the MUSVs" used in the proposed solution. AR 262. Blue Water conceded [redacted]

[redacted] AR 465; *see also* AR 2383. As the Navy explained in its debrief to Blue Water:

[redacted]

AR 2383. Blue Water had its chance to explain why its test vessel was representative in a proposal, but it failed to do so.

The Navy's assessment was not a departure from the stated evaluation criteria merely because [redacted] are not individually tested. First, Blue Water's attempted reliance on the Navy's answers to industry questions, BWA Brief at 33-34, is misplaced because the answers to offerors' questions do not take precedence over the requirements in the solicitation guidance. AR 255-256 ("Information contained in the Government's responses to offerors' questions shall not supersede any information contained in the solicitation, including any amendments thereto. In the event of a discrepancy between a response to a bidder's question and the content of the solicitation as amended, the latter shall take precedence."). Second, the Navy did not define representative in its response to these questions; it merely pointed back to the solicitation.[6] AR 266. Finally, keeping in mind the physical reality of maritime operations,

[6] Further, Blue Water's attempt to rely on the Post Award Conference as an alternative escape hatch to avoid exclusion would circumvent the terms of the solicitation. BWA Brief at 34. "Post Award" is, by definition, after the award and evaluation. Anything that happens after evaluation cannot be used to change the Phase 1 evaluation. *See Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1292 n.4 (Fed. Cir. 2020) ("[s]ubsequent events are irrelevant" in a bid

[redacted]

autonomy systems are inextricably linked to the hydrodynamic and mechanical properties of the vessel they command. It was Blue Water's burden to "fully demonstrate a test asset that is representative of the MUSVs used in the offerors proposed business model." AR 263. Instead of doing so, it merely asserted that [redacted]. While the [redacted] installed on the proposed test vessel were representative of those on the proposed design solution, the proposed test vessel was [redacted]. For example, [redacted] *Compare* AR 491, *with* AR 487. Blue Water may disagree with the Navy's technical assessment, but Blue Water has not demonstrated that the Navy's technical judgment was irrational. *See Technatomy*, 180 Fed. Cl. at 776 ("protesters ask the court to second-guess the [agency's] technical evaluation. The court will rarely do that."); *Benchmade Knife*, 79 Fed. Cl. at 740 ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."). Blue Water has failed to meet this high burden, and this Court does not second-guess the agency's technical judgments as super source selection authority. *See Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 367 (2009).

---

protest); *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 745 n.6 (2006) ("The court cannot use events that occurred after award of the contract – which the contracting officer could not have considered during the procurement process – to evaluate whether the contracting officer abused his discretion during the procurement process or at the time of the contract award."), *aff'd*, 228 F. App'x 980, 983 (Fed. Cir. 2007); *Portfolio Disposition Mgmt. Group LLC v. United States*, 64 Fed. Cl. 1, 11 (2005) (similar)

[redacted]

2. Any Challenge to Navy's Definition of "Representative" is Barred by Blue & Gold – Patent Ambiguity

Blue Water argues that its test vessel was [redacted] and that the Navy applied unstated evaluation criteria and deviated from the solicitation to find otherwise. BWA Brief at 32. The Navy found that Blue Water's test vessel was not representative of its design. Blue Water cannot now challenge the Navy's interpretation of "representative" when it knew the term was not defined in the solicitation and the Navy merely directed offerors back to the RPP and declined to provide any further clarity in its answers to potential offerors' questions about its meaning. *See* AR 266 (answering a question about representativeness by responding "Test vessel shall be able to perform the test plan as written in the J-5 attachment. Section 7 of the J-1 Attachment discusses the approval process for test USVs."). That is a quintessential example of a patent ambiguity – any potential offeror such as Blue Water should have known, or would have been able to discover through reasonable diligence, that the Navy did not define exact metric for what constitutes a "representative" test vessel. Yet, Blue Water chose not to protest prior to the proposal deadline, and instead to submit a proposal in the hopes of receiving a prototype OT, thus waiving any such protest grounds under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). *See Telesto*, 176 Fed. Cl. at 740-41 (applying *Blue & Gold Fleet* waiver rule in protest regarding OTs).

3. Blue Water's Disparate Treatment Claim Is Meritless

Blue Water argues that the Navy's evaluation demonstrates that it evaluated offerors unequally and against different standards under Criteria 4. BWA Brief at 37. Glossing over clear differences in the technical proposals, Blue Water purports to seize upon one similarity with Leidos's test vessel that also [redacted]

[redacted]

[redacted] BWA Brief at 37. Blue Water argues that "to the extent that the test vessel and design solutions must have the same [redacted] to satisfy the RPP's testing requirements, the Navy treated Blue Water unequally by waiving the requirement for Leidos but not for Blue Water. BWA Brief at 37. This perfunctory argument is specious.

To prevail on a disparate treatment claim related to a technical evaluation, in addition to prejudice, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies (or unreasonably ignored strengths) that were "substantively indistinguishable" from, or "nearly identical" to, another proposal. *Office Design Group v. United States*, 951 F.3d 1366, 1372-73 (Fed. Cir. 2020). If a protestor meets this threshold, the Court can then comparatively analyze the agency's treatment of proposals without interfering with the agency's broad discretion. *Id*. at 1373. If a protestor does not, then the Court should dismiss the claim. *Id*. To allow otherwise would give the Court free rein to "second-guess the agency's discretionary determinations underlying its technical ratings," which is not the Court's role. *Id*.

Many of the Navy's articulated concerns regarding the representativeness of Blue Water's test vessel are simply not implicated in Leidos's proposal. Specifically, [redacted] AR 491, 487. Moreover, a comparison of the companies' proposals reveals [redacted], underscoring the rationality and evenhandedness of the Navy's evaluation under Criteria 4. *See, e.g.* AR 465-466, 487, 491; AR 984-985, 1023-1024.

[redacted]

Nor is there any record support for Blue Water's suggestion that the Navy might have required [redacted] *See* BWA Brief at 37. As discussed above, Blue Water's "Unacceptable" rating was based on [redacted]. This is what the Navy advised Blue Water in the debriefing – that the Navy did not agree with Blue Water's assessment that [redacted]. AR 2383. With respect to [redacted], the Navy explained:

[redacted]

*Id*. With respect to [redacted][7] the Navy noted [redacted] *Id*. at 3, AR 2384. The Navy further explained that [redacted]

---

[7] [redacted]

[redacted]

[redacted] *Id*. Finally, the Navy explained that [redacted] *Id*.

While Blue Water is correct that Leidos's test vessel and proposed design solution also have a different [redacted], they operate in a different context, because Leidos's vessels, unlike Blue Water's, have the same [redacted]. *See* AR 959, 980, 985 ([redacted]). This means that although [redacted] *See, e.g.*, AR 959, 964 [redacted]); *see also* AR 1023-24 [redacted]). [redacted]. *See* AR 964, 980, 985; AR 1023-24.

[redacted]

Although [redacted]. [redacted]

*See* AR 1023-24.

Regardless of the [redacted] issue and any alleged similarity with Leidos proposal, Blue Water overlooks other significant differences that independently support an "Unacceptable" rating under Criteria 4. The most notable issue is that, in terms of size, Blue Water's [redacted]. AR 487, 491. In addition, Blue Water's [redacted]. AR 466. [redacted]

[redacted]

[redacted] *See* AR 959, 980, 985; AR 1023-24. Given the numerous technical differences described above in the representativeness of Blue Water and Leidos's [redacted], Blue Water cannot prevail with its disparate treatment claim under Criteria 4.

D. <u>The Navy's Criteria 2 and Criteria 4 Evaluations Complied with Law</u>

Blue Water alleges that the Navy's evaluations of Criteria 2 and 4 failed to use competitive procedures as required by 10 U.S.C. §4022(b)(2) by applying unstated evaluation criteria and other claimed evaluation errors. BWA Brief at 31, 38. This allegation is completely duplicative and derivative of Blue Water's arguments of Navy's Criteria 2 and Criteria 4 evaluations, and it similarly fails for the same reasons discussed above. To the extent that Blue Water is challenging whether the RPP established competitive procedures in accordance with section 4022(b)(2), that argument is waived under *Blue & Gold*. *See Telesto*, 176 Fed. Cl. at 740-41 (applying *Blue & Gold* to protest involving OTs).

E. <u>Blue Water's Protest Failes Because It Cannot Show Prejudice</u>

Blue Water cannot show prejudice in the form of a "substantial chance" of award unless the Court finds a combination of errors that would result in an acceptable rating in *both* Criteria 2 and Criteria 4. *See*, *Banknote*, 365 F.3d at 1351 (the protestor "must show that there was a substantial chance it would have received the contract award absent the alleged error.") (cleaned up). This is because any single unacceptable rating renders the entire proposal unacceptable. *See* AR 262 ("If an offeror is found unacceptable in any of the criteria below the offerors proposal will be deemed unacceptable and will not move forward for potential prototype OT award."). Blue Water has failed to make this showing.

[redacted]

## III. Saildrone's Challenges Fail

### A. The Navy's Criteria 2 Evaluation was Rational

#### 1. The Navy's Criteria 2 Evaluation Reflects No Disparate Treatment

Saildrone does not seriously dispute that it botched Criteria 2, but it alleges that the Navy applied a different standard to Sea Machines under Criteria 2 in advancing Sea Machines to Phase 2 because, according to Saildrone, Sea Machines made the same error with [redacted]. Saildrone Brief at 16. Further, Saildrone alleges that the Navy evaluated Sea Machine's proposal as acceptable even though it disclosed much less information [redacted] than Saildrone's proposal. *Id.* Although Sea Machines made a similar error as Saildrone on [redacted], this lends only a superficial patina of support for Saildrone's argument. Sea Machines's proposal was substantively distinguishable because it contained sufficient information to allow the Navy to conclude that its proposed solution satisfied the solicitation's [redacted], while Saildrone's proposal did not contain that information. As such, the Navy properly treated the different proposals differently. On these facts discussed more fully below, Saildrone cannot show that Navy unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" from, or "nearly identical" to, Sea Machines. *See Office Design Grp.*, 951 F.3d at 1372-73.

The Government does not dispute that the two companies made similar errors in populating [redacted]. But that is not the end of the inquiry. Rather, the impact of missing or incorrect information in the [redacted] is contingent on the totality of information regarding [redacted] in the proposal. The solicitation specified threshold requirements for the [redacted], including, as relevant here, [redacted]

[redacted]

[redacted] AR 258. Although the solicitation instructed offerors to provide a summary of the vessel design using the [redacted], offerors were also permitted to provide [redacted]. *Id.* With respect to the narrative information, [redacted] *Id.* Thus, the relevant evaluation inquiry for Criteria 2 was not whether offerors' [redacted], but whether offerors' [redacted]. In this regard, Saildrone and Sea Machines' proposals are completely dissimilar.

In addressing the solicitation's [redacted], the narrative portion of Saildrone's proposal claims, *without* supporting evidence, that its proposed vessel solution meets these requirements. *See* AR 1194, 1199, 1200. For example, Saildrone's proposal states that its vessel "[redacted]," AR 1194, and that its vessel's [redacted]," AR 1199. Under "[redacted]," Saildrone's proposal claims that the [redacted] AR 1200. Regarding the solicitation's [redacted] requirements, Saildrone's [redacted]

[redacted]

[redacted]. AR 1219. Finally, in support of its proposal, Saildrone submitted a diagram of [redacted] AR 1255.

Collectively, this information demonstrated very little about the Saildrone vessel's ability to meet solicitation's [redacted]. While the proposal contained superficial statements about the vessels design with respect to these requirements, it offered little evidence or technical information to support its claims. Worse, the detailed, supporting information that was provided contained inconsistencies and ambiguity that left the Navy second guessing whether Saildrone's representation that its vessel meets the solicitation's [redacted] requirements could be true. *See*, AR 2403. In this regard, Saildrone's [redacted] should have reflected [redacted]. However, Saildrone's [redacted]. AR 1219. Accordingly, this information calls into question whether the solution can [redacted] *See*, AR 2402 [redacted]

The only other data contained in Saildrone's proposal regarding [redacted] does nothing to clear this up. There is a single sentence in the narrative portion of Saildrone's proposal explaining that the [redacted]

[redacted]

[redacted].” AR 1200. Notably, this figure is [redacted]. AR 1219. There is no other information in Saildrone’s proposal that can help reconcile this conflicting information or provide separate support for Saildrone’s claims that its vessel meets the solicitation’s threshold requirements.

In contrast, Sea Machines’s proposal provided the Navy with robust information concerning its solution’s design, which allowed the Navy to conclude that Sea Machines’s proposal meets the solicitation’s threshold requirements, including the [redacted] requirements at issue. Specifically, in addressing the solicitation’s [redacted] requirements, the narrative portion of Sea Machines’ proposal goes beyond stating that its solution meets these requirements. Sea Machines offered evidence to support its claims by representing that [redacted] which confirms that the proposed vessel design can meet [redacted].[8] *See* AR 1330, 1337.

---

[8] Saildrone attempts to differentiate Sea Machines’ [redacted] solutions. *See* Saildrone Brief at 16-17. While [redacted] *See, e.g.*, AR 1310, 1330-1339 [redacted]). Accordingly, in many respects, the Navy could rely on the same information to validate both [redacted] design. Further, the differences that exist reflect an advancement of the [redacted] design that Sea Machines can provide over a longer horizon. *See* AR 1310, 1330 [redacted]). Finally, while the evaluation record arguably reflects that the Government advanced Sea Machines based on [redacted], the Government considered both designs. The record demonstrates that Sea Machines proposed to deliver [redacted]. *See, e.g.*, AR 1316. Accordingly, given the number of [redacted] vessels the Government would receive, it would be completely illogical for the Government to not consider whether [redacted] met the solicitation’s requirements in making an award decision.

[redacted]

Specifically, Sea Machines, like Saildrone, submitted a diagram of general arrangements. *See* AR 1362-1438. But unlike Saildrone, with respect to the solicitation's [redacted], Sea Machines's general arrangements document includes a design study that provides detailed [redacted]. *See* AR 1400-01. In particular, with respect to the solicitation's [redacted] requirement, the design study provides output from modeling that confirms that the vessel can [redacted]. *See* AR 1400 [redacted]. With respect to the solicitation's [redacted] requirement, Sea Machine's design study provides similar modeling output that confirms that the vessel can [redacted]. *See id.* at 49, AR 1401 (noting that, [redacted]). Additionally, the design study includes a [redacted]. *See* AR 1407 ([redacted] Accordingly, the Navy, [redacted]. Collectively, with respect to [redacted]

[redacted]

[redacted] Such robust information obviated the need for [redacted].

Further differentiating the Saildrone and Sea Machines proposals, with respect to the Sea Machines [redacted], the new construction [redacted] and therefore did not provide any information that might contradict [redacted]. AR 1346. With respect to the Sea Machines [redacted], we agree that this information contains the same flaw as the [redacted]. *See* AR 1344 ([redacted]). This error, however, was mitigated by the fact that [redacted]. *See*, AR 1330, 1337. Further, unlike Saildrone, there was no information in Sea Machines' proposal that [redacted].

---

9 [redacted]

[redacted]

In short, in arguing that Sea Machines' proposal suffers from the same deficiency as Saildrone's with respect to its solution's ability to meet the [redacted], Saildrone completely ignores the information that Sea Machines provided in its diagram of general arrangements, [redacted]. Accordingly, while Sea Machines' proposal has the same issue with the [redacted] for one of its vessels, that defect was not fatal for Sea Machines because Sea Machines' proposal, unlike Saildrone's, otherwise provided the Navy with the required information. In light of the aforementioned differences, Saildrone's disparate treatment claim under Criteria 2 must fail.

2. The Solicitation Contains No Latent Ambiguity

Saildrone alleges that the [redacted] was latently ambiguous and that Saildrone's interpretation of [redacted] was reasonable. Saildrone Brief at 29. Saildrone's argument fails because Saildrone has not demonstrated any ambiguity with the term [redacted] by its unreasonable interpretation that reads [redacted] out of the phrase. Further, even if Saildrone could establish an ambiguity, Saildrone's argument fails because any ambiguity was patent on the face of the Placemat and Saildrone's interpretation was unreasonable.

An ambiguity exists when "the parties differ in their respective interpretations of a contract term," and "both interpretations[] fall within a 'zone of reasonableness.'" *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). A contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *Id.* (citing *McAbee Contr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996)).

[redacted]

A patent *error* is "an obvious omission, inconsistency or discrepancy of significance." *Inserso*, 961 F.3d at 1349 (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016)). A patent *ambiguity* is present when the solicitation contains facially inconsistent provisions that would place a reasonable offeror on notice and prompt the offeror to rectify the inconsistency by inquiring of the Government. *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018). An error or ambiguity is patent whenever it "could have been discovered by reasonable and customary care." *Inserso*, 961 F.3d at 1349. But an error or ambiguity is latent if it is "hidden or concealed," "not apparent on the face of the document," and not discoverable through "reasonable and customary care[.]" *Per Aarsleff*, 829 F.3d at 1312 (citation omitted). The question of whether an ambiguity is patent or latent is an issue of law. *Id.* In determining whether it was patent or latent, offerors are "charged with knowledge of law and fact appropriate to the subject matter." *Inserso*, 961 F.3d at 1350 (quoting *Per Aarslef*, 829 F.3d at 1314).

Here, Saildrone has not shown any ambiguity. Its reading of [redacted] to [redacted], *see* Saildrone Br. at 29, is not a reasonable interpretation because it reads [redacted] out of the phrase.

Saildrone argues that the [redacted]. Saildrone Brief at 29. Here, Saildrone inexplicably interprets [redacted] as referencing [redacted] *Id.* (emphasis added). Besides illogically interpreting the [redacted] to mean [redacted]

The problem is thrown into sharper relief when Saildrone describes the interpretation it rejected, [redacted] *Id.* That phrase contains two words that mean the same thing,

[redacted]

[redacted] Saildrone's interpretation renders the term [redacted] meaningless, which is an irrational interpretation. *See NVT Technologies*, 370 F.3d at 1159 ("[a]n interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.") (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Further, a reasonable interpreter would note that it keeps using synonyms of a word to describe what it thinks the word does not mean and antonyms to describe what it thinks the word does mean. A reasonable interpreter would then conclude that it had got the interpretation backwards. If the Navy wanted the [redacted], it could have asked for that without using a word that meant the exact opposite of what it intended.

Further, any ambiguity in the [redacted] was patent. As Saildrone argues, the phrase [redacted] was undefined in the solicitation. Saildrone Brief at 30. Saildrone argues that there was "no indication" that the Navy would interpret the term [redacted] This argument makes no sense as [redacted] describe the same relative measure. Saildrone merely feigns ignorance of the plain language while attempting to rewrite the solicitation after-the-fact. Saildrone fails to establish any latent ambiguity here.

3. <u>The Navy Was Not Obligated to Engage in Clarifications</u>

Saildrone argues in the alternative that, if the [redacted] contained a patent ambiguity rather than a latent one, then the Navy was obligated to conduct clarifications to fix any error in Saildrone's Placemat data. Saildrone Brief at 30-31. This argument fails for several reasons.

Saildrone's clarifications argument is the sort that is commonly made with reference to the Federal Acquisition Regulation (FAR), which defines "clarifications" as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306. However, the FAR does not apply to this prototype OT. *See*

[redacted]

*Bader v. United States*, 97 F.4th 904, 915 (Fed. Cir. 2024) (recognizing that "the FAR does not apply to the [OT] Authority"); *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435 (2019) (similar); 32 C.F.R. § 3.2 (OTs "are not required to comply with the Federal Acquisition Regulation (FAR) and its supplements (48 CFR)."). There is no statute, regulation, or RPP provision that requires the Navy to seek clarifications of prototype OT proposals. Saildrone cites to none. Because clarifications and discussions are procurement concepts with no legal foundation in the context of prototype OTs, Saildrone's clarifications argument is without merit.

Even if this were a procurement conducted under FAR part 15 – and it is not – Saildrone's argument would fare no better. FAR 15.306 is permissive; the Government "may" grant offerors the opportunity to provide clarifications of "minor or clerical errors." 48 C.F.R. § 15.306(a)(2). "And, absent a requirement in the solicitation, the government is not required to request clarifications." *Technatomy*, 180 Fed. Cl. at 768 (citing *Safeguard Base Ops., LLC v. United States*, 989 F.3d 1326, 1348 (Fed. Cir. 2021); *GovWave, LLC v. United States*, 175 Fed. Cl. 564, 642 (2025). The RPP did not mention, much less require, clarifications. AR 251-65.

Moreover, "the government has no obligation to seek clarifications when it justifiably determines that an offeror has made a material omission." *Constellation W., Inc. v. United States*, 125 Fed. Cl. 505, 550 (2015). "[E]rrors are considered to be material when they (1) violate an express provision in the RFP and (2) the provision served a substantive purpose." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 506 (2019). "An RFP provision is considered to have a substantive purpose when it is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid." *Id.* at 508.

[redacted]

"The onus is not on the government to find ways to clarify or correct material errors in submitted proposals." *Gemini Tech Servs. LLC v. United States*, 177 Fed. Cl. 227, 235 (2025). Rather, the burden is on the offeror to submit a well-written proposal with adequately detailed information that allows for meaningful review. *Id.* (citing *SSI Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 743 (2024)). And just because an agency could seek clarifications, does not mean the agency "was *required* to do so and its reported failure in this regard was arbitrary, capricious, an abuse of discretion, or was contrary to law." *Id.* at 235 n.9 (emphasis in original).

Saildrone's error was material. As explained above, the solicitation specified threshold requirements for the [redacted] AR 258. While the Navy's debrief noted, [redacted]" AR 2403. Compounding this problem, Saildrone's proposal contained inconsistencies in this area, including a sentence in the narrative portion that explained that the [redacted]. AR 1200, 1219. The Navy did not "know" what the offeror intended as in *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502 (2013), upon which Saildrone misplaces reliance.[10]

[10] In *BCPeabody*, the plaintiff mistakenly submitted two identical project information sheets that failed to substantiate relevant experience for a subcontractor, and the agency deemed the plaintiff's proposal unacceptable. *BCPeabody*, 112 Fed. Cl. at 505-06. However, during the evaluation of a different proposal, the agency determined that the *same* subcontractor's experience was acceptable. *Id.* at 512. The Court concluded the agency abused its discretion in

[redacted]

Saildrone Brief at 31. The Navy was under no obligation to conduct clarifications for this additional, independent reason.

B. Criteria 3 & 4

Saildrone challenges whether the Navy rationally evaluated Saildrone's proposal under Criteria 3 and 4, and whether there was disparate treatment with the evaluations of certain other proposals on Criteria 3 and 4. Although the Navy articulated a rational basis in the record for its evaluation of Saildrone's proposal, in retrospect, the Navy has determined that there were some variances in evaluations of certain proposals under Criteria 3 and 4 as argued by Saildrone. To correct for these unintended variances, the Navy no longer contends that Saildrone failed to meet the requirements of Criteria 3 and 4. Nevertheless, as demonstrated above, Saildrone did not meet the requirements in Criteria 2, which, standing alone, is fatal to its proposal. Accordingly, any error in the evaluation of Saildrone's proposal under Criteria 3 and 4 is harmless.

**CONCLUSION**

For these reasons, the Court should deny the plaintiffs' motions for judgment upon the administrative record, deny plaintiffs' request for injunctive relief, grant our cross-motion for judgment upon the administrative record, and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

---

refusing to clarify the subcontractor's experience because "the clerical error led the contracting officer to evaluate the past performance of a subcontractor differently for two offerors." *Id.* *BCPeabody* is readily distinguishable. Unlike *BCPeabody*, the Navy did not have information about the merits of Saildrone's proposal from another offeror. The Court should decline to extend *BCPeabody* to the facts of this case. *See KACE Co., LLC v. United States*, 167 Fed. Cl. 192, 207 (2023) (declining to follow *BCPeabody* because "there are no issues involving unequal treatment of offerors regarding the same corporate experience examples").

[redacted]

PATRICIA M. McCARTHY
Director

CORINNE A. NIOSI
Assistant Director

s/ Natalee A. Allenbaugh
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
NATALEE A. ALLENBAUGH
Trial Attorney
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant United States

Of Counsel:

GWENDOLYN IACI
Supervisory Associate Counsel
EMILY RUBINO
Attorney Advisor
BENJAMIN DEARDEN
Attorney Advisor
NAVSEA Office of Counsel
1333 Isaac Hull Avenue, Bldg 197
Washington Navy Yard, D.C. 20376

August 24, 2026

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 24, 2026, I caused a copy of the foregoing sealed brief to be served, via electronic file transfer, on all counsel of record.

s/ Natalee A. Allenbaugh
NATALEE A. ALLENBAUGH