# In the United States Court of Federal Claims

**BLUE WATER AUTONOMY, INC., *et al.*,**

***Plaintiffs,***

**v.**

**THE UNITED STATES,**

***Defendant,***

**and**

**HII UNMANNED SYSTEMS, INC., *et al.*,**

***Defendant-Intervenors.***

Nos. 26-936, 26-944
(Filed: October 29, 2026)

*Alexander O. Canizares*, *Christopher M. O'Brien*, *Tyler E. Robinson*, Vinson & Elkins, LLP, Washington, DC, for Plaintiff Blue Water Autonomy, Inc.

*Laura M. King, Faith E. Gay,* Selendy Gay, PLLC, New York, NY, *Carla J. Weiss*, Nichols Law, Washington, DC, for Plaintiff Saildrone, Inc.

*Douglas G. Edelschick*, Senior Trial Counsel, *Natalee A. Allenbaugh*, Trial Attorney, *Corrine A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for Defendant. *Gwendolyn Iaci*, *Emily Rubino*, *Benjamin Dearden*, Office of Counsel, Naval Sea Systems Command, Washington, DC, of counsel.

*J. Hunter Bennett*, *Kayleigh Scalzo*, *Jason A. Carey*, Covington & Burling LLP, Washington DC, for Defendant-Intervenor HII Unmanned Systems, Inc.

*Michael J. Anstett*, *James J. McCullough*, *Robert C. Starling*, *Noah B. Curtiss*, Fried, Frank, Harris, Shriver, & Jacobson, LLP, Washington, DC, for Defendant-Intervenor Leidos, Inc.

*Jon W. Burd*, *Cara L. Sizemore,* Wiley Rein, LLP, Washington, DC, for Defendant-Intervenor Saronic Technologies, Inc.

## OPINION AND ORDER

**HADJI, *Judge*.**

This is a consolidated protest involving the Navy's decision to eliminate two offerors from the competition for a prototype "other transaction" (OT) agreement for Medium Unmanned Surface Vessels (MUSVs). Pending before the Court is the Government's Motion to Dismiss (ECF 75), which alleges that this Court lacks jurisdiction over OTs and therefore cannot hear Protesters' claims. The Court finds that its broad procurement protest statute, 28 U.S.C. § 1491(b)(1), encompasses the instant protest because the OT competition at issue is in connection with the Navy's procurement of MUSVs. Accordingly, the Government's Motion to Dismiss is **DENIED**.

## BACKGROUND[1]

In efforts to enhance and modernize the Navy's ships, the President instituted the Golden Fleet Initiative, under which the Navy has prioritized rapid acquisition of unmanned maritime capabilities. ECF 73 ¶ 24. As relevant here, the MUSV acquisition is a part of the Navy's broader 30-year Shipbuilding Plan to expedite the production and procurement of unmanned vessels. ECF 73 ¶ 26; ECF 74 ¶¶ 2, 23. To that same end, Congress has allocated $2.1 billion for acquisition of MUSVs. ECF 73 ¶ 25. The Navy's Shipbuilding Plan prioritizes expanding MUSV use, contemplating a total fleet inventory of 39 MUSVs by fiscal year 2027. ECF 73 ¶ 26.

With these needs in mind, the Navy Portfolio Acquisition Executive for Robotic and Autonomous Systems (PAE RAS) issued Solicitation No. N00024-26-R-6326 (the Solicitation) as a request for prototype proposals pursuant to the Navy's other transaction authority under 10 U.S.C. § 4022 on March 26, 2026. ECF 73 at 1; ECF 74 ¶ 36. The Navy encouraged offerors to work together to provide a "complete system that is production-ready, inexpensive, and operationally effective." ECF 74 ¶ 36. The MUSVs were sought to provide "autonomous carrying capacity of containerized payloads while possessing the attributes defined" by the Navy. AR 251. The Navy issued the Solicitation as "a direct, competitive down-select for a potential multi-vessel production and/or service contract with delivery of a production vessel in [fiscal year 2027]." AR 72. The Navy's intention was to consider existing industry solutions that would permit the Navy to "test [MUSV] capability and go straight into production." ECF 73 ¶ 29; ECF 74 ¶ 20. The Navy supported this intention for quick movement on the prototype OT because it "is no longer interested in paying industry to build prototypes." AR 77. The Navy further characterized its need as

[1] The facts in this section are derived from both the Protesters' Complaints (ECF 73; ECF 74) as well as the Administrative Record. "In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings …." *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

for "technically mature solutions" with the intention to deploy the MUSVs quickly. ECF 73 ¶ 28.

The Solicitation provided for two phases. ECF 73 ¶ 30; ECF 74 ¶ 38. During Phase 1, offerors could submit proposals demonstrating how they met specific criteria regarding vessel design, manufacturing readiness, and a plan for executing the on-water test event. ECF 73 ¶ 30; ECF 74 ¶¶ 2, 38. Under manufacturing readiness, offerors were required to demonstrate an ability to provide a field-operational vessel by fiscal year 2027. ECF 74 ¶ 2. The Navy evaluated proposals against objective, pass/fail criteria to determine offerors to continue into Phase 2. ECF 73 ¶ 3. Proposals meeting the criteria would receive an "acceptable" rating and move on to Phase 2. ECF 73 ¶ 3. During Phase 2, the Navy plans to invite offerors to negotiate the terms of a prototype OT agreement (OTA). ECF 73 ¶ 4; ECF 74 ¶ 38. For companies that are selected for a potential award for a prototype OTA, the prototype OT work consists of a post-award conference and the completion of the on-water MUSV test event. ECF 73 ¶ 31; ECF 74 ¶ 6; AR 92. Following this water test, successful offerors would have the opportunity to receive follow-on work. ECF 74 ¶¶ 2, 6. In particular, the Solicitation provided that "[i]n accordance with 10 U.S.C. § 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the successful prototype project participants." ECF 74 ¶ 19. The Navy has stated publicly that successful prototype testing will promptly lead to follow-on production. ECF 74 ¶ 20.

The Protesters, Blue Water and Saildrone, timely submitted proposals for Phase 1. ECF 73 ¶ 6; ECF 74 ¶ 70. The Navy selected 7 of the 25 offerors to move onto Phase 2. AR 1575, 1577. The Protesters were not selected as a part of the seven. ECF 73 ¶ 59; ECF 74 ¶¶ 6, 77-78. As a result, the Protesters each protested their exclusion from further consideration. *See* ECF 73; ECF 74.

## LEGAL STANDARD

Court of Federal Claims Rule 12(b)(1) permits dismissal for lack of subject matter jurisdiction.[2] If the Court determines that it lacks subject matter jurisdiction, it must dismiss the action. Rule 12(h)(3); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). When considering whether dismissal for lack of subject matter jurisdiction is proper, the Court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The Court may, however, "inquire into jurisdictional facts" to determine whether it has jurisdiction. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

[2] Court of Federal Claims Rule 12(b)(1) is the same as Federal Rule of Civil Procedure 12(b)(1). *Compare* RCFC 12(b)(1) *with* Fed. R. Civ. P. 12(b)(1).

## DISCUSSION

In its Motion to Dismiss, the Government argues that the Court lacks subject matter jurisdiction under this Court's procurement protest jurisdictional statute, 28 U.S.C. § 1491(b)(1), to hear protests of actions taken by an agency pursuant to their "other transaction" authority. ECF 75 at 18. The Federal Circuit has not addressed whether procurement protests involving other transactions fall within 28 U.S.C. § 1491(b)(1). As a result, the Court is not bound by any Federal Circuit precedent addressing OTs. To guide the Court's analysis, the Court looks to Federal Circuit opinions addressing the scope of 28 U.S.C. § 1491(b), the statutes governing other transaction authority and "procurement contracts," and the non-binding opinions of other judges of the Court. For the reasons explained below, the Court finds that Protesters' claims fall within this Court's broad procurement protest jurisdiction under 28 U.S.C. § 1491(b)(1) because the OT prototype competition that is the subject of the instant protest is in connection with the Navy's procurement of MUSVs.

### I. Statutory Framework for Other Transaction Authority

As the Court has previously recounted the history of OT authority,[3] it will not do so again; instead, it will briefly lay out the statutory framework for the OT authority at play.

Three specific statutes addressing OTs are relevant here. First, the Research and Development Project Statute, 10 U.S.C. § 4001, gives the Secretary of Defense and the Secretary of each military department the authority to carry out research and development projects. 10 U.S.C. § 4001(b) provides:

> The Secretary of Defense or the Secretary of a military department may perform research and development projects-
>
> (1) by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31 [the Federal Grant and Cooperative Agreement Act (FGCAA)];
>
> ….
>
> (5) by transactions (other than contracts, cooperative agreements, and grants) entered into pursuant to section 4021 or 4022 of this title; …

Next, 10 U.S.C. § 4021(a) provides an actual grant of authority for the Department of Defense (DoD) to enter into other transactions:

[3] *See, e.g.*, *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 289-90 (2025); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 257-58 (2024); *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435-36 (2019).

> Additional Forms of Transactions Authorized.—The Secretary of Defense and the Secretary of each military department may enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects. The authority under this subsection is in addition to the authority provided in section 4001 of this title to use contracts, cooperative agreements, and grants in carrying out such projects.

And finally, 10 U.S.C. § 4022 builds on section 4021's authority by permitting each military department to enter into prototype transactions, follow-on production OTs, and contracts under certain circumstances specified in the statute for the purposes of carrying out prototype projects "directly relevant to enhancing the mission effectiveness of personnel of the [DoD] or improving platforms, systems, components, or materials proposed to be acquired or developed by the [DoD]." *Id.* § 4022(a)(1).[4] Under these circumstances, the DoD is required to use competitive procedures to the maximum extent practicable. *Id.* § 4022(b)(2). A prototype OT awarded under 10 U.S.C. § 4022 may also provide for a follow-on production contract or transaction to successful participants, in some circumstances without further competition. *Id.* § 4022(f). This is the authority that the Navy cites for the solicitation that is the subject of this protest.

Plainly stated, 10 U.S.C. § 4001 identifies that the DoD may use other transactions for research and development purposes; 10 U.S.C. § 4021 authorizes the DoD to use other transaction authority; and 10 U.S.C. § 4022 authorizes the DoD to use other transaction authority for prototype purposes.

## II. Procurement Protest Jurisdiction Under the Tucker Act

The analysis of whether a procurement protest may properly be brought before this Court begins with the Tucker Act. This Court, like all federal courts, is a court of limited jurisdiction; its jurisdiction is generally defined by the Tucker Act, 28 U.S.C. § 1491. *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998). The Tucker Act, as amended, gives this Court:

> jurisdiction to render an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a

[4] Although § 4022 exercises "the authority in [§] 4021," it does not import § 4021(a)'s limitation to "basic, applied, and advanced research projects." Rather, § 4022 borrows only the authorization to use "other transactions." It independently defines the scope of activity it covers. It further conditions the exercise of that authority on one of several statutory prerequisites, including participation by a nontraditional defense contractor or the use of competitive procedures providing a reasonable opportunity for offerors to submit proposals. 10 U.S.C. § 4022(d).

> contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1070 (Fed. Cir. 2022) (recognizing [the Administrative Dispute Resolution Act of 1996] conferred "exclusive jurisdiction upon the Court of Federal Claims over bid protests against the government.").[5]

"On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement." *Sys. Application & Techs. Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012). Put simply, section 1491(b)(1) provides a "broad grant of jurisdiction over objections to the procurement process." *Id.* at 1381 (noting "a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction").

While the Tucker Act does not define "procurement," the Federal Circuit has taken an expansive view of what the term "procurement" encompasses in the context of section 1491(b)(1) in several key cases. In *Distributed Solutions, Inc. v. United States*, the Federal Circuit determined that the statutory definition for procurement found in 41 U.S.C. § 403(2) should be utilized in determining the scope of section 1491(b)(1).[6] 539 F.3d 1340, 1345 (Fed. Cir. 2008). Recognizing that Congress expressly defined "procurement" in 41 U.S.C. § 403(2), the Federal Circuit adopted section 403(2)'s definition: '"procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need …." *Id*. at 1345. Of particular relevance to this matter, the Federal Circuit noted section 1491(b)(1) "does not require an actual procurement," but "explicitly contemplates the ability to protest … pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over "proposed procurements." *Id*. at 1346. It continued: "A proposed procurement, like a procurement, begins with the process for determining a need for property or services." *Id.*

The facts of *Distributed Solutions* illustrate how far this principle reaches. There, the United States Agency for International Development and the Department of State issued a request for information seeking software solutions, expressly stating that the request was for market-research purposes only and would not result in a contract award. *Id.* at 1342. After reviewing the responses, the agencies elected not to conduct a procurement of their own at all, instead tasking an existing contractor with selecting and awarding subcontracts to software vendors. *Id*. at 1342-43. Disappointed offerors who had

[5] The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. 104–320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996) amended the Tucker Act to provide this Court with exclusive procurement protest jurisdiction through inclusion of a sunset provision that terminated the jurisdiction of federal district courts over procurement protests in 2001. Pub. L. 104–320, § 12(d), 110 Stat. at 3875.

[6] 41 U.S.C. § 403(2), currently codified at 41 U.S.C. § 111, establishes the Office of Federal Procurement Policy (OFPP) in the Office of Management and Budget.

responded to both solicitations but were not selected sued, and this Court dismissed for lack of jurisdiction on the theory that no federal agency procurement had occurred. *Id*. at 1343. The Federal Circuit reversed, holding that it was immaterial that the agencies never conducted a procurement of their own, because the initial request for information was itself part of "the process for determining a need for property or services" and therefore fell within the broad jurisdictional grant of section 1491(b)(1). *Id*. at 1346. The Federal Circuit did not merely apply an existing definition of "procurement" to an easy case; it bridged the gap left open by the Tucker Act by adopting the definition found in 41 U.S.C. § 403(2), and it held that an agency cannot avoid this Court's jurisdiction simply by declining to complete, or by delegating away, the procurement it set in motion.

In *Resource Conservation Group, LLC v. United States*, which involved a solicitation seeking interest in leasing the Navy's real property in Gambrills, Maryland, the Federal Circuit began its analysis of what "procurement" means by looking to the dictionary definitions of "procurement contract" and "procure." 597 F.3d 1238, 1240 (Fed. Cir. 2010). The Federal Circuit stated:

> In construing statutory language, we look to dictionary definitions published at the time that the statute was enacted. At the time that the ADRA was enacted in 1996, the definition of "procurement contract" was "[a] government contract with a manufacturer or supplier of goods or machinery or services under the terms of which a sale or service is made to the government." Black's Law Dictionary 1208 (6th ed.1990). "Procure" was defined as "to get possession of; obtain, acquire." Webster's Third New International Dictionary 1809 (1993). These definitions of "procurement" and of "procure" signify the act of obtaining or acquiring something, in the context of acquiring goods or services.

*Res. Conservation Grp., LLC*, 597 F.3d at 1243-44 (internal footnotes omitted). Based on these dictionary definitions, the Federal Circuit concluded that "[i]t strains the ordinary meaning of 'procurement' to extend that definition to encompass a situation in which it is the government that is seeking to lease its own property." *Res. Conservation Grp., LLC*, 597 F.3d at 1244. Citing *Distributed Solutions*, the Federal Circuit then reiterated its "conclus[ion] that the definition of 'procurement' in 41 U.S.C. § 403(2) should be utilized in determining the scope of section 1491(b)(1), as the statutory provisions related to the establishment of the [OFPP] 'give overall direction for federal procurement policies, regulations, procedures, and forms.'" *Id*. (citing *Distributed Sols., Inc.*, 539 F.3d at 1345).

Similarly, in *Systems Application & Technologies, Inc. v. United States*, the Federal Circuit applied the broad definition of procurement in 41 U.S.C. § 403(2) to find the intermediate step of a corrective action, a pre-contract award step, was in connection with a procurement, and therefore within the broad jurisdiction defined by section 1491(b)(1).

691 F.3d at 1380-81. Articulating its clearest statement yet on the breadth of this Court's procurement protest jurisdiction, the Federal Circuit noted "that once a party objects to a procurement, section 1491(b)(1) provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" *Sys. Application & Techs., Inc.*, 691 F.3d at 1381 (quoting 41 U.S.C. § 403(2)). Given their collective reliance on 41 U.S.C. § 403(2)'s definition of "procurement," *Resource Conservation Group*, *Distributed Solutions*, and *Systems Applications* together stand for the proposition that the definition of "procurement" now in 41 U.S.C. § 111 guides the analysis of what constitutes a procurement for purposes of Tucker Act jurisdiction.[7]

More recently, in *Hymas v. United States*, the Federal Circuit confirmed that it has relied on the definition of "procurement" in 41 U.S.C. § 111 "to determine whether a 'procurement' has occurred pursuant to § 1491(b)." 810 F.3d 1312, 1324 (Fed. Cir. 2016) (citations omitted). But because courts "must respect the concinnity between the separate yet interrelated statutes that Congress has enacted," it declined "to rely solely upon 41 U.S.C. § 111." *Id.* at 1325-27. The question in *Hymas* was whether certain cooperative farming agreements were "procurement contracts" or "cooperative agreements." *Id.* at 1317. Drawing on the FGCAA, which requires: (1) a procurement contract when "the principal purpose of the instrument is to acquire … property or services for the direct benefit or use of the United States Government;" and (2) a cooperative agreement when the principal purpose is to transfer a thing of value to carry out a public purpose, the Federal Circuit held that the inquiry turns on "the principal purpose of the relationship." *Id.* at 1325, 1327 (quoting 31 U.S.C. § 6303; citing 31 U.S.C. § 6305). Applying that test, the Federal Circuit considered the Fish and Wildlife Service's agreements, which let farmers cultivate refuge cropland, in part to provide winter food plots for migratory birds, in exchange for below-market access to refuge land. *Id.* at 1326. It found these agreements were principally meant to further Congress's wildlife conservation goals rather than to obtain a service for the government's direct benefit. *Id.* at 1315-16, 1327-29. The instruments at issue therefore were outside of the jurisdiction of section 1491(b)(1). *Id. Hymas* thus illustrates that, in deciding whether an instrument reflects a procurement contract under the FGCAA, the Federal Circuit looks to the agreement's principal purpose.

These cases, read together with the plain statutory language of section 1491(b)(1), indicate that the Court's procurement protest jurisdiction is broad in scope. Ultimately, the Court has broad procurement protest jurisdiction over any objection to a solicitation,

---

[7] "When Congress amended the [Competition in Contracting Act] and reorganized Title 41 of the United States Code in 2011, it moved the definition of 'procurement' from 41 U.S.C. § 403(2) to § 111." *Hymas v. United States*, 810 F.3d 1312, 1324 n.4 (Fed. Cir. 2016) (citing Sec. 3, § 111, 124 Stat. at 3681). *Resource Conservation Group*, *Distributed Solutions*, and *Systems Applications* all cite to the definition under § 403(2). *Resource Conservation Grp.*, 597 F.3d at 1244; *Distributed Sols.*, 539 F.3d at 1345; *Sys. Applications*, 691 F.3d at 1381.

proposed award, award, or alleged violation of statute or regulation "in connection with a procurement or proposed procurement," which includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services." *Res. Conservation Grp., LLC*, 597 F.3d at 1244-45. Once an agency determines it has a need, *i.e.*, initiated a procurement, the question of whether the agency's actions are within this Court's jurisdiction turns on whether it is using an instrument "in connection with" the procurement. *Distributed Sols., Inc.*, 539 F.3d at 1346.[8] The Court may look to the principal purpose of the instrument in making this determination. *Hymas*, 810 F.3d at 1327-29. This inquiry also marks the limit of the Court's jurisdiction. An instrument whose principal purpose is something other than acquiring a product or service for an agency's own use, and that is not a step in the agency's process of doing so, is not in connection with a procurement. *See id.* at 1328.

## III. Whether the MUSV Competition is in Connection with a Procurement or a Proposed Procurement

With the above backdrop as a roadmap, the Court now turns to whether the MUSV competition conducted pursuant to the OT statute is in connection with a procurement or proposed procurement and therefore within the broad parameters of the Court's procurement protest jurisdiction.

As discussed above, a procurement begins when an agency identifies a need. *Res. Conservation Grp., LLC*, 597 F.3d at 1244 ("[p]rocurement 'includes all stages of the process of acquiring property or services, beginning with the process for determining a need ….'") (quoting 41 U.S.C. § 403(2)).

Here, the Navy initiated a procurement by determining a need—acquiring MUSVs.[9] At a high-level, the Navy determined this need in the Navy's 30-year Shipbuilding Plan,

---

[8] Several cases from this Court have addressed this Court's jurisdiction with respect to other transactions, including: *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433 (2019); *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777 (2021); *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167 (2022); *Independent Rough Terrain Center, LLC v. United States (IRTC)*, 172 Fed. Cl. 250 (2024); *Raytheon Co. v. United States*, 175 Fed. Cl. 281 (2025); and *Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711 (2025). While not binding authority, the Court finds these cases persuasive, with the exception of *Telesto*, from which the Court respectfully departs in part. *See infra* Part V.F. As such, these cases are referenced throughout the opinion in footnotes to acknowledge their persuasive, but non-binding authority.

[9] At the time of filing its Motion to Dismiss, the Government noted that the Navy has not yet decided whether to acquire MUSVs or to use a services model. ECF 75 at 8, 33. That does not matter. A procurement includes the acquisition of "services," 41 U.S.C. § 111, and no commitment to buy is required for jurisdiction. *Distributed Sols.*, 539 F.3d at 1346. Since this matter was briefed, the Navy has in fact made follow-on production awards for MUSVs. *See* ECF 106 at 2. This development does not alter the jurisdictional analysis. Whether the MUSV OT competition was "in connection with a procurement or proposed procurement" under 28 U.S.C. § 1491(b)(1) turns on the nature of the competition and the record at the time of the challenged exclusion, not on whether a production contract has since been awarded. Nor

which contemplates a total fleet inventory of 39 MUSVs by fiscal year 2027. This goal was not mere rhetoric; it was supported by an appropriation of $2.1 billion. PAE RAS was tasked with fulfilling this need. Specifically, RAS outlined a plan to consider existing industry solutions that would permit the Navy to "test [MUSV] capability and go straight into production." ECF 73 ¶ 29; ECF 74 ¶ 20. The rationale for quick movement on the prototype OT was that the Navy was "no longer interested in paying industry to build prototypes." AR 77. The Navy further characterized its need for "technically mature solutions" with the intention to deploy the MUSVs quickly. ECF 73 ¶ 28. Accordingly, even prior to issuing the Solicitation, the Navy set a schedule that contemplated follow-on production awards of MUSVs before the end of fiscal year 2027, consistent with the Shipbuilding Plan. The Navy then issued the Solicitation as a request for prototype proposals pursuant to the Navy's other transaction authority under 10 U.S.C. § 4022, an additional step towards acquiring the MUSVs. ECF 73 at 1; ECF 74 ¶ 36. Taken together, these facts not only demonstrate that the Navy determined a need for MUSVs—the initial step of a "procurement"—but also that the Navy developed a plan to acquire the MUSVs,[10] as demonstrated by the concrete actions and statements it made to that end.[11]

Because the Navy initiated a procurement for MUSVs, the Court next turns to whether the MUSV OT Competition is in connection with that procurement. As discussed above, like the broad definition of procurement, what is "in connection with a procurement or proposed procurement" is also very broad. *Distributed Sols., Inc.*, 539 F.3dat 1342-43 (noting section 1491(b)(1) does not require an actual procurement but "explicitly contemplates the ability to protest … pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over "proposed procurements"); *see also Sys. Application & Techs., Inc.*, 691 F.3d at 1381 (finding the intermediate step of a corrective action, a pre-

do the intervening awards moot this protest, since effective relief—including injunctive relief and recovery of bid and proposal costs—remains available notwithstanding the Navy's subsequent action.

[10] The Government characterizes the Solicitation as "testing only." ECF 75 at 33. But it does not dispute what the Navy has said about its plans, and testing conducted so that the Navy can select the vessels it will itself acquire is part of determining its need, not research for its own sake.

[11] This conclusion is consistent with Judge Bonilla's synthesis of this Court's OT jurisprudence in *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 292-93 (2025). Drawing together *Space Expl. Techs. Corp.*, *Kinemetrics*, *Hydraulics International*, and *IRTC*, *Raytheon* distinguished between "the government facilitating the creation or expansion of a commercial market for the general public from which a federal agency or instrumentality might someday purchase," and "the government seeking to acquire a specific product or service and directing or otherwise facilitating its generation and production." *Id.* at 293. It therefore treated an OT "intended to provide the government with a direct benefit in the form of products or services" as within this Court's jurisdiction. *Id.* The Court understands that inquiry as asking what the agency is trying to accomplish with the transaction, analogous to the principal-purpose inquiry in *Hymas v. United States*, 810 F.3d 1312, 1325-27 (Fed. Cir. 2016). It does not read the word "immediate" in Judge Bonilla's phrase "immediate endgame" to impose a temporal requirement. A proposed procurement exists once the agency begins determining its need, *Distributed Sols.*, 539 F.3d at 1346, and nothing in section 1491(b)(1) asks how soon the acquisition is expected to occur. *See infra* Part IV.F.

contract award step, was in connection with a procurement, and therefore within the broad jurisdiction defined by section 1491(b)(1)).

Here, under the Navy's stated plans, only successful prototype offerors may receive production contracts. ECF 74 ¶ 20. Specifically, the MUSV prototype competition was described in the Solicitation as "a direct, competitive down-select." AR 72. The Navy further stated the Solicitation was "a direct path to production." ECF 74 ¶ 20. As such, the *only* way an offeror may receive the ultimate MUSV contract is through successful participation in the prototype competition. As a result, the MUSV transaction is in connection with a procurement,[12] and this Court has jurisdiction.

## IV. <u>The Government's Arguments to the Contrary Are Unpersuasive</u>

Resisting this reasoning, the Government argues that *Hymas* "controls the jurisdictional inquiry in this case" and compels a different result. ECF 75 at 19, 28. The Government advances a number of different flavors of this argument as well as advancing arguments addressing the Court's general power, which the Court addresses in turn.

### A. <u>The Navy's Invocation of OT Authority</u>

First, the Government argues that, under *Hymas*, the jurisdictional questions facing the Court boil down to: "(1) whether the Navy possesses statutory authority to use a non-procurement OT for the prototype project at issue; and (2) whether the Navy properly invoked its non-procurement authority for the prototype OTs in this case." ECF 75 at 28. According to the Government, if the answers to those questions are yes, the case does not involve a procurement and the Court necessarily lacks jurisdiction. *Id.* Momentarily putting aside the accuracy of the "non-procurement authority" label the Government affixes to the transaction, which is addressed in Part B *infra*, this categorical conclusion is not supported by the substance of *Hymas*. Critically, *Hymas* did not address OTs. Regardless, the Federal Circuit's analysis in *Hymas* centered on the principal purpose of the agreements at issue in that particular case, illustrating that the question of jurisdiction cannot be settled simply by looking to the type of authority invoked. Specifically, the Federal Circuit required an analysis of "the principal purpose of the relationship" in determining whether the cooperative farming agreements at issue constituted cooperative agreements. *Hymas*, 810 F.3d at 1327-29. The Federal Circuit considered the agency's intent—transfer or acquisition—and noted that, "importantly, the Service does not directly benefit from the … services provided pursuant to the [cooperative farming agreements]." *Hymas*, 810 F.3d

---

[12] The Government warns that this reading would bring every OT within this Court's bid protest jurisdiction. ECF 75 at 35-36. It would not. Section 1491(b)(1) reaches only transactions "in connection with a procurement," meaning ones through which the agency seeks to acquire property or services for its own direct benefit. *Hymas*, 810 F.3d at 1328. An OT whose principal purpose is to fund research or to stimulate a commercial market, and through which the agency does not intend to acquire anything for its own use, remains outside the statute. *See id.* That limit comes from the text of section 1491(b)(1) and from the nature of the agency's objective. *See Distributed Sols.*, 539 F.3d at 1346.

at 1328. Upon finding that the agreements at issue were properly construed as cooperative agreements, the *Hymas* court then went on to resolve whether this Court's subject matter jurisdiction under the Tucker Act extends to cooperative agreements. 810 F.3d at 1317-18, 1329-30. Accordingly, the Court declines to find that, just because the Navy invoked OT authority, the inquiry ends.[13]

B. Statutory Harmony

Next, the Government contends that, because "*Hymas* clarified that the term 'procurement' must be construed harmoniously for purposes of the Tucker Act, the FGCAA, and the Competition in Contracting Act (CICA)," it necessarily follows that OTs authorized by Congress are not procurements. ECF 75 at 19-20. A harmonious reading of these statutes does not support that conclusion.

First, regarding the definition of "procurement." As the Federal Circuit recognized, "[t]he CICA now defines 'procurement' as 'all stages of the process of acquiring property [or] services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" *Hymas*, 810 F.3d at 1319 (quoting 41 U.S.C. § 111). That definition looks to the process of acquiring property or services. It does not depend on the kind of instrument the agency uses.

Second, the FGCAA does not define "procurement" at all. It tells agencies which instrument to use: a procurement contract when "the principal purpose of the instrument is to acquire … property or services for the direct benefit or use of the United States Government," and a grant or cooperative agreement otherwise. 31 U.S.C. §§ 6303-6305. The FGCAA does not mention OTs, so it cannot be read to exclude them from the definition of "procurement."

Third, 10 U.S.C. § 4001(b). It provides that the Secretary of Defense or of a military department may perform research and development projects:

> (1) by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31 [the FGCAA]; [or]
>
> ….

[13] The Court is mindful that *Hymas* applied *Chevron* deference in places, including to the agency's choice between a cooperative agreement and a procurement contract. *See Hymas*, 810 F.3d at 1319-20, 1324 (first citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); then citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); and then citing *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992)). The Supreme Court has since overruled *Chevron*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). This opinion does not rest on deference. It relies on *Hymas* only for propositions drawn from statutory text: that "procurement" in section 1491(b)(1) is read in harmony with the FGCAA and CICA, and that the principal purpose of an instrument determines whether it is a procurement contract. *See* 31 U.S.C. §§ 6303, 6305. Those holdings remain binding. *See Loper Bright*, 603 U.S. at 412 (holdings that rested on *Chevron* "are still subject to statutory stare decisis"). What the Court does not do is defer to the Navy's characterization of its OT as "non-procurement." The reach of section 1491(b)(1) is a question of law for the Court.

> (5) *by transactions (other than contracts, cooperative agreements, and grants) entered into pursuant to section 4021 or 4022 of this title*; … (emphasis added).

The Government reads the cross-reference to the FGCAA in subsection (1) as showing that the FGCAA's procurement framework governs only those instruments, leaving "non-procurement OTs" outside it. ECF 75 at 18-19, 25-26. But the cross-reference appears only in subsection (1); subsection (5), which covers OTs, contains no similar reference. Section 4001 does not define "procurement," and the phrase "non-procurement OT" appears nowhere in the statute. It is just a label coined and brandished by the Government.

Fourth, section 4022 (the statute that authorizes the DoD to use OT authority for prototype purposes) itself uses procurement concepts. It incorporates the Procurement Integrity Act, 10 U.S.C. § 4022(h), and requires a written determination by the "senior procurement executive" that certain conditions are met, *id.* § 4022(a)(2)(B). Those references are difficult to reconcile with the Government's premise that OT authority is a "non-procurement" one.[14]

Finally, the Government argues that Congress's grant of OT authority, and its preference for OTs in the 2018 NDAA, show an intent to shield OTs from procurement protests, and that jurisdiction here would render the authority superfluous. ECF 75 at 11-15, 23-25. The Court disagrees. Whether the FAR and CICA govern an agreement is a different question from whether this Court has jurisdiction under section 1491(b)(1). Jurisdiction here leaves OT flexibility intact. OTs remain exempt from the FAR, CICA, and most procurement statutes, and review reaches only the Navy's compliance with section 4022's own conditions and the Solicitation's terms. Nothing in the 2018 preference addresses judicial review under section 1491(b)(1). And, as mentioned previously, Congress used procurement concepts in the OT statute itself. *See* 10 U.S.C. § 4022(a)(2)(B), (h).

C. Statutory Backdrop

Further, the Government makes two arguments hinging upon Congressional intent with respect to both CICA and the Administrative Dispute Resolution Act (ADRA). The Government argues that the existence of both of these statutes at the times that Congress has expanded OT authority demands a reading that other transactions cannot fall within the procurement meaning of either statute. ECF 75 at 25-27. The Government observes that Congress enacted CICA in 1984, before DOD's OT authority existed, and argues that Congress "presumably would not have used the terms 'other transactions' and 'cooperative

---

[14] The Court does not hold that an OT is itself a "procurement contract." *Space Expl. Techs. Corp.* and *Hydraulics* concluded that OTs are not, and nothing here is to the contrary. *See Space Expl. Techs. Corp.*, 144 Fed. Cl. at 442; *Hydraulics Int'l*, 161 Fed. Cl. at 176. The question under section 1491(b)(1) is not the instrument's label but whether the transaction is in connection with a procurement.

agreements' in the [National Defense Authorization Acts] if it had meant 'procurements' within the meaning of the FGCAA and CICA." ECF 75 at 27-28.

There is a presumption that Congress legislates with knowledge of existing law. *See Hymas*, 810 F.3d at 1327 (quoting *Aectra Refining & Mktg., Inc. v. United States*, 565 F.3d 1364, 1370 (Fed. Cir. 2009)); *see Percipient.Ai, Inc. v. United States*, 153 F.4th 1226, 1240 (Fed. Cir. 2025) ("[T]here is a longstanding understanding that Congress legislates against the backdrop of preexisting law, unless the statute otherwise dictates"). The Government relies on this presumption, ECF 75 at 27, but this presumption applies with equal force to CICA's own exception clause, which provides that CICA's full-and-open-competition mandate yields to "procurement procedures otherwise expressly authorized by statute." 10 U.S.C. § 3201(a) (previously 10 U.S.C. § 2304(a)(1) (1994)); *see also* 41 U.S.C. § 3301(a). That exception was already an enacted statute when Congress built out DoD's prototyping authority in 1993-94 and when it expanded that authority in 2015 (in the FY 2016 NDAA). Congress's presumed awareness of CICA therefore undercuts the Government's inference that Congress silently placed OT authority outside CICA's framework. It is more plausible that Congress legislated with awareness of CICA's competition requirements and made room for exactly this kind of separately authorized alternative procedure. That does not require treating sections 4021 and 4022 as procurements that CICA governs. It means only that CICA's silence on the subject of OTs is not the unacknowledged gap the Government's timing argument assumes.

The Government's parallel argument about timing with respect to the 1996 ADRA fares no better. ECF 75 at 27-28. The Government notes that Congress amended the Tucker Act to add procurement protest jurisdiction in 1996, by which time OT authority had existed for the National Aeronautics and Space Administration since 1958 and for DoD since 1989, and argues that Congress "presumably would not have used the term 'procurement' in the Tucker Act … if it had intended to authorize bid protests challenging non-procurement OTs." ECF 75 at 27. But the relevant backdrop against which the 1996 Congress legislated was not DoD's OT statutes alone; it included the Office of Federal Procurement Policy Act's own definition of "procurement," which had been codified since 1979, *see* 41 U.S.C. § 403(2) (1979), and was construed broadly to cover "all stages of the process of acquiring property or services." It would be reasonable to presume that Congress would have carried this definition into section 1491(b)(1) when it used the word "procurement" without further qualification. *See Percipient.Ai, Inc. v. United States*, 153 F.4th 1226, 1237 (Fed. Cir. 2025) (citing *United States v. Davis*, 588 U.S. 445, 458 (2019)) ("Absent any indication of alternative Congressional intent, [an] old term of art still means something, and this understood meaning should be conserved and carried forward…."). It is, after all, the definition the Federal Circuit, as addressed above, has applied. *Res. Conservation Grp., LLC*, 597 F.3d at 1244-45. Nothing in the text of the 1996 amendment purports to narrow that established meaning by reference to which acquisition instrument an agency happens to select. *Hymas* itself confirms as much. Like here, *Hymas* involved a transacting authority that predated section 1491(b)(1). Despite that fact, the Federal Circuit did not treat that timing alone as dispositive; it still required a fact-specific inquiry into

"the principal purpose of the relationship" before concluding the transaction at issue was a cooperative agreement and fell outside the Court's jurisdiction. *Hymas*, 810 F.3d at 1327-29. If mere awareness of a pre-existing, differently-labeled transacting authority were sufficient to categorically exclude that authority from "procurement," the principal-purpose inquiry *Hymas* performed would have been unnecessary. The Government's own authority—*Hymas*, applied on its own terms, thus forecloses the categorical, timing-based exclusion the Government asks this Court to adopt here.

Congress's own practice points the same way. When Congress has wanted to remove a category of agency action from procurement protest review, it has done so expressly. In 1994, two years before ADRA, it provided that protests of task and delivery orders under indefinite-delivery / indefinite-quantity (IDIQ) contracts are generally "not authorized." *See* 10 U.S.C. § 3406(f) (amending 41 U.S.C. § 4106(f)) (adding Pub. L. 103-355, Title I, § 1004(a)(1), Oct. 13, 1994, 108 Stat. 3252); *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1411 (Fed. Cir. 2014). In 2008, it revisited that rule, giving the Government Accountability Office exclusive jurisdiction over such protests above a dollar threshold. Pub. L. No. 110-181, § 843 (2008). DoD's OT authority existed throughout. Yet Congress has never excluded OTs from this Court's protest jurisdiction, although it withdrew another category of procurement action. That silence is not conclusive, but it is consistent with reading section 1491(b)(1) to reach an OT competition that is in connection with a procurement.

D. The Alleged Statutory Violations

Next, the Government argues that, even if the MUSV competition is in connection with a procurement, Protesters do not allege a "violation of statute or regulation in connection with a procurement or a proposed procurement" because the statute they invoke, 10 U.S.C. § 4022(b)(2), governs prototype OTs rather than procurements. ECF 75 at 29-30; ECF 94 at 3. It relies on *Cleveland Assets, LLC v. United States*, 883 F.3d 1378 (Fed. Cir. 2018), which held that an appropriations-process statute, 40 U.S.C. § 3307, could not support jurisdiction because it "says nothing of how [an agency] must run its procurement once the appropriation is made." *Id.* at 1382. The Federal Circuit cautioned that allowing "any statutory or regulatory violation tangentially related to a government procurement" would expand section 1491(b)(1) "far beyond the procurement context." *Id.* at 1381.

*Cleveland Assets* does not help the Government. Section 4022(b)(2) is different in kind. It provides that "[t]o the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects …." 10 U.S.C. § 4022(b)(2). It is essentially the OT counterpart to CICA's competition mandate, *see* 41 U.S.C. § 3301(a), and it dictates how the Navy must conduct the very competition Protesters challenge. The Government's position is circular because it assumes that statutes governing prototype OTs "do not govern procurements." ECF 75 at 30. But, because the MUSV competition is in connection with a procurement, a statute prescribing how the

Navy must conduct that competition is a statute violated "in connection with" it; not the sort of tangential appropriations statute described in *Cleveland Assets*.

E. Other Avenues of Judicial Review

Next, the Government contends that judicial review of OTs only exists in two fora: under this Court's 28 U.S.C. § 1491(a)(1) jurisdiction, which is limited to monetary relief, or in a United States District Court under the Administrative Procedure Act. ECF 75 at 34. Neither approach is consistent with the plain meaning of 28 U.S.C. § 1491(b)(1) or the stated aims of ADRA. 28 U.S.C. § 1491(b)(1) explicitly designated this Court as the *exclusive* judicial forum for procurement protests.[15] The Federal Circuit has explained that a "narrow application of section 1491(b)(1) does not comport with the [Tucker Act's] broad grant of jurisdiction over objections to the procurement process." *Sys. Application & Techs., Inc.*, 691 F.3d at 1381. This plain meaning of the statutory text is consistent with the statute's legislative history: Congress passed ADRA "to prevent forum shopping and to promote uniformity in government procurement award law [and] sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001). Directing OT protests to district court would result in inconsistent and piecemeal litigation in which aspects of a procurement involving an OT would be decided in district court and other aspects of the same procurement would be decided before this Court. This would run contrary to the purpose of ADRA and lead to the "fragmentation of government contract law." *Res. Conservation Grp.*, 597 F.3d at 1243.

F. *Telesto's* Jurisdictional Blackout

Finally, the Government urges the Court to follow *Telesto Group, LLC v. United States*, which held that challenges to an agency's conduct of the prototyping phase of an OT fall outside this Court's protest jurisdiction until prototyping concludes and the agency decides to acquire the successful prototype; until then, "there is an effective jurisdictional blackout." 176 Fed. Cl. 711, 733 (2025); *see* ECF 75 at 24-27. The Court respectfully declines to adopt that rule for three reasons.

First, a blackout is difficult to reconcile with *Distributed Solutions*. In *Distributed Solutions*, the Federal Circuit concluded that section 1491(b)(1) reaches violations "in connection with a procurement or a proposed procurement," and a proposed procurement "begins with the process for determining a need for property or services." 539 F.3d at 1346. Applying that principle to the facts at hand, the court found that jurisdiction attached to a request for information that disclaimed any contract award, before the agency had decided

[15] Judge Bonilla concluded that this Court is the *de facto* forum for OT protests in *Raytheon*, 175 Fed. Cl. at 284. Not to quibble with Judge Bonilla, because *Raytheon* is a sound opinion, but for the reasons explained in this opinion, the undersigned finds that it is more accurate to state that the Court has *exclusive* procurement protest jurisdiction, not *de facto* jurisdiction, and therefore procurement protests involving OTs, such as the instant matter, fall within the Court's exclusive procurement protest jurisdiction.

to acquire anything. *Id.* at 1342, 1346. *Telesto* itself recognized that the agency's decision to proceed under its OT authority "was itself a procurement decision," 176 Fed. Cl. at 728, and that an OT that "from the outset" anticipates acquiring the successful prototype "takes on the characteristics of a procurement," *id.* at 732. Yet, it declined to find jurisdiction until the agency later decides to buy, a condition the statute does not impose. The opinion acknowledged as much, noting that its rule "departs modestly" from the Court's earlier decisions and that "there is at present no definitive answer to the jurisdictional puzzle presented by protests of OTs." *Id.* at 733, 735-36.

Second, the rule fits this record poorly. *Telesto* involved "a multi-year process of research and development" that the Army "may, if the process is successful, eventually seek to acquire." *Id.* at 733. Here, the Navy structured the competition as "a direct, competitive down-select" for production, AR 72, and noted that only successful prototype offerors may receive production contracts, AR 53. An offeror eliminated at Phase 1 is therefore foreclosed from production. Deferring review until the Navy declares a prototype successful would leave that offeror without a forum until the competition it challenges has run its course and would leave the timing of this Court's jurisdiction to the agency's own determination.

Third, a blackout would divide a single acquisition between fora. *Telesto* contemplated that, absent a procurement, review lies in district court under the APA. *Id.* at 733. Splitting one acquisition between courts by phase is the fragmentation ADRA was meant to prevent, as discussed above.

## CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss (ECF 75) is **DENIED**.

**IT IS SO ORDERED.**

PHILIP S. HADJI
Judge