# In the United States Court of Federal Claims

| | |
|---|---|
| **BLUE WATER AUTONOMY, INC., *et al.*,**<br>***Plaintiffs,***<br>**v.**<br>**THE UNITED STATES,**<br>***Defendant,***<br>**and**<br>**HII UNMANNED SYSTEMS, INC., *et al.*,**<br>***Defendant-Intervenors.*** | Nos. 26-936, 26-944<br>(Originally Filed: October 30, 2026)<br>(Reissued: November 3, 2026) |

*Alexander O. Canizares*, *Christopher M. O'Brien*, *Tyler E. Robinson*, Vinson & Elkins, LLP, Washington, DC, for Plaintiff Blue Water Autonomy, Inc.

*Laura M. King, Faith E. Gay,* Selendy Gay, PLLC, New York, NY, *Carla J. Weiss*, Nichols Law, Washington, DC, for Plaintiff Saildrone, Inc.

*Douglas G. Edelschick*, Senior Trial Counsel, *Natalee A. Allenbaugh*, Trial Attorney, *Corrine A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for Defendant. *Gwendolyn Iaci*, *Emily Rubino*, *Benjamin Dearden*, Office of Counsel, Naval Sea Systems Command, Washington, DC, of counsel.

*J. Hunter Bennett*, *Kayleigh Scalzo*, *Jason A. Carey*, Covington & Burling LLP, Washington DC, for Defendant-Intervenor HII Unmanned Systems, Inc.

*Michael J. Anstett*, *James J. McCullough*, *Robert C. Starling*, *Noah B. Curtiss*, Fried, Frank, Harris, Shriver, & Jacobson, LLP, Washington, DC, for Defendant-Intervenor Leidos, Inc.

*Jon W. Burd*, *Cara L. Sizemore,* Wiley Rein, LLP, Washington, DC, for Defendant-Intervenor Saronic Technologies, Inc.

## Opinion and Order

**HADJI,** ***Judge.***

This is a consolidated protest involving the Navy's decision to eliminate two offerors from consideration for a prototype "other transaction" (OT) agreement. Protester Blue Water argues that the Navy unreasonably evaluated its proposal under two evaluation criteria through deviating from the stated evaluation criteria, applying unstated evaluation criteria, and engaging in disparate treatment. *See* ECF 77. Protester Saildrone argues that the Navy unreasonably evaluated its proposal under one criterion through engaging in disparate treatment. *See* ECF 76. Pending before the Court are: (1) Saildrone's Motion for Judgment on the Administrative Record (ECF 76); (2) Blue Water's Motion for Judgment on the Administrative Record (ECF 77); (3) the Government's Cross-Motion for Judgment on the Administrative Record (ECF 83); (4) Defendant-Intervenor Saronic's Cross-Motion for Judgment on the Administrative Record (ECF 85); and (5) Defendant-Intervenor Leidos's Cross-Motion for Partial Judgment on the Administrative Record (ECF 87). For the following reasons, Saildrone's Motion for Judgment on the Administrative Record is **GRANTED**. Blue Water's Motion for Judgment on the Administrative Record is **DENIED**. The Government's Cross-Motion for Judgment on the Administrative Record is **GRANTED** with respect to Blue Water and **DENIED** with respect to Saildrone. Saronic's Cross-Motion for Judgment on the Administrative Record is **DENIED**. Leidos's Cross-Motion for Partial Judgment on the Administrative Record is **GRANTED**.[1]

## Background

### I. The Solicitation

In 2025, Congress appropriated $2.1 billion, available until September 30, 2029, "for development, procurement, and integration of purpose-built medium unmanned surface vessels." Pub. L. No. 119-21, § 20002(31), 139 Stat. 72 (2025). In 2026, the Department of the Navy, acting through the Portfolio Acquisition Executive for Robotic and Autonomous Systems (PAE RAS), issued Solicitation N00024-26-R-6326 "to accelerate the design, development, and demonstration of Medium Unmanned Surface Vessels (MUSV[s])." AR 251; *see also* AR 78 (Navy stating that it would use funds appropriated in Pub. L. No. 119-21 for MUSVs). The Solicitation further provides that the MUSVs "must provide autonomous carrying capacity of containerized payloads while possessing the attributes defined herein" and that they "may be new construction and/or converted vessels." *Id.* The Solicitation sought prototype OT proposals pursuant to the Navy's authority under 10 U.S.C. § 4022 for the purpose of performing a MUSV Test Event. *Id.* The Solicitation provided for two phases. *Id.* During Phase 1, offerors were invited to submit proposals in accordance with the Solicitation evaluation criteria. *Id.*

[1] This Opinion was issued under seal on October 30, 2026. The parties were directed to propose redactions within seven days of issuance of the Opinion. The parties indicated that they had no proposed redactions. ECF 110. The Court hereby publicly releases the Opinion in full.

Successful Phase 1 offerors were then afforded the opportunity to move on to Phase 2. *Id.* During Phase 2, the proposals that the Navy deems "to be of merit" may be selected for a prototype award and invited to negotiate the terms of a prototype OT agreement. *Id.* The work under the prototype OT agreement was to be comprised of two contract line items (CLINs): the post-award conference (CLIN 0001) and completion of an on-water MUSV Test Event (CLIN 0002). *Id.* Offerors successfully passing through Phases 1 and 2 were set to receive $15,010,000 upon completion of the two CLINs. AR 252. The Solicitation also advised offerors that "[i]n accordance with 10 U.S.C. § 4022(f), a transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the successful prototype project participants." AR 257.

## II. Phase 1 Procedures and Evaluation Criteria

The Solicitation Guidance mandated that proposals be submitted in accordance with Section 3 and that proposals would be evaluated against the criteria as specified in Section 4. AR 251. The Navy permitted potential offerors to submit questions prior to the submission deadline. AR 255. The Solicitation Guidance specified four criteria: proposed business model (Criterion 1); vessel solution design (Criterion 2); manufacturing readiness to support the future production of MUSV (Criterion 3); and a plan for test execution to complete an on-water MUSV Test Event (Criterion 4). AR 257. Criterion 1 was only for information purposes. AR 262. The remaining criteria were evaluated as either "acceptable" or "unacceptable." AR 262-63. If the Navy found a proposal unacceptable under any of the criteria, then the offeror would not move on to Phase 2. AR 262. Of the four criteria, Criteria 2 and 4 are the only disputed criteria in the pending protests. Accordingly, these criteria will be discussed more in depth.

First, Criterion 2, vessel solution design, required offerors to propose "an MUSV design that is a vessel with the ability to operate autonomously and carry containerized payloads." AR 258. Offerors' responses to this criterion were not to exceed ten pages. *Id.* The Solicitation also instructed offerors to provide a summary of the MUSV production design and test vessel using an attachment to the Solicitation, referred to as the "J-8 Placemat Template." *Id.* The Solicitation further included a list of nine "MUSV Threshold Requirements" and nine "MUSV Desired Attributes." AR 258-59. In particular, the threshold requirements included specific details on vessel range, payload capacity, autonomous performance, emissions control, refueling, interior reservation, shipping standards, seakeeping, and field operational ability. *Id.* The instructions also required a vessel characteristics overview, which included an "[o]verview of vessel 3D design models if any"; "[d]esign history/maturity overview and previous employment if any"; and demonstration that "maturity of the design enables fielding of operational vessels in FY27." AR 260. To be deemed "acceptable" under this criterion, the proposal was required to "demonstrate[] the proposed MUSV Design meets or exceeds the threshold requirements." AR 262-63.

Second, Criterion 4, on-water MUSV Test Event plan, required offerors to "detail [their] planned execution of the scope in Attachment J-1 MUSV Statement of Work." AR 262. The offerors' plans for test execution were not to exceed three pages. AR 262. The Solicitation required offerors to detail six pieces of information relating to the on-water MUSV Test Event, including, as relevant to this protest, a description of "how the test asset is representative of the MUSVs used in the offeror's proposed business models…." *Id.* To be deemed "acceptable" under this criterion, a proposal must "demonstrate[] the feasibility of the test schedule, including the completion of the MUSV test plan and delivery of test report on or before 30 September 2026, and demonstrate[] a test asset that is representative of the MUSVs used in the offerors proposed business models…." AR 263.

## III. The Navy's Evaluation of Blue Water

The Navy found Blue Water unacceptable under both Criteria 2 and 4. AR 1577. On Criterion 2, the Navy found that Blue Water was specifically unacceptable with regard to the "vessel range" requirement. AR 1581, 1585. The vessel range requirement mandated that the production vessel be capable of "2500 nm at 25 knots while carrying a 25 MT load on the payload deck in NATO STANAG 4194 Sea State 4." AR 1581. The same results chart marks Blue Water as passing Criterion 2-9, "Field Operational in FY27." AR 1581, 1585. The Navy noted that "[Blue Water's] design [was] infeasible due to immature technology." AR 1586. The Navy additionally found Blue Water's proposal unacceptable under Criterion 4 because of the "test vessel representative" requirement. AR 1583, 1586. The Navy found that Blue Water's proposed test vessel was not representative because its hull form and machinery layout differed from its proposed production vessel. AR 3033; *see* AR 1586.

On June 12, 2026,[2] the Navy sent Blue Water a debriefing expanding on why it found Blue Water's proposal unacceptable under Criteria 2 and 4. AR 2383-84. Under Criterion 2 with respect to maturity, the Navy wrote that "the evaluation of [Blue Water's] vessel design … indicates that the maturity of the design is likely insufficient to support operational FY [2027] capability" based upon the Solicitation's "Vessel Characteristics Overview" directives, including the directives to provide "[d]esign history/maturity overview" and "[d]emonstrate maturity of the design enables fielding of operational vessels in FY [2027]." AR 260, 2382-83. The debriefing detailed three reasons for this conclusion. First, it identified that: (1) there is not a vessel currently operating with the four engine modules that Blue Water proposed; and (2) though a singular version of the engine modules has been tested, testing on the singular version did not sufficiently demonstrate that the four engine modules would be successful in the Navy's view. AR 2382-83. Second, the Navy also identified that Blue Water's proposed hull form involved significant

[2] The debriefing is undated. AR 2382-84. Blue Water represents that the Navy sent it on June 12, 2026, ECF 77 at 21 & n.3; ECF 74 ¶ 78, and no party disputes that date. The record shows the Navy sent another offeror its written debriefing that day, AR 2394, and Saildrone acknowledged its own debriefing on June 17, 2026, AR 2401. The precise date does not matter. What matters is that the Navy issued the debriefing before Blue Water filed suit on June 29, 2026. *See* ECF 1.

modifications, which further led the Navy to view the vessel as having a lower maturity. *Id.* And finally, the debriefing noted concerns that "the proposal indicates that the vessel has never been constructed before, given that detail design has not yet been completed." AR 2383. Ultimately, the Navy explained that "[t]he evaluation determined a low probability of a successful delivery of operational capability by FY27" based on Blue Water's design modifications, reliance on novel machinery plant architecture, and incomplete detail design work. AR 2383.

Under Criterion 4, the Navy provided more detail on how it found Blue Water's proposed test vessel to not be representative of its production vessel. *See* AR 2383-84. After explaining that "[a] key characteristic of any ship is the hull form, and the results of at-sea tests will differ based on different hull forms," the Navy noted the differences between the two vessels' hull forms. AR 2383. Specifically, Blue Water's proposed test vessel is a twin-hulled catamaran, and its proposed production vessel is an axe-bow monohull. AR 2383. Though the Navy noted that "some deviation between a test vessel and the future production vessel is allowable and expected," the Navy ultimately shared its concern that the vessels "differ[ed] significantly" and that the "difference in these hull forms is expected to produce results from the test vessel that do not accurately represent the future performance of the production vessel." AR 2383. Beyond the noted hull form differences, the Navy also explained that the test vessel's machinery plant differs from the production vessel, which led the Navy to express concern that the machinery control system (MCS) would be different between the two vessels. AR 2384.

## IV. The Navy's Evaluation of Saildrone

The Navy found Saildrone unacceptable under Criteria 2, 3, and 4.[3] AR 1577, 1587. On Criterion 2, the Navy found that Saildrone was specifically unacceptable because the "[d]esign [was] infeasible with payloads … exceeding defined max displacement." AR 1587. The Navy sent Saildrone a debriefing expanding on its evaluation. AR 2402. Within the debrief, the Navy clarified "[e]xceeding a maximum displacement in a design condition is not allowable and is not considered an acceptable design solution." AR 2402. The Navy cited Saildrone's J-8 Placemat as "indicat[ing] the vessel cannot support either the 25 MT [Metric Tons] load in the first threshold requirement or the required payload capacity of 72.6 MT required by the second threshold requirement." AR 2402. The Navy also acknowledged several discrepancies between the displacement data provided in the text of Saildrone's proposal and its J-8 Placemat, noting the discrepancies "may be a technical reporting error, but another explanation of the status of the weight estimate of the vessel is not provided and cannot be verified." AR 2402-03.

[3] The Navy initially found Saildrone unacceptable under Criteria 3 and 4. AR 1577, 1587. However, the Government now asserts "there were some variances in evaluations of certain proposals under Criteria 3 and 4 as argued by Saildrone." ECF 83 at 45. As a result, "the Navy no longer contends that Saildrone failed to meet the requirements of Criteria 3 and 4." ECF 83 at 45.

### V. Phase 1 Elimination and Litigation

The Navy selected seven of the 25 proposals received during Phase 1 to move on to Phase 2. AR 1575. Blue Water and Saildrone were not among the successful offerors. AR 1577. On June 29, 2026, Blue Water filed its Complaint. *See* ECF 1. Saildrone filed its Complaint the next day. *See Saildrone*, No. 26-944, ECF 1. The Court subsequently consolidated the cases, designating *Blue Water*, No. 26-936, as the lead case. *See* ECF 18. Three offerors that successfully moved on to Phase 2 intervened. *See* ECF 45, 48, 64. On August 10, 2026, the Government filed its Motion to Dismiss. ECF 75. That same day, Saildrone and Blue Water amended their respective Complaints, ECF 73 and ECF 74, and moved for Judgment on the Administrative Record. ECF 76; ECF 77. In response, the Government and two of the Defendant-Intervenors, Saronic and Leidos, cross-moved for Judgment on the Administrative Record. ECF 83; ECF 85; ECF 87. The Court heard oral argument on September 17, 2026.

## LEGAL STANDARDS

### I. Procurement Protest Jurisdiction and the Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b), confers jurisdiction on this Court to render judgment on "an action by an interested party objecting to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."[4] 28 U.S.C. § 1491(b)(1). In accordance with this Court's jurisdictional opinion in this matter, the Court has jurisdiction over the instant protests. ECF 106.

The Court reviews a procurement protest action under the standards set forth in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *see NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004) (stating that APA standard of review is applicable to procurement protests). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). "The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). In reviewing procurement decisions, the Court should not substitute its judgment for the agency's. *See R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed.

---

[4] No party disputes that Blue Water and Saildrone are interested parties, and the Court finds that they are. An interested party under § 1491(b)(1) is "an actual or prospective bidder or offeror" whose direct economic interest would be affected by the award or by the failure to award. *Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025) (*en banc*). Each plaintiff submitted a proposal in response to the Solicitation and was rated unacceptable, *see* ECF 73 ¶ 23; ECF 74 ¶ 25, which eliminated them from the competition, affecting their direct economic interest.

Cir. 2003). Instead, the Court fulfills its judicial function "by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority,' … and ensuring the agency has engaged in 'reasoned decisionmaking.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395-96 (2024) (citation omitted).

### II. Judgment on the Administrative Record in a Procurement Protest

Court of Federal Claims Rule 52.1(c) provides for judgment on the administrative record. Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). To prevail on a procurement protest, a plaintiff must demonstrate either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "When a challenge is brought on the first ground, the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* (internal quotation marks and citation omitted). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (internal quotation marks and citations omitted). If an error is found in the procurement, the APA instructs that "due account shall be taken of the rule of prejudicial error," which the Court determines as a factual matter. 5 U.S.C. § 706; *see Bannum*, 404 F.3d at 1351. A protester must show "a substantial chance" of award but for the error. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004); *Bannum*, 404 F.3d at 1353.

## DISCUSSION

This opinion proceeds in two parts. First, the Court considers Blue Water's protest. Then, the Court turns to Saildrone's protest.

### I. Blue Water's Protest

Turning first to Blue Water's protest, it broadly alleges that the evaluation record is insufficient for judicial review and that the Navy's evaluation under Criteria 2 and 4 was unreasonable. Because a rating of "unacceptable" under any one criterion ended an offeror's participation in Phase 1, AR 262, Blue Water can prevail only if the Navy erred under both Criteria 2 and 4. The Court finds that the record properly supports that the Navy's evaluation was conducted in a reasonable manner with respect to Criterion 4. As such, the Court does not reach Blue Water's arguments concerning Criterion 2.

#### A. Sufficiency of the Record for Judicial Review

Blue Water argues that the Navy's evaluation record is insufficient for judicial review. ECF 77 at 24-28. This argument is largely premised upon Blue Water's contention

that the Navy's debriefing constitutes impermissible *post hoc* rationale and that absent the debriefing, the Navy only provided conclusory statements. *See id.* at 25. The Government counters that the Navy's debriefing simply provided further explanation of the decisions already given to Blue Water. ECF 83 at 19. Because the Court does not reach Criterion 2, it addresses this argument solely as to Criterion 4.

To begin with, an "agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts,* 411 U.S. 138, 142-43 (1973)). However, "an explicit explanation is not necessary where the agency's decisional path is reasonably discernable." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021) (internal quotation marks and citations omitted). Therefore, what constitutes "sufficient clarity" is highly context specific.

Further, "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation modified). "Stated differently, when reviewing an agency decision, the Court must look to the decision-making process contemporaneous to the agency's decision, not *post hoc* justifications crafted for subsequent litigation." *Advanced Tech. Sys. Co. v. United* States, 177 Fed. Cl. 443, 455 (2025). In supplying rationale, the agency may provide "further explanation[s] of the process used by the agency." *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011), *aff'd without op.*, 484 F. App'x 558, 559 (Fed. Cir. 2012). Critically, though, these further explanations meaningfully differ from *post hoc* rationalizations, which the Court cannot review for further insight into an agency's action. *See id.* (finding "[t]he Court may consider explanatory materials that do not offer new rationales for past decisions and that illuminate the methodology the agency employed in making its determination"). Therefore, when looking at the contents of the Navy's debriefing, the relevant inquiry becomes whether the material at issue provided new, after-the-fact rationale created for litigation, rather than having come from a relevant decision-maker and more deeply explaining a past decision. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009); *see also Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) ("[the *post hoc* rationalization] rule directed at reviewing courts … forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decision[-]makers.").

Here, Blue Water takes issue both with what it views as the conclusory nature of the rationale provided by the Navy as well as with the information provided in the Navy's debrief. ECF 77 at 24-28. But Blue Water's general argument that the Navy's concise rationale provided in the evaluation results created a record that is incapable of judicial review overstates the Navy's documentation obligations. The Navy's documentation obligation is merely that its decisional path must be reasonably discernable. *DynCorp*, 10 F.4th at 1315.

To be sure, the Navy's evaluation results were in fact concise; they took the form of charts on slides with boxes of information (about a sentence in length) corresponding to specific evaluation criteria. However, the Navy's Criterion 4 evaluation results plainly stated that Blue Water's "[t]est vessel is not representative." AR 1586. The Navy's contemporaneous evaluation workbook recorded: "Fail – unrepresentative test vessel. Entirely different hullform and machinery layout."[5] AR 3033. And the debriefing detailed the Navy's assessment of Blue Water's proposal further, describing specific ways in which the vessel was not representative. *See* AR 2382-84. In particular, the Navy explained the significance of hull form as it relates to the test vessel being representative, noting the difference between Blue Water's vessels' "hull forms is expected to produce results from the test vessel that do not accurately represent the future performance of the production vessel." AR 2383. The Navy also explained that the differences between Blue Water's vessels' MCSs were relevant to whether the test vessel was representative. AR 2384. Rather than providing a separate basis for the Navy's determination, it built out its already-supplied rationale for finding the test vessel unrepresentative "[b]ased on the differences between the proposed test vessel and the proposed production vessel, namely the differences between the hull forms and the propulsion architecture…." *Id.*

Under these facts, the debriefing's Criterion 4 discussion only provided additional context for the Navy's determination rather than supplying different or inconsistent rationale. *D & S Consultants, Inc.*, 101 Fed. Cl. at 35. Further, the debriefing was issued by the Navy before Blue Water filed suit on June 29, 2026, and it was not prepared by counsel for the Government. *See supra* note 2; Tr. 90:18-25. Accordingly, the Court may properly consider the debriefing in assessing the reasonableness of the Navy's evaluation of Blue Water.

B. <u>Criterion 4 Evaluation</u>

With respect to Criterion 4, MUSV Test Event plan, Blue Water alleges that the Navy's evaluation of its proposal as "unacceptable" lacked a rational basis. ECF 77 at 40. Blue Water's challenges to the Navy's evaluation can be distilled into three separate bases of disagreement: (1) the Navy's evaluation was inconsistent with the stated evaluation criteria; (2) the term "representative" was ambiguous; and (3) the Navy engaged in disparate treatment. *See* ECF 77 at 39-44. The Government counters that while Blue Water may disagree with the Navy's technical assessment, this disagreement does not mean it acted irrationally. ECF 83 at 27. The Court agrees with the Government.

---

[5] No party disputes that the Navy's contemporaneous evaluation workbook indicated Blue Water's test vessel was rated unacceptable with respect to Criterion 4 because it was not representative due to a different hull form and machinery layout. *See* ECF 77 at 21, 26; ECF 96 at 7. This text, specifically "Fail – unrepresentative test vessel. Entirely different hullform and machinery layout," is embedded in the evaluation workbook before the Court. AR 3033.

### *1. Consistency Between the Navy's Evaluation and the Stated Criteria*

First, Blue Water alleges the Navy departed from the evaluation criteria under Criterion 4 because "[h]ull and machinery plants are not listed as assets to be evaluated in the testing." ECF 77 at 42. Under Criterion 4, the Solicitation required offerors to "[d]escribe how the test asset is representative of the MUSVs used in the offeror's proposed business models…." AR 262. As relevant here, an acceptable rating was to be assigned where a proposal "demonstrates a test asset that is *representative* of the MUSVs used in the offerors proposed business models." AR 263 (emphasis added).

Whether the Solicitation permitted the Navy to compare hull form and machinery plant is a question of solicitation interpretation, which the Court decides for itself. *Banknote*, 365 F.3d at 1353. Interpretation begins with the plain language, read as a whole so that every term has meaning. *Id.*; *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021). Here, the reference point for "representative" is the production vessel the offeror proposes to field. A test asset can be representative only by comparison to it, and nothing in the text limits that comparison to particular subsystems. The Solicitation's forms confirm that hull and propulsion are part of the comparison. The J-8 Placemat, which offerors completed for both the production vessel and the test vessel, AR 258, 262, asks for the vessel's "Hull Type," "Prime Mover Type," and "Propulsor Type and #." AR 169; *see, e.g.*, AR 487, 491 (Blue Water's production and test-vessel Placemats); AR 1023-24 (Leidos's production and test-vessel Placemats). The J-5 test-vessel description asks for the vessel's class, "Max Speed / Propulsion," sensor suite and Placemat, AR 279, and it describes the autonomy system under test as including the "Machinery Control System." *Id.* Reading the Solicitation as a whole, the Court concludes that "representative" unambiguously calls for comparing the test vessel with the production vessel, and that nothing in the Solicitation excludes hull form or propulsion architecture from that comparison. How much difference is disqualifying is a technical judgment; the Navy itself recognized that "some deviation between a test vessel and the future production vessel is allowable and expected." AR 2383.

Blue Water also argues that the Navy's answers to offerors' questions limited "representative" to a vessel "able to perform the test plan." ECF 77 at 40-41; ECF 91 at 31 n.4. The Solicitation foreclosed that reading. It provided that the Navy's responses "shall not supersede any information contained in the solicitation" and that, in the event of a discrepancy "between a response to a bidder's question and the content of the solicitation as amended, the latter shall take precedence." AR 255-56. In any case, the answers also do not provide the support Blue Water believes. Asked which subsystems "must match the proposed production MUSV, and which may differ without impacting evaluation," the Navy answered that the test vessel "must be able to perform the test plan defined in the J-5 Attachment" and referred offerors to the Section 7 approval process. AR 268; *see also* AR 266. Blue Water itself asked one of those questions. It flagged the tension between sensor representativeness and "speed, range and other vessel dynamics," and told the Navy that, "[a]bsent government guidance on these tradeoffs," it would test on a vessel that

represents its autonomy and C2 systems "rather than maneuver characteristics," which "are functions of hull form and architecture."[6] AR 266; *see* AR 1570 (identifying Blue Water as the author). The Navy did not say that hull form or propulsion could differ. The ability to perform the test plan is a floor, not a definition. The Section 7 process follows award, whereas Criterion 4 determined whether a proposal advanced at all. *See* ECF 77 at 41.

Having construed the term, the Court turns to its application. Whether the differences between Blue Water's vessels made its test vessel unrepresentative is a technical judgment, which the Court will not set aside if it "evinc[es] rational reasoning." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman*, 419 U.S. at 285. The differences themselves are not in dispute. *See* ECF 77 at 19. Blue Water's proposal acknowledged that its vessels differ in "mast height, hull form, and propulsion architecture" but asserted that those differences "do not affect [the test vessel]'s ability to perform as an operationally representative surrogate for [the production vessel] in autonomy testing." AR 465. The Navy disagreed. Its evaluation recorded: "Fail – unrepresentative test vessel. Entirely different hullform and machinery layout." AR 3033; *see* AR 1586. Its debriefing, which the Court may consider for the reasons given in Part I.A, explained why those differences matter. The difference between a "twin-hull catamaran" and an "axe-bow monohull" "is expected to produce results from the test vessel that do not accurately represent the future performance of the production vessel." AR 2383. And the production vessel's "diesel-electric machinery plant" is "significantly different from the direct-drive machinery plant used by the test vessel," which matters because "[a] key aspect of the test plan is the ability of the machinery control system (MCS) to interface with the platform autonomy." AR 2384. Blue Water argues that calling a decision a technical judgment cannot shield it from review. ECF 91 at 30. That is true, but the Navy did more than invoke its expertise: it identified the differences Blue Water's own proposal disclosed and explained why they matter for the Test Event. The Court construed the Solicitation itself, and it defers only on how much difference is too much. On that question, the Court will not substitute its judgment for the Navy's.

*2. Waiver of Argument Regarding Ambiguity of the Term "Representative"*

The Court has held that the Solicitation unambiguously required a comparison of Blue Water's test vessel with its production vessel, and that nothing in it excluded hull form or propulsion architecture from that comparison. That holding resolves Blue Water's challenge to the meaning of "representative." The Government and Leidos argue in the alternative that any challenge to that meaning is waived. ECF 83 at 28; ECF 87 at 12-14. The Court agrees, as an alternative ground.

"[W]here a government solicitation contain[s] a patent ambiguity, the government contractor has a duty to seek clarification from the government, and its failure to do so

[6] Counsel for Leidos identified the question as Blue Water's at oral argument. Tr. 100:8-15. Blue Water did not dispute it, and its counsel referred to "the answers that it got." Tr. 103:6-7.

precludes acceptance of its interpretation in a subsequent action against the government." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (citation modified). The rule reaches "all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).[7] As such, it applies in protests of prototype OT solicitations. An ambiguity is patent if it is "an obvious omission, inconsistency or discrepancy of significance" that "could have been discovered by reasonable and customary care." *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016)).

Blue Water responds that it does not challenge the Solicitation's terms but the Navy's failure to follow them, and that a pre-award protest would have been unnecessary because the Navy's answers to offerors' questions "adopted the interpretation Blue Water now advances." ECF 91 at 30-31 & n.4. The Court agrees that Blue Water challenges how the Navy applied the term, and it has addressed that challenge on the merits above. But the premise of Blue Water's challenge—that a test vessel is representative if it can perform the J-5 test plan—is a reading of the term that the Solicitation does not support. The Solicitation provided that the Navy's answers "shall not supersede any information contained in the solicitation," AR 255-56, and the Navy's answers did not adopt Blue Water's reading. Asked which subsystems must match the production vessel and which may differ, the Navy declined to say and referred offerors to the J-5 and to the post-award approval process. AR 266, 268. To the extent Blue Water relies on a narrower meaning of "representative," that is a contention about what the Solicitation required, and it was one that Blue Water had to raise before it submitted its proposal.

Even if the term were ambiguous, the ambiguity was patent. It was apparent from the face of the Solicitation and the Navy's answers, which the Navy posted on April 9, 2026, eight days before proposals were due. AR 244, 256, 326. Offerors, including Blue Water, asked the Navy to say which subsystems and performance characteristics must match, and which may differ, AR 266, 268; AR 1570, and the Navy gave no such guidance. Blue Water's own question shows that it saw the issue: it told the Navy that, absent guidance, it would use a test vessel that did not represent the production vessel's "maneuver characteristics," which "are functions of hull form and architecture." AR 266, 1570. Its proposal then acknowledged that "hull form, and propulsion architecture" differed between its vessels and asserted that the differences did not matter. AR 465; *see* AR 2383. At oral argument, Blue Water's counsel described the Q&As as going "right to the heart of the matter by asking about when you say representative, are you talking about the propulsion systems?" and acknowledged that "it's precisely the situation that's now arisen." Tr.

---

[7] The Court notes *Telesto Group, LLC v. United States* found that the *Blue & Gold* rule applies in protests involving OTs. *See* 176 Fed. Cl. 711, 740-41 (2025) (citing *Blue & Gold Fleet, L.P.*, 492 F.3d at 1313). Blue Water distinguishes *Telesto* as a case in which the protester failed to timely object to "last-minute changes" to the evaluation criteria. ECF 91 at 31 n.4 (citing 176 Fed. Cl. at 739-40). Whether the rule applies depends on whether the protester had an opportunity to object before the proposal deadline and award, not on the type of instrument. *See COMINT*, 700 F.3d at 1382.

103:22-104:2. Having asked the question and received an answer that did not resolve it, Blue Water did not seek further clarification or object before proposals were due. *See COMINT*, 700 F.3d at 1382; *Per Aarsleff*, 829 F.3d at 1312-14. It cannot now challenge the meaning of "representative."

This alternative holding is limited. It bars Blue Water from advancing its own reading of the term, but the Court's conclusion that the Navy reasonably judged the differences between Blue Water's test and production vessels to be significant does not rest on waiver. The Court has addressed that conclusion on the merits above.[8]

*3. Equality of Treatment Between Blue Water and Leidos*

Blue Water's final argument arising from the Navy's evaluation under Criterion 4 alleges that the Navy evaluated offerors unequally with respect to the MCS by holding Blue Water to a higher standard than it did Leidos, who successfully moved on to Phase 2. ECF 77 at 44. The Government and Leidos argue that Blue Water's proposal was clearly different. ECF 83 at 29-33; ECF 87 at 10-12.

A disparate treatment claim requires that "a protest[er] must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that the agency "inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Once the protester has established the nearly identical aspects of the proposals, then the Court may properly compare the agency's treatment of the proposals. *Id.* at 1373. As the Court must not interfere with the Navy's broad discretion in reviewing the technical evaluations of proposals, the Court will not compare the parties' treatment absent a showing that the proposals were substantively indistinguishable. *Id.*

Blue Water cannot show that the Navy held it to a more stringent standard for the MCS than it did for Leidos. Blue Water argues that, "to the extent that the test and production vessels must have the same MCS," the Navy waived that requirement for Leidos, whose test vessel omitted Leidos's automated MCS, but not for Blue Water. ECF 77 at 44; ECF 91 at 32-33. Blue Water's argument is erroneous because the Navy did not apply a same-MCS requirement to Blue Water. The Navy's evaluation found Blue Water's

---

[8] Blue Water additionally alleges that the Navy failed to use competitive procedures in violation of 10 U.S.C. § 4022(b)(2), which requires competitive procedures "to the maximum extent practicable." ECF 77 at 37, 45. This argument is derivative of Blue Water's preceding arguments and evaluation challenges, and because the Navy's Criterion 4 rating independently supports Blue Water's elimination, it fails as well. To the extent Blue Water instead challenges the competitive procedures that the Solicitation established, the challenge is untimely. The procedures were apparent from the Solicitation, and Blue Water did not object before proposals were due. *See* ECF 83 at 33 (citing *Telesto*, 176 Fed. Cl. at 740-41); *Blue & Gold*, 492 F.3d at 1313.

test vessel unrepresentative because of an "[e]ntirely different hullform and machinery layout." AR 3033; *see* AR 1586. The Navy's debriefing explained the machinery-layout finding. Specifically, Blue Water's production design uses a diesel-electric machinery plant and its test vessel a direct-drive plant, and "[t]he MCS for a diesel-electric machinery plant differs significantly from a direct-drive machinery plant, therefore the proposed test vessel's machinery plant is unrepresentative of the proposed production vessel." AR 2384. The debriefing thus located the problem in the machinery plant, and it identified "the differences between the hull forms and the propulsion architecture," not the MCS, as the basis for the rating. *Id.*; *see* ECF 87 at 9. Nor did the Navy overlook a comparable plant difference in Leidos's proposal: Leidos's Placemats list the same prime mover and propulsors for its test and production vessels. AR 1023-24. Blue Water therefore does not establish that its proposal was nearly identical to Leidos's nor does it identify an inconsistently applied requirement. *See* ECF 83 at 30; *Off. Design Grp.*, 951 F.3d at 1373.

C. Conclusion

Blue Water acknowledges that it needed an acceptable rating under both Criterion 2 and Criterion 4 to move on to Phase 2. ECF 77 at 11; ECF 91 at 10. The Government argues that Blue Water cannot make this showing. ECF 83 at 33. The Court agrees. For the reasons above, the Navy reasonably rated Blue Water unacceptable under Criterion 4, and that rating alone was sufficient justification for the Navy to end Blue Water's participation in Phase 1. AR 262-63. Accordingly, the Court resolves Blue Water's protest based on Criterion 4; it need not evaluate the reasonableness of the Navy's evaluation under Criterion 2.

## II. Saildrone's Protest

With respect to Saildrone's protest, it challenges the Navy's determination that its proposal was unacceptable under Criterion 2.[9] The Court finds that the Navy engaged in disparate treatment, and thus, acted in an arbitrary and capricious manner in its review of Saildrone's proposal. Because the Court grants relief on that ground, it does not reach Saildrone's remaining arguments.[10]

---

[9] Saildrone initially challenged the Navy's evaluation of its proposal under Criteria 3 and 4 as well. *See* ECF 76 at 24-34. As noted above, the Government has withdrawn those findings. ECF 83 at 45.

[10] Saronic limits its cross-motion to Saildrone's arguments that potentially implicate the evaluation of Saronic. ECF 85 at 1. It argues that the Navy reasonably rated Saildrone unacceptable under Criterion 2 and, alternatively, that Saronic's and Saildrone's proposals differed under Criteria 3 and 4. *Id.* at 3-5. Because the Court holds the Criterion 2 rating arbitrary, and the Government has withdrawn its Criteria 3 and 4 findings, ECF 83 at 45, Saronic's cross-motion is denied.

A. Disparate Treatment

*1. The Navy's Evaluation of Saildrone's Proposal*

As detailed above, the Solicitation provided that a proposal was acceptable under Criterion 2 if the offeror "demonstrate[d] the proposed MUSV Design me[t] or exceed[ed] the threshold requirements." AR 262-63. In the Navy's review of Saildrone's proposal, the two threshold requirements at issue were: (1) the vessel range requirement, requiring "2500 nm at 25 knots while carrying a 25 MT load on the payload deck in NATO STANAG 4194 Sea State 4;" and (2) the payload capacity requirement, requiring "[t]wo (2) Forty-foot Equivalent Units (FEU) in accordance with Attachment J-4." AR 258, 1581, 1585. The Solicitation permitted offerors ten pages, accompanied by a completed J-8 Placemat and any diagrams of general arrangements to respond to this criterion. AR 258. As relevant here, Criterion 2 required offerors to "provide a summary of the MUSV production design and the test vessel, if proposed for testing purposes, using the provided Attachment J-8 Placemat Template." *Id.*

Saildrone completed the J-8 Placemat. The Navy found Saildrone's proposal unacceptable under Criterion 2, and in the evaluation results, the Navy stated that Saildrone's "[d]esign [was] infeasible with payloads … exceeding defined max displacement." AR 1587. In the debrief, the Navy observed inconsistencies between Saildrone's narrative and its J-8 Placemat. *See* AR 2402-03. For example, the debriefing observed that a narrative statement—that SPECTRE's full load displacement excluding payload is 223.2 MT—is not accurately reflected in the Placemat. AR 2402-03.

*2. Saildrone's and Sea Machines' Placemat Deficiencies*

Success on a claim of disparate treatment requires that "a protest[er] must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372. "A protest[er] may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Id.* at 1372. After finding deficiencies, "a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.*

Both Saildrone's and Sea Machines' Placemats listed a "Max Displacement" lower than the displacements their respective Placemats reported for the required payload conditions. Saildrone's Placemat lists a "Max Displacement" of 231 MT, a "Displacement w/ 25 MT" of 256 MT, and a "Displacement w/ 2x FEU" of 303 MT. AR 1219. Sea Machines' STEAMRUNNER Placemat lists a "Max Displacement" of 370.71 MT, a "Displacement w/ 25 MT" of 380.96 MT, and a "Displacement w/ 2x FEU" of 428.56 MT. AR 1344. Sea Machines' STEAMRACER Placemat lists a "Displacement @ FL" (full load) of 410 MT but leaves the "Max Displacement" field and both payload-condition

fields blank. AR 1346. The Government "does not dispute that the two companies made similar errors in populating the J-8 Placemats." ECF 83 at 34.

The record does not explicitly say which Sea Machines vessel the Navy evaluated. The Government acknowledges that "the evaluation record arguably reflects that the Government advanced Sea Machines based on STEAMRACER," while maintaining that the Navy "considered both designs." ECF 83 at 37 n.8. The Court need not choose. *See* ECF 90 at 8 (arguing that "either way" the Navy's treatment was uneven); Tr. 121:3-122:11. The Navy marked Sea Machines acceptable on every sub-criterion, including the range and payload requirements Saildrone failed. AR 1585. If the Navy evaluated STEAMRACER, it accepted a Placemat that left blank the fields on which it faulted Saildrone. If it evaluated STEAMRUNNER, it advanced a Placemat reporting both payload-condition displacements above the stated "Max Displacement," the same entries it treated as disqualifying for Saildrone. On either account, the Navy did not treat Sea Machines' Placemat error as disqualifying, and nothing in the evaluation explains why.

#### 3. *The Government's Distinctions Between the Two Proposals*

Relying on rationales that do not appear in the Navy's contemporaneous evaluation, the Government tries to justify the unequal treatment documented in the AR based on three alleged distinctions between the offerors. The Court addresses each in turn.

##### a. *Saildrone's Additional Narrative and Placemat Discrepancies*

The Government's first distinction does not withstand scrutiny. The Government contends that Saildrone's proposal, unlike Sea Machines' proposal, contained inconsistencies between its narrative and its Placemat, such as the difference between the narrative's 223.2 MT full load displacement excluding payload and the Placemat's 231 MT displacement. ECF 83 at 34, 36-37. But the Navy did not eliminate Saildrone because of those narrative-to-Placemat inconsistencies. It eliminated Saildrone because its Placemat-reported loaded displacements exceeded the stated maximum displacement. Specifically, the Navy's evaluation results state that Saildrone's design was "infeasible with payloads - exceeding defined max displacement." AR 1587. The debriefing likewise identifies "excessive displacement at the required loading condition" as the reason for the unacceptable rating. AR 2403. The Government concedes that Sea Machines made "similar errors" on its Placemat. ECF 83 at 34. As to the narrative-to-Placemat inconsistencies, by contrast, the Navy observed that they "may be a technical reporting error, but another explanation of the status of the weight estimate of the vessel is not provided and cannot be verified." AR 2403. The Navy did not find that those inconsistencies, standing alone, rendered Saildrone's proposal unacceptable, and the Court will not supply that rationale on the Navy's behalf. *See Regents*, 591 U.S. at 20-21.

##### b. *Reliance on Other Aspects of Sea Machines' Proposal*

As further justification for the different treatment of the proposals, the Government alleges that other aspects of Sea Machines' proposal provided information that established

Sea Machines met the vessel range and payload capacity requirements. ECF 83 at 34. The Government also alleges that, because Sea Machines' STEAMRUNNER's parent hull was already tested to confirm it could satisfy the payload conditions and was discussed within its diagram of general arrangements, the Placemat error was inconsequential. ECF 83 at 39.

The Government's support for this rationale is absent from the Navy's contemporaneous evaluation. The contemporaneous evaluation of Sea Machines consists of acceptability ratings, AR 1577, 1585, 1590, a general statement that each advanced offeror "[d]elivered all required data and me[t] all threshold requirements,"[11] AR 1578, and a slide reproducing STEAMRACER's Placemat, AR 1600. None of these documents mentions the design study, the parent-hull testing, or the Placemat error. The Government's assertion that Sea Machines' proposal contained "robust information concerning its solution's design, which allowed the Navy to conclude that Sea Machines' proposal meets the solicitation's threshold requirements," ECF 83 at 37, rests entirely on the proposal; every record citation the Government offers for it is to the proposal, not the evaluation. *See* ECF 83 at 37-40. Indeed, the Government acknowledges that the evaluation "does not explicitly mention the placemat and does not reflect that Sea Machines made an error at all." ECF 96 at 14. The Government's explanation is therefore a *post hoc* rationalization, and the Court will not credit "rationalizations offered for the first time in litigation affidavits and arguments of counsel." *Local 814*, 546 F.2d at 992 (internal citation omitted); *see Regents*, 591 U.S. at 20-21.

Nor can the Government's account be sustained on the theory that the Navy's decisional path is reasonably discernable. To be sure, an agency's explanation need not be explicit "where the agency's decisional path is reasonably discernable." *DynCorp*, 10 F.4th at 1315. That principle allows the Court to discern the path the agency took from the record the agency made; it does not allow counsel to supply a path the record does not show. Unlike the Navy's debriefings, which the Navy issued before this litigation to explain determinations already recorded in its evaluation, *see supra* Part I.A; AR 2402-03, nothing in the evaluation explains: (1) what parts of Sea Machines' proposal the Navy relied on to render its acceptability rating; or (2) why the Placemat error the Government concedes, ECF 83 at 34, did not render Sea Machines' proposal unacceptable. To find the Navy's path discernable, the Court would have to adopt counsel's account of what the Navy must have read and concluded. That is the *post hoc* rationalization the Court may not credit.

---

[11] The Navy's evaluation at AR 1578 is the only contemporaneous finding that Sea Machines met the threshold requirements, and it does not identify what material the Navy relied on to reach such a conclusion. Its companion statement, that each advanced offeror "[d]elivered all required data," is difficult to reconcile with the blank weight fields in STEAMRACER's Placemat, AR 1346, particularly because the Navy listed "Submit J-8 vessel placemat" as a Criterion 2 requirement, AR 1590.

*c. Whether Saildrone's Narrative Was "Unsupported"*

The Government characterizes Saildrone's narrative as claiming compliance "without supporting evidence." ECF 83 at 35. But neither the evaluation nor the debriefing says so. *See generally* AR 1573-1600, 2402-04. That characterization comes from counsel, not the Navy, and Saildrone's proposal does contain material offered to support its claims of compliance.[12] Saildrone's narrative states that its performance parameters result "from extensive 1/7th scale, self-propelled model testing and [computational fluid dynamics (CFD)] simulations in a multitude of sea states and load cases." AR 1199. It includes a figure labeled as a CFD analysis at displacements of 180 and 256 tonnes. AR 1201. Its Placemats list a payload "Weight Capacity" of 75 MT, where two FEUs require 72.6 MT, AR 1219-20, 2402, and a range at 25 knots with a 25 MT payload of 2,790 nm in Sea State 4, AR 1220. Its general arrangement drawing lists the same Sea State 4 range, AR 1255, although it also lists a "Max Load Displacement" of 256 tonnes, below the 303 MT the Placemat reports with two FEUs. AR 1255, 1219. The Court expresses no view on what this material shows. Whether it demonstrates compliance is a technical judgment for the Navy.[13] But the Government cannot defend the Navy's evaluation on the ground that such material was entirely absent from Saildrone's proposal.

*4. Conclusion*

Therefore, because the Navy accepted from Sea Machines a Placemat that either reported both payload-condition displacements above the stated "Max Displacement," as Saildrone's did (STEAMRUNNER), or left those fields blank (STEAMRACER), the Court finds the Navy's subsequent treatment of the proposals disparately favored Sea Machines and arbitrarily held Saildrone to a higher standard. *Off. Design Grp.*, 951 F.3d at 1372; *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 691 (2012) (finding disparate treatment where protester's proposal "was rated according to a different standard" than the successful offeror's proposal). In reaching this conclusion, the Court does not endeavor to determine whether Saildrone's proposal demonstrated that its vessel (SPECTRE) meets the

---

[12] At oral argument, the Court asked Saildrone's counsel to identify where the proposal itself shows that the requirements are met. Tr. 109:5-16, 110:8-16. Counsel pointed to the Placemat's payload weight capacity, AR 1219; the general arrangement drawings, AR 1254-58, 1263-64, 1267; the narrative's description of model testing and CFD analysis, AR 1189, 1199, 1201; and the narrative's statements of compliance, AR 1188-89, 1194. Tr. 111:3-112:6; *see also* Tr. 113:5-11. The Court cites these pages to identify the referenced material, not to adopt counsel's characterization of it.

[13] The Government took the same view at oral argument. Asked how the Navy could find that Sea Machines met the requirements without the disputed appendix pages, Government counsel offered two reasons: first that Sea Machines proposed an existing vessel and that the numbers in its narrative were consistent, and then that "that's the technical expertise of the Navy finding … those things." Tr. 130:1-131:7. Neither reason appears in the Navy's evaluation, *see supra* Part II.A.3.b, and counsel acknowledged that one of Sea Machines' two vessels, STEAMRACER, is new construction, Tr. 132:13-15. The Navy has not documented that technical judgment for Sea Machines, and the Court cannot make a technical judgment on the Navy's behalf for either offeror.

threshold requirements. That determination is reserved to the technical judgment of the Navy. Rather, the Court merely holds that the Navy's stated basis for finding otherwise cannot be reconciled with its acceptance of Sea Machines' proposal.[14]

B. Prejudice

Having found the Navy's actions to be arbitrary and capricious, the Court must determine whether the Navy's conduct prejudiced Saildrone. 5 U.S.C. § 706; *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996-97 (Fed. Cir. 2021). In the context of procurement protests, the Federal Circuit describes "prejudice" as a requirement that a protester show a "substantial chance of award" to prevail. *See Sys. Stud. & Simulation*, 22 F.4th at 998; *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013).

Here, Saildrone argues that, apart from the Navy's error under Criterion 2, no other impediment would prevent it from moving on to Phase 2. ECF 76 at 39. The Court agrees. The Government has withdrawn its Criteria 3 and 4 findings, ECF 83 at 45, and Criterion 1 was for "informational purposes only," AR 262, so the Criterion 2 rating is the only finding that kept Saildrone from advancing. Moreover, an acceptable rating was all that advancement required; the Solicitation placed no limit on the number of offerors that could advance, AR 251, and the Navy advanced all seven of the proposals it rated acceptable, AR 1575, 1577. Had the Navy applied the same approach to Saildrone's proposal as it applied to Sea Machines' proposal, Saildrone would have had a substantial chance of being found acceptable and advancing to the MUSV Test Event. Accordingly, Saildrone was prejudiced by the Navy's disparate treatment.

## III. Permanent Injunctive Relief

Saildrone asks for a permanent injunction. A permanent injunction requires that the plaintiff succeed on the merits, that it suffer irreparable harm without an injunction, that the balance of hardships favor an injunction, and that an injunction serve the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

As relevant here, Saildrone's Amended Complaint pleaded the request and the injunction factors, ECF 73 ¶¶ 149-55 & Prayer for Relief ¶¶ c-e, and its motion briefed them, ECF 76 at 41-46. The Government did not respond.[15] The Court does not treat the Government's silence as the sole basis for relief, but instead addresses the issue based on

[14] Saildrone made other arguments regarding the reasonableness of the Navy's evaluation under Criterion 2. Having found in favor of Saildrone on its disparate treatment argument, the Court need not address the remaining arguments.

[15] In its cross-motion, the Government states in its conclusion that the Court should "deny plaintiffs' request for injunctive relief." ECF 83 at 45. The Government's reply repeats that sentence. ECF 96 at 18. However, neither brief addresses irreparable harm, the balance of hardships, or the public interest as to Saildrone. Nor does either brief identify any harm the Government or the Navy would suffer from the relief Saildrone describes. Similarly, Saronic's cross-motion does not address the injunctive relief factors. *See* ECF 85.

the record before it.[16] Having found that Saildrone has succeeded on the merits, the Court addresses the remaining factors in turn. Because the Court finds that these factors favor injunctive relief, the Court grants Saildrone's request for such relief, limited to the scope described below.

A. Irreparable Harm

A protester suffers irreparable harm when it is deprived of the opportunity to compete fairly for a contract and has no adequate remedy without an injunction. *RLB Contracting Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015) ("[I]n the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief."); *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 582 (2013) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) ("[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'")).

This describes Saildrone's position. The Navy eliminated Saildrone in Phase 1 on a finding under Criterion 2 that the Court has found arbitrary and capricious. Phase 1 was the gateway to negotiation of a prototype OT agreement, to participation in the on-water Test Event, and to eligibility for a follow-on production contract or transaction under 10 U.S.C. § 4022(f). AR 262-64; ECF 73 ¶¶ 28-30, 150; ECF 76 at 42. The Navy has since made follow-on production awards. *See* ECF 106-1 at 2. These awards amount to approximately $1.245 billion of the $2.1 billion Congress appropriated for MUSVs. *See id.*; Pub. L. No. 119-21, § 20002(31). Absent injunctive relief, Saildrone would not be able to compete for an award of a production contract. And, even if it could compete, the Navy could in the meantime obligate the rest of the appropriation, whether through follow-on awards under the Solicitation or through another vehicle, leaving Saildrone without a meaningful opportunity to compete for a production contract. The Government has not argued otherwise. This factor favors Saildrone.

B. Balance of Hardships

When a protester has succeeded on the merits, the balance of hardships ordinarily favors the protester unless specific facts counsel otherwise. *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 402 (2025) ("[T]he harm to the Agency of having to reconsider a procurement in a fair and rational way does not outweigh the harm to an individual organization that was denied its right to fair consideration."); *Lab'y Corp. of*

[16] As injunctive relief "does not follow from success on the merits as a matter of course," *Winter v. NRDC*, 555 U.S. 7, 32 (2008), the Court makes its own findings on each factor. As such, it need not decide whether the Government's failure to address the injunctive relief factors would alone concede them as Saildrone argues. *See* ECF 90 at 33-35 (citing *Dist. Commc'ns Grp., LLC v. United States*, 169 Fed. Cl. 538, 551 (2024)).

*Am. v. United States*, 108 Fed. Cl. 549, 568-69 (2012); *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 & n.13 (2012).

Saildrone argues that its requested relief "imposes virtually no burden on the Government." ECF 76 at 43. The Court agrees. Saildrone does not ask the Court to cancel any award, to unwind any agreement, to halt the procurement, or to delay the Test Event for other participants. ECF 73 ¶¶ 152-53; ECF 76 at 43. It asks that its proposal be evaluated lawfully, and that, if the proposal is acceptable, it be allowed to compete. It would bear its own costs of the Test Event. ECF 73 ¶ 151. The Navy does not pay for participation beyond a $10,000 payment for attending a conference, and the $15 million fee is earned only on successful completion of the Test Event. ECF 76 at 43 (citing the Solicitation); ECF 73 ¶ 151. The principal restriction the requested relief places on the Navy is a limit on MUSV obligations while Saildrone's proposal is reevaluated. That limit is set at $1.5 billion of the $2.1 billion appropriation, ECF 73 ¶ 153; ECF 76 at 43-44, which leaves the Navy free to obligate the bulk of the appropriation. ECF 73 ¶ 153; ECF 76 at 42-44. And because the appropriation remains available until September 30, 2029, a temporary limit does not risk the loss of funds. *See* Pub. L. No. 119-21, § 20002. The relief requested leaves in place the production awards the Navy made to Galliano Marine Services, HII, and Saronic Technologies, and does not disturb the $15 million awards the Navy made to Leidos, PAC MAR, and Sea Machines for successful completion of the projects provided for in their prototype OTs. *See* ECF 106-1 at 2. Delay and administrative burden from corrective action do not alone defeat an injunction, and in any event, they follow from the Navy's own evaluation. *See Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008). The Government has not argued that a reevaluation would be burdensome or otherwise disputed Saildrone's argument. The balance of hardships favors Saildrone.[17]

C. Public Interest

Turning to the final factor, "[t]he public interest is well-served by ensuring that the government procurement process is fair." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). That interest has particular force here. Congress directed that the Navy use competitive procedures to the maximum extent practicable in awarding prototype OTs, 10 U.S.C. § 4022(b)(2), and the Solicitation contemplated prototype awards "to one or more offerors" without capping how many could advance. AR 251, 262-63. The Court has held that the Navy eliminated Saildrone on a basis it did not apply to an offeror it advanced, which is arbitrary and capricious. The public interest in the integrity of the competition and in the Navy's access to the broadest field of acceptable vessels favors relief. The Court has considered the Navy's interest in fielding

[17] One additional fact should be mentioned. The Solicitation required that the Test Event be completed by September 30, 2026. AR 251, 263. That date passed while this case was pending on a schedule that the parties, including the Government, requested. *See* ECF 16 at 2-3; ECF 18 at 1. The Court does not know from this record whether the Navy has extended the deadline for any offeror, or what the Navy's current schedule is. That uncertainty bears on how the injunction should be written. It does not bear on whether one should be issued.

MUSVs quickly but does not find that interest outweighs the public interest in conducting a fair procurement. The Government has not argued that the relief would impair its interest in a speedy procurement, and the injunction described below is limited in scope (it does not halt the Test Event for other offerors, to the extent they are not already complete, or cancel any award), which further mitigates that concern. Similarly, national-security considerations do not displace the public interest in a lawful evaluation, particularly where the relief is limited in this way. *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 494 (2012). This remains true even when considering schedule concerns and national security concerns collectively, given the limited nature of the relief. This factor favors Saildrone.

D. Scope of the Injunction

As all four factors favor relief, the Court will enter an injunction. An injunction must be tailored to the violation. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). That principle carries added weight here, where Congress has directed the Court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).

As described above, the violation here is that the Navy's Criterion 2 finding is arbitrary because it eliminated Saildrone on a basis it did not apply to an offeror it advanced. The relief ordered below is limited accordingly. It sets aside the Criterion 2 finding and remands to the Navy to reevaluate Saildrone's proposal under the approach the Navy applied to the offerors it advanced, but it leaves the outcome of that reevaluation to the Navy's technical judgment. It bars the Navy from relying on the Criteria 3 and 4 findings, which the Government has abandoned, ECF 83 at 45, because permitting the Navy to revive them now would be inequitable. The relief restores Saildrone to the position it would have occupied absent the error, without delaying the Test Event for any other offeror. And pending the reevaluation, it limits obligations for MUSV production, however made, to $1.5 billion of the $2.1 billion Congress appropriated for medium unmanned surface vessels, which preserves Saildrone's opportunity to compete while leaving in place the Navy's substantial awards in the meantime. *See* Pub. L. No. 119-21, § 20002(31); ECF 106-1 at 2.

Regarding bid and proposal costs, because the Court is remanding this matter to the Navy for further proceedings, Saildrone will have an opportunity to have its proposal fairly considered by the Navy. Therefore, such relief is not appropriate. *See Beta Analytics Int'l, Inc. v. United States*, 75 Fed. Cl. 155, 159 (2007) (citation modified) (quoting *Heyer Products Co. v. United States,* 135 Ct. Cl. 63, 69, 71 (1956)) ("A reevaluation restores to a victim of arbitrary and capricious procurement activity its substantial chance to receive the contract award, [which typically eliminates] the basis for an award of bid preparation and proposal costs, as the investment in the proposal is no longer a 'needless expense,' and

the bidder may yet see the fulfillment of the promise of 'fair and impartial consideration' which 'induced it to spend its money to prepare its bid.'").

## CONCLUSION

For the foregoing reasons, the Clerk of Court is **DIRECTED** to **DECONSOLIDATE** the dockets in these matters.

Regarding Blue Water's protest, Case No. 26-936, Blue Water's Motion for Judgment on the Administrative Record (ECF 77) is **DENIED** and the Government's Cross-Motion (ECF 83) is **GRANTED**. Leidos's Cross-Motion (ECF 87) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

As to Saildrone's protest, Case No. 26-944, Saildrone's Motion for Judgment on the Administrative Record (ECF 76) is **GRANTED**. The Government's Cross-Motion (ECF 83) is **DENIED**. Saronic's Cross-Motion (ECF 85) is **DENIED**.

Further, regarding Case No. 26-944, it is **ORDERED** that:

1. The Navy's Criterion 2 finding as to Saildrone's proposal is **SET ASIDE**.
2. Pursuant to Rule 52.2, the matter is **REMANDED** to the Navy for 60 days. On remand, the Navy shall reevaluate Saildrone's proposal under Criterion 2, consistent with the Solicitation and this Opinion, applying to Saildrone's proposal the same approach it applied to the proposals it advanced, and shall document its evaluation in a manner sufficient for judicial review. The Navy may, in its discretion, seek clarification or supplementation from Saildrone if it concludes that it needs additional information to evaluate the proposal.
3. The Navy is **ENJOINED** from relying on its withdrawn Criteria 3 and 4 findings as a basis to eliminate Saildrone from the competition.
4. If the Navy finds Saildrone's proposal acceptable under Criterion 2, the Navy shall reinstate Saildrone to the competition and shall treat it as eligible, on the same terms as the offerors the Navy previously advanced, for negotiation of a prototype OT agreement and for participation in the on-water MUSV Test Event. The Navy shall set a Test Event schedule for Saildrone that is reasonable in light of the passage of the Solicitation's September 30, 2026 deadline. The Navy need not delay the Test Event for any other offeror.
5. Until seven days after the Navy completes its reevaluation and communicates its decision to Saildrone in writing, the Navy is **ENJOINED** from awarding any contract, agreement, or other transaction for the production of medium unmanned surface vessels that would, together with all such obligations made exceed an aggregate obligation total of $1.5 billion. This limit applies to any obligation for the "development, procurement, and integration of purpose-built medium unmanned surface vessels" appropriated pursuant to Pub. L. No. 119-21, § 20002(31),

including, but not limited to, follow-on production awards under 10 U.S.C. § 4022(f) arising from the Solicitation and obligations made under any other solicitation, authority, agreement, or other transaction.

6. Proceedings in Case No. 26-944 are **STAYED** during the remand period, except for the status reports required below. Once deconsolidated, the parties are not required to file or refile any prior pleadings or submissions in Saildrone, Inc., Case No. 26-944, the docket and record of which shall be deemed to include the applicable prior filings in this action. All further filings shall be made in Case No. 26-944.

7. No later than 14 days from the date of this Opinion and Order, the Government shall file a status report stating: (a) the total the Navy has obligated of the $2.1 billion Congress appropriated for medium unmanned surface vessels, broken down to include the name and amounts obligated to each entity awarded an instrument comprising a portion of this total; (b) the status of the Test Event for each offeror, including any extension of the September 30, 2026 date; and (c) the Navy's schedule for the reevaluation. The other parties may respond no later than 7 days after the Government's status report to address any need to modify the injunctive relief in light of that information.

8. No later than 74 days from the date of this Opinion and Order, the parties shall file either a stipulation of dismissal or a joint status report describing the Navy's decision on remand and proposing further proceedings.

The **CLERK** is **DIRECTED** to serve a certified copy of this sealed filing on the Department of the Navy, c/o: (1) Christopher Miller, Portfolio Acquisition Executive for Robotic and Autonomous Systems (PAE RAS), 701 South Courthouse Road, Bldg. 15, Rm. 1H025, Arlington, VA 22204; and (2) Cassandra J. Brese, Agreements Officer, Naval Sea Systems Command, 1333 Isaac Hull Avenue SE, Washington, DC 20376. *See* Rule 52.2(b)(2).

**IT IS SO ORDERED.**

Philip Hadji

PHILIP S. HADJI
Judge